**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL FAULK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:    4:18-cv-308 |
| | ) | |
| CITY OF SAINT LOUIS, MISSOURI, | ) | **JURY TRIAL DEMANDED** |
| and | ) | |
| COL. GERALD LEYSHOCK, in his individual | ) | |
| capacity, and | ) | |
| LT. SCOTT BOYHER, in his individual | ) | |
| capacity, and | ) | |
| LT. TIMOTHY SACHS, in his individual | ) | |
| capacity, and | ) | |
| SGT. RANDY JEMERSON, in his individual | ) | |
| capacity, and | ) | |
| SGT. MATHEW KARNOWSKI, in his | ) | |
| individual capacity, and | ) | |
| SGT. BRIAN ROSSOMANNO, in his | ) | |
| Individual capacity, and | ) | |
| DOE POLICE OFFICERS #1-5, | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1.      On the night of September 17, 2017, Plaintiff Michael Faulk, an award-winning journalist, was reporting on protests against police violence in the St. Louis area when he was surrounded by officers of the St. Louis Metropolitan Police Department (hereinafter, "SLMPD"), pepper sprayed, assaulted, and arrested. Mr. Faulk had been covering the wave of protests following the acquittal of former SLMPD Officer Jason Stockley for killing Anthony Lamar Smith. Mr. Faulk's unlawful arrest and assault by the SLMPD resulted in Mr. Faulk spending 13 hours in the St. Louis City jail and has caused continuing psychological and professional distress.

## JURISDICTION AND VENUE

2.     Plaintiff Michael Faulk brings this claim pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

3.     The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

4.     Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

5.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Plaintiff and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

6.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

7.     Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

8.     Plaintiff Faulk is a 32 year-old resident of the City of St. Louis and an award-winning reporter for the St. Louis Post-Dispatch (hereinafter, the "Post-Dispatch") newspaper. He is a citizen of the United States.

9.     Defendant City of St. Louis, Missouri (hereinafter, "Defendant City") is a first-class city and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

10.     The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality

of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

11.     Gerald Leyshock is employed as a police officer with the SLMPD. Mr. Leyshock has the rank of lieutenant colonel. Mr. Leyshock was the incident commander during the events of September 17, 2017. Defendant Leyshock is sued in his individual capacity.

12.     Scott Boyher is employed as a police officer with the SLMPD. Mr. Boyher has the rank of lieutenant. Mr. Boyher was on the ground supervising SLMPD officers during the events of September 17, 2017.  Defendant Boyher is sued in his individual capacity.

13.     Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest. Defendant Sachs is sued in his individual capacity.

14.     Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Jemerson is sued in his individual capacity.

15.     Mathew Karnowski is employed as a police officer with the SLMPD. Mr. Karnowski has the rank of sergeant. Mr. Karnowski was on the ground supervising SLMPD officers during the events of September 17, 2017. He declared the protests an "unlawful assembly" earlier in the evening, which SLMPD used as a predicate to the arrests and use of chemical agents. Defendant Karnowski is sued in his individual capacity.

16.      Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Rossomanno is sued in his individual capacity.

17.      Defendants Doe Police Officers 1-5, whose names are not known yet to Plaintiff, were police officers with the St. Louis Metropolitan Police Department at all times relevant to this complaint. On the night of September 17, 2017, Defendant Doe Police Officers encountered Plaintiff as described in this complaint, arrested him without probable cause, and assaulted him. Defendant Doe Police Officers are sued in their individual capacities.

18.      At all times, each of the Defendants was acting under color of law.

## FACTUAL ALLEGATIONS

19.      Mr. Faulk is an award-winning reporter in the early stages of his career. Less than a decade into professional journalism, his career has been on an upward trajectory: initially a reporter at the Anniston Star in Anniston, Alabama, Mr. Faulk moved to the Yakima Herald-Republic in Yakima, Washington, and was subsequently hired at the St. Louis Post-Dispatch  in 2016. Each newspaper Mr. Faulk has moved to has been in a larger city and each has had a larger circulation. Mr. Faulk was hired by the Post-Dispatch specifically to cover public projects and public-private partnerships for the newspaper.

20.      Mr. Faulk was raised with a tremendous respect for law enforcement and the justice system; his mother was a Chief Assistant District Attorney in Alabama for 16 years and later served as District Attorney for 4 years.

### *The Stockley Verdict and the September 17 Protest*

21.     On the morning of Friday, September 15, 2017, Judge Timothy Wilson, of Missouri's 22nd Judicial Circuit in St. Louis City, acquitted former SLMPD Officer Jason Stockley in the 2011 shooting and killing of Anthony Lamar Smith. Stockley, who was carrying his own AK-47 assault rifle with him at the time, had been audio-recorded minutes before the shooting, saying, "We're killing this motherfucker." After the shooting, Officer Stockley claimed that he found a weapon in Mr. Smith's car. Tests later revealed that only Officer Stockley's DNA was found on the gun.

22.      There was an upswell among citizens, both nationally and in St. Louis, who were outraged at what they perceived to be a lack of justice for black men killed by law enforcement officials. Protesters immediately gathered near the courthouse in downtown St. Louis on that Friday morning, and many protests were held around the St. Louis area throughout that weekend.

23.     Mr. Faulk had reported on the protests held Friday, September 15th. He was credited as a contributor to the front-page article published on Saturday, September 16 about the previous day's protest.[1] Mr. Faulk would also be credited as a contributor for his reporting on the events of the evening of September 17.[2]

24.     This was far from Mr. Faulk's first protest as a reporter. Mr. Faulk had previously covered mass demonstrations in the U.S., Nicaragua, and Honduras. He had never previously been arrested or assaulted by law enforcement officials while reporting at these demonstrations.

---

[1] Joel Currier, et al, *Heated Protests Follow Stockley Acquittal,* St. Louis Post-Dispatch (Sep. 16, 2017), http://www.stltoday.com/news/local/crime-and-courts/heated-protests-follow-stockley-acquittal/article_c7ee91ad-e65b-5da6-84cb-0b478078c8cb.html.

[2] Staff Reporters, *More than 80 Arrestsed After Protest Violence Downtown*, St. Louis Post-Dispatch (Sep. 18, 2017), http://www.stltoday.com/news/local/govt-and-politics/more-than-arrested-after-protest-violence-downtown-police-owned-tonight/article_ebf53117-0396-515c-a6c2-84d50c6bbdfc.html.

25.　　Protesters had planned a "Die-in" on the afternoon of Sunday, September 17 in front of SLMPD headquarters at 19th and Olive Streets. Mr. Faulk went on location to report on the Sunday protests beginning that afternoon.

26.　　As is a common journalistic practice, Mr. Faulk actively used Twitter on the 17th, tweeting updates and images about the protest throughout the day.

27.　　After starting at SLMPD headquarters, Sunday's protest of several hundred people moved west toward Harris-Stowe State University and St. Louis University before eventually moving back east toward downtown St. Louis in the early evening hours. The organized protest concluded around 8:00 pm in front of the SLMPD headquarters, with many protesters leaving downtown while others continued to stay in the area. Because many protesters remained, and previous protester/police interactions had taken place after the Stockley verdict protests, Mr. Faulk remained downtown reporting. On this evening, Mr. Faulk used his bicycle to travel around downtown, as it was the easiest way to navigate the crowds and to quickly move from one location to another.

28.　　At all times while Mr. Faulk covered these events he wore his Post-Dispatch ID card, attached by a lanyard, hanging visibly around his neck.

29.　　Around 8:30 pm, Mr. Faulk saw masked individuals break a restaurant window near 9th and Olive Streets. Around this time, Mr. Faulk tweeted several other photos of damaged windows.[3]

30.　　Mr. Faulk then rode his bicycle to the intersection of Washington Avenue and Tucker Boulevard, where he saw a giant armored SLMPD vehicle warning that the dispersal of chemical munitions was possible. Despite the announcement, no such munitions were dispersed

---

[3] https://twitter.com/Mike_Faulk/status/909591036518944768.

at this time.

31.     Around 9:00 pm, Mr. Faulk saw police officers wearing riot gear at St. Charles and 13th Streets. However, as there did not seem to be a significant group of protesters anywhere, the group of officers did not move from the area. Mr. Faulk sent a tweet around this time that read, "There have to be more cops than protesters out at this point."[4]

32.     Just before 10:00 pm, Mr. Faulk observed some officers walk south on Tucker, board a MetroBus, and depart. He then rode his bike back to his car located at the Post-Dispatch parking lot, to charge his phone, and to drink some water. Around 10:15, Mr. Faulk tweeted, "Normal traffic starting to resume on Tucker. #STLVERDICT Perhaps the worst is over for tonight?"[5]

33.     Mr. Faulk next rode his bike to the intersection of 7th and Olive Streets, where a car accident unrelated to the protests had drawn a crowd. He continued southward on his ride, passing City Garden and moving west to City Hall at 12th and Market Streets, which appeared to be another staging ground for SLMPD officers.

34.     He eventually rode back near the intersection of Olive Street and Tucker Boulevard. At this time, Mr. Faulk seemed to again believe the events of the night were concluding, tweeting, "I didn't see any tear gas tonight. #STLVerdict."[6] Small clusters of people, including protesters, neighborhood residents, and tourists stood talking at this point in the evening; there was little formal protesting, and nearly every person was standing on the sidewalk. Months later, Judge Catherine Perry of the Eastern District of Missouri federal court, after hearing three days of testimony and reviewing evidence, described the intersection at this

---

[4] https://twitter.com/Mike_Faulk/status/909598815623286785.
[5] https://twitter.com/Mike_Faulk/status/909616879194591232.
[6] https://twitter.com/Mike_Faulk/status/909621338922536960.

time by writing, "The scene appears calm and most people appear relaxed." *See Ahmad v. City of St. Louis,* No. 4:17 CV 2455 CDP, 2017 U.S. Dist. LEXIS 188478, at *13 (E.D. Mo. Nov. 15, 2017).

35.     The last reported property damage had occurred at least four blocks away, and it had occurred at least three hours previously.

### *Kettling and Arrest*

36.     Suddenly, looking south on Tucker Boulevard, Mr. Faulk saw emergency lights flashing and officers approaching from the south. He tweeted "Lots of cop cars responding to Tucker between Olive and Wash again."[7]

37.     From Locust Street looking east, Mr. Faulk spotted SLMPD officers with bicycles lined up in a row across Locust Street, just east of Tucker Boulevard. He tweeted "Bike cops blocking Locust and 11th #STLVerdict Spectators there and big group of people at St. Charles/Tucker."[8] The officers began to lift their bikes and pound them against the ground in unison while walking west toward Mr. Faulk and others. The officers ordered people to move west on Locust or North on Tucker.

38.     At no time had any dispersal order been given by any SLMPD officials after telling people to move west on Locust or north on Tucker. At no point when he was near the Tucker and Washington intersection did Mr. Faulk hear officers warn citizens that chemical agents would be used.

39.     Mr. Faulk heeded the officers' orders and walked north on Tucker Boulevard to the southeast corner of the intersection of Washington Avenue and Tucker Boulevard. Mr. Faulk and

---

[7] https://twitter.com/Mike_Faulk/status/909622380062019585.
[8] https://twitter.com/Mike_Faulk/status/909623060298379264.

others remained on the sidewalk.

40.     Suddenly, the riot police north of Mr. Faulk on Tucker started to beat their batons on their shields in unison. Mr. Faulk, looking south from the intersection, saw officers in that direction doing the same thing, slowly moving toward the group of people gathered near the intersection.   Mr. Faulk tweeted at this time, "The clap clap of the batons on their armor. The SWAT cops are back. Marching both directions down Tucker squeezing us west on WA [Washington]."[9]

41.     A fourth line of SLMPD officers began to approach the intersection from the west on Washington. Mr. Faulk tweeted, "Less than 100 of us including media blocked in at wa [Washington] and Tucker all four sides. People moving toward bike cops looks like best option."[10] As is clear from his tweet, Mr. Faulk was seeking some way to get out of the police kettle that had formed.

42.     Faulk approached SLMPD officers north of the intersection. They refused to acknowledge his questions. Mr. Faulk asked another SLMPD officer in riot gear, "Where do we go?" There was no response. Mr. Faulk describes the officers as avoiding eye contact with citizens, choosing to ignore their questions and requests for help.

43.     Approaching SLMPD officers to the east on Washington, he attempted to ask for help. As Mr. Faulk neared them, the officers pulled out their pepper spray, pointed it at him, and told him and others to back up.

44.     Not only was Mr. Faulk never given an order to disperse, but at this point, surrounded on all sides by SLMPD officers who were slowly boxing in the citizens (a technique

---

[9] https://twitter.com/Mike_Faulk/status/909632800659263488.
[10] https://twitter.com/Mike_Faulk/status/909634150503735301.

referred to as "kettling"), dispersal would have been impossible.

45.     A wave of terror passed through those gathered at the intersection as they realized that they were trapped. Although people in the intersection screamed in panic, nobody in the intersection threatened any actions toward the SLMPD officers in any way. The SLMPD officers on all four sides continued to beat their batons against the pavement, and the noise grew louder and louder as they approached. At this point, Mr. Faulk tweeted, "We are closed in on all four sides now I have no idea where people are supposed to go. People freaking out #STLVerdict."[11]

46.     Scores of officers surrounded the group in the intersection, advancing on the kettled individuals. SLMPD officers screamed "Back up! Back up!" but, because the citizens in the kettle were surrounded on all sides, there was nowhere for them to move.

47.     Video of the event, including video possessed by SLMPD, shows citizens in the kettle uniformly putting their hands in the air or getting on the ground as SLMPD officers screamed contradictory directions at them.

48.     Following the lead of others gathered in the intersection, Mr. Faulk placed his bike on the ground and then got down on his hands and knees over the bike.  A young African-American woman next to Mr. Faulk seemed to be frozen in fear, so Mr. Faulk calmly tapped her on the shoulder and instructed her to get down, as he was doing. While SLMPD officers yelled, "Lay Down on the Ground!" doing so was impossible because of the small space into which the group had been cornered.

49.     SLMPD officers approached individuals in the group who were kneeling or lying down, shouting "Stop Resisting" and "Get Down!" to the citizens who were, quite visibly, trying to obey whatever SLMPD officers commanded.

---

[11] https://twitter.com/Mike_Faulk/status/909633682780147713.

50.     Approaching the group of kettled citizens on the ground, SLMPD officers began to indiscriminately deploy pepper spray on the submissive crowd. The noxious spray wafted over the group, causing choking and coughing. Mr. Faulk felt the pepper spray land on his back and neck, causing immediate and acute stinging pain.

51.     SLMPD officers singled out a member of the group broadcasting the kettling live on video through the internet. The SLMPD officer—who did not appear to be wearing a name badge—stepped over several citizens lying on the ground to spray the member of the press with yellow pepper spray. As the officer sprayed the man, the officer repeatedly yelled, "PUT IT DOWN! PUT IT DOWN!" referring to the man's phone, which was recording the incident. SLMPD officers taunted the man, calling him "Superstar," presumably because of his media following.

52.     One member of the SLMPD, Officer Willis, grabbed Mr. Faulk as he lay on the ground, attempting to pull Mr. Faulk up by his collar. As he was grabbed by the officer, Mr. Faulk shouted several times, "Post-Dispatch!" and lifted his media credential ID card to show to the officer. This ID card had been hanging visibly around Mr. Faulk's neck for the entirety of the evening. Officer Willis then let go of Mr. Faulk, who was now standing because he had been pulled up by then officer. When Mr. Faulk asked Officer Willis's name, he was given no response, nor was Mr. Faulk given any commands by the officer. Officer Willis walked away from Mr. Faulk.

53.     Immediately after this, Mr. Faulk was pushed from behind by one of Defendant Doe Police Officers 1-5. He was shoved in the direction of several other SLMPD officers, who were facing him with their riot shields in front of them. These Defendant Doe Police Officers 1-5 used their shields to shove Mr. Faulk off of the sidewalk and into the street.

54.     Several of the Defendant Doe Police Officers 1-5 then grabbed Mr. Faulk from behind, using their full weight to tackle him to the ground. One Doe Police Officer used his baton to try to strike Mr. Faulk in the genitals as several other Doe Police Officers jumped on top of him, seizing each of his limbs. As is true at every point previous to this, Mr. Faulk did not resist officers in any way.

55.     As a result of the assault, Mr. Faulk sustained injuries to his neck, shoulders, hips, and legs.

56.     One of the Defendant Doe Police Officers 1-5 placed his boot onto Mr. Faulk's head and used his weight to press Mr. Faulk's head into the asphalt of the street. Despite cries of pain from Mr. Faulk, the officer continued to press Mr. Faulk's head against the ground.[12]

57.     As the Defendant Doe Police Officers held Mr. Faulk's limbs, another Defendant Doe Police Officer approached Mr. Faulk, leaned down toward him, and sprayed him directly in the face with pepper spray from a distance of less than two feet.[13] Mr. Faulk stated that the excruciating pain from this pepper spray made it almost impossible for him to see for the following two hours.

58.     As Mr. Faulk lay on the ground, a Defendant Doe Police Officer very tightly tied Mr. Faulk's hands with plastic "zip-cuffs," causing Mr. Faulk significant pain. A doctor later diagnosed his left wrist and thumb with temporary nerve damage as a result of the tightness of

---

[12] Video shot by another member of the kettle demonstrates the exact same practice, with one kettled citizen shouting "STOP PUSHING MY HEAD IN THE GROUND," to which an SLMPD officer can be heard to respond only "Shut up!" *See* https://www.youtube.com/watch?v=UlUX1HrV9p8.

[13] According to Lieutenant Timothy Sachs, who testified at the preliminary injunction hearing in *Ahmad v. City of St. Louis*, every person who is pepper sprayed by SLMPD is supposed to be charged with resisting arrest. It is noteworthy that Mr. Faulk, sprayed at point-blank range while complying with SLMPD orders, has not been charged with resisting arrest (or any other charge). *See* Transcript of Hearing, Vol II at 41, *Ahmad v. St. Louis* (No. 4:17 CV 02455).

the zip-cuffs. The numbness caused by this injury lasted for several months.

59.     Mr. Faulk was then pulled up to his feet by the officers, at which point he asked for his glasses and his cellular phone, which had fallen to the ground. One Defendant Doe Police Officer picked up Mr. Faulk's phone and, because it had been unlocked, began to scroll through it.  The Defendant Doe Officer then handed the phone to another officer escorting Mr. Faulk and said, "I turned it off for you."

60.     After being led toward a waiting police van, Mr. Faulk's photo was taken by SLMPD officers. As the photo was being taken, one officer held a piece of paper under Mr. Faulk's face. When Mr. Faulk told an officer that he wished to file assault charges, he was told, "You can do that downtown."

61.     Mr. Faulk was then led into the back of an SLMPD van. Inside the van, another arrestee stated that his zip-cuffs were attached entirely too tightly and that he could no longer feel his hands. Mr. Faulk could see that the African-American man's hands, tightly bound, had turned white. When an SLMPD officer said, "We don't have any more zip ties," Mr. Faulk responded, "You don't *want* to do anything about it!" Mr. Faulk saw dozens of zip-cuffs hanging from the belts of several officers in and around the van. The SLMPD officers in and near the van simply ignored Mr. Faulk and the man's cries for aid.

62.     Looking through a metal grate out of the rear van door, Mr. Faulk could see SLMPD officers giving each other high-fives and smoking cigars. Mr. Faulk heard an SLMPD officer say, "We arrested more than 100 of you clowns tonight." He also heard officers chanting "Whose Streets? Our Streets!" This chant—a common protester expression meant to assert power against a police force often accused of brutality—carried a special irony when used by SLMPD officers

after this sickening and unconstitutional act of police brutality.[14]

### *Jailing at the City Justice Center*

63.     Mr. Faulk was brought, with other citizens arrested in the kettle, to the St. Louis City Justice Center (hereinafter, "The CJC"), the city-run jail in downtown St. Louis. Mr. Faulk needed help getting out of the van because he was almost completely unable to see due to the pepper spray in his eyes.

64.     He was placed with about fifteen other men in a cell. The cell was mostly quiet, with some men moaning or cursing in pain. One arrestee worried aloud that he was not an American citizen. When a nearby SLMPD officer outside the cell heard this, he told the man, "We're gonna have fun with you!" When Mr. Faulk told the man that the laws of the United States still applied to him, the officer responded, with mock disappointment, "You won't let me have any fun."

65.     In the cell, Mr. Faulk continued to do the same work he had attempted to do all night long: report the news. Jail staff had only confiscated cell phones from arrestees; most had keys and other daily items in their pockets. Mr. Faulk retrieved his pen and notepad from his pocket and began interviewing other arrestees. Soon after beginning his interviews, an officer came into the cell and asked whether there were any journalists in that cell. When Mr. Faulk responded that he was a journalist, the officer removed Mr. Faulk and placed him in his own cell.

66.     The officer told Mr. Faulk that someone from the Police Commissioner's office

---

[14] The boastful SLMPD rhetoric was not limited to rank-and-file officers: Acting Chief Lawrence O'Toole, at a press conference a few hours after the unconstitutional arrest of Mr. Faulk and others, stated, "I'm proud to say the city of St. Louis and the police owned the night." Mayor Lyda Krewson said at the same press conference, "Law enforcement has my full support." https://www.riverfronttimes.com/newsblog/2017/09/18/the-police-owned-the-night-chief-says-after-80-arrested-downtown.

had called the CJC about arrested journalists and was planning to come speak with any arrested

journalists. Another officer came back twenty minutes later and told him he would be bailed out

with all of the other arrestees. Mr. Faulk—wanting to continue reporting—asked to be moved

back to the cell with other arrestees. He was told that he would only be able to do so if he turned

over his pen and notepad to the jail staff. While Mr. Faulk was told that safety was the reason his

pen and paper would be confiscated, other arrestees still possessed their keys, belts, and other

potentially dangerous items. The "no pen or paper" rule seemed to be implemented to prevent

Mr. Faulk from taking interviews of the other arrestees.

67.     Rather than give up his notes to the officers, Mr. Faulk remained in his cell by

himself.  He continued writing the events of the evening throughout his incarceration.

68.     A few hours later, Mr. Faulk was processed by CJC staff and placed in an over-

capacity cell with the other protest arrestees. He was not once asked if he needed medical care,

despite pain from his assault and the pepper spray. He requested medical help several times but

was provided none.

69.     Mr. Faulk was brought into a room where SLMPD officers were processing the

arrestees.  Mr. Faulk saw several of the officers laugh incredulously, because the forms brought

in with the arrestees lacked the names of arresting officers as well as specific details of the arrest.

70.     While Mr. Faulk sat in jail, SLMPD put out a "Media Alert" on their Twitter page

which stated, among other things, "[A]fter dark, the agitators outnumbered the peaceful

demonstrators and the unruly crowd became a mob." The alert went on to name all of the

arrestees, including Mr. Faulk. The release mentioned Mr. Faulk's name, age, and even the block

on which he lived.

71.     Around 4:00 a.m., Mr. Faulk's employers paid 10% of the $500 bond that had

been set for his release. Despite this, he was not released until thirteen hours of incarceration, at 1:30 in the afternoon on Monday, September 18th.

72.     When he was released, Mr. Faulk was given a piece of paper that notified him that he had been arrested on suspicion of failure to disperse. The paper also contained a court date scheduled for him in October of 2017.

73.     Mr. Faulk went directly to the Post-Dispatch, his employer, to debrief them on what had happened to him at the hands of the SLMPD. Co-workers observed Faulk's injuries, including an obvious limp and the lingering odor of pepper spray. When colleagues attempted to hug Mr. Faulk, he turned them away for fear that the still-active spray would get on their skin.

74.     When Mr. Faulk finally went home and showered, the pepper spray on his hair and skin activated once more, causing further pain.

75.     The following day, Tuesday September 19th, Mr. Faulk visited his doctor. Paperwork from that visit diagnosed him suffering from an "assault," which included a strained neck as well as injuries to his left wrist, shoulders, legs, and hips. He was prescribed physical therapy for these injuries. Mr. Faulk suffered physical pain for more than a month due to his injuries inflicted by Defendants.

76.     Upon returning to work, Mr. Faulk was immediately prohibited from reporting on the protests and was not allowed to write any articles about the SLMPD or other police departments.

77.     Mr. Faulk received a significant amount of emails, tweets, and reports from conservative media, and members of the public, including social media trolls, telling him that he deserved what happened to him and questioning his journalistic bias.

78.      Mr. Faulk also began to suffer from psychological difficulties that continue to

this day. He regularly experiences nightmares in which he is slowly being surrounded by groups of people and is unable to act. He continues to meet with a psychologist weekly.

79.     In the months following his arrest, Mr. Faulk's assignments from editors have slowly diminished.

80.     As the stress related to his changed reporting duties compounded with the psychological issues related to his arrest, Mr. Faulk began to realize that he suffered significantly greater harm than he first believed. At the advice of his psychologist, Mr. Faulk requested and was granted medical leave from the Post-Dispatch in January of 2018.  He remains on medical leave to this day.

81.     Mr. Faulk met with investigators for the Internal Affairs Division of the SLMPD and recounted the events of September 17-18 to them for nearly two hours.  He answered every question posed to him by SLMPD investigators, and a transcript of the conversation has been made.

82.     In November of 2017, Defendant City issued a "special order" for the SLMPD affirming the right of journalists covering protests.[15]  The order was a direct result of a meeting between Mr. Faulk's bosses and Defendant City officials.  Despite this fact (and despite Mr. Faulk's cooperation with SLMPD), Defendant City has refused to dismiss the pending charges against Mr. Faulk or to agree that charges against him will not be brought. Besides a letter informing him that his October court date was postponed, Mr. Faulk has waited for months with no response from the City.

---

[15] *See* Celeste Bott, *St. Louis Police Issue Special Order Reiterating Rights of Journalists*, St. Louis Post- Dispatch (Nov. 17, 2017), http://www.stltoday.com/news/local/crime-and-courts/st-louis-police-issue-special-order-reiterating-rights-of-journalists/article_2d1bc87d-db66-5733-9a28-b20cfdf249b7.html.

83.     Mr. Faulk now believes that it is unlikely that he can continue his journalistic career in St. Louis because editors concerned about a perceived conflict of interest will not permit him to report on the broad scope of governmental issues for which he was hired. Further, he is significantly less likely to cover protests in the future for fear of assault by police.

84.     The above-mentioned injuries to Mr. Faulk are irreparable.

85.     Remedies at law are inadequate to fully compensate him for those injuries.

86.     Mr. Faulk, who is still employed as a reporter, is at risk of further harm if he continues to report on protests in St. Louis.

## COUNT I
### 42 U.S.C. § 1983 - First and Fourteenth Amendment Violations
### (Against All Defendants)

87.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88.     Observing and recording public protests, and the police response to those protests, is a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

89.     Defendants' actions violated Mr. Faulk's rights under the First Amendment to freedom of the press and freedom of speech by interfering with his ability to gather information and cover a matter of public interest as a member of the media.

90.     Defendants further violated Mr. Faulk's rights under the First Amendment by isolating him from other arrestees and refusing to allow him back into the cell with other arrestees unless he forfeited his pen and paper.

91.     Defendants engaged in these unlawful actions willfully and knowingly, acting

with reckless or deliberate indifference to Plaintiff's First Amendment rights.

92.     As a direct and proximate result of Defendants' unlawful actions described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

93.     Additionally, Defendants' actions described herein have had a chilling effect on Mr. Faulk, who is now less likely to report on police protests out of fear of further unconstitutional treatment.

94.     At all times, Defendants were acting under color of state law.

95.     If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## <u>COUNT II</u>
### 42 U.S.C. § 1983- Fourth and Fourteenth Amendment Violations: Unreasonable Seizure
### (Against All Defendants)

96.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97.     Defendants did not have probable cause to arrest Mr. Faulk.

98.     Defendants unreasonably seized Mr. Faulk, thereby depriving him of his right to be free from unreasonable seizure of his person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

99.     Further, there was no objectively reasonable belief that Plaintiff Faulk had committed a criminal offense, nor was there even *arguable* probable cause for the arrest. As such, the seizure was unreasonable.

100.    As a direct result of the conduct of Defendants described herein, Mr. Faulk

suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

101.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.  As a direct and proximate result of Defendants' unlawful actions, Mr. Faulk was damaged.

102.    At all times, Defendants were acting under color of state law.

103.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## <u>COUNT III</u>
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against Defendant Doe Police Officers 1-5)

104.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.  As a direct and proximate result of Defendants' unlawful actions, Mr. Faulk was damaged.

106.    The use of force against Mr. Faulk, by inflicting harm though physical force applied on Mr. Faulk's body and by using chemical agents against a compliant, prone, and restrained Mr. Faulk was objectively unreasonable under any circumstances.

107.    As a direct result of the conduct of Defendants described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

108.    At all times, Defendants were acting under color of state law.

109.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42

U.S.C. § 1988.

**COUNT IV**
**42 U.S.C. § 1983-Conspiracy to Deprive Civil Rights**
**(Against All Defendants)**

110.    Plaintiff incorporates by reference each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

111.    Defendants, acting in their individual capacities and under color of law, conspired

together and with others, and reached a mutual understanding to undertake a course of conduct

that violated Mr. Faulk's civil rights.

112.    In furtherance of this conspiracy, Defendants committed overt acts, namely:

    a.   Defendants, acting in concert, kettled and unlawfully seized Mr. Faulk without
any probable cause that he had committed a crime. They later detained him in
the City Justice Center for thirteen hours.

    b.   Defendants used excessive force by pressing Mr. Faulk's head face into the
street with a boot, spraying him with pepper spray at point-blank range, and
applying handcuffs to his wrists in a manner intended only to inflict pain.

113.    Defendants shared the conspiratorial objectives, which were to punish Mr. Faulk

and others gathered at the intersection of Washington and Tucker, because Defendants believed

the group to be protesting police brutality.

114.    As a direct and proximate result of the conspiracy between the Defendants as

described above, Plaintiff's right to be free from excessive force and unreasonable search and

seizure was violated by Defendants.

115.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and will

continue to suffer physical pain and injury, emotional pain and suffering, loss of wages and

reputation, mental anguish, inconvenience, humiliation, embarrassment, and stress.

116.    The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Plaintiff, thus entitling him to an award of punitive damages against the Defendants.

117.    At all times, Defendants were acting under color of state law.

118.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.


## COUNT V
### 42 U.S.C. § 1983: Municipal Liability
### *Monell* Claim against Defendant City of St. Louis for Failure to Train, Failure to Discipline, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force

119.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.    Defendant City is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for the remaining Defendants' violation of Mr. Faulk's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Mr. Faulk are the following:

- SLMPD officers' routinely use of excessive force when policing protests, especially those at which police brutality is being protested;

- SLMPD custom or policy of using chemical agents without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

- SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

- SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or

unlawful conduct;

- Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

121.    Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, including the remaining Defendants, with respect to its officers' use of chemical agents, understanding of probable cause, use of force, and recognition of rights of members of the press.

122.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Mr. Faulk as alleged herein.

123.    As a direct result of the Defendant City's failures and policies as described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society., including mental anguish, physical harm, pain, and suffering.

124.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## <u>COUNT VI:</u>
### Missouri State Law: Assault and Battery
### (Against Defendant Doe Police Officers 1-5)

125.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

126.    During the process of being unconstitutionally arrested, Mr. Faulk suffered assault and battery at the hands of Defendant Doe Police Officers 1-5.

127.    Namely, by pressing Mr. Faulk's head into the street with their boots, Defendant Doe Police Officers 1-5 intended and did cause offensive bodily harm to Mr. Faulk.

128.    In spraying Mr. Faulk--lying on the ground and attempting to heed the directive of SLMPD officers--directly in the face with pepper spray, Defendant Doe Police Officers 1-5 further intended to--and did--cause offensive bodily contact with Mr. Faulk.

129.    As a direct result of the conduct of Defendant Doe Police Officers 1-5 described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

130.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

131.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

132.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to RSMo. §537.610.1.

133.    The actions of Defendant Doe Police Officers 1-5 as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendant Doe Police Officers 1-5 and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT VII**
**Missouri State Law: False Arrest and False Imprisonment**
**(Against All Defendants)**

134.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

135.     Mr. Faulk was arrested and imprisoned without any legal justification by Defendant Does.  Further, even after a corrections officer realized that Mr. Faulk was a member of the press, Mr. Faulk was imprisoned for another ten hours.

136.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

137.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

138.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to RSMo. §537.610.1.

139.     As a direct result of the conduct of Defendants described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

140.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT VIII**
**Missouri State Law: Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

141.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.   By surrounding Mr. Faulk, assaulting him, spraying him in the face at point-blank range with a chemical agent, and arresting him without probable cause, Defendants committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

143.   Defendants' actions were intentional or, at best, reckless.

144.   Such actions by Defendants have caused Mr. Faulk severe emotional distress that has resulted in bodily harm, as described above.

145.   Defendants' sole motivation was to cause emotional distress to Plaintiff and the other protesters.

146.   As a direct result of the conduct of Defendants described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

147.   Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

148.   Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

149.   By possessing such insurance or self-insurance, the City has waived sovereign

immunity on state claims pursuant to RSMo. §537.610.1.

150.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT IX**
**IN THE ALTERNATIVE TO COUNT VIII**
**Missouri State Law: Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

151.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    Alternative to Count VII, above, by surrounding Mr. Faulk, assaulting him, spraying him in the face at point-blank range, and arresting him without probable cause, Defendants realized or should have realized that their conduct posed an unreasonable risk to Mr. Faulk.

153.    Further, Mr. Faulk was reasonably in fear for his own person because of the actions of Defendants, and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

154.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

155.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

156.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to RSMo. §537.610.1.

157.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

### COUNT X
**Missouri State Law: Conversion**
**(Against All Defendants)**

158.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159.    Mr. Faulk's $200 single speed bicycle was seized by SLMPD officers during his wrongful and unconstitutional arrest.

160.    Mr. Faulk was the owner of the bicycle.

161.    Defendants took possession of the property without Mr. Faulk's permission.

162.    Defendants deprived him of the right of possession.

163.    Mr. Faulk has made demand on Defendants to return the bicycle.

164.    Defendants have failed to provide the return of the bicycle, after such demand has been made.

165.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

166.    Alternatively, the City's relationship with the PFPC serves as a self-insurance

plan.

167.    By possessing such insurance or self-insurance, the City has waived sovereign

immunity on state claims pursuant to RSMo. §537.610.1.

168.    Mr. Faulk was injured as a result of these actions in the form of actual damages for

the purchase value of the bicycle, as well as for the loss of use of the bicycle.


### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Faulk respectfully requests that this Court:

   a.  Enter judgment in favor of Plaintiff and against Defendants for each of Counts I
       through X above;

   b.  Award Plaintiff monetary damages as the Court deems appropriate, as well as all
       litigation costs, expenses, and attorneys' fees recoverable under 42 U.S.C. § 1988;

   c.   Issue injunctive relief requiring the City of St. Louis to:

       i.    Refrain from the unconstitutional conduct described herein;

       ii.   Refrain from engaging in unconstitutional police activities at protests;
             declare protests "unlawful assemblies" pursuant to constitutional
             methods; and order protestors in a constitutional manner to disperse;
             and

       iii.  Refrain from arresting members of the press who are exercising their
             First Amendment rights in public spaces and posing no threat toward
             officers of the St. Louis Metropolitan Police Department.

   d.  Award Plaintiff punitive damages against the individually-named Defendants,
       where applicable, in such amounts to be determined by a jury; and

   e.  Allow such other and further relief as this Court deems just and proper.


Dated: April 30, 2018                        Respectfully submitted,

                                             By: s/ David C. Nelson
                                                 David C. Nelson  (MBE #46540MO)
                                                 Nelson and Nelson

420 N. High St.
Belleville, IL 62220
618-277-4000
314-925-1307 (fax)
dnelson@nelsonlawpc.com

*and*

**ArchCity Defenders, Inc.**

By:/s/ John M. Waldron
    Blake A. Strode  (MBE #68422MO)
    Michael John Voss (MBE #61742MO)
    Nathaniel R. Carroll (MBE #67988MO)
    Sima Atri (MBE #70489MO)
    John M. Waldron (MBE #70401MO)
    1210 Locust Street, 2nd Floor
    Saint Louis, MO 63103
    855-724-2489 ext. 1021
    314-925-1307 (fax)
    bstrode@archcitydefenders.org
    mjvoss@archcitydefenders.org
    ncarroll@archcitydefenders.org
    satri@archcitydefenders.org
    jwaldron@archcitydefenders.org

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that notice of filing and a true and correct copy of the foregoing was served on all counsel and parties of record via this Court's ECF/PACER notification system upon filing on this 30th day of April, 2018.

*/s/ John M. Waldron*