**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL FAULK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:      4:18-cv-308 |
| | ) | |
| CITY OF SAINT LOUIS, MISSOURI, | ) | **JURY TRIAL DEMANDED** |
| and | ) | |
| COL. GERALD LEYSHOCK, in his individual | ) | |
| capacity, and | ) | |
| LT. SCOTT BOYHER, in his individual | ) | |
| capacity, and | ) | |
| LT. TIMOTHY SACHS, in his individual | ) | |
| capacity, and | ) | |
| SGT. RANDY JEMERSON, in his individual | ) | |
| capacity, and | ) | |
| SGT. MATHEW KARNOWSKI, in his | ) | |
| individual capacity, and | ) | |
| SGT. BRIAN ROSSOMANNO, in his | ) | |
| individual capacity, and | ) | |
| OFFICER ANDREW WISMAR, in his | ) | |
| individual capacity, and | ) | |
| DOE POLICE OFFICERS #2-5, | ) | |
| in their individual capacities, | ) | |
| Defendants. | ) | |

**FOURTH AMENDED COMPLAINT**

**INTRODUCTION**

1.      On the night of September 17, 2017, Plaintiff Michael Faulk, an award-winning journalist, was reporting on protests against police violence in the St. Louis area when he was surrounded by officers of the St. Louis Metropolitan Police Department (hereinafter, "SLMPD"), pepper sprayed, assaulted, and arrested. Mr. Faulk had been covering the wave of protests following the acquittal of former SLMPD Officer Jason Stockley for killing Anthony Lamar Smith. Mr. Faulk's unlawful arrest and assault by the SLMPD resulted in Mr. Faulk spending 13

hours in the St. Louis City jail and has caused continuing psychological and professional distress.

## JURISDICTION AND VENUE

2.     Plaintiff Michael Faulk brings this claim pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

3.     The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

4.     Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

5.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Plaintiff and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

6.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

7.     Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

8.     Plaintiff Faulk is a 32 year-old resident of the City of St. Louis and an award-winning reporter for the St. Louis Post-Dispatch (hereinafter, the "Post-Dispatch") newspaper. He is a citizen of the United States.

9.     Defendant City of St. Louis, Missouri (hereinafter, "Defendant City") is a first-class city and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

10.     The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

11.     The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

12.     Gerald Leyshock is employed as a police officer with the SLMPD. Mr. Leyshock has the rank of lieutenant colonel. Mr. Leyshock was the incident commander during the events of September 17, 2017. Lieutenant Colonel Leyshock knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.  Defendant Leyshock is sued in his individual capacity.

13.      Scott Boyher is employed as a police officer with the SLMPD. Mr. Boyher has the rank of lieutenant. Mr. Boyher was on the ground supervising SLMPD officers during the events of September 17, 2017.  Lieutenant Boyher knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.  Defendant Boyher is sued in his individual capacity.

14.     Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest.  Lieutenant Sachs knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Sachs is sued in his individual capacity.

15.     Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team

tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Jemerson knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.  Defendant Jemerson is sued in his individual capacity.

16.     Mathew Karnowski is employed as a police officer with the SLMPD. Mr. Karnowski has the rank of sergeant. Mr. Karnowski was on the ground supervising SLMPD officers during the events of September 17, 2017. He declared the protests an "unlawful assembly" earlier in the evening, which SLMPD used as a predicate to the arrests and use of chemical agents. Sergeant Karnowski knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.  Defendant Karnowski is sued in his individual capacity.

17.     Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Rossomanno knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.  Sergeant Rossomanno is sued in his individual capacity.

18.     Andrew Wismar is employed as a police officer with the SLMPD. Mr. Wismar was working during the events of September 17, 2017 and arrested Plaintiff Faulk. He is sued in his individual capacity. Officer Wismar was one of the five "Doe Police Officers" in Plaintiff's First Complaint (ECF No. 1) and Plaintiff's First Amended Complaint (ECF No. 10).  Officer

Wismar knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

19.     Defendants Doe Police Officers 2-5, whose names are not known yet to Plaintiff, were police officers with the St. Louis Metropolitan Police Department at all times relevant to this complaint. On the night of September 17, 2017, Defendant Doe Police Officers encountered Plaintiff as described in this complaint, arrested him without probable cause, and assaulted him. Defendant Does #2-5 knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Doe Police Officers are sued in their individual capacities.

20.     At all times, each of the Defendants was acting under color of law.

## FACTUAL ALLEGATIONS

### SLMPD History of Unconstitutional Protest Actions

21.     On the morning of Friday, September 15, 2017, Judge Timothy Wilson, of Missouri's 22nd Judicial Circuit in St. Louis City, acquitted former SLMPD Officer Jason Stockley in the 2011 shooting and killing of Anthony Lamar Smith. Stockley, who was carrying his own AK-47 assault rifle with him at the time, had been audio-recorded minutes before the shooting, saying, "We're killing this motherfucker." After the shooting, Officer Stockley claimed that he found a weapon in Mr. Smith's car. Tests later revealed that only Officer Stockley's DNA was found on the gun.

22.     There was an upswell among citizens, both nationally and in St. Louis, who were outraged at what they perceived to be a lack of justice for black men killed by law enforcement officials. Protesters immediately gathered near the courthouse in downtown St. Louis on that

Friday morning, and many protests were held around the St. Louis area throughout that weekend.

23.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

24.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LQBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

25.     Virtually all of the Stockley protests were non-violent.

26.     On three occasions, a handful of protesters committed minor property damage, including broken windows and broken flower pots.

27.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

     a.  The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

     b.  The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

     c.  The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

     d.  The evening of Friday, September 15, 2017, near the intersection of Lindell and

Euclid Avenues.

 e. The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

 f. The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

 g. The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

 h. The evening of Friday, September 15, 2017, on Hortense Place.

 i. The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

 j. The evening of September 29, 2017 outside of Busch Stadium.

28. These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

### C. Post-Ferguson Federal Court Proceedings

29. In October 2014, SLMPD fired chemical agents at protestors on South Grand.

30. In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

31. On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

> (1) utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

(a)   without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
(b)   without providing the individuals sufficient opportunity to heed the warnings and exit the area;
(c)   without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
(d)   without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)   utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. A, Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo.

Dec. 11, 2014) at 3.

32.     This suit was in response to SLMPD firing chemical agents into a business where

peaceful protestors had congregated without allowing the protestors to leave.

33.     The City entered into a settlement agreement on March 25, 2015, where it agreed

as follows:

A.     Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:
(1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:

(a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
(b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;
(c)     without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
(d)     without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.

(2)     utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.

B.      Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

*See* Exh. B, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar. 25, 2015) at 1-2.

### D.      SLMPD Violations of the Consent Decree

34.      Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

35.      On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning. *See* Exh. C, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 69.

36.      On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *Id*. at 50-52. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id.* SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *Id.* Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

37.      On July 21, 2017, SLMPD officers used chemical agents against people

protesting the treatment of detainees in the St. Louis City Workhouse. *Id.* at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

38.     Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton.*

**E.     The Buildup to the Kettling on September 17, 2017**

39.     This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

40.     According to Defendant Rossomanno, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flower pots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis. *See* Exh. D, Transcript of Testimony, Volume 2, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 188.

41.     There is no evidence nor allegations that Plaintiff was in any way involved in this destruction of property.

42.     Defendants testified that Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendants. *Id*. at 191.

43.     Defendants testified that Defendant Sachs was in direct command of the officers in tactical gear. *Id*.

44.     Defendant Rossomanno also testified that at approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions." *See* Exh. E, Rossomanno Declaration, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 12, 2017), Doc. 33-6 at 4.

45.     Defendant Rossomanno testified that a second dispersal order was given at 8:51 PM. *Id.* at 5.

46.     Plaintiff was not present for these alleged dispersal orders.

47.     Defendants Rossomanno and Jemerson directed people to the intersection of Washington and Tucker, where the Defendants had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff. *See* Exh. D at 195.

48.     Although Defendant Sachs heard some sort of order being given, he testified that he could not make out "exactly what was being said." *See* Exh. D at 25.

**F.     The Kettling**

49.     Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

50.     Defendant Karnowski testified that he and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. *See* Exh. D at 125-126. He also testified that he determined that the protest that evening was an "unlawful assembly." *Id.* at 136-137.

51.     This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

52.     Defendant Sachs came up with the plan to arrest everyone present. *See* Exh. D at 27. He presented his plan to Defendant Leyshock, who approved the plan. *Id*. The plan was to

not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard. *Id.*  at 27-40.

53.     Defendants Leyshock, Sachs, Rossomanno, and Jemerson knew or should have known that their plan to kettle the people that SLMPD directed to the intersection of Washington and Tucker and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate said arrests.

54.     At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

55.     This was nearly three hours after the windows and flower pots were broken and many blocks away from the damaged businesses.

56.     SLMPD's Civil Disobedience Team appeared at the scene.

57.     A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

58.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

59.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

60.     All three of these lines were comprised of officers all wearing military-like tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

61.     A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

62.     These officers were carrying bicycles and were being directed by Defendant

Boyher. *See* Exh. D at 30-31.

63.     Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

64.     Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

65.     As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

66.     As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, the officers blocked anyone from leaving the area.

67.     Video evidence shows multiple citizens approaching officers and requesting to be let through. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!"

68.     In addition, the closing phalanxes of officers cut off access to all alleys and other means of egress.

69.     As the four lines closed, they trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

70.     This is a law enforcement tactic known as "kettling."

71.     The SLMPD police officers kettled self-admitted protestors, residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, a homeless person, and an even an undercover SLMPD officer.

72.     Video evidence even shows the officers grabbing an African-American male who was outside of the kettle and throwing him into the kettle.

73.     As the kettle closed, video evidence shows many individuals approaching the officers and begging to pass.

74.     Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

75.     Video evidence shows individuals peacefully approaching the bicycle officers with their hands up.

76.     In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

77.     Defendants Boyher and Karnowski were directing these officers. *See* Exh. D at 30, 119, and 124. Rather than defuse the situation, Defendants Boyher and Karnowski directed the officers under their command including Defendant Wismar to use force against the peacefully assembled people and supervised the unlawful arrests.

78.     Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

79.     Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

80.     Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

81.     Many were kicked, beaten, and dragged.

82.     Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

83.     Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

84.     In response, SLMPD officers roughly removed the goggles and then sprayed some of those individuals directly in the face.

85.     At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

86.     These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

87.     Defendant Rossomanno can be seen on video within arms-length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, Defendant Rossomanno took control of the situation and directed the officers' unlawful actions.

88.     SLMPD officers used hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

89.     Over 100 people were arrested that night.

90.     During and after the arrests, SLMPD officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against

the arrestees will, and chanting "Whose Streets? Our Streets!"

91.    That evening, the following celebratory picture was posted on Twitter by an anonymous person:



92.    By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned and ordered the conduct of Defendants.

93.    Defendants' actions did not occur randomly. Rather, Defendants decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

94.    The next day, the SLMPD Acting Chief reinforced the City's ratification of the Defendants' actions when he said, "I'm proud to say the city of St. Louis and the police owned the night," while standing next to Saint Louis Mayor Lyda Krewson.

95.     The day after the arrests, Mayor Krewson further validated the illegal actions of Defendants when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

96.     On November 29, 2018, four SLMPD officers were indicted for their actions on September 17, 2017. Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno.

**G.      The Police Department Intentionally Ignored Its Own Policies**

97.     When detaining individuals in custody who require medical care, the City of St. Louis and its SLMPD has established the following policy:

<u>PRISONERS REQUIRING MEDICAL ATTENTION</u> (72.6.1)

1.     A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2.     Should a prisoner require <u>emergency</u> medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

3.     Should a prisoner require <u>non-emergency</u> medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.

4.     The confidential relationship of doctor and patient extends to prisoner patients and their physician.

5.     In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If

practical, the photos should be taken both prior to the application of bandages, etc., and after the injury has received appropriate medical attention

PRISONER HEALTH SCREENING (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded on the Field Booking Form when prisoners are booked and verified upon their transfer to another facility or release:

1.   Current health and medical history of the prisoner; (72.6.3.a)
2.   Medication taken by the prisoner; (72.6.3.b)
3.   Known medication/drug allergies;
4.   Behavior, including state of consciousness and mental status; and (72.6.3.c)
5.   Body deformities, trauma markings, bruises, lesions, jaundice (a yellowness of the skin and whites of the eyes), and ease of movement (72.6.3.d)

NOTE:  a copy of the Field Booking Form **must** be attached to the computerized Arrest Register whenever a prisoner is transferred to the City Justice Center.

98.     On information and belief, the SLMPD and City of St. Louis Correctional Staff failed and/or refused to follow this policy when they provided no medical care to any of the people illegally pepper sprayed or who were hurt by the zip-cuffs.

99.     Defendants' decision to ignore the policy constitutes a custom and practice of failing and/or refusing to follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other injured detainees.

100.    Despite this policy, at no time between their arrest and their release from the St. Louis City Justice Center did any police officer or other city official provide any arrestee with medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

**H.     Arrest and Charges of Kettling Victims**

101.    Upon their release, all of the arrestees were given summonses showing that they

had been charged with "failure to disperse." They were instructed to appear at St. Louis City

Municipal Court on October 18, 2017.

102.    They were charged as such even though SLMPD officers provided no means of

egress, denied repeated requests to be allowed to leave, and kettled the individuals.

103.    In at least one case, a person was thrown from outside of the kettle into the kettle

by SLMPD and was subsequently arrested for failure to disperse.

104.    The press release stated "[m]any of the demonstrators were peaceful, however

after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a

mob. Multiple businesses also sustained property damage and one officer suffered a serious

injury."

105.    Egregiously and in an attempt to further punish its victims, SLMPD publicly

released the addresses of the arrestees.

106.    The video evidence, as the federal court observed, "shows no credible threat of

force or violence to officers or property in this mixed commercial and residential area" – much

less a mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was

an undercover officer who was pepper sprayed and beaten by SLMPD.

107.    SLMPD used its Twitter account to disseminate this false statement to its

approximately 70,000 followers. SLMPD subsequently deleted the tweet.

108.    During a preliminary injunction hearing, attorneys representing the City stated

that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is

justified in declaring an unlawful assembly and then deploying chemical agents regardless of the

proximity of the target individuals in time or space to the property damage and regardless of if

the people were engaged in criminal activity. According to the City, officers are justified to use

chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

109.     On October 13, 2017, the St. Louis City Counselor's office issued a letter stating "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges."

### I.     Federal Court Injunctive Relief

110.     On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Exh. F, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

111.     The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

112.     The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id*. at 9.

113.     The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive

to leave the area." *Id*. at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id*. at 8-9.

114.     The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

115.     The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a large crowd congregating in the streets" and "(n)o violent activity by protesters can be observed on the video." *Id.* at 10. In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

116.     The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12. The Court found that no audible warning could be heard on the video. *Id.*

117.     The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

118.     In an attempt to defend the SLMPD's actions, the City's attorney "stated during

closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id*. at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

119.   The Court made the following findings:

   a.   Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id*. at 35-36.

   b.   Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

   c.   Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id*. at 37. (Emphasis added).

   d.   Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner

in violation of plaintiffs' constitutional rights. *Id*.

e.  Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

f.  Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

g.  Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

h.  Plaintiffs have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id*. at 42.

i.  The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

j.  Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 44.

k.  Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id*. at 44. That is because "it is well-

settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id.* at 44-45.

120. Upon information and belief, senior officials of the SLMPD, including Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

### *The Arrest and Assault of Mr. Faulk*

121. Mr. Faulk is an award-winning reporter in the early stages of his career. Less than a decade into professional journalism, his career has been on an upward trajectory: initially a reporter at the Anniston Star in Anniston, Alabama, Mr. Faulk moved to the Yakima Herald-Republic in Yakima, Washington, and was subsequently hired at the St. Louis Post-Dispatch in 2016. Each newspaper Mr. Faulk has moved to has been in a larger city and each has had a larger circulation. Mr. Faulk was hired by the Post-Dispatch specifically to cover public projects and public-private partnerships for the newspaper.

122. Mr. Faulk was raised with a tremendous respect for law enforcement and the justice system; his mother was a Chief Assistant District Attorney in Alabama for 16 years and later served as District Attorney for 4 years.

123. Mr. Faulk had reported on the protests held Friday, September 15th. He was

credited as a contributor to the front-page article published on Saturday, September 16 about the previous day's protest.[1] Mr. Faulk would also be credited as a contributor for his reporting on the events of the evening of September 17.[2]

124.    This was far from Mr. Faulk's first protest as a reporter. Mr. Faulk had previously covered mass demonstrations in the U.S., Nicaragua, and Honduras. He had never previously been arrested or assaulted by law enforcement officials while reporting at these demonstrations.

125.    Protesters had planned a "Die-in" on the afternoon of Sunday, September 17 in front of SLMPD headquarters at 19th and Olive Streets. Mr. Faulk went on location to report on the Sunday protests beginning that afternoon.

126.    As is a common journalistic practice, Mr. Faulk actively used Twitter on the 17th, tweeting updates and images about the protest throughout the day.

127.    After starting at SLMPD headquarters, Sunday's protest of several hundred people moved west toward Harris-Stowe State University and St. Louis University before eventually moving back east toward downtown St. Louis in the early evening hours. The organized protest concluded around 8:00 pm in front of the SLMPD headquarters, with many protesters leaving downtown while others continued to stay in the area. Because many protesters remained, and previous protester/police interactions had taken place after the Stockley verdict protests, Mr. Faulk remained downtown reporting. On this evening, Mr. Faulk used his bicycle to travel around downtown, as it was the easiest way to navigate the crowds and to quickly move

---

[1] Joel Currier, et al, *Heated Protests Follow Stockley Acquittal,* St. Louis Post-Dispatch (Sep. 16, 2017), http://www.stltoday.com/news/local/crime-and-courts/heated-protests-follow-stockley-acquittal/article_c7ee91ad-e65b-5da6-84cb-0b478078c8cb.html.
[2] Staff Reporters, *More than 80 Arrestsed After Protest Violence Downtown*, St. Louis Post-Dispatch (Sep. 18, 2017), http://www.stltoday.com/news/local/govt-and-politics/more-than-arrested-after-protest-violence-downtown-police-owned-tonight/article_ebf53117-0396-515c-a6c2-84d50c6bbdfc.html.

from one location to another.

128.    At all times while Mr. Faulk covered these events he wore his Post-Dispatch ID card, attached by a lanyard, hanging visibly around his neck.

129.    Around 8:30 pm, Mr. Faulk saw masked individuals break a restaurant window near 9th and Olive Streets. Around this time, Mr. Faulk tweeted several other photos of damaged windows.[3]

130.    Mr. Faulk then rode his bicycle to the intersection of Washington Avenue and Tucker Boulevard, where he saw a giant armored SLMPD vehicle warning that the dispersal of chemical munitions was possible. Despite the announcement, no such munitions were dispersed at this time.

131.    Around 9:00 pm, Mr. Faulk saw police officers wearing riot gear at St. Charles and 13th Streets. However, as there did not seem to be a significant group of protesters anywhere, the group of officers did not move from the area. Mr. Faulk sent a tweet around this time that read, "There have to be more cops than protesters out at this point."[4]

132.    Just before 10:00 pm, Mr. Faulk observed some officers walk south on Tucker, board a MetroBus, and depart. He then rode his bike back to his car located at the Post-Dispatch parking lot, to charge his phone, and to drink some water. Around 10:15, Mr. Faulk tweeted, "Normal traffic starting to resume on Tucker. #STLVERDICT Perhaps the worst is over for tonight?"[5]

133.    Mr. Faulk next rode his bike to the intersection of 7th and Olive Streets, where a car accident unrelated to the protests had drawn a crowd. He continued southward on his ride,

---

[3] https://twitter.com/Mike_Faulk/status/909591036518944768.
[4] https://twitter.com/Mike_Faulk/status/909598815623286785.
[5] https://twitter.com/Mike_Faulk/status/909616879194591232.

passing City Garden and moving west to City Hall at 12th and Market Streets, which appeared to be another staging ground for SLMPD officers.

134.     He eventually rode back near the intersection of Olive Street and Tucker Boulevard. At this time, Mr. Faulk seemed to again believe the events of the night were concluding, tweeting, "I didn't see any tear gas tonight. #STLVerdict."[6] Small clusters of people, including protesters, neighborhood residents, and tourists stood talking at this point in the evening; there was little formal protesting, and nearly every person was standing on the sidewalk.

135.     The last reported property damage had occurred at least four blocks away, and it had occurred at least three hours previously.

136.     Suddenly, looking south on Tucker Boulevard, Mr. Faulk saw emergency lights flashing and officers approaching from the south. He tweeted "Lots of cop cars responding to Tucker between Olive and Wash again."[7]

137.     From Locust Street looking east, Mr. Faulk spotted SLMPD officers with bicycles lined up in a row across Locust Street, just east of Tucker Boulevard. He tweeted "Bike cops blocking Locust and 11th #STLVerdict Spectators there and big group of people at St. Charles/Tucker."[8] The officers began to lift their bikes and pound them against the ground in unison while walking west toward Mr. Faulk and others. The officers ordered people to move west on Locust or North on Tucker.

138.     At no time had any dispersal order been given by any SLMPD officials after telling people to move west on Locust or north on Tucker. At no point when he was near the

---

[6] https://twitter.com/Mike_Faulk/status/909621338922536960.
[7] https://twitter.com/Mike_Faulk/status/909622380062019585.
[8] https://twitter.com/Mike_Faulk/status/909623060298379264.

Tucker and Washington intersection did Mr. Faulk hear officers warn citizens that chemical agents would be used.

139.     Mr. Faulk heeded the officers' orders and walked north on Tucker Boulevard to the southeast corner of the intersection of Washington Avenue and Tucker Boulevard. Mr. Faulk and others remained on the sidewalk.

140.     Suddenly, the riot police north of Mr. Faulk on Tucker started to beat their batons on their shields in unison. Mr. Faulk, looking south from the intersection, saw officers in that direction doing the same thing, slowly moving toward the group of people gathered near the intersection.   Mr. Faulk tweeted at this time, "The clap clap of the batons on their armor. The SWAT cops are back. Marching both directions down Tucker squeezing us west on WA [Washington]."[9]

141.     A fourth line of SLMPD officers began to approach the intersection from the west on Washington. Mr. Faulk tweeted, "Less than 100 of us including media blocked in at wa [Washington] and Tucker all four sides. People moving toward bike cops looks like best option."[10] As is clear from his tweet, Mr. Faulk was seeking some way to get out of the police kettle that had formed.

142.     Faulk approached SLMPD officers north of the intersection. They refused to acknowledge his questions. Mr. Faulk asked another SLMPD officer in riot gear, "Where do we go?" There was no response. Mr. Faulk describes the officers as avoiding eye contact with citizens, choosing to ignore their questions and requests for help.

143.     Approaching SLMPD officers to the east on Washington, he attempted to ask for

---

[9] https://twitter.com/Mike_Faulk/status/909632800659263488.
[10] https://twitter.com/Mike_Faulk/status/909634150503735301.

help. As Mr. Faulk neared them, the officers pulled out their pepper spray, pointed it at him, and told him and others to back up.

144.    Not only was Mr. Faulk never given an order to disperse, but at this point, surrounded on all sides by SLMPD officers who were slowly boxing in the citizens, dispersal would have been impossible.

145.    A wave of terror passed through those gathered at the intersection as they realized that they were trapped. Although people in the intersection screamed in panic, nobody in the intersection threatened any actions toward the SLMPD officers in any way. The SLMPD officers on all four sides continued to beat their batons against the pavement, and the noise grew louder and louder as they approached. At this point, Mr. Faulk tweeted, "We are closed in on all four sides now I have no idea where people are supposed to go. People freaking out #STLVerdict."[11]

146.    Scores of officers surrounded the group in the intersection, advancing on the kettled individuals. SLMPD officers screamed "Back up! Back up!" but, because the citizens in the kettle were surrounded on all sides, there was nowhere for them to move.

147.    Video of the event, including video possessed by SLMPD, shows citizens in the kettle uniformly putting their hands in the air or getting on the ground as SLMPD officers screamed contradictory directions at them.

148.    Following the lead of others gathered in the intersection, Mr. Faulk placed his bike on the ground and then got down on his hands and knees over the bike.  A young African-American woman next to Mr. Faulk seemed to be frozen in fear, so Mr. Faulk calmly tapped her on the shoulder and instructed her to get down, as he was doing. While SLMPD officers yelled, "Lay down on the ground!" doing so was impossible because of the small space into which the

---

[11] https://twitter.com/Mike_Faulk/status/909633682780147713.

group had been cornered.

149.     SLMPD officers approached individuals in the group who were kneeling or lying

down, shouting "Stop Resisting" and "Get Down!" to the citizens who were, quite visibly, trying

to obey whatever SLMPD officers commanded.

150.     Approaching the group of kettled citizens on the ground, SLMPD officers began

to indiscriminately deploy pepper spray on the submissive crowd. The noxious spray wafted over

the group, causing choking and coughing. Mr. Faulk felt the pepper spray land on his back and

neck, causing immediate and acute stinging pain.

151.     SLMPD officers singled out a member of the group broadcasting the kettling live

on video through the internet. The SLMPD officer—who did not appear to be wearing a name

badge—stepped over several citizens lying on the ground to spray the member of the press with

yellow pepper spray. As the officer sprayed the man, the officer repeatedly yelled, "PUT IT

DOWN! PUT IT DOWN!" referring to the man's phone, which was recording the incident.

SLMPD officers taunted the man, calling him "Superstar," presumably because of his media

following.

152.     One member of the SLMPD, Officer Willis, grabbed Mr. Faulk as he lay on the

ground, attempting to pull Mr. Faulk up by his collar. As he was grabbed by the officer, Mr.

Faulk shouted several times, "Post-Dispatch!" and lifted his media credential ID card to show to

the officer. This ID card had been hanging visibly around Mr. Faulk's neck for the entirety of the

evening. Officer Willis then let go of Mr. Faulk, who was now standing because he had been

pulled up by then officer. When Mr. Faulk asked Officer Willis's name, he was given no

response, nor was Mr. Faulk given any commands by the officer. Officer Willis walked away

from Mr. Faulk.

153.    Immediately after this, Mr. Faulk was pushed from behind by one of Defendant Doe Police Officers 2-5. He was shoved in the direction of several other SLMPD officers, who were facing him with their riot shields in front of them. These Defendant Doe Police Officers 2-5 used their shields to shove Mr. Faulk off of the sidewalk and into the street.

154.    Several of the Defendant Doe Police Officers 2-5 then grabbed Mr. Faulk from behind, using their full weight to tackle him to the ground. One Doe Police Officer used his baton to try to strike Mr. Faulk in the genitals as several other Doe Police Officers jumped on top of him, seizing each of his limbs. As is true at every point previous to this, Mr. Faulk did not resist officers in any way.

155.    As a result of the assault, Mr. Faulk sustained injuries to his neck, shoulders, hips, and legs.

156.    One of the Defendant Doe Police Officers 2-5 placed his boot onto Mr. Faulk's head and used his weight to press Mr. Faulk's head into the asphalt of the street. Despite cries of pain from Mr. Faulk, the officer continued to press Mr. Faulk's head against the ground.[12]

157.    As the Defendant Doe Police Officers held Mr. Faulk's limbs, another Defendant Doe Police Officer approached Mr. Faulk, leaned down toward him, and sprayed him directly in the face with pepper spray from a distance of less than two feet.[13] Mr. Faulk stated that the excruciating pain from this pepper spray made it almost impossible for him to see for the

_____

[12] Video shot by another member of the kettle demonstrates the exact same practice, with one kettled citizen shouting "STOP PUSHING MY HEAD IN THE GROUND," to which an SLMPD officer can be heard to respond only "Shut up!" *See* https://www.youtube.com/watch?v=UlUX1HrV9p8.

[13] According to Lieutenant Timothy Sachs, who testified at the preliminary injunction hearing in *Ahmad v. City of St. Louis*, every person who is pepper sprayed by SLMPD is supposed to be charged with resisting arrest. It is noteworthy that Mr. Faulk, sprayed at point-blank range while complying with SLMPD orders, has not been charged with resisting arrest (or any other charge). *See* Exh. D, Transcript of Hearing, Vol II at 41, *Ahmad v. St. Louis* (No. 4:17 CV 02455).

following two hours.

158.    As Mr. Faulk lay on the ground, a Defendant Doe Police Officer very tightly tied Mr. Faulk's hands with plastic "zip-cuffs," causing Mr. Faulk significant pain. A doctor later diagnosed his left wrist and thumb with temporary nerve damage as a result of the tightness of the zip-cuffs. The numbness caused by this injury lasted for several months.

159.    Mr. Faulk was then pulled up to his feet by the officers, at which point he asked for his glasses and his cellular phone, which had fallen to the ground. One Defendant Doe Police Officer picked up Mr. Faulk's phone and, because it had been unlocked, began to scroll through it.  The Defendant Doe Officer then handed the phone to another officer escorting Mr. Faulk and said, "I turned it off for you."

160.    Defendant Wismar arrested Mr. Faulk without probable cause, and is listed in the SLMPD Incident Report as the "Arresting Officer" of Mr. Faulk.  Upon information and belief, Defendant Wismar was one of the SLMPD Officers who used excessive force against Mr. Faulk.

161.    After being led toward a waiting police van, Mr. Faulk's photo was taken by SLMPD officers. As the photo was being taken, one officer held a piece of paper under Mr. Faulk's face. When Mr. Faulk told an officer that he wished to file assault charges, he was told, "You can do that downtown."

162.    Mr. Faulk was then led into the back of an SLMPD van. Inside the van, another arrestee stated that his zip-cuffs were attached entirely too tightly and that he could no longer feel his hands. Mr. Faulk could see that the African-American man's hands, tightly bound, had turned white. When an SLMPD officer said, "We don't have any more zip ties," Mr. Faulk responded, "You don't *want* to do anything about it!" Mr. Faulk saw dozens of zip-cuffs hanging from the belts of several officers in and around the van. The SLMPD officers in and near the van

simply ignored Mr. Faulk and the man's cries for aid.

163.    Looking through a metal grate out of the rear van door, Mr. Faulk could see SLMPD officers giving each other high-fives and smoking cigars. Mr. Faulk heard an SLMPD officer say, "We arrested more than 100 of you clowns tonight." He also heard officers chanting "Whose Streets? Our Streets!" This chant—a common protester expression meant to assert power against a police force often accused of brutality—carried a special irony when used by SLMPD officers after this sickening and unconstitutional act of police brutality.

164.    By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendants.

165.    Defendants' actions did not occur randomly. Rather, Defendants decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

### *Jailing at the City Justice Center*

166.    Mr. Faulk was brought, with other citizens arrested in the kettle, to the St. Louis City Justice Center (hereinafter, "The CJC"), the city-run jail in downtown St. Louis. Mr. Faulk needed help getting out of the van because he was almost completely unable to see due to the pepper spray in his eyes.

167.    He was placed with about fifteen other men in a cell. The cell was mostly quiet, with some men moaning or cursing in pain. One arrestee worried aloud that he was not an American citizen. When a nearby SLMPD officer outside the cell heard this, he told the man, "We're gonna have fun with you!" When Mr. Faulk told the man that the laws of the United

States still applied to him, the officer responded, with mock disappointment, "You won't let me have any fun."

168.    In the cell, Mr. Faulk continued to do the same work he had attempted to do all night long: report the news. Jail staff had only confiscated cell phones from arrestees; most had keys and other daily items in their pockets. Mr. Faulk retrieved his pen and notepad from his pocket and began interviewing other arrestees. Soon after beginning his interviews, an officer came into the cell and asked whether there were any journalists in that cell. When Mr. Faulk responded that he was a journalist, the officer removed Mr. Faulk and placed him in his own cell.

169.    The officer told Mr. Faulk that someone from the Police Commissioner's office had called the CJC about arrested journalists and was planning to come speak with any arrested journalists. Another officer came back twenty minutes later and told him he would be bailed out with all of the other arrestees. Mr. Faulk—wanting to continue reporting—asked to be moved back to the cell with other arrestees. He was told that he would only be able to do so if he turned over his pen and notepad to the jail staff. While Mr. Faulk was told that safety was the reason his pen and paper would be confiscated, other arrestees still possessed their keys, belts, and other potentially dangerous items. The "no pen or paper" rule seemed to be implemented to prevent Mr. Faulk from taking interviews of the other arrestees.

170.    Rather than give up his notes to the officers, Mr. Faulk remained in his cell by himself.  He continued writing the events of the evening throughout his incarceration.

171.    A few hours later, Mr. Faulk was processed by CJC staff and placed in an over-capacity cell with the other protest arrestees. He was not once asked if he needed medical care, despite pain from his assault and the pepper spray. He requested medical help several times but was provided none.

172.    Mr. Faulk was brought into a room where SLMPD officers were processing the arrestees.  Mr. Faulk saw several of the officers laugh incredulously, because the forms brought in with the arrestees lacked the names of arresting officers as well as specific details of the arrest.

173.    While Mr. Faulk sat in jail, SLMPD put out a "Media Alert" on their Twitter page which stated, among other things, "[A]fter dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob." The alert went on to name all of the arrestees, including Mr. Faulk. The release mentioned Mr. Faulk's name, age, and even the block on which he lived.

174.    Around 4:00 a.m., Mr. Faulk's employers paid 10% of the $500 bond that had been set for his release. Despite this, he was not released until thirteen hours of incarceration, at 1:30 in the afternoon on Monday, September 18th.

175.    When he was released, Mr. Faulk was given a piece of paper that notified him that he had been arrested on suspicion of failure to disperse. The paper also contained a court date scheduled for him in October of 2017.

176.    Mr. Faulk went directly to the Post-Dispatch, his employer, to debrief them on what had happened to him at the hands of the SLMPD. Co-workers observed Faulk's injuries, including an obvious limp and the lingering odor of pepper spray. When colleagues attempted to hug Mr. Faulk, he turned them away for fear that the still-active spray would get on their skin.

177.    When Mr. Faulk finally went home and showered, the pepper spray on his hair and skin activated once more, causing further pain.

178.    The following day, Tuesday September 19th, Mr. Faulk visited his doctor. Paperwork from that visit diagnosed him suffering from an "assault," which included a strained neck as well as injuries to his left wrist, shoulders, legs, and hips. He was prescribed physical

therapy for these injuries. Mr. Faulk suffered physical pain for more than a month due to his injuries inflicted by Defendants.

179.    Upon returning to work, Mr. Faulk was immediately prohibited from reporting on the protests and was not allowed to write any articles about the SLMPD or other police departments.

180.    Mr. Faulk received a significant amount of emails, tweets, and reports from conservative media, and members of the public, including social media trolls, telling him that he deserved what happened to him and questioning his journalistic bias.

181.    Mr. Faulk also began to suffer from psychological difficulties that continue to this day. He regularly experiences nightmares in which he is slowly being surrounded by groups of people and is unable to act. He continues to meet with a psychologist weekly.

182.    In the months following his arrest, Mr. Faulk's assignments from editors have slowly diminished.

183.    As the stress related to his changed reporting duties compounded with the psychological issues related to his arrest, Mr. Faulk began to realize that he suffered significantly greater harm than he first believed. At the advice of his psychologist, Mr. Faulk requested and was granted medical leave from the Post-Dispatch in January of 2018.  He remained on medical leave for over 4 months.

184.    Mr. Faulk met with investigators for the Internal Affairs Division of the SLMPD and recounted the events of September 17-18 to them for nearly two hours.  He answered every question posed to him by SLMPD investigators, and a transcript of the conversation has been made.

185.    In November of 2017, Defendant City issued a "special order" for the SLMPD

affirming the right of journalists covering protests.[14]  The order was a direct result of a meeting between Mr. Faulk's bosses and Defendant City officials.  Despite this fact (and despite Mr. Faulk's cooperation with SLMPD), Defendant City has refused to dismiss the pending charges against Mr. Faulk or to agree that charges against him will not be brought. Besides a letter informing him that his October court date was postponed, Mr. Faulk has waited for months with no response from the City.

186.    Mr. Faulk has since left St. Louis and his job at the Post-Dispatch. Further, he is significantly less likely to cover protests in the future for fear of assault by police.

187.    The above-mentioned injuries to Mr. Faulk are irreparable.

188.    Remedies at law are inadequate to fully compensate him for those injuries.

189.    Mr. Faulk, who is still employed as a reporter, is at risk of further harm if he continues to report on protests in St. Louis.

## COUNT I
### 42 U.S.C. § 1983 - First and Fourteenth Amendment Violations
### (Against All Defendants)

190.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

191.    Observing and recording public protests, and the police response to those protests, is a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

---

[14] *See* Celeste Bott, *St. Louis Police Issue Special Order Reiterating Rights of Journalists*, St. Louis Post- Dispatch (Nov. 17, 2017), http://www.stltoday.com/news/local/crime-and-courts/st-louis-police-issue-special-order-reiterating-rights-of-journalists/article_2d1bc87d-db66-5733-9a28-b20cfdf249b7.html.

192.    Defendants' actions violated Mr. Faulk's rights under the First Amendment to freedom of the press and freedom of speech by interfering with his ability to gather information and cover a matter of public interest as a member of the media.

193.    Defendants further violated Mr. Faulk's rights under the First Amendment by isolating him from other arrestees and refusing to allow him back into the cell with other arrestees unless he forfeited his pen and paper.

194.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

195.    As a direct and proximate result of Defendants' unlawful actions described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

196.    Additionally, Defendants' actions described herein have had a chilling effect on Mr. Faulk, who is now less likely to report on police protests out of fear of further unconstitutional treatment.

197.    At all times, Defendants were acting under color of state law.

198.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT II
### 42 U.S.C. § 1983- Fourth and Fourteenth Amendment Violations: Unreasonable Seizure (Against Individual Defendants)

199.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

200.    Defendants knew or should have known that SLMPD officers did not have

probable cause to arrest Mr. Faulk.

201.    Defendants unreasonably seized Mr. Faulk, thereby depriving him of his right to be free from unreasonable seizure of his person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

202.    Further, there was no objectively reasonable belief that Plaintiff Faulk had committed a criminal offense, nor was there even *arguable* probable cause for the arrest. As such, the seizure was unreasonable.

203.    As a direct result of the conduct of Defendants described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

204.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.  As a direct and proximate result of Defendants' unlawful actions, Mr. Faulk was damaged.

205.    At all times, Defendants were acting under color of state law.

206.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## <u>COUNT III</u>
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against Defendant Doe Police Officers 2-5 and Defendant Wismar)

207.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

208.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.   As a direct and

proximate result of Defendants' unlawful actions, Mr. Faulk was damaged.

209.     The use of force against Mr. Faulk, by inflicting harm though physical force applied on Mr. Faulk's body and by using chemical agents against a compliant, prone, and restrained Mr. Faulk was objectively unreasonable under any circumstances.

210.     As a direct result of the conduct of Defendants described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

211.     At all times, Defendants were acting under color of state law.

212.     If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT IV
**42 U.S.C. § 1983-Conspiracy to Deprive Civil Rights**
**(Against All Defendants)**

213.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

214.     Defendants, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Mr. Faulk's civil rights.

215.     The City of St. Louis itself was a member of the conspiracy because throughout the night, the highest levels of the SLMPD, Department of Public Safety, and City government were involved in the planning, monitoring and/or execution of this event.

216.     As described above, Defendants Leyshock, Sachs, Jemerson, and Rossomanno conspired to design and implement the illegal kettling plan, with the intent to unlawfully arrest and

use excessive force on Plaintiff.

217.   Defendants Boyher and Karnowski joined the conspiracy when they directed officers under their control and supervision to execute the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff.

218.   Defendants Wismar and Does joined the conspiracy when they agreed to participate in the illegal kettling plan and then unlawfully arrested and used excessive force on Plaintiff.

219.   In furtherance of this conspiracy, Defendants committed overt acts, namely:

    a.   Defendants, acting in concert, kettled and unlawfully seized Mr. Faulk without any probable cause that he had committed a crime. They later detained him in the City Justice Center for thirteen hours.

    b.   Defendants used excessive force by pressing Mr. Faulk's head face into the street with a boot, spraying him with pepper spray at point-blank range, and applying handcuffs to his wrists in a manner intended only to inflict pain.

220.   Defendants shared the conspiratorial objectives, which were to punish Mr. Faulk and others gathered at the intersection of Washington and Tucker, because Defendants believed the group to be protesting police brutality.

221.   As a direct and proximate result of the conspiracy between the Defendants as described above, Plaintiff's right to be free from excessive force and unreasonable search and seizure was violated by Defendants.

222.   As a direct and proximate result of Defendants' actions, Plaintiff suffered and will continue to suffer physical pain and injury, emotional pain and suffering, loss of wages and reputation, mental anguish, inconvenience, humiliation, embarrassment, and stress.

223.   The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Plaintiff, thus entitling him to an award of punitive damages against the Defendants.

224.    At all times, Defendants were acting under color of state law.

225.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42

U.S.C. § 1988.

## COUNT V
### 42 U.S.C. § 1983: Municipal Liability
*Monell* **Claim against Defendant City of St. Louis for Failure to Train, Failure to Discipline, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force**

226.    Plaintiff incorporates by reference each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

227.    Defendant City is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for the remaining

Defendants' violation of Mr. Faulk's rights because the violations were caused by a policy,

practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies,

practices, or customs that caused constitutional harm to Mr. Faulk are the following:

- SLMPD officers' routinely use of excessive force when policing protests, especially those at which police brutality is being protested;

- SLMPD custom or policy of using chemical agents without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

- SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

- SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

- Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

228.    Further, Defendant City has inadequately trained, supervised, and disciplined

SLMPD officers, including the remaining Defendants, with respect to its officers' use of

chemical agents, understanding of probable cause, use of force, and recognition of rights of members of the press.

229.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Mr. Faulk as alleged herein.

230.    As a direct result of the Defendant City's failures and policies as described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society., including mental anguish, physical harm, pain, and suffering.

231.    If Mr. Faulk prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT VI:
### Missouri State Law: Assault and Battery
### (Against Defendants Wismar, Doe Police Officers 2-5, and City of St. Louis)

232.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

233.    During the process of being unconstitutionally arrested, Mr. Faulk suffered assault and battery at the hands of Defendant Wismar and Doe Police Officers 2-5.

234.    Namely, by pressing Mr. Faulk's head into the street with their boots, Defendant Doe Police Officers 2-5 intended and did cause offensive bodily harm to Mr. Faulk.

235.    In spraying Mr. Faulk--lying on the ground and attempting to heed the directive of SLMPD officers--directly in the face with pepper spray, Defendant Doe Police Officers 2-5 further intended to--and did--cause offensive bodily contact with Mr. Faulk.

236.    As a direct result of the conduct of Defendant Doe Police Officers 2-5 described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

237.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

238.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

239.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to RSMo. §537.610.1.

240.    The actions of Defendant Doe Police Officers 2-5 as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendant Doe Police Officers 2-5 and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VII
### Missouri State Law: False Arrest and False Imprisonment
### (Against All Defendants)

241.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

242.    Mr. Faulk was arrested and imprisoned without any legal justification by all individual Defendants.  Further, even after a corrections officer realized that Mr. Faulk was a member of the press, Mr. Faulk was imprisoned for another ten hours.

243.    Individual Defendants either arrested Plaintiff, or encouraged, promoted, or instigated his arrest by another SLMPD officer.

244.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

245.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

246.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to RSMo. §537.610.1.

247.    As a direct result of the conduct of Defendants described herein, Mr. Faulk suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

248.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VIII
### Missouri State Law: Intentional Infliction of Emotional Distress
### (Against All Defendants)

249.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

250.    By surrounding Mr. Faulk, assaulting him, spraying him in the face at point-blank

range with a chemical agent, and arresting him without probable cause, Defendants committed

acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds

of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

251.    Defendants' actions were intentional or, at best, reckless.

252.    Such actions by Defendants have caused Mr. Faulk severe emotional distress that

has resulted in bodily harm, as described above.

253.    Defendants' sole motivation was to cause emotional distress to Plaintiff and the

other protesters.

254.    As a direct result of the conduct of Defendants described herein, Mr. Faulk

suffered damages including: physical injury, emotional trauma, great concern for his own safety;

fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of

employment opportunity; and loss of faith in society.

255.    Defendant City of St. Louis obtains insurance from the Public Facilities

Protection Corporation, a not for profit corporation into which the City pays funds yearly. The

funds are later disbursed by the corporation to pay claims against the City.

256.    Alternatively, the City's relationship with the PFPC serves as a self-insurance

plan.

257.    By possessing such insurance or self-insurance, the City has waived sovereign

immunity on state claims pursuant to RSMo. §537.610.1.

258.    The actions of Defendants as described above were carried out in bad faith and

with malice, and done with actual, wanton intent to cause injury, such that punitive damages

should be awarded to punish Defendants and to deter them, as well as other similarly-situated

individuals, from engaging in similar conduct in the future, in an amount to be determined by a

jury.

**COUNT IX**
**IN THE ALTERNATIVE TO COUNT VIII**
**Missouri State Law: Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

259.    Plaintiff incorporates by reference each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

260.    Alternative to Count VII, above, by surrounding Mr. Faulk, assaulting him,

spraying him in the face at point-blank range, and arresting him without probable cause,

Defendants realized or should have realized that their conduct posed an unreasonable risk to Mr.

Faulk.

261.    Further, Mr. Faulk was reasonably in fear for his own person because of the

actions of Defendants, and suffered emotional distress or mental injury that is medically

diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

262.    Defendant City of St. Louis obtains insurance from the Public Facilities

Protection Corporation, a not for profit corporation into which the City pays funds yearly. The

funds are later disbursed by the corporation to pay claims against the City.

263.    Alternatively, the City's relationship with the PFPC serves as a self-insurance

plan.

264.    By possessing such insurance or self-insurance, the City has waived sovereign

immunity on state claims pursuant to RSMo. §537.610.1.

265.    The actions of Defendants as described above were carried out in bad faith and

with malice, and done with actual, wanton intent to cause injury, such that punitive damages

should be awarded to punish Defendants and to deter them, as well as other similarly-situated

individuals, from engaging in similar conduct in the future, in an amount to be determined by a

jury.

## COUNT X
### Missouri State Law: Conversion
### (Against All Defendants)

266.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

267.     Mr. Faulk's $200 single speed bicycle was seized by SLMPD officers during his wrongful and unconstitutional arrest.

268.    Mr. Faulk was the owner of the bicycle.

269.    Defendants took possession of the property without Mr. Faulk's permission.

270.    Defendants deprived him of the right of possession.

271.    Mr. Faulk has made demand on Defendants to return the bicycle.

272.    Defendants have failed to provide the return of the bicycle, after such demand has been made.

273.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

274.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan.

275.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to RSMo. §537.610.1.

276.    Mr. Faulk was injured as a result of these actions in the form of actual damages for the purchase value of the bicycle, as well as for the loss of use of the bicycle.

277.    The actions of Defendants as described above were carried out in bad faith and

with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Faulk respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff and against Defendants for each of Counts I through X above;

b. Award Plaintiff monetary damages as the Court deems appropriate, as well as all litigation costs, expenses, and attorneys' fees recoverable under 42 U.S.C. § 1988;

Dated: August 8, 2019                     Respectfully submitted,

By:_____
    David C. Nelson  (MBE #46540MO)
    Nelson and Nelson
    420 N. High St.
    Belleville, IL 62220
    618-277-4000
    314-925-1307 (fax)
    dnelson@nelsonlawpc.com

    *and*

    **ArchCity Defenders, Inc.**

By:/s/ John M. Waldron_____
    Blake A. Strode  (MBE #68422MO)
    Michael John Voss (MBE #61742MO)
    Sima Atri (MBE #70489MO)
    John M. Waldron (MBE #70401MO)
    440 North 4th Street, Ste. 290
    St. Louis, MO 63102
    855-724-2489 ext. 1021
    314-925-1307 (fax)
    bstrode@archcitydefenders.org
    mjvoss@archcitydefenders.org
    satri@archcitydefenders.org

jwaldron@archcitydefenders.org

*Attorneys for Plaintiff*