UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MALEEHA S. AHMAD, et al.,          )
                                   )
                  Plaintiffs,      )
                                   )
      v.                           )  No. 4:17–CV–2455–CDP
                                   )
CITY OF ST. LOUIS, MISSOURI,       )
                                   )
                  Defendant.       )


PRELIMINARY INJUNCTION HEARING
VOLUME 1


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


OCTOBER 18, 2017


**APPEARANCES:**
For Plaintiffs:      Anthony E. Rothert, Esq.
                     Jessie M. Steffan, Esq.
                     Omri E. Praiss, Esq.
                     **AMERICAN CIVIL LIBERTIES UNION**
                     **OF MISSOURI FOUNDATION**
                     906 Olive Street, Suite 1130
                     St. Louis, MO  63101–1448

For Defendant:       H. Anthony Relys, Esq.
                     Thomas R. McDonnell, Esq.
                     **ST. LOUIS CITY COUNSELOR'S OFFICE**
                     1200 Market Street, Room 314
                     St. Louis, MO  63103

*REPORTED BY:*       *Gayle D. Madden, CSR, RDR, CRR*
                     *Official Court Reporter*
                     *United States District Court*
                     *111 South Tenth Street, Third Floor*
                     *St. Louis, MO  63102      (314) 244-7987*
            (Produced by computer–aided mechanical stenography.)

**EXHIBIT D**

# INDEX

*Witnesses:*

**ALISON DREITH**
    Direct Examination by Ms. Steffan . . . . . . . . Page   5
    Cross-examination by Mr. Relys . . . . . . . . . Page  12
    Redirect Examination by Ms. Steffan . . . . . . . Page  15

**MALEEHA AHMAD**
    Direct Examination by Mr. Rothert . . . . . . . . Page  15
    Cross-examination by Mr. Relys . . . . . . . . . Page  25
    Redirect Examination by Mr. Rothert . . . . . . . Page  28
    Recross-examination by Mr. Relys . . . . . . . . Page  29

**DANA KELLY-FRANKS**
    Direct Examination by Mr. Rothert . . . . . . . . Page  31
    Cross-examination by Mr. McDonnell . . . . . . . Page  44

**SARAH MOLINA**
    Direct Examination by Ms. Steffan . . . . . . . . Page  47
    Cross-examination by Mr. McDonnell . . . . . . . Page  53

**KEITH ROSE**
    Direct Examination by Mr. Rothert . . . . . . . . Page  56
    Cross-examination by Mr. Relys . . . . . . . . . Page  80
    Redirect Examination by Mr. Rothert . . . . . . . Page  98
    Recross-examination by Mr. Relys . . . . . . . . Page 103

**STEVEN HOFFMANN**
    Direct Examination by Ms. Steffan . . . . . . . . Page 106
    Cross-examination by Mr. McDonnell . . . . . . . Page 117

**CHRIS SOMMERS**
    Direct Examination by Mr. Rothert . . . . . . . . Page 120
    Cross-examination by Mr. Relys . . . . . . . . . Page 134

**MEGAN GREEN**
    Direct Examination by Ms. Steffan . . . . . . . . Page 139
    Cross-examination by Mr. McDonnell . . . . . . . Page 143

**DEMETRIUS THOMAS**
    Direct Examination by Mr. Rothert . . . . . . . . Page 146
    Cross-examination by Mr. Relys . . . . . . . . . Page 155

**WILLIAM PATRICK MOBLEY**
    Direct Examination by Mr. Praiss . . . . . . . . Page 159
    Cross-examination by Mr. Relys . . . . . . . . . Page 168

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 3 of 333 PageID #: 4120
Preliminary Injunction Hearing Volume 1

3

**DILLAN NEWBOLD**
    Direct Examination by Mr. Rothert . . . . . . . . Page 171
    Cross-examination by Mr. McDonnell . . . . . . . Page 182

**TONY RICE**
    Direct Examination by Ms. Steffan . . . . . . . Page 185
    Cross-examination by Mr. Relys . . . . . . . . Page 193

**IRIS NELSON**
    Direct Examination by Mr. Rothert . . . . . . . Page 201
    Cross-examination by Mr. Relys . . . . . . . . Page 212

**ALEX NELSON**
    Direct Examination by Mr. Rothert . . . . . . . Page 217
    Cross-examination by Mr. Relys . . . . . . . . Page 230

**JOSHUA TORREZ WEDDING**
    Direct Examination by Mr. Praiss . . . . . . . . Page 237
    Cross-examination by Mr. Relys . . . . . . . . Page 245

**JONATHAN ZIEGLER**
    Direct Examination by Mr. Praiss . . . . . . . . Page 250
    Cross-examination by Mr. McDonnell . . . . . . . Page 260

Plaintiffs rest. . . . . . . . . . . . . . . . . Page 264

**TIMOTHY SACHS**
    Direct Examination by Mr. Relys . . . . . . . . Page 265
      (continued to 10/19/2017)

1          (Proceedings commenced at 9:05 a.m.)

2          THE COURT:  All right.  Good morning.  We are here in

3    the case of Maleeha S. Ahmad versus the City of St. Louis.

4    This is Case No. 4:17-CV-2455.  Would counsel who are

5    representing the parties please stand and identify themselves

6    for the record?

7          MR. ROTHERT:  Tony Rothert, Anthony Rothert, for

8    Plaintiffs.

9          MS. STEFFAN:  Jessie Steffan for Plaintiffs.

10          MR. PRAISS:  Omri Praiss for Plaintiffs.

11          MR. MCDONNELL:  Thomas McDonnell on behalf of the

12    City of St. Louis.

13          MR. RELYS:  Tony Relys on behalf of the City.

14          THE COURT:  All right.  Thank you.

15          Okay.  So we're ready to proceed on this preliminary

16    injunction hearing.  As you all know, this case was assigned

17    to me at the end of last week.  I have reviewed all of the

18    parties' filings, and I know you both have a -- have provided

19    witness lists.  The Plaintiff filed a motion to exclude

20    witnesses under the rule.  Is there any objection to that from

21    the Defendants?

22          MR. MCDONNELL:  No, Judge.

23          THE COURT:  Okay.  So anybody who is a witness in the

24    case is required to leave the courtroom other than the named

25    Plaintiffs, and counsel will be required to enforce that

5

1    because I have no idea who your witnesses are, so make sure

2    you tell people, and there's a room outside, or you can wait

3    in the hallway.

4         All right.  So do you wish to make any statements

5    before we begin, or are you just ready to begin with your

6    evidence, Mr. Rothert?

7         MR. ROTHERT:  We're ready to begin with evidence.

8         THE COURT:  All right.  You may call your first

9    witness.

10        MR. ROTHERT:  Plaintiffs call Alison Dreith.

11        THE COURT:  And the City, of course, is allowed to

12   have one representative remain in the courtroom even if they

13   are a witness.  I don't know who you wish to have that be,

14   but . . .

15        THE CLERK:  Ma'am.  I'm sorry.

16        THE COURT:  Oh, would you step over here to the clerk

17   to be sworn?  Sorry.

18                        **ALISON DREITH**,

19   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

20   FOLLOWS:

21                        DIRECT EXAMINATION

22   BY MS. STEFFAN:

23   Q    Good morning, Ms. Dreith.  Could you please state your

24   name for the record?

25   A    Alison Dreith.

Alison Dreith Direct Examination                          Volume 1

6

1  Q    Directing your attention to Friday, September 15th, 2017,

2  did you have occasion to go to downtown St. Louis on that day?

3  A    Yes.

4  Q    And what was the reason you went downtown?

5  A    To protest.

6  Q    Why did you wish to protest?

7  A    So that the system stops murdering black people with

8  impunity.

9  Q    Was there an event that triggered your desire to

10 participate in a protest on that subject?

11 A    The decision of the Stockley verdict.

12 Q    At what time did you arrive downtown?

13 A    Around 9:45 a.m.

14 Q    And at that point, was traffic flowing normally or were

15 the streets closed?

16 A    I came -- I was heading north on Tucker, and the street

17 was closed at Tucker and Clark.

18 Q    And who had closed the street?

19 A    The police.

20 Q    After you arrived downtown, what did you do?

21 A    Gathered at Tucker and Market where there was a group of

22 people holding an intersection.

23 Q    And how long were you near the intersection of Tucker and

24 Market?

25 A    Fifteen to 30 minutes.

1    Q    Okay.  Did you participate in any protest activity after

2    that point?

3    A    After that point, I followed a group of protestors led by

4    clergy and elected officials marching around the streets of

5    downtown.

6    Q    At some point, you left the Tucker and Market

7    intersection?

8    A    About an hour or less later.  I was tired.

9    Q    What did you do after you left that intersection?

10   A    I -- after we marched around downtown, I left early and

11   came back to the intersection of Market and Tucker and stayed

12   at that intersection for the next two hours.

13   Q    Okay.  And when you left that intersection, what did you

14   do?

15   A    I needed to use the restroom.  So I found a elected

16   representative to let me in City Hall to use the restroom.

17   Q    And you were able to use the restroom in City Hall?

18   A    Correct.

19   Q    What happened after that?

20   A    After I was let into City Hall by an alderman, I used the

21   facilities, and I left City Hall, exiting the door facing

22   Clark.

23   Q    And that's the back entrance of City Hall?

24   A    Uh-huh.

25   Q    What happened after you left through that back entrance?

1  A    As I exited the back entrance, there was a police officer

2  on the steps of City Hall, on a radio, describing what

3  different protestors were wearing, and I promptly walked back

4  down to the sidewalk on Tucker close to the intersection of

5  Clark.

6  Q    And this is on the west sidewalk of Tucker?

7  A    Right.

8  Q    What happened after you got there to the west sidewalk of

9  Tucker?

10  A    Dozens of police officers on bicycles came peddling

11  quickly down from the top parking lot near the Scottrade

12  Center, almost knocking me over, and started picking up their

13  bicycles and pushing protestors with their bicycles.

14  Q    And this is on Tucker?

15  A    On Tucker.

16  Q    At that point, had you seen any civilian commit any act

17  of violence?

18  A    No.

19  Q    Or use any force?

20  A    No.

21  Q    Had you seen anyone damage any property?

22  A    No.

23  Q    And is that true the whole time you were marching and

24  participating in the protests?

25  A    The whole time was peaceful.

1   Q    Did you see anyone who posed a threat to the safety of an

2   officer or to another person?

3   A    No.

4   Q    What happened after you saw the police officers pick up

5   their bikes and push them at people?

6   A    Out of the left corner of my eye, I saw a woman get

7   maced.

8   Q    At that point, were you committing any crime?

9   A    No.

10  Q    What happened after you saw that?

11  A    I, within seconds, got maced in my face.

12  Q    Had you heard any warning about the use of mace or any

13  other chemical agent?

14  A    No.

15  Q    Did the police tell you to disperse before deploying a

16  chemical agent at you?

17  A    No.

18  Q    What did it feel like to be maced?

19  A    Like my face was melting.

20  Q    I'm going to hand you an exhibit that has been previously

21  marked as Plaintiffs' Exhibit 2.

22          THE COURT:  Yeah, you can use the -- let's see.

23  Yeah, we can just leave them on given there's no jury.

24  Q    (By Ms. Steffan) Can you identify or can you see this

25  picture?

10

1    A     Yes.

2    Q     Can you identify what it is?

3    A     That's a picture of me in my husband's car after he could

4    pick me up from downtown, the first picture I could take of

5    myself after the incident.

6    Q     So this is on September 15th?

7    A     Yes.

8    Q     And you took this photo?

9    A     Yes.

10   Q     What does it show in the picture?

11   A     The white stuff on my face is Milk of Magnesia.

12   Q     And why did you have Milk of Magnesia on your face?

13   A     It reduces the burning sensation of the chemical agents

14   that were on my face.

15   Q     So would you say that this is a true and accurate

16   representation of what you looked like after being sprayed in

17   the face with a chemical agent without warning in the city of

18   St. Louis on September 15th?

19   A     Yes.

20         MS. STEFFAN:  I would like to move for admission of

21   Exhibit 2.

22         THE COURT:  Exhibit 2 is received into evidence for

23   purposes of this hearing.

24   Q    (By Ms. Steffan) Has the experience from September 15th

25   changed how or whether you participate in protests?

```
 1   A    Yes.

 2   Q    In what way?

 3   A    I'm scared of exerting my First Amendment rights and the

 4   retaliation of the police, and I have participated far less

 5   than I had thought I would before this incident happened and

 6   now only go out with my husband.

 7   Q    I'm going to show you an exhibit that has been previously

 8   marked as Plaintiffs' Exhibit 21.  Do you recognize this

 9   declaration?

10   A    Yes.

11   Q    I'm going to page through the pages.  This consists of

12   four pages typed plus a photo of you?

13   A    Yes.

14   Q    And your signature is at the end?

15   A    Yes.

16   Q    Have you had the opportunity since the date you signed

17   this declaration to review it for accuracy?

18   A    Yes.

19   Q    And does everything you say in the declaration remain

20   true?

21   A    Yes.

22        MS. STEFFAN:  I would move for admission of

23   Plaintiffs' Exhibit 21.

24        THE COURT:  It's received in evidence.

25        MS. STEFFAN:  That is all my questions, Your Honor.
```

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 12 of 333 PageID #:
4120
Alison Dreith Cross-examination                              Volume 1

12

1          THE COURT:  Cross-examination.

2                      CROSS-EXAMINATION

3  BY MR. RELYS:

4  Q     Good morning, Ms. Dreith.

5  A     Good morning.

6  Q     So you have -- the incident you just described occurred

7  on September 15th; correct?

8  A     Yes.

9  Q     And you've protested since that day?

10  A     Yes.

11  Q     How many times?

12  A     One, two -- three.

13  Q     Three.  You sound like maybe you're not sure.

14  A     I'm pretty positive it was three.  The September 15th was

15  a Friday.  That Sunday, on the 17th, I went out with my

16  husband.  The morning, Monday morning, of the 18th and the day

17  of the Busch Stadium protest.

18  Q     So at least three other times, you've protested since

19  this incident?

20  A     Correct.

21  Q     Okay.  And where exactly were you standing when you say

22  you were maced?

23  A     On Tucker.

24  Q     On Tucker.  Do you know about where on Tucker?  Could you

25  describe for us?

1   A    Near the intersection of Clark.

2   Q    Okay.  I'm going to put a map up for you.  I think you

3   can draw on the screen.  Can you test that for me?

4        THE COURT:  If you touch it with your finger, it

5   should work.

6   Q    (By Mr. Relys) This is the intersection of Clark and

7   Tucker.  I know it's a little bit small, but could you put a

8   little X on there for us as to where, like indicating where it

9   was when you got -- where you got maced?

10  A    Umm, could you just scroll out a little so I could see --

11  Q    Sure.

12  A    -- where City Hall is located?

13  Q    Yeah.

14  A    Is that the long yellow building?

15  Q    I'm sorry?  Yeah, along Tucker there.

16       Okay.  Thank you.

17       And you say that you witnessed a woman get maced?

18  A    Yes.

19  Q    And that was shortly before you got maced?

20  A    Yes.

21  Q    What was she doing when she got maced?  Do you know?

22  A    I have no idea.

23  Q    She was blocking the bus in with some of the protestors,

24  wasn't she?

25  A    I don't know.

1    Q    You weren't aware of that?

2    A    No.

3    Q    And you say you went -- you didn't see any -- any acts of

4    violence?

5    A    No, I did not.

6    Q    You didn't see anybody throw any bottles or rocks at the

7    police?

8    A    No.

9    Q    Did you hear the police give any commands?

10   A    No.

11   Q    No "Move back" or anything like that?

12   A    No.

13   Q    Nothing at all?

14   A    No.

15   Q    But the scene was chaotic, wasn't it?

16   A    Not until I saw somebody get maced.

17   Q    There were police.  They were using their bikes as -- to

18   move people around; right?

19   A    Correct.

20   Q    And you actually remarked about the number of police that

21   were there; correct?

22   A    Correct.

23   Q    All right.  And no one gave you any commands before you

24   were maced?

25   A    No.

1        MR. RELYS:  All right.  I have no further questions.

2        THE COURT:  Any redirect?

3        MS. STEFFAN:  Just a few questions.

4                    REDIRECT EXAMINATION

5  BY MS. STEFFAN:

6  Q    Ms. Dreith, have you skipped any protests as a result of

7  the spraying?

8  A    Yes.

9        MS. STEFFAN:  That's all I have, Your Honor.

10       THE COURT:  All right.  You may step down.

11       You may call your next witness.

12       MR. ROTHERT:  Plaintiffs' next witness will be

13  Maleeha Ahmad.

14       THE COURT:  Step right up here to the clerk to be

15  sworn.

16       Oh, the Plaintiffs can stay in the courtroom.  Yeah,

17  if they're parties, they're allowed to stay in.

18       Ms. Ahmad, would you step over here to the clerk to

19  be sworn?

20                    **MALEEHA AHMAD**,

21  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

22  FOLLOWS:

23                    DIRECT EXAMINATION

24  BY MR. ROTHERT:

25  Q    Good morning, Ms. Ahmad.

1    A     Good morning.

2    Q     Could you state your name for the record, please?

3    A     My name is Maleeha Ahmad.

4    Q     And you live in St. Louis?

5    A     Yes.

6    Q     How long have you lived here?

7    A     Three years.

8    Q     Directing your attention to September 15th, 2017, did you

9    have occasion to go to downtown St. Louis?

10   A     Yes.

11   Q     What was the reason you went downtown on September 15th?

12   A     To protest the Jason Stockley verdict and police

13   brutality.

14   Q     Why did you feel the need to go down and protest on

15   September 15th?

16   A     I did not think that the verdict was in accordance to the

17   justice system, proper justice system, and justice wasn't

18   served.

19   Q     Do you know approximately what time you arrived?

20   A     Around 12ish.

21   Q     12 noon?

22   A     12 noon.  Yes.  Sorry.  Uh-huh.

23   Q     When you arrived, was traffic flowing normally or had

24   streets been closed by the police?

25   A     Streets had been closed by the police.

Case: 4:18-cv-00308-JCH  Doc. #:_126-3  Filed: 01/30/20  Page: 17 of 333 PageID #:
1234
Maleeha Ahmad Direct Examination                        Volume 1

17

1    Q    Did there come a time that afternoon on September 15th,

2    2017, where you stood with others, linking arms on Tucker

3    Boulevard between Spruce and Clark Streets?

4    A    Yes.

5    Q    Was that street still closed at that time?

6    A    Yes.

7    Q    Was there a bus of police officers behind you?

8    A    Yes.

9    Q    Was the bus trapped by -- by the line you were with?

10   A    Not by the line I was with.

11   Q    How many people were you with?  Do you --

12   A    Umm --

13   Q    That you assembled with there.

14   A    Two, three on either side of me.

15   Q    Did there come a time when a line of police officers

16   approached you?

17   A    Yes.

18   Q    Were these regular police officers or --

19   A    Bicycle officers, yes.

20   Q    Bicycle officers.  Okay.  And how do you know they were

21   bicycle officers?

22   A    They were -- they had their bicycles with them.  They had

23   their helmets on.

24   Q    Okay.  Were they riding their bicycles?

25   A    No.  They were standing.  They were -- they had their

Maleeha Ahmad Direct Examination                      Volume 1

18

1    bicycles to -- to their side.

2    Q    Okay.  Prior to those officers reaching you, were you

3    ever told to move?

4    A    No.

5    Q    Were you ever asked to move?

6    A    No.

7    Q    What happened when they reached you?

8    A    About -- when they were about a foot away, they said,

9    "Get out of our way.  Get out of the way."  And then -- yeah,

10   and then --

11   Q    Okay.

12   A    And then after that, they maced us without any warning.

13   Q    Okay.  Did you have time to get out of the way after they

14   said, "Get out of the way"?

15   A    No.

16   Q    How much time do you believe passed between when you were

17   told to get out of the way and when you were sprayed with --

18   with some kind of mace or chemical spray?

19   A    Maybe five, 10 seconds.

20   Q    Had there been any order to disperse that you had heard?

21   A    No.

22   Q    Had there been any warning that chemical agents might be

23   used?

24   A    No.

25   Q    How did that feel -- being sprayed?

1    A    It burns like hell.  It is very excruciating pain.  You

2    can't see.  You can't breathe.  And you think the world is

3    ending.

4    Q    On the screen next to you, if you would look at what's

5    been previously -- what's been marked as Plaintiffs' Exhibit

6    1 --

7           THE COURT:  Can you clear the mark there that's

8    there?

9           MR. ROTHERT:  Yes.

10          THE COURT:  Carol, can you help him clear it?

11          MR. ROTHERT:  Thank you.

12   Q    (By Mr. Rothert) What's this a photograph of?

13   A    A photograph of me after I had been maced and been given

14   Milk of Magnesia by the protestors.

15   Q    Why were you given Milk of Magnesia?

16   A    To counteract the mace and the -- to counteract the burn

17   of the mace.

18   Q    Okay.  And did it help?

19   A    Yeah, somewhat.  Not -- it didn't cure, but it helped.

20   It reduced the burn probably by like 20 percent.

21   Q    Is -- is this Plaintiffs' Exhibit 1 that's on the

22   screen -- is that a true and accurate picture of what you saw

23   when you were looking in the mirror after being sprayed in the

24   face with chemicals on September 15th or 17th?

25   A    Yes.

Maleeha Ahmad Direct Examination                         Volume 1

                                                                      20

1            MR. ROTHERT:  I'd move for admission of Plaintiffs'

2   Exhibit 1.

3            THE COURT:  Exhibit 1 is received into evidence.

4   Q    (By Mr. Rothert) Were you arrested on September 15th,

5   2017?

6   A    No.

7   Q    Were you -- we talked about that police bus.  Were you at

8   any time holding onto a bike rack attached to that bus?

9   A    No.

10  Q    And you were not warned that you would be maced?

11  A    No.

12  Q    Were you throwing anything, any objects at the bus?

13  A    No one in our assembly, no.

14  Q    Okay.  You weren't personally?

15  A    No, I wasn't.

16  Q    Was any of the people you were assembled with?

17  A    Not -- no, none I was assembled with.

18  Q    Okay.

19           THE COURT:  I don't quite know what that means.

20           THE WITNESS:  Anyone that I was right beside.  We

21  weren't throwing anything.

22           THE COURT:  How many people were there?

23           THE WITNESS:  Like on either side of me, about like

24  three.

25           THE COURT:  But there were other people around?

Maleeha Ahmad Direct Examination                              Volume 1

21

1           THE WITNESS:  I'm not sure.  I couldn't see behind

2   me.  I was right in the front of the bus.

3           THE COURT:  So it was just seven people standing

4   there and nobody else in the area?  Is that your testimony?

5           THE WITNESS:  Nobody else right directly in front of

6   the bus.  Yes, ma'am.

7           THE COURT:  Okay.  But there were other people around

8   there, right, or not?

9           THE WITNESS:  Not that I could see --

10          THE COURT:  Okay.

11          THE WITNESS:  -- because I'm standing -- I'm standing

12  in front.  I had my arms linked, and I wasn't like turning.

13          THE COURT:  Well, so --

14          THE WITNESS:  Does that make sense?

15          THE COURT:  Yeah, but I'm just trying to understand

16  because the evidence I'd heard or what was in the motions

17  indicated there were a lot of people there, and what you're

18  saying is, no, it was just seven people standing by themselves

19  out in the middle of the street and there was nobody else

20  around.

21          THE WITNESS:  No.  There were other --

22          THE COURT:  And I don't think that's what you mean.

23          THE WITNESS:  No, no, no, ma'am.  No.  There were

24  other protestors around --

25          THE COURT:  Right.

1         THE WITNESS:  -- but not -- not that I was with.

2         THE COURT:  So that's what I'm -- so what you're

3    trying to say is none of those seven people that you were

4    linked arms with threw anything?

5         THE WITNESS:  Yes, ma'am.

6         THE COURT:  But you're not saying anything about

7    anybody else?

8         THE WITNESS:  Yes, ma'am.

9         THE COURT:  Okay.  That's what I was trying to just

10   clarify as to who did not throw anything.

11   Q    (By Mr. Rothert) And just to clarify further, you could

12   not see behind the bus?

13   A    No.

14   Q    All right.

15        THE COURT:  Which direction -- so the bus was on

16   Clark?

17        THE WITNESS:  It was facing -- it was on Tucker --

18        THE COURT:  It was on Tucker.  Okay.

19        THE WITNESS:  -- facing north.

20        THE COURT:  Coming from -- yeah, so coming --

21        THE WITNESS:  In between Clark and Spruce.

22        THE COURT:  Okay.  Thank you.  And you were in front

23   of the bus?

24        THE WITNESS:  Yes, ma'am.

25   Q    (By Mr. Rothert) Okay.  The bus was parked when you stood

Maleeha Ahmad Direct Examination                          Volume 1

23

1   in front of it; is that correct?

2   A     Yes.

3   Q     All right.  Prior to September 15th, 2017, had you

4   previously experienced being sprayed with chemical agents by

5   the police while you were protesting police misconduct in the

6   city of St. Louis?

7   A     Yes.

8   Q     When did that happen?

9   A     2014.

10  Q     Okay.  Do you know what time of year it was?

11  A     November, I think.  October, November.  I'm sorry.  I

12  blocked that part out.

13  Q     Where did that happen?

14  A     It happened Tower Grove on Arsenal.

15  Q     What happened?

16  A     Tear gas.

17  Q     What happened at that location?

18  A     We were tear-gassed.  I was on the sidewalk.  I wasn't

19  even on the street, and we were tear-gassed without any

20  warning, and my back was turned.  There were protestors in the

21  line of police, and there was no order of dispersal, no order

22  of -- that I heard, and nothing of -- no warning of using the

23  tear gas.

24  Q     Has your experience on September 15th, 2017, about which

25  you've testified -- has that changed how or whether you're

1   participating in protest activity?

2   A     Yes.

3   Q     How has it changed it?

4   A     My therapist has recommended that I don't go to any more

5   protests until I've fully processed this.

6   Q     And is that advice you've been following?

7   A     Yes.  I went to one protest in the morning, on Monday

8   after.  It was a 7:00 a.m. protest.  And then I went to one

9   protest that Sunday, the 17th, but I only stayed for half an

10  hour because this was right before.  I only stayed -- I've

11  stayed for very little because the sixth sense inside me said

12  something was about to go wrong.

13  Q     Okay.  And have you -- have you cut back on protesting as

14  a result of what happened?

15  A     Yes, yes.

16  Q     I'm now going to put on the ELMO here what's been marked

17  as Plaintiffs' Exhibit 20.  Do you recognize this document?

18  A     Yes.

19  Q     Okay.  Is this a declaration you signed earlier in this

20  case?

21  A     Yes.

22  Q     And that's your signature on the fourth page, your

23  electronic signature?

24  A     Yes.

25  Q     And, hmm, that's not a very good version, but is that the

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 25 of 333 PageID #: 4142
Maleeha Ahmad Cross-examination                          Volume 1

25

1    picture that we showed that was Plaintiffs' Exhibit 1 that's

2    attached?

3    A    Yes.  That's the girl that's sitting beside me in the

4    picture.

5    Q    Have you had an opportunity in recent days to review

6    everything in Plaintiffs' Exhibit 20?

7    A    Yes.

8    Q    And has it remained true?

9    A    Yes.

10           MR. ROTHERT:  We move for admission of Plaintiffs'

11   Exhibit 20.

12           THE COURT:  Exhibit 20 is received into evidence.

13           MR. ROTHERT:  I have no further questions of this

14   witness.

15           THE COURT:  All right.  Cross-examination.

16                        CROSS-EXAMINATION

17   BY MR. RELYS:

18   Q    Good morning, Ms. Ahmad.

19   A    Good morning.

20   Q    So you say that when you were pepper sprayed you were

21   linking arms and standing in front of a bus?

22   A    Yes.

23   Q    All right.  And you were trying to block that bus,

24   weren't you?

25   A    The bus could have gone back from my knowledge, and the

1   police could have gone into the Police Academy.

2   Q     You were trying to block the bus?

3   A     From going forward into the other protestors, yes.

4   Q     Okay.  And in fact, you don't know if the bus could have

5   gone backward because you couldn't see behind the bus, you

6   told us?

7   A     Yes.

8   Q     And you were linking arms with several people in front of

9   that bus?

10  A     Yes.

11  Q     And you saw the police coming towards you before you were

12  pepper sprayed; correct?

13  A     Yes.

14  Q     Did you know what they wanted?  Why were they coming?

15  A     There were a lot of police there.

16  Q     Okay.  Did you assume that the police were okay with you

17  blocking the bus?

18  A     I'm not sure.

19  Q     You thought that maybe they might be okay with you

20  blocking the bus?

21  A     No.

22  Q     You didn't think that?

23  A     No.  I'm saying no, I didn't think that they'd be okay.

24  Q     Okay.  You understood that the police didn't want you to

25  block the bus?

Maleeha Ahmad Cross-examination                                    Volume 1

27

1    A    Yes.

2    Q    And you've actually been to two more protests since this

3    event; correct?

4    A    Yes.

5    Q    And then your therapist told you you shouldn't go to any

6    more protests?

7    A    After -- after going to those two, yes.

8    Q    Okay.  And the reason is because having been pepper

9    sprayed it was a traumatic event for you?

10   A    Developing PTSD, yes.

11   Q    Okay.  But you've been tear-gassed, tear-gassed before,

12   you told us?

13   A    Yes.

14   Q    A couple years ago?

15   A    Yes.

16   Q    And you've been going to protests in the intervening time

17   period?

18   A    Yes.

19   Q    But this event that occurred on September 15th was too

20   much for you?

21   A    Both events were too much for me.

22   Q    But you went to protest in between the tear-gassing

23   incident and the incident on September 15th?

24   A    Not Black Lives Matter, police brutality protests.

25   Q    Okay.  What kind of protests?

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 28 of 333 PageID #:
1145
Maleeha Ahmad Redirect Examination                    Volume 1

28

1   A    Women's March.  I don't keep track of all the marches

2   that I go to.  I'm sorry.

3   Q    How many protests do you think you went to?

4   A    I'm not sure.  I can't say with any truthful count.

5   Q    Ten, 20?

6   A    Five, 10 maybe, if even five.

7   Q    Okay.  And you actually -- you did go to two, though,

8   after this incident that we've discussed earlier?

9   A    Yes.

10           MR. RELYS:  I have nothing further at this time.

11           THE COURT:  Redirect.

12                      REDIRECT EXAMINATION

13  BY MR. ROTHERT:

14  Q    You mentioned you went to some other protests that did

15  not involve Black Lives Matter, police brutality.

16  A    Uh-huh.

17  Q    In your experience in the city of St. Louis, is police

18  behavior different at those protests?

19  A    Yes.

20  Q    How is it different?

21  A    There's not riot police showing up when there's peaceful

22  protesting without any --

23  Q    Were only you sprayed, or was everyone that was standing

24  on your line sprayed?

25  A    I'm not sure, but there were other people that were

1    sprayed beside me.  I don't know if everyone was or not.

2    Q    Okay.  And when you -- do you believe that if you were to

3    engage in civil disobedience -- do you know what civil

4    disobedience is?

5    A    If you could explain it to me please.

6    Q    Have you heard of it before?

7    A    I have heard of it.

8    Q    What's your understanding of civil disobedience?

9    A    Disobeying civil law.  I don't -- I'm just going from --

10   Q    Right.

11   A    -- news and --

12   Q    Did you have any reason to believe that you would be

13   pepper sprayed on September 15th, 2017, based on what you were

14   doing and what commands you had been given?

15   A    No.

16            MR. ROTHERT:  No further questions.

17            MR. RELYS:  Just briefly, Judge.

18            THE COURT:  You may.

19                      RECROSS-EXAMINATION

20   BY MR. RELYS:

21   Q    You said that this protest was different than the

22   protests you'd been to since the tear gas incident?

23   A    Yes.

24   Q    Because they were not -- there were riot police here?

25   A    Uh-huh.

Maleeha Ahmad Recross-examination                          Volume 1

30

1    Q    And police with the bicycles trying to move people

2    around?

3    A    Assaulting them with the bicycles, yes.

4    Q    Okay.  But none of that happened at the other protests?

5    A    No.

6    Q    Did you try to block a bus at any of the other protests?

7    A    I'm not sure if anyone else did, but I did not.

8    Q    Okay.  So you've been to five or 10 protests since the

9    tear gas incident, you said, and at none of those protests

10   were there any incidents that were traumatic for you?

11   A    If you can define -- they were still traumatic for me.  I

12   almost break down at every single protest since after the

13   protest in 2014.

14   Q    Just the mere presence of police?

15   A    Yes.

16   Q    But no riot police?

17   A    The mere presence of police scare me.

18   Q    No riot police during those protests?

19   A    No.

20   Q    No macing that you witnessed?

21   A    No.

22        MR. RELYS:  Nothing further.

23        THE COURT:  You may step down.

24        THE WITNESS:  Thank you.

25        THE COURT:  You may call your next witness.

1          MR. ROTHERT:  Plaintiffs' next witness is Dana

2    Kelly-Franks.

3          MR. RELYS:  I'm sorry.  Who'd you call?

4          MR. ROTHERT:  Dana Kelly-Franks.

5          THE COURT:  Ma'am, would you step right over here to

6    the clerk to be sworn?

7                          **DANA KELLY-FRANKS**,

8    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

9    FOLLOWS:

10                        DIRECT EXAMINATION

11   BY MR. ROTHERT:

12   Q    Good morning, Mrs. Kelly-Franks.

13   A    Good morning.

14   Q    Could you state your name for the record, please?

15   A    Dana Franks.

16   Q    Are you also --

17   A    Kelly-Franks.

18         THE COURT:  Well, what do you call yourself?

19         THE WITNESS:  Dana Kelly-Franks.  I apologize.

20         THE COURT:  Well, actually, I mean, twice you said --

21   whatever it is, it's your name.

22         THE WITNESS:  Right.

23         THE COURT:  You tell us.  What do you want to be

24   called?

25         THE WITNESS:  It is hyphenated.

1           THE COURT:  Okay.

2           THE WITNESS:  It's Dana Kelly-Franks.

3           THE COURT:  Okay.  Thank you.  Yeah.  I mean it's

4    fine with us whatever it is.  So I just need to know.

5           MR. ROTHERT:  Just need to pick one.  Right.

6           THE COURT:  Yeah, that's right.

7    Q    (By Mr. Rothert) Okay.  Ms. Kelly-Franks, I wanted to

8    direct your attention to September 15th, 2017.  Did you have

9    occasion to go to downtown St. Louis on that date?

10   A    Yes, I did.

11   Q    And you live in St. Louis?

12   A    Yes, I do.

13   Q    Have you lived in the St. Louis area your whole life?

14   A    My whole life, yeah.

15   Q    And how old are you?

16   A    How old am I?

17   Q    Yes.

18   A    39.

19   Q    What's the reason -- what's the reason you went to

20   downtown St. Louis on September 15th, 2017?

21   A    I was protesting.

22   Q    Okay.  Why did you feel the need to be present at that

23   protest?

24   A    I'm a mother.  I have a -- I have two sons and a husband

25   who looks just as young as our sons on a good day.  My whole

Dana Kelly-Franks Direct Examination                    Volume 1

33

1    adult life since I could pay attention, I've seen boys that

2    look like my son and my husband as -- excuse me.  I'm sorry.

3    My entire life I've seen boys the same age as my son and

4    that -- my sons and that look like my husband as being

5    victimized, and -- and I speak to mothers who look like me,

6    and they turn to me, and I listen to their stories, and I hold

7    them, and they are hurt, and often, I come home and I'm

8    broken, but I get to -- I get to see my -- you know, so . . .

9    I'm sorry.  Excuse me.

10            THE COURT:  There are tissues there.  That's okay.

11   A    I -- I'm often with mothers my age and some even younger

12   who have lost their sons to a Stockley and --

13   Q    (By Mr. Rothert) Now, when you say that -- when you're

14   talking about people who look like your husband and your sons,

15   what do you mean?  Look like them in what way?

16   A    Young black men.

17   Q    And when you say "to a Stockley," what do you mean?

18   A    I believe -- I know there are some good ones.  I believe

19   there are more good than bad.  I do.  But the bad ones -- the

20   bad ones do so much harm.  They do so much damage in our small

21   area.  It just overshadows everything.  They've taken so much.

22   Q    And when you're referring to -- you're referring to

23   police officers; is that correct?

24   A    Yes.

25   Q    St. Louis police officers?

Dana Kelly-Franks Direct Examination                         Volume 1

34

1    A      The bad police officers have taken so much from us, and

2    sitting there, they don't have to sit with those mothers and

3    fathers.  They don't have to sit with my sons when they lose

4    their friends.  They don't have to return home broken.  They

5    don't care.  To me, they don't care what they've done to them.

6    The bad ones.

7    Q      So you went down to -- to protest the bad ones?

8    A      Yes, that's what I'm protesting.

9    Q      Approximately what time did you arrive?  Do you know?

10   A      I arrived closer to around maybe 2:40, maybe 3:00.

11   Q      And when you arrived, how many people do you estimate

12   were there?

13   A      Oh, my gosh, I believe there were probably three, three

14   hundred fifty people.

15   Q      Does that include the police?

16   A      No, no.  I think there were maybe 150 police officers.

17   Maybe a little less.

18   Q      And were the people who were assembled there -- were

19   they -- were any of them upset?

20   A      Yeah.  Yes.  I would say more passionate than upset.

21   Especially when I first arrived, everyone -- just like I said,

22   there was just a lot of passion more than anger and just

23   unification more than anger.  Not anger.

24          THE COURT:  Can you tell me where this was more

25   specifically?

Dana Kelly-Franks Direct Examination                    Volume 1

35

1           THE WITNESS:  When we first arrived?  Because he

2    asked me when I got there.

3           THE COURT:  Yeah, when you first got there.

4           THE WITNESS:  It was around the Lumière when I first

5    arrived.

6           THE COURT:  Okay.  Thank you.

7    Q    (By Mr. Rothert) And -- and what were people doing when

8    you arrived?

9    A    Just -- just marching and chanting.

10   Q    Did you participate in that marching and chanting?

11   A    Yes.

12   Q    Did there come a time when you saw someone do something

13   other than just simply protesting?

14   A    Yes.

15   Q    Okay.  What did you see?

16   A    They -- well, there was a time where we stopped, which --

17   there was a time where we stopped, and we were all just

18   talking, and then I saw a young lady with her child get on the

19   truck, a police truck.

20   Q    So she jumped up on a police truck?

21   A    Yes, she was jumping up and down on the police truck.

22   Q    Okay.  And then what happened to her?

23   A    They -- they immediately got her down.  They got her and

24   the child down, and that was -- that was it for that part.

25   Q    Then what was the police response after that?

Dana Kelly-Franks Direct Examination                    Volume 1

36

1   A    Oh, well, everyone had kind of gathered around that area,

2   but nothing was really going on, but the police -- around that

3   time, that's when you started kind of hearing the boots.  Just

4   the -- the big -- the boots started hitting the ground, and

5   they started forming like a square, and once you -- once I

6   started hearing the boots, I really just started concentrating

7   on getting the kids out because it felt like a really bad

8   situation, and I started screaming, like "Move the kids.  Move

9   the kids."  And my friends who were there, they helped me get

10  the kids out of the way.  They started screaming with me,

11  "Move the kids.  Move the kids."  And so we started getting

12  all the little ones, four feet and under -- I mean, I think we

13  even pushed some adults that weren't -- you know, they were

14  four feet and under, so we pushed them out of the way.

15  Q    Okay.

16  A    But we just started moving the kids, and they started

17  forming this square.

18  Q    The police started forming a square?

19  A    Yes.  Their boots -- it's just so hard to get their boots

20  hitting the ground out of your head, you know, because it was

21  like something really bad.  It's like a scary movie is about

22  to happen.  And so, yeah, the police boots.  And they started

23  forming this square, and we were moving the kids, and I saw

24  people trapped in that square.

25  Q    Now, when you said something scary was happening, is this

1   the protestors were doing something scary?

2   A    No, no, no.  It was the police.

3   Q    Okay.  And the people who were caught in the square --

4   had they done anything wrong that you'd seen?

5   A    No.  It was completely random.  It was completely random.

6   Q    So when you saw this happen and you were trying to get --

7   what do you mean by kids?  Like what age?

8   A    Oh, well, they -- like I said, they were less than four

9   feet tall.  I would say ages -- anything -- if they looked or

10  were recognized as children to me --

11  Q    Okay.

12  A    -- I was just pushing them out of the way.  I -- the last

13  kids that I was pushing out of the way were about 10 -- I

14  think they were 10 and six.

15  Q    Okay.  So where did you -- where did you push them?

16  Where did you --

17  A    So we had kids lined up from the entryway to the City

18  Hall on the Clark side down to Tucker.  They were lined up.

19  Q    And that's St. Louis City Hall?

20  A    Yes.

21  Q    At Clark and Tucker?

22  A    At Clark and Tucker, yes.

23  Q    Okay.  Why?  Why did you feel the need to get the kids

24  out?

25  A    Well, I felt something bad happening.  Like those boots,

Dana Kelly-Franks Direct Examination                    Volume 1

38

1   I can't -- like I said, I can't even get them out of my head,

2   just thinking about it now.  And when I saw those people

3   trapped in the middle of them and then their shields go up and

4   they were formed, like they made this formation, it was

5   just -- it was scary.  And honestly, I didn't think that the

6   kids should have been there to see what was about to happen

7   because it looked like something was about to happen.  It felt

8   as if something was about to happen.

9   Q    Once you got the kids into the City Hall, was it the

10  parking lot area?

11  A    No.  It was right outside the gate.  It was right outside

12  the gate.

13  Q    Right outside the gate?

14  A    Uh-huh.

15  Q    The sidewalk between --

16  A    The sidewalk between the gate and the street and all

17  that.

18       THE COURT:  We're talking the west side of Tucker.

19  So towards the county; right?

20       THE WITNESS:  No, no.

21       MR. ROTHERT:  On Clark.

22       THE COURT:  I mean you're on Clark.

23       THE WITNESS:  I'm on Clark.

24       THE COURT:  But Clark and Tucker is an intersection.

25       THE WITNESS:  Uh-huh.

Dana Kelly-Franks Direct Examination                    Volume 1

39

1            THE COURT:  So I'm trying to figure out which part.

2    If you're on Clark, are you on like here where the courthouse

3    side is --

4            THE WITNESS:  I'm on Clark.

5            THE COURT:  -- or are you on the other side of

6    Tucker?

7            THE WITNESS:  I'm on the Clark side.

8            THE COURT:  I know, but of the main street, Tucker,

9    where the City Hall faces, which side of that street?  Which

10   part of Clark were you on?  In other words, were you on the

11   part of Clark that's on the courthouse side or on the part of

12   Clark that's on the highway entrance side?

13           THE WITNESS:  Oh, okay.

14           THE COURT:  You know what I'm saying?

15           THE WITNESS:  Right.  I'm on this side where Tucker

16   is.

17           THE COURT:  Okay.  And where City Hall is?

18           THE WITNESS:  Where City Hall is.  Correct.

19           THE COURT:  Okay.  Okay.  I got you.  Okay.

20   Q    (By Mr. Rothert) When you -- did you turn and leave those

21   kids behind?

22   A    Yes.

23   Q    Okay.  What happened when you turned?

24   A    When I -- when I finally thought I kind of got them out

25   of the way, the moment I turned around is when an officer was

Dana Kelly-Franks Direct Examination                    Volume 1

40

```
1   there with his shield and it hit me, and I was maced almost

2   simultaneously.

3   Q    And you were on the sidewalk at Clark when this happened?

4   A    Right.  I hadn't exited the sidewalk yet.

5   Q    Was there any warning that --

6   A    No, none at all.

7   Q    Okay.  Any warning that you would be sprayed?

8   A    None.  I wasn't doing anything.

9   Q    Was it just you that was sprayed, or was the whole -- the

10  crowd --

11  A    I believe there were some other people, but I wasn't -- I

12  couldn't see at that point.  I couldn't see at that point.  I

13  heard screaming.  I was on the ground, and I was trampled

14  over.

15  Q    Do you -- you were -- how did you wind up on the ground?

16  A    I was knocked to the ground and maced.

17  Q    Okay.  The police officer also knocked you over?

18  A    The police officer knocked me over initially.  I was

19  trampled because everyone started running.  You could hear the

20  screaming, and just I didn't --

21  Q    Do you know approximately what time this was on

22  September 15th?

23  A    I'm not sure of the time.  I know that it was after 5:30

24  but before 7:00 maybe.

25  Q    Okay.  How did it feel to be sprayed with that chemical
```

Dana Kelly-Franks Direct Examination                    Volume 1

41

1   spray?

2   A    It was painful.  It was -- it just -- it burned.  It

3   burned like hell, and I couldn't breathe.  I couldn't breathe,

4   but I couldn't -- I felt like I couldn't breathe.  My chest

5   hurt, but I was hyperventilating at the same time.  It's --

6   it's -- I don't know.  It's just -- it was -- it was scary as

7   hell.

8   Q    How long did that burning last?

9   A    For -- for days.  You take a shower, and the burning kind

10  of comes back.  But for days behind my eyeballs.  Like I had a

11  headache for days.

12  Q    Had you ever been sprayed with chemical spray like

13  this --

14  A    Yes.

15  Q    -- before in your life?

16  A    Yes, I have.

17  Q    Okay.  When did that happen?

18  A    I was -- I took public safety back in high school, and we

19  got to do like a ride-along, and the police officer came in,

20  and he had his belt, and he was showing us, but one of -- one

21  of the kids was -- they played with the mace, and he maced me

22  in my face accidentally.  He wasn't supposed to be doing that,

23  but he hit me.

24  Q    How long ago was that?

25  A    It was like '95.  I think '94, '95.

Dana Kelly-Franks   Direct Examination                    Volume 1

42

1    Q    Did -- was that the same?  The feeling that you got from

2    the mace in '94 or '95, was that similar?

3    A    No, not at all.  No.  This was much more painful.  I

4    don't -- I don't remember feeling it for days later, like

5    days, days later.  No, not at all.  As a matter of fact, I was

6    fine later that day.

7    Q    Now, what do you -- do you know -- you've had some time

8    to think about this, September 15th.  What do you think you

9    could have done differently to avoid being sprayed with a

10   chemical agent on September 15th?

11           MR. MCDONNELL:  Objection, Your Honor.  It calls for

12   speculation.

13           THE COURT:  Overruled.

14   A    There was nothing I could have done.

15   Q    (By Mr. Rothert) Was there any announcement before you

16   were sprayed?

17   A    None.

18   Q    Were you arrested?

19   A    No.

20   Q    Were you committing any crime?

21   A    No, I wasn't.

22   Q    Have you been back to participate in or observe protests

23   since September 15th?

24   A    No, I haven't.

25   Q    Well, why not?

Dana Kelly-Franks Direct Examination                    Volume 1

43

1    A    I want to -- well, I have kids and -- I have kids and I

2    want to -- I have the responsibility to return home to them.

3    As much as I need to be there for and fight for what I believe

4    is right, I do have to return home to them as well.

5    Q    Does the choice whether or not to attend protests or

6    observe protests or participate in protests -- does that cause

7    any kind of dilemma for you?

8    A    Yes, a huge dilemma.  Big-time.

9    Q    What's the dilemma?

10   A    Because I feel I have a responsibility to the people that

11   I care about and I do feel that I am -- I am not giving them

12   everything I could be giving them because I do have to also be

13   a mother to my children.

14   Q    On the screen next to you, I'm going to put up what's

15   been previously marked as Plaintiffs' Exhibit 34.  Can you see

16   that there?

17   A    Yes.

18   Q    Okay.  Does this look familiar to you?  Have you seen

19   this before?

20   A    Yes.

21   Q    It's a two-page declaration; is that right?

22   A    Yes.

23   Q    Okay.  Is that your signature at the end?

24   A    Yes.

25   Q    Have you had an opportunity recently to review this

1    declaration for accuracy?

2    A    No, I haven't been able to look at it since we -- I've

3    been busy.  I'm sorry.

4    Q    Okay.  When you signed -- you did sign this declaration?

5    A    Yes, I did.

6    Q    And when you signed it, was it -- everything in there

7    true?

8    A    Yes.

9              MR. ROTHERT:  Okay.  I'd move for admission of

10   Plaintiffs' Exhibit 34.

11             THE COURT:  Exhibit 34 is received into evidence.

12             MR. ROTHERT:  And I have no further questions.

13             THE COURT:  Cross-examination.

14                        CROSS-EXAMINATION

15   BY MR. MCDONNELL:

16   Q    Good morning, ma'am.

17   A    Good morning.

18   Q    Ma'am, you're married to Bruce Franks?

19   A    Yes.

20   Q    He's your husband?

21   A    Yes.

22   Q    He's heavily involved in all of the protests going back

23   from Ferguson to today?

24   A    Yes, he is.

25   Q    Ma'am, and I see where you're running for License

Dana Kelly-Franks Cross-examination                    Volume 1

45

1    Collector of the City of St. Louis; is that correct?

2    A    Yes, I am.

3    Q    Okay.  When you were downtown and saw the people jumping

4    on the police car, did you hear the police give a warning to

5    get off, to leave?

6    A    I didn't hear them to get off of the car.  I did see them

7    getting them down though.  I didn't hear them tell them to get

8    down and get off or nothing like that, no.

9    Q    Did you see any other acts of violence around those

10   police vehicles that were getting jumped on?

11   A    Other than the girl jumping on the --

12   Q    Yes.

13   A    No, I didn't.

14   Q    Did you see anybody throwing anything?

15   A    Yes.  There was -- I'm sorry.  There were some bottled

16   waters being thrown at the girl on the police car.

17   Q    And were these bottles of water -- were they the kind

18   that were like half frozen, half water, or couldn't you tell?

19   A    I couldn't tell.

20   Q    Did you see anybody break any windows of these police

21   vehicles when they were jumping on them?

22   A    I didn't -- I can't say that I saw that when I was there,

23   no.

24   Q    Ma'am, when you said you were maced, what were you doing?

25   A    I was moving the kids.  I got the kids to the curb and

1    closest to the gate as possible, and I stepped back and just

2    turned around.  I wasn't -- I wasn't doing anything.

3    Q    How many kids were with you?

4    A    It was just the two kids.  They weren't my kids.  I was

5    looking for whoever their parent was.

6    Q    Okay.  And you didn't hear any police officer say, "Get

7    back.  Leave the scene"?  Anything like that?  That this

8    officer just came out of the blue and maced you in the face?

9    A    And hit me with his shield.

10   Q    Your husband still protesting?

11   A    Yes.

12   Q    But you're claiming you're not?

13   A    I'm not -- I'm not claiming that I'm not.  I'm claiming

14   that -- I said that I would probably be out there if I were --

15   if I could be.

16   Q    And other than the jumping on the vehicles, the throwing

17   of bottles, did you see any other acts of violence by people

18   in the crowd?

19   A    No.

20   Q    And it was chaotic when people were jumping on the

21   vehicle; correct?

22   A    It was not chaotic when people were jumping on the

23   vehicle, no.

24           MR. MCDONNELL:  No further questions.

25           THE COURT:  Redirect?

1          MR. ROTHERT:  No.

2          THE COURT:  You may step down.

3          THE WITNESS:  Thank you.

4          THE COURT:  You may call your next witness.

5          MR. ROTHERT:  Next witness for Plaintiffs is Sarah

6    Molina.

7          THE COURT:  Ms. Molina, would you step right over

8    here to the clerk to be sworn?

9                          **SARAH MOLINA**,

10   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

11   FOLLOWS:

12                        DIRECT EXAMINATION

13   BY MS. STEFFAN:

14   Q    Good morning, Ms. Molina.  Could you please state your

15   name for the record?

16   A    Sarah Molina, M-O-L-I-N-A.

17   Q    And directing your attention to September 15th, 2017, did

18   you have occasion to go downtown in St. Louis on that day?

19   A    Yes.  I went to the intersection of Clark and Tucker in

20   the afternoon.

21   Q    And why did you go there?

22   A    I -- so I feel like right now we're experiencing the

23   civil rights movement of my lifetime, and I was upset about

24   the verdict in the Jason Stockley trial, and I knew that my

25   teenaged daughter was also very upset because she was texting

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 48 of 333 PageID #: 4165
Sarah Molina Direct Examination                                     Volume 1

48

1   me from school, and when she got home from school, I asked her

2   if she wanted to go to the protest to express that, and she

3   said yes, so we went together.

4   Q    And you said it was the afternoon.  Do you remember about

5   what time you arrived?

6   A    I don't remember exactly, but she gets home from school

7   at 3:00.  She came home, had a snack, changed clothes, into

8   comfortable shoes, and then we went after that.  So I think it

9   would be after 4:00.

10  Q    What did you see when you arrived?  You said you got to

11  the intersection of Tucker and Clark; is that right?

12  A    Yes.

13  Q    And what did you see there?

14  A    I saw people protesting.  There was a line of police that

15  was across the street, closer to the Clark Street.  Protestors

16  were on Tucker all the way from Clark to maybe halfway down

17  the block, along the side of the City Hall, and there were

18  already people who had signs that they had been pepper sprayed

19  when we arrived.

20  Q    How could you tell that people had been pepper sprayed?

21  A    So there were medics frantically treating people who

22  had -- who were crying and sitting on the ground.  They were

23  pouring water mixed with antacids into people's eyes to help

24  with the pain, and also, there were other people who were just

25  sitting around or walking around who had the signs of the

1    treatment on their faces.  This is when I arrived.  Also,

2    later on, did see people coming up who were crying who had

3    just been sprayed.

4    Q    And when you say "medics," who do you mean by that term?

5    A    These are just volunteers who go to protests to take care

6    of people who get injured at a protest.

7    Q    You said you saw a line of police officers?

8    A    Yes.

9    Q    How many police officers did you see approximately when

10   you arrived that day?

11   A    I can't quantify it, but there were -- it was a huge

12   amount of police officers.

13   Q    And how many protestors did you see?

14   A    Probably less than 200 people at that point.

15   Q    How many people would you estimate that you saw near that

16   intersection who showed some sign of having been pepper

17   sprayed?

18   A    Five to 10.

19   Q    Did you see any other evidence of the use of chemical

20   agents in that first weekend after the Stockley verdict in

21   St. Louis?

22   A    Yes.

23   Q    What else did you see?

24   A    I am part of the legal -- I'm an attorney.  I'm part of

25   the legal support team for protestors, and one of the things

1    we do is go to the jails to see if there are people who need

2    visits to check on their health.  We try to coordinate with

3    the jail staff about payment of bonds and things like that,

4    and so on both the morning of Saturday, September 16th, and

5    also Monday, September 18th, I was at the jail, greeting

6    people who were coming out of the jail.

7    Q    And are you saying that some people who were coming out

8    of the jail showed signs that they had been pepper sprayed?

9    A    Yes.

10   Q    What signs did you see?

11   A    So mainly, the ones that I can -- so I'm -- there were

12   people on the Saturday were coming out with injuries.  The

13   people on Monday were coming out with signs that they had been

14   sprayed.  You could smell spray on them still, like you didn't

15   want to shake hands or touch people.  There were people whose

16   faces looked like their eyes were bloodshot from having had

17   something on it, and people were complaining about not having

18   had an opportunity to wash themselves off.

19   Q    Have you ever seen the St. Louis police deploy chemical

20   agents before September of 2017?

21   A    Yes.  I saw them use tear gas in the Fountain Park

22   neighborhood, in three different areas of the Fountain Park

23   neighborhood, on August 19th, 2015.

24   Q    Did you hear an audible warning before each of those

25   deployments that you saw?

Sarah Molina Direct Examination                    Volume 1

51

1   A     I did not hear a warning.  I didn't hear an audible

2   warning or an intelligible warning in any of those three.

3   Q     Were you given an opportunity to leave before each of

4   those deployments of chemical agents?

5   A     So, I mean, obviously, anywhere you are, you can always

6   leave, but I wasn't given a notice that we had to leave or

7   that that would happen to us.  And also, I was saying the two

8   second places in the Fountain Park neighborhood.  So the first

9   one, we did leave.  The second one, they followed people and

10  shot tear gas directly at people.  And the third one, this was

11  like a half an hour later, several blocks away.  When I was

12  standing in a prop -- in my yard, of a house that I own, they

13  came down and shot tear gas at us with no warning.

14  Q     Can you just describe generally those three areas in the

15  Fountain Park neighborhood?  Where were they that tear gas was

16  deployed?

17  A     The first one was just about 7:00 p.m. on that date, on

18  the 19th, at the intersection of Walton and Page.  Everyone

19  fled and moved west on Page.  People went either north or

20  south into the neighborhoods, the side streets off of Page,

21  and the police followed everyone and shot tear gas canisters

22  and projectiles directly at them.  I saw lots of people with

23  welts.  I ran south on Bayard.  They followed us down Bayard.

24  And I was with another lawyer also.  I was there as a legal

25  observer that day.  We were shot at.  We hid behind a car, and

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 52 of 333 PageID #:
4160
Sarah Molina Direct Examination                              Volume 1

52

1    then we ran into an alley.  We watched them go down and gas

2    the entire block.  Then I ran over to Euclid, south on Euclid.

3    We were about four blocks away from where the protest was.  A

4    half an hour later, they came down Euclid and started shooting

5    at us standing in front of this property I own.

6    Q    And when you say "us," are you saying that tear gas was

7    shot directly at you and the group --

8    A    Yes.

9    Q    -- you were with?

10   A    Yes.

11   Q    I'm going to show you what we've marked as Plaintiffs'

12   Exhibit 41.  Do you recognize this declaration?

13   A    Yes.  That's an affidavit I signed on, I think,

14   September 22nd of this year.  Yep.

15   Q    This is your signature here?

16   A    Yes, it is.

17   Q    Have you had an opportunity since the date you signed

18   this affidavit to review it for accuracy?

19   A    Yes.  I read it this morning.

20   Q    And does everything you said in the declaration remain

21   true?

22   A    Yes.

23        MS. STEFFAN:  I would move for admission of

24   Plaintiffs' Exhibit 41.

25        THE COURT:  Exhibit 41 is received into evidence.

53

1           MS. STEFFAN:  That's all I have, Your Honor.

2           THE COURT:  Cross-examination.

3                     CROSS-EXAMINATION

4  BY MR. MCDONNELL:

5  Q    Good morning, ma'am.

6  A    Good morning.

7  Q    On September 15th, you said you saw people when you

8  arrived there that had been obviously maced; correct?

9  A    I think it was probably pepper spray, but yes.

10 Q    But you can't tell the Court what acts they engaged in

11 which caused the police to have to use pepper spray?

12 A    That's correct.

13 Q    You said when you were down there that day on

14 September 15th the protests -- protestors brought medics with

15 them?

16 A    So they -- protestors don't bring medics, but medics were

17 there.

18 Q    Okay.  And they were there, and they're part of the

19 protest group; correct?

20 A    I don't consider the medics to be part of the protest

21 group just like I don't consider legal observers to be part of

22 the protest group, but they are groups that are there to

23 ensure safety of protestors.

24 Q    Okay.  And the medics are brought to render aid in case

25 the protestors do activities which cause the police to have to

1   use chemical munitions; correct?

2   A    No.

3   Q    When you were down there on September --

4   A    Excuse me.  Can I answer that?

5   Q    You did.

6   A    The protestors are not engaging in activities that are

7   causing the police to use violence against them.  That is a

8   decision of the police, and the medics are there because

9   they're aware that the police in St. Louis city frequently use

10  excessive force, and they're there to protect people who are

11  harmed by the police.

12       MR. MCDONNELL:  Move to strike as nonresponsive, Your

13  Honor.

14       THE COURT:  Overruled.  There's no jury here.  I can

15  consider it.

16  Q    (By Mr. McDonnell) Okay.  So in your opinion, ma'am, if

17  police officers are attacked by people in these protesting

18  crowds, they can't use anything to defend themselves?  Is that

19  your position?

20  A    That is not my position.

21  Q    Back in 2015, where you said you were a witness to

22  chemical munitions -- correct?

23  A    Yes.

24  Q    What was the purpose of those protests?

25  A    The police had killed Mansur Ball-Bey that afternoon, and

1   mourners had come to the scene, and people were protesting the

2   death of another young person in the city of St. Louis.

3   Q    And you've been to protests since then; correct?

4   A    Just very recently, yes.

5   Q    And it hasn't prevented you from continuing to protest or

6   show up as a legal advisor?

7   A    Actually, that was the last time that I worked as a legal

8   observer, and I did not go to any protests for more than a

9   year after that.  It was terrifying.

10  Q    On September 15th, when you were downtown, did you see

11  anybody throwing anything?

12  A    I did not.

13  Q    See anybody breaking anything?

14  A    No.

15  Q    See anybody jumping on any vehicles?

16  A    No.

17          MR. MCDONNELL:  No further questions.

18          THE COURT:  Redirect?

19          MS. STEFFAN:  No, Your Honor.

20          THE COURT:  All right.  You may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  You may call your next witness.

23          MR. ROTHERT:  Plaintiffs' next witness is Keith Rose.

24  Your Honor, as a -- this particular witness would like to

25  affirm to tell the truth.

 1          THE COURT:  Well, the oath, if you've been listening

 2  to it --

 3          MR. ROTHERT:  Yes.

 4          THE COURT:  -- asks if they swear or affirm.  Every

 5  witness who appears in my court is offered the opportunity to

 6  affirm or swear.  If they say, "I do," it means whatever they

 7  believe it means, or if they want to say, "I affirm," they

 8  may, but every witness, that is always true in every case in

 9  my court.

10          MR. ROTHERT:  Yes, I understand.  He asked me to

11  clarify that before he came in.

12          Mr. Rose, if you could come right over here.

13          THE COURT:  Come over here to be -- to --

14          MR. ROTHERT:  Give your affirmation.

15          THE COURT:  -- give your affirmation.

16                          **KEITH ROSE**,

17  HAVING FIRST DULY AFFIRMED, WAS EXAMINED AND TESTIFIED AS

18  FOLLOWS:

19                      DIRECT EXAMINATION

20  BY MR. ROTHERT:

21  Q    Good morning, Mr. Rose.

22  A    Good morning, Mr. Rothert.

23  Q    Could you state your name for the record, please?

24  A    Keith Rose.

25  Q    Mr. Rose, I'm just going to cut to the chase and direct

Case: 4:18-cv-00308-JCH  Doc. #:  126-3  Filed: 01/30/20  Page: 57 of 333 PageID #:
Keith Rose Direct Examination 1274                                    Volume 1

57

1    your attention to Friday, September 15th, 2017.  Did you have

2    occasion to go to downtown St. Louis?

3    A    Yes, I went to downtown St. Louis that morning or that

4    afternoon.

5    Q    What was the reason you went to downtown St. Louis on

6    September 15th?

7    A    Judge Wilson had put out a not-guilty ruling in the case

8    of Officer Jason Stockley, and people were gathering to

9    express displeasure with that ruling.

10   Q    About what time did you arrive?

11   A    So I think the judge's decision came out around 9:00

12   a.m., and I didn't get there until about 1:00 p.m.

13   Q    At the time you arrived, had the police blocked off

14   streets to vehicular traffic?

15   A    Yeah.  So when I got there, I parked my car.  I couldn't

16   go all the way toward the protest because the roads were

17   blocked.  I parked my car and walked a block.  The police had

18   the roads blocked on Tucker, north to -- what is that?  I'm

19   sorry.  North to Chestnut and south to Clark.  So just, yeah,

20   about a block north and south of Market.

21   Q    And when you arrived, were pedestrians walking freely on

22   those streets?

23   A    Yes.

24   Q    Did you take any recordings with your mobile phone while

25   you were downtown on September 15th?

1   A    I did.

2   Q    Why did you do that?

3   A    I saw the police were pepper spraying people, and I

4   decided to document that.

5   Q    Do you recall a particular officer who you recorded

6   around a little after 5:00 that night?

7   A    Yes.  Sergeant Brian Rossomanno.

8   Q    Okay.

9   A    Oh, I'm sorry.  I recorded a statement from Brian

10  Rossomanno, but are you referring to an officer who I recorded

11  actually the face of?

12  Q    Yes.

13  A    Okay.  So yes.

14  Q    What stands out about him, the one you recorded the face

15  of?

16  A    Well, so he wasn't wearing a name tag, and he approached

17  me and sprayed me in the face with a chemical weapon as I was

18  filming.

19  Q    At the time you were sprayed, had there been any

20  announcements to disperse?

21  A    No, not -- not before I was sprayed, but soon afterward,

22  I heard an announcement.

23  Q    Prior to the time that you were sprayed, was there any

24  warning that you might be sprayed with chemical agent?

25  A    No, no one gave a verbal warning that we would be

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 59 of 333 PageID #: 1276
Keith Rose Direct Examination                                    Volume 1

59

1    sprayed.

2    Q    Were you doing anything illegal or dangerous when you

3    were sprayed?

4    A    No.  I was -- I was standing next to a bunch of other

5    people.  I was filming.

6    Q    Were you sprayed directly?

7    A    Yes.  It was -- I was the only person who was hit with

8    that stream of spray, and it was directly in my face.  I

9    turned my body, and it got on the back of my head and my neck,

10   soaked the back of my shirt.  I was hit very much directly.

11   Q    And how did that feel?

12   A    It was insufferably painful.  It burned.  I had the

13   sensation of, you know, being in direct sunlight or something

14   times 100.  It was just a fire on my skin, in my eyes.

15   Q    Did you -- did you leave the protest because -- because

16   of that pain?

17   A    I did.  It was -- it was unbearable, and so I was able to

18   find someone who could take me to their house nearby where I

19   was able to shower and change my clothes.

20   Q    Okay.  Did you have occasion to return to downtown

21   St. Louis on that Sunday, Sunday, September 17th, 2017?

22   A    Yes.

23   Q    Do you recall about what time you came downtown that

24   night?

25   A    I believe it was around 9:00 p.m.

Keith Rose Direct Examination                          Volume 1

60

1   Q    What was the purpose of you coming down at around

2   9:00 p.m. on September 17th?

3   A    I had gotten a few phone calls from other people who were

4   downtown, telling me that the police were acting particularly

5   aggressively, and I decided to go down there to try to

6   document what was going on.

7   Q    Now, you mentioned him earlier.  Are you familiar with a

8   Mr. Brian Rossomanno?

9   A    Yes.

10  Q    Okay.  Who is he?

11  A    He is a sergeant with the SLMPD.  He oversees most of the

12  protests.  Some -- some people call him the riot king because

13  whenever he shows up there often is an escalation and tension.

14  Q    Okay.  Did you happen to hear him make any announcements

15  that evening, the 17th, about an assembly being unlawful?

16  A    Yes.

17  Q    Do you recall when or when and where that was?

18  A    At around 9:30.

19  Q    Okay.  And do you remember the intersection?

20  A    Yes.

21  Q    And what intersection was that?

22  A    It was, I believe, Tucker and Washington.

23  Q    Okay.  And as part of that announcement, did

24  Mr. Rossomanno say where you or others should go to avoid

25  arrest or being assaulted with chemical weapons?

1  A     Yes.  He specifically told people to go west on

2  Washington.

3  Q     Did you go west on Washington as Mr. Rossomanno directed?

4  A     I began to go west on Washington, walking through the

5  intersection of Tucker and Washington, but before I even got

6  all the way over there, I was yelled at by police officers

7  directing me to go a different way, saying that I would be

8  arrested if I continued in that direction.

9  Q     Okay.  So what did you do then?

10 A     I decided to turn and go north instead.  That seemed to

11 be the only way out, but even then, it was -- it was partially

12 blocked.  So I really didn't know what to do.  I ended up

13 going north.

14 Q     North on Tucker?

15 A     North on Tucker.

16 Q     Was there a police line there?

17 A     There was.  A police line basically was -- had pushed the

18 people out of that area and formed up behind them.  So there

19 was a line of police officers staring at those of us who were

20 gathered there on the sidewalk.

21 Q     Okay.  When you got to the police line, did you receive

22 instructions from police officers on where you could stand?

23 A     Yes.  An officer specifically told us we could stand four

24 to five feet away from the line.

25 Q     Okay.  Is that what you did?

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 62 of 333 PageID #:
1270
Keith Rose Direct Examination                                    Volume 1

62

1    A    I did.

2    Q    And were you left alone standing there four to five feet

3    from the line?

4    A    No.  Almost immediately afterward, we were told that we

5    would be arrested for -- if we continued to stand there.

6    Q    By -- did the -- was the situation then tense at all?

7    A    No, not really.  We were just standing there.  Some of us

8    were talking to officers that we know.  People were meandering

9    about.  It wasn't almost anything going on.

10   Q    Okay.  Did -- did those police lines and orders about

11   where to stand -- did that continue for the rest of the night,

12   or did there come a time when things loosened up.

13   A    No.  Afterward, the police line dispersed.  Some officers

14   remained standing around, kind of just keeping watch, but

15   the -- what we would call the riot police moved away, and

16   people were able to come and go as they pleased.  So we

17   continued walking on the sidewalk in, you know, whatever

18   direction we wanted.  No officers were stopping us.

19   Q    Now, when you said the riot police left, can -- or what

20   you call the riot police.  What do you mean by "riot police"?

21   A    So I mean officers who had shields, long batons, helmets,

22   body armor, shin guards.  Sometimes they have gloves with

23   protruding knuckles.

24   Q    What time would you say or estimate that it was when the

25   police lines disbanded and the riot police left?  What time of

63

1   night was that, if you know?

2   A    I believe that was maybe 10:20.

3   Q    That's pretty precise for an estimate.

4   A    Yes.

5   Q    So a little after -- after 10:00?

6   A    Yeah, I guess it was around -- it was around 10:00.

7   Q    Okay.

8   A    I'm trying to do the timeline in my head of where I was.

9   Yes.

10  Q    All right.  So then I think you've testified that after

11  that you and others were just walking around.  Is that

12  accurate?

13  A    Yes.

14  Q    How long were you able to walk around without anything

15  unusual happening?

16  A    Well, so we were -- a friend and I had walked down there.

17  There had been a car wreck.  We walked down and tried to see

18  what was going on over there.  We stayed there for about half

19  an hour.  Then right before 11:00 we walked back toward the

20  direction of Tucker and Olive, I believe, and when we got over

21  there, we were completely unmolested.  There were no officers

22  giving any commands or anything.  We were just standing

23  around, talking to people.

24  Q    All right.  Now, this car accident that you went and saw

25  the aftermath of -- was that -- I mean, do you know where that

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 64 of 333 PageID #: 1181
Keith Rose Direct Examination                                    Volume 1

64

1    was?

2    A    Yes.  I believe it was at 9th and Olive.

3    Q    Okay.  So during this period from slightly after 10:00 to

4    that hour or so after that when you were walking around, were

5    there any announcements made during that time that you heard

6    from the police?

7    A    No, not at all.

8    Q    Anything like Mr. Rossomanno's earlier announcement?

9    A    No.

10   Q    Did you observe any illegal activity?

11   A    No.  There had been windows broken hours earlier in the

12   night, but nothing was happening at this time.

13   Q    Okay.  In fact, those windows that were broken -- that

14   was before you even arrived; correct?

15   A    It was.  That was before I even got those phone calls

16   that inspired me to go.

17   Q    Did you notice anything unusual starting around 11:15

18   that evening?

19   A    Yes.  Police were forming up ranks, lines of those riot

20   cops, and they started marching toward the group of people

21   that were congregating on the sidewalk of Tucker.

22   Q    Okay.  And so what did you do?

23   A    I -- well, it was very clear that they wanted us to

24   walk -- the first line of officers I saw -- it was very clear

25   they wanted us to walk north.  So I began walking north as

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 65 of 333 PageID #: 1182
Keith Rose Direct Examination                              Volume 1

65

1   they advanced toward us.

2   Q    Any announcements or any words at all from those -- that

3   line of riot cops?

4   A    None.

5   Q    Okay.  And what happened as you moved north?

6   A    As we moved north, I saw more officers blocking another

7   side street from that intersection, Washington, and so while

8   we were trying to turn onto Washington to get out of the way

9   of these advancing officers, we realized that we couldn't go

10  that way either.  We saw more officers who were not only

11  blocking the road, but they were also blocking the sidewalks

12  all the way up to the buildings.  So there was really no

13  getting around them, and they were advancing from another

14  direction.  Then I turned and I saw officers coming from a

15  third direction, and then soon after I saw them coming from

16  the fourth, and it was at that point I knew that we were all

17  just being pushed into one big group, herded.

18  Q    Okay.  And during that, that herding, was there ever an

19  opportunity or a way to leave?

20  A    No.  It was very clear that no one was getting past those

21  officers.

22  Q    And were you ever told to leave?

23  A    No.

24       THE COURT:  I have a question about this.  So where

25  were you when you first saw these officers, and then where did

66

1    you start walking towards?

2         THE WITNESS:  So I was standing on a sidewalk.  I

3    guess it was in front of a bar on Tucker, about half a block

4    south of Washington.  And so I walked probably half a block up

5    to the corner of Tucker and Washington, turned to my left,

6    looked down the street where you see all the string lights

7    across Washington, and in the distance there, about half a

8    block down, I saw another line of police advancing toward me.

9         THE COURT:  So when you saw the police, they were not

10   on the other side of any intersection?  In other words, what

11   you're saying is they were on the -- you couldn't have walked

12   down another street and gone a different way?

13        THE WITNESS:  No.

14        THE COURT:  Or an alley?

15        THE WITNESS:  No.

16        THE COURT:  I don't know if there are alleys there.

17   I'm just --

18        THE WITNESS:  No, no.  There was no other way that I

19   saw for us to go.  That was -- they were coming from the

20   south, and then I saw them from the west, and then I saw them

21   from the east, and then I saw them from the north -- all

22   within the span of 30 seconds, and --

23        THE COURT:  Yeah.  And each time, they were on the

24   block?  They weren't a block away?  They were on that

25   particular block?

1          THE WITNESS:  That's right.  That's right.

2          THE COURT:  Okay.

3          THE WITNESS:  They were within half a block each

4   time.

5          THE COURT:  All right.  Thank you.  Go ahead.

6   Q    (By Mr. Rothert) Now, was any -- were any people who were

7   caught in this group able to get into buildings that you saw

8   or get out any other way?

9   A    No, I don't -- I don't remember seeing anyone going into

10  buildings to try to flee.

11  Q    So once you were kettled in, did you -- did the police

12  give any directions then once you were --

13  A    I heard an order for us to "Get on the ground.  Get on

14  the ground.  Stop filming.  Put your cameras away.  Stop

15  filming."  Those were the directions I heard.

16  Q    Did you follow all directions?

17  A    Yes.  I got on the ground.  I turned off my phone and put

18  it in my pocket.

19  Q    Were you sprayed with pepper spray or some chemical

20  agent?

21  A    I was repeatedly.  I was sprayed while originally

22  complying to the "Get on the ground."  I was sprayed again

23  while on the ground, and I was sprayed again after I had been

24  zip-tied.

25  Q    And when you say "zip-tied," you mean handcuffed with a

1   zip tie behind your back?

2   A    Yes.

3   Q    And do you have any idea -- I mean, do you know what you

4   were doing that caused you to be pepper sprayed?

5   A    Originally, I think that they sprayed me because I was

6   holding a camera.  It was a Nikon.

7   Q    What about -- were you in any way disobeying or resisting

8   what was happening?

9   A    No, not at all.  I -- I wasn't yelling.  I wasn't

10  taunting them.  I was -- I was overwhelmed by what was going

11  on around me, but I wasn't doing anything other than what they

12  said.  I got on the ground.  I -- I put my phone away.  And I

13  waited.  And then they still sprayed me.

14  Q    Did you see other people who were caught in that group

15  being sprayed?

16  A    I did.  I saw people sprayed.  I saw people kicked and

17  beaten.  I myself was kicked and hit as well.

18  Q    Now, you've participated or observed in a lot of

19  protests, haven't you?

20  A    I have.

21  Q    All right.  And this has included protests in the city of

22  St. Louis?

23  A    Yes.

24  Q    Were the incidents of Friday, September 15th, and Sunday,

25  September 17th, the first time that you were sprayed with

1   chemical agents by the police in the city of St. Louis with no

2   warning?

3   A    No.

4   Q    When else has that happened to you?

5   A    I was sprayed by SLMPD officers in May of 2015, in the

6   Holly Hills neighborhood.

7   Q    Okay.  And at that time, had you -- were you doing

8   anything illegal?

9   A    No.

10  Q    Were you --

11  A    I was standing on a sidewalk.

12  Q    Were you -- had you been given any warnings?

13  A    No.  They arrived on the scene and sprayed the protestors

14  immediately.

15  Q    All right.  Other than September 15th, September 17th of

16  this year, and May 19th, 2015, in the Holly Hills

17  neighborhood, is there anywhere else where you've been sprayed

18  with chemical agents by the police in the city of St. Louis?

19  A    Yes.

20  Q    Okay.  Where?

21  A    I was sprayed at a protest outside the -- the

22  medium-security institution, the workhouse on Hall Street.

23  Q    Okay.  Do you know when that was?

24  A    I believe it was mid to late July or maybe June of 2017.

25  Q    This year; correct?

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 70 of 333 PageID #:
Keith Rose Direct Examination   4487                                    Volume 1

70

1   A   Yes.

2   Q   Any other times that -- beyond -- besides the workhouse,

3   Holly Hills, and the two times downtown that we've talked

4   about that you've been sprayed?

5   A   Yes.  I was --

6   Q   In the city of St. Louis?  I'm sorry.

7   A   Yes.

8   Q   Okay.

9   A   I was sprayed in October, mid October of 2014, down near

10  Vandeventer and Manchester.  They also tear-gassed us that

11  night.

12  Q   Okay.  And were you doing anything illegal that time?

13  A   Not at all.  I was acting as a legal observer for the

14  National Lawyers Guild.  I hadn't participated in the protests

15  in any way.  I was just there to document what was going on.

16  I was standing on a sidewalk across the street from the

17  protest, and the police saw fit to tear-gas the three legal

18  observers individually.  They didn't tear-gas the crowd of

19  protestors.

20  Q   Were you doing anything -- were you given any warnings in

21  October 2014 before you were tear-gassed?

22  A   Not at all.  And that was only one of the times that

23  month that I was tear-gassed.  I also was -- I'm sorry.  I was

24  sprayed.  I also was sprayed at the intersection of Grand and

25  Arsenal at some point that same week.  The police sprayed a

Keith Rose Direct Examination                              Volume 1

71

1    large group of people, including me.

2    Q    Okay.  Were you doing anything illegal then?

3    A    I was not.

4    Q    Given any warnings?

5    A    Not that I recall.

6    Q    All right.  And I didn't ask about the workhouse.  At the

7    workhouse in July of this year, were you doing anything

8    illegal?

9    A    No.

10   Q    Was it a protest?

11   A    Yes.

12   Q    All right.  Were you given any warnings before the

13   chemical agents were used?

14   A    I don't recall.

15        THE COURT:  Counsel, excuse me a moment.  We're going

16   to take a break at this time.  Just be back up there.  You can

17   step down.  Just be back up in 15 minutes.

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  We'll take a 15-minute break.  Before we

20   do, I wanted to ask a question about your motion to exclude

21   witnesses.

22        You can step down.

23        THE WITNESS:  Yes, yes, ma'am.

24        THE COURT:  For the lawyers because in your motion

25   you said you request the Court to exclude from the courtroom

Keith Rose Direct Examination                                Volume 1

72

1    all actual and potential nonparty witnesses during the

2    proceedings in this case other than the period of actual

3    testimony, and I noticed that some of your witnesses who are

4    not parties to the case have remained in the courtroom after

5    their testimony, and your motion clearly asked that they be

6    excluded.  Did you have a different agreement with the

7    Defendant?  Do you care?  I mean --

8              MR. ROTHERT:  We do not.  I don't.  I intended for,

9    you know, just until they testified, but it's --

10             THE COURT:  Do the Defendants care?

11             MR. MCDONNELL:  No, Judge.

12             THE COURT:  Okay.  So you're modifying what you asked

13   for --

14             MR. ROTHERT:  Yes, please.

15             THE COURT:  -- and you only want it to be before they

16   testify, not also afterward?

17             MR. ROTHERT:  Yes, please, Your Honor.

18             THE COURT:  Because technically, it applies -- I

19   mean --

20             MR. ROTHERT:  I understand.

21             THE COURT:  -- I gave you what you asked for.  Okay.

22             MR. ROTHERT:  Thank you, Your Honor.

23             THE COURT:  All right.  Court's in -- do you have any

24   estimate of how much longer it will take to present the

25   Plaintiffs' case?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 73 of 333 PageID #:
1190
Keith Rose Direct Examination                                    Volume 1

73

1          MR. ROTHERT:  I would need a few minutes to figure

2    that out.

3          THE COURT:  Yeah.  When you come back, if you can

4    give me an estimate, and then I'd appreciate just generally

5    knowing sort of where we're going today.

6          MR. ROTHERT:  All right.  Thank you.

7          THE COURT:  Court's in recess.

8       (Court recessed from 10:37 a.m. until 10:57 a.m.)

9          THE COURT:  All right.  You may continue with the

10   direct exam.

11         Oh, before you do, do you have any estimate on the

12   time?

13         MR. ROTHERT:  We think that we could have up to three

14   hours of --

15         THE COURT:  Yeah.  Okay.

16         MR. ROTHERT:  -- our evidence.

17         THE COURT:  That's -- that's fine.  Yeah.

18         All right.  Go ahead.

19   Q    (By Mr. Rothert) Mr. Rose, you're still under oath.  You

20   understand that; correct?

21   A    Yes.

22   Q    All right.  I'd like to ask you some questions about your

23   experience with permits for protests in the city of St. Louis.

24   Have you or others, other groups you've been involved with,

25   ever inquired about the need for a permit for a protest in the

Keith Rose Direct Examination                                    Volume 1

74

1   city of St. Louis?

2   A     Yes.

3   Q     And what city official have you all communicated with

4   about whether permits are needed?

5   A     A woman named Ann Chance, who's in the Office of Special

6   Events.

7   Q     And what was the protest for which you first learned of

8   Ms. Chance's advice on this?

9   A     The Women's March, which was January, I believe, 21st of

10  2017.

11  Q     Okay.  And that happened in the city of St. Louis?

12  A     Yes.  Downtown.

13  Q     And what do you understand that she told you about the

14  need for a permit for a protest in the city of St. Louis?

15  A     So the group of people putting it on had contacted the

16  City, and she let the group know that, no, they couldn't get a

17  permit, a permit wasn't required, and that it would be

18  something called a First Amendment event, and so they were

19  allowed to take the road, and the way it was explained to us

20  is if your numbers are such that being on the sidewalk is

21  impractical, then taking the road is acceptable.

22  Q     What was the Women's March about?

23  A     The Women's March -- it was in -- in response to the

24  inauguration of President Trump.  It was, you know, furthering

25  women's rights.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 75 of 333 PageID #:
1192
Keith Rose Direct Examination                                    Volume 1

75

1   Q     And that protest included marching in streets in the city

2   of St. Louis?

3   A     Yes.  There were thousands of people, and they very

4   thoroughly blocked Market Street for hours.

5   Q     Was there -- were there other -- was there another

6   protest you were involved with planning in February?

7   A     Yes.  I helped organize the LGBTQ March, which was

8   inspired by the Women's March.  It was a bunch of queer and

9   trans people and their supporters coming together to try to

10  have a rally and demonstration to advance causes and rights

11  for LGBTQ people.

12  Q     Now, Mr. Rose, on that occasion, did you have the

13  opportunity to speak directly to Ms. Chance about whether a

14  permit was needed?

15  A     Yes.  She contacted us directly.  I was one of the three

16  primary organizers for that.  She told us specifically that we

17  couldn't get a permit.  She also told us that we shouldn't

18  hold our event.

19  Q     Why shouldn't -- why did she say you shouldn't hold your

20  event?

21  A     She said it might be taxing on the police because they

22  were going to be busy that same day policing the Mardi Gras

23  celebration in Soulard.

24  Q     Okay.  So did you move the date of your event?

25  A     No.

76

1    Q    Did that LGBTQ March in February include marching in

2    streets in St. Louis without --

3    A    Yes.

4    Q    -- without a permit?

5    A    Yes.

6    Q    Did you have occasion to be involved in organizing

7    immigrants' rights protests in downtown St. Louis this year?

8    A    Yes.  So I was -- I was involved with the group who was

9    organizing the Immigrants' March, yes.

10   Q    Okay.  And did that involve marching in the streets?

11   A    It did.  It was all a, you know, similar protest.  People

12   gathered in the streets.  They marched east.  Sometimes they

13   took side streets and different things, but it was all pretty

14   much just people marching through the streets.

15   Q    Did you need a permit for that?

16   A    No.

17   Q    What about the March for Science?

18   A    The March for Science organizers didn't get a permit

19   either.

20   Q    So based on your experience organizing protests in the

21   city of St. Louis, do you need a permit to march and protest

22   on the streets in the city of St. Louis?

23   A    No.

24   Q    When you choose to protest or observe protests in the

25   city of St. Louis, do you feel like you're -- you're at risk?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 77 of 333 PageID #:
1294
Keith Rose Direct Examination                                    Volume 1

77

1    A    Yes.

2    Q    What do you feel like you're at risk of?

3    A    Arrest, chemical weapons, beatings.

4    Q    Why do you feel you're at risk of these things?

5    A    Because I've witnessed on countless occasions the SLMPD

6    arresting, using chemical weapons, and beating protestors.

7    Q    Now, those protestors had all done things illegal;

8    correct?

9    A    No.

10   Q    Okay.  And, in fact, you yourself have been subjected to

11   some of those things?

12   A    I have.

13   Q    All right.  If you look at the screen next to you --

14   A    Okay.

15   Q    -- you can see a document that's been previously marked

16   Plaintiffs' Exhibit 31.  Do you see that?

17   A    Yes.

18   Q    And it's -- do you agree with me it's four pages?

19   A    Yes.

20   Q    And is that your signature at the end?

21   A    It is.

22   Q    Have you had the opportunity since you signed this

23   declaration to review it for accuracy?

24   A    Yes.

25   Q    And does everything you describe and state in there

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 78 of 333 PageID #: 1195
Keith Rose Direct Examination                              Volume 1

78

1   remain true?

2   A     Yes.

3           MR. ROTHERT:  Okay.  I move for admission of

4   Plaintiffs' Exhibit 31.

5           THE COURT:  Exhibit 31 is received into evidence.

6   Q     (By Mr. Rothert) You mentioned you've observed and

7   participated in many protests; correct?

8   A     Yes.

9   Q     Does that include protests in the city of Ferguson?

10  A     Yes.

11  Q     All right.  Has -- with respect to protests and how

12  protests are handled, has -- has anything changed or has

13  Ferguson changed its behavior since it entered -- since a

14  consent judgment was entered in the case *United States versus*

15  *City of Ferguson*?

16  A     Yes, very much.

17  Q     How has it changed?

18  A     Before the Consent Decree, the police officers in

19  Ferguson were really not operating by any rules, and their

20  response to protests was at the discretion of the officer in

21  charge that night or the number of people who were filming.

22  Since the Consent Decree, we've seen a lot more consistency in

23  the way they're policing protests.

24  Q     Okay.  And is -- your experiences protesting in the city

25  of St. Louis -- is that like Ferguson before the consent

Case: 4:18-cv-00308-JCH Doc. #: 126-3 Filed: 01/30/20 Page: 79 of 333 PageID #:
1196
Keith Rose Direct Examination                              Volume 1

79

1  judgment, Ferguson after the consent judgment, or nothing like

2  it at all?

3  A    It's a lot like Ferguson before the consent judgment.  So

4  they -- the way that protests are policed in St. Louis is

5  largely dependent upon a combination of the content of the

6  protest speech and the particular officers who are making

7  decisions on that evening.  So as it stands right now, you

8  can't really tell what's going to happen at a protest until

9  you get there and you see which officers are in charge.

10 Q    You mentioned -- we went through a series of other

11 protests that have happened this year in the city of

12 St. Louis -- the Immigrants' Rights March, the LGBTQ March,

13 the March for Science, and the Women's March.  Did you

14 participate in those protests?

15 A    I did.

16 Q    And was --

17 A    I'm sorry.

18     I did not participate in the Science March.  I

19 participated in the other ones.

20 Q    Okay.

21     And did the police come to those march -- those protests

22 in riot gear?

23 A    No.

24          MR. ROTHERT:  I have no further questions.

25          THE COURT:  Cross-examination.

                                                                            80

1                          CROSS-EXAMINATION

2     BY MR. RELYS:

3     Q    Good morning, Mr. Rose.

4     A    Good morning.

5     Q    I want to ask you a couple of questions about this

6     photograph in your declaration.

7     A    Yes, sir.

8     Q    It is a declaration.  Yeah.  You took this photograph?

9     A    I did.  So that photograph is actually a screenshot of a

10    frame from a video that I took.

11    Q    Okay.  So it's a screenshot from a video?

12    A    Yes, sir.

13    Q    I see.  And where -- where is this photograph taken?

14    Where were you located when you took this photograph?

15    A    I believe I was standing between parked cars on Clark,

16    just south of -- I'm sorry -- just west of Tucker.

17    Q    Just west of Tucker.  So this is Clark Street, looking

18    east toward Tucker?

19    A    Yes, sir.

20    Q    And I don't think it's apparent from the photograph, but

21    on your right, if you would pan right, you would see the old

22    police headquarters; right?

23    A    I guess it's the current Police Academy.  Is that --

24    Q    Correct.

25    A    Yes.

1   Q    The current Police Academy?

2   A    Yes.

3   Q    Is that right?

4   A    Yes.

5   Q    And if you were to pan left, you would see the City Hall

6   parking lot?

7   A    Yes, sir.

8   Q    And it appears that there's a line of police officers in

9   front of you?

10  A    Yes.

11  Q    In sort of the distance or the middle distance?

12  A    Uh-huh.

13  Q    What direction were they facing?

14  A    Most of them were facing the direction away from me.  So

15  east.

16  Q    They had their backs to you?

17  A    Yeah, most of them did.  Some of them were facing toward

18  me.

19  Q    So you were behind the police line at this point?

20  A    Umm, I -- no, I wouldn't say I was behind the police

21  line.

22  Q    There's a line of police officers, and most of them have

23  their backs to you; right?

24  A    Well, most of them do.  Some of them don't.  And so I

25  don't think there was a front or a back to that line.  I think

Keith Rose Cross-examination                                Volume 1

82

1    it was just a line.

2    Q    Okay.  But you do agree that they're standing there and

3    most of them have their backs to you?

4    A    Yes.

5    Q    Okay.  And you say you didn't get any warning before you

6    were maced in this situation?

7    A    That's right.

8    Q    Okay.  And this -- this is a screenshot from just before

9    you got maced, you say?

10   A    Yes.

11   Q    Okay.  And what about -- what -- this was on

12   September 15th, 2017, the day of --

13   A    September 15th, yes.

14   Q    The day of the verdict?

15   A    Yes.

16   Q    And about what time in the afternoon was this?

17   A    This was around 5:00, 5:20, I believe.

18   Q    Do you know; had you been at this location long at the

19   time you got maced?

20   A    Yes.  I had been there for -- I had gotten in that

21   general area around 1:00, and I had remained there from 1:00

22   to around 5:30.

23   Q    So you're aware that prior to you -- prior to this

24   photograph taking, the police had moved people from the

25   location where you are onto Tucker?

Keith Rose  Cross-examination                              Volume 1

                                                                83

1    A      No, that's not what happened.

2    Q      That's not what happened?

3    A      No.

4    Q      What were the events just preceding your -- you taking

5    the picture?

6    A      Police officers -- so there was a crowd of people.

7    Police officers basically formed kind of like a spear and went

8    into the crowd.  The crowd scattered.  It wasn't moved as a

9    unit.  It was -- it was put in separate directions, which is

10   why I ended up on this side.  It's not like they pushed us the

11   way they did on the night of the kettle.  It was -- this was

12   more like a dispersal where they go into the crowd and

13   everyone goes in a different direction.

14   Q    I see, but there had been a crowd of people congregated

15   in the general vicinity of where you are standing in this

16   picture shortly before?

17   A      That's right.

18   Q      Okay.  And the police had taken some action to move those

19   people away?

20   A      Yes.

21   Q      Okay.  But you were still there?

22   A      Yes.  So I actually couldn't have moved.  I think Tucker

23   was the direction that you said they were pushing us.  I

24   couldn't because the police were specifically blocking the

25   sidewalk and road between where I was and Tucker.  I was -- I

84

1    was stuck where I was.

2    Q    All right.  Let's talk about -- I think it's Sunday

3    night, the 17th.

4    A    Yes, sir.

5    Q    You were at some protests on that day?

6    A    Yes.

7    Q    And you -- you had been at the protest during the day;

8    correct?  I think you told us that you actually came back.

9    A    No, I hadn't been there at all that day.  I was only

10   there in the evening.

11   Q    I see.  But you came back downtown.  You came back

12   downtown.  I guess you came downtown that day after you heard

13   that the police were acting aggressively?

14   A    Yes.

15   Q    All right.  So you actually -- the police acting

16   aggressively actually drew you to downtown?

17   A    Yes.

18   Q    All right.  And -- and you said that when you got

19   downtown at around 9:30 in the evening -- you know, an

20   estimate or so -- you said that you heard a dispersal order

21   being given?

22   A    Yes.

23   Q    And we're talking about Sunday here?

24   A    We're talking about -- excuse me?

25   Q    We're talking about Sunday?

Keith Rose Cross-examination                                    Volume 1

85

1    A    Yes.

2    Q    And that dispersal order was given by Sergeant

3    Rossomanno?

4    A    Yes.

5    Q    And it directed the crowd to disperse west on Washington?

6    A    Yes.

7    Q    And you say that you tried to disperse west on

8    Washington; right?

9    A    I did.

10   Q    But then you got some sort of contradictory orders from

11   some officers on Washington?

12   A    Yes.  They made it very clear that we would be arrested

13   if we continued to walk in that direction.

14   Q    So then you walked away from there, and you went north on

15   Tucker?

16   A    Yes.  We very quickly -- me and the person I was with

17   very quickly turned around and went north on Tucker, yes.

18   Q    Did anyone mace you when you tried to go west on

19   Washington?

20   A    No.

21   Q    All right.  And then on Tucker, Tucker was open, was

22   partially open?

23   A    Do you mean north of the intersection or south of the

24   intersection?

25   Q    The way that you went.  I think that you told us that you

1    tried to go north on Tucker and it was partially open.

2    A    That's correct.

3    Q    Okay.  Did you disperse through the open avenue on Tucker

4    at that time?

5    A    I took the sidewalk, I went north on Tucker, and, yes, so

6    that's what happened.  I don't know if you would consider that

7    dispersing north or not, but I went north.

8    Q    Did you leave the area?

9    A    Yes.  I went north, and I stopped at the point where the

10   officers told me I was allowed to stand.

11   Q    Okay.  So you didn't leave the area; you stood around

12   with some officers?

13   A    I guess that depends on how you define "the area."  I

14   left the area that they said we couldn't be in, and I went to

15   another area where they said we could be.

16   Q    Okay.  And at some point after speaking with these

17   officers, you did leave the area altogether and you went to

18   around 9th and Olive?

19   A    Right.  We had heard that there was some interesting

20   thing going on, a car wreck and possibly a shooting.  So we

21   went down there to see what was going on, to see if it somehow

22   related to the protests.

23   Q    Okay.

24   A    It turns out it wasn't.

25   Q    Okay.  And how long did you spend at around 9th and

1    Olive, investigating these reports of shootings and car

2    wrecks?

3    A    About half an hour, but I wouldn't say I was

4    investigating as much as just talking.  I was talking to a

5    reporter who I knew who was also there for that, and we were

6    just chatting for most of the time.

7    Q    Okay.  So how long?  How long was that that you spent

8    doing that?

9    A    About half an hour.

10   Q    About half an hour.  And then you say you came back to

11   the Tucker and Washington area?

12   A    Right.  The reporter -- her name is Alexis Zotos -- she

13   specifically said that she was hearing from someone that

14   something was going on over there, and we decided to go check

15   it out.

16   Q    Any idea what was going on?

17   A    No.  She had no idea.  So we didn't know either.

18   Q    But you had -- before you had left, you had heard a

19   dispersal order?

20   A    Yes.

21   Q    Okay.  And you said -- you told us earlier that -- that

22   you didn't hear any dispersal orders after that dispersal

23   order; correct?

24   A    That's correct.

25          THE COURT:  When you say "a dispersal order," what --

1   well, what did you hear?  What was the dispersal order that

2   you heard?

3          THE WITNESS:  Good question.  So what I heard was --

4   let's see here.  I heard Sergeant Rossomanno telling us we had

5   to leave the area and we could go west on Washington.  And

6   then I was told, "You can't go west on Washington."  And then

7   he -- I went back to him and said, "You just told us to go

8   that way."  I know him quite well.  So I said, you know,

9   "Sergeant, you just told us to go that way," and he said,

10  "Well, okay, you can't go that way.  Then, you know, I

11  guess -- I don't know -- go this way."  And we went north.  So

12  that, I guess, was the dispersal order that we heard.  It

13  was --

14         THE COURT:  Yeah.  I mean I think when you say,

15  "dispersal order," if a dispersal order means move off of this

16  particular spot or, you know, leave the city of St. Louis -- I

17  don't know.  I mean, you know, I don't know what it means

18  exactly.  So I'd appreciate knowing exactly what you're

19  talking about.

20  Q    (By Mr. Relys) Well, the order in this case, I think you

21  said, was "Leave the area"; right?

22  A    I don't remember if he used the word "area" or not.

23  Q    West on Washington is what he told you to do?

24  A    West on Washington.  I assume he didn't mean walk west on

25  Washington until I hit the county line.  I assume that there

1    was some kind of --

2    Q    Right.  There's some element of common sense that you'd

3    stop at some point after you got far enough away; right?

4    A    Yes.  And it's very clear to me that I got far enough

5    away.  They stopped telling me that I hadn't gone far enough.

6    Q    Okay.

7    A    And they ended up leaving and let us stay where we were.

8    I went somewhere else, and I came back.

9    Q    Now, you said that you didn't hear any other dispersal

10   orders after that; correct?

11   A    Correct.

12   Q    You've described to us where the lines form and the

13   police close in on you, and you said before that -- is that

14   right?

15   A    Yes.

16   Q    Okay.  And before that happened, you say you didn't hear

17   any other dispersal orders?

18   A    That's right.

19   Q    But you were gone from the scene for half an hour,

20   following up on this car accident and possible shooting;

21   right?

22   A    Yes, sir.

23   Q    So if there were dispersal orders given during that time

24   period, you wouldn't have heard them?

25   A    That's true.

90

1   Q    In addition to -- I kind of lost count.  It seems like

2   you've been pepper sprayed quite a few times.

3   A    Yes.

4   Q    I counted three other times.  Is that right?  Can you do

5   a tally for me?

6   A    I can think of just -- I can think of at least four.

7   Q    Okay.  All the times you told us about?

8   A    Yes.

9   Q    I just stopped taking notes at some point.  How many

10  protests have you been to, total, over like, say, the last

11  five years?

12  A    Do you mean particularly in the city or in general?

13  Q    I guess I'm interested in both numbers.  Tell me both.

14  A    Well, it would take me a long time to tally that.  I can

15  say, off the top of my head, a rough estimate of at least 50

16  in the city of St. Louis and at least 150 in general,

17  including things in the county, in Ferguson.  Mizzou.  Yes.

18  Q    So you do a lot of protesting?

19  A    Yes.

20  Q    All right.  And of those 50 times that you've been to

21  protests in the city, you've been pepper sprayed four of them,

22  five of them?

23  A    Yeah, at least 50 times I can think of.  Let me think.

24  Q    Maybe more than 50?

25  A    Yes.

1   Q     Possible?

2   A     Yes.

3   Q     And of those 50 or more times that you've been at

4   protests in the city, you've been pepper sprayed five times?

5   A     At least, yeah.

6   Q     Okay.  And you say on each occasion you actually weren't

7   doing anything wrong?

8   A     Yeah.  It's a -- it's a problem in the city.  They like

9   to spray people who aren't doing anything wrong.

10  Q     And you said one of the protests you got pepper sprayed

11  at was a protest at the workhouse on Hall Street, in July of

12  this year?

13  A     Yes.

14  Q     At that protest, people were climbing the fence and

15  jumping in behind the fence, the perimeter fence of the

16  facility, weren't they?

17  A     They were.  And I wasn't one of those people.

18  Q     People were trying to tear down the fence, weren't they?

19  A     They were.  And I wasn't one of those people.

20  Q     But that was occurring at that protest?

21  A     It was.

22  Q     All right.  It sounds like the vast majority of the

23  protests you attend, you're not pepper sprayed?

24  A     Yes.

25  Q     And you're not arrested?

Keith Rose Cross-examination                              Volume 1

92

1   A     Yes.

2   Q     And I'm assuming the chemical munitions aren't used at

3   most of those protests either.

4   A     That's correct.

5   Q     But the fact that sometimes pepper spray is used or

6   sometimes that chemical munitions are used, it doesn't deter

7   you from continuing to come back to protests?

8   A     That's not true actually.  There have been protests that

9   I've skipped out on, including the protest at Page and Walton

10  where tear gas was used and, I believe, pepper spray was used,

11  and I specifically didn't go to those two days of protests

12  because I was worried about the effects of chemical weapons

13  after I had been injured in May of that same year.

14  Q     But on September 17th, Sunday night, two days after the

15  verdict, you had been pepper sprayed two days before, and when

16  you got a call saying, "The police are being violent," you

17  decided that meant that you should go downtown?

18  A     Yes.  There came a point when I realized that none of

19  this would stop unless we stand up to it, and it was at that

20  point that I thought I'm willing to take this if it's going to

21  help make it stop, and so whenever I got that call that people

22  were in distress, I decided to go down there so that I may

23  document it so that one day we may hold the City accountable

24  and try to stop these actions.

25  Q     On September 15th, the day that you got pepper sprayed,

1   did you see anybody damaging any property?

2   A    Can you repeat the date again?

3   Q    September 15th.

4   A    September 15th.

5   Q    The day you got pepper sprayed.  The day of this

6   photograph.

7   A    Yes, I did.

8   Q    You saw people damaging property?

9   A    I saw someone break the windshield of a police SUV.

10  Q    And that was nearby --

11  A    It was.

12  Q    -- where this picture was taken, wasn't it?

13  A    Yes, sir.

14  Q    Did you see anybody else doing any property damage?

15  A    No, I don't think there was any other property damage

16  that day.

17  Q    Anybody else -- did you see anybody throwing things,

18  throwing bottles or rocks or things at the police?

19  A    No.  I don't remember seeing any bottles or rocks being

20  thrown.

21  Q    How about on -- have you seen people throwing bottles and

22  rocks at the police at any of the protests you've been to?

23  A    Yes.

24  Q    So that does happen --

25  A    Yes.

1    Q    -- whether you saw it that day?

2    A    Yes, especially empty plastic water bottles.  Those are

3    the most likely thing to be thrown.

4    Q    And you said that -- you said that -- you talked a little

5    bit about this Consent Decree that was entered in Ferguson;

6    correct?

7    A    Yes, sir.

8    Q    And you said that things have gotten better in Ferguson

9    since that in your experience?

10   A    Yes.

11   Q    And you protest all the time.  You've probably been to

12   Ferguson a bunch of times; right?

13   A    I have been to Ferguson a bunch of times.

14   Q    To protest?  Not just to go to the restaurants?

15   A    That's correct.

16   Q    Okay.  But yet you were arrested in Ferguson within the

17   last week or two, weren't you?

18   A    I was.  Five of us were arrested on last Friday.

19   Q    And that made it into the *Post-Dispatch*, did it not?

20   A    It did.

21   Q    So even though Ferguson is improved, you're still getting

22   arrested in Ferguson?

23   A    That's right, and so I think the difference now is that

24   Ferguson is more consistent with the way they are policing,

25   and the people who got arrested were told that they are going

Keith Rose Cross-examination                              Volume 1

95

1    to come out there and possibly arrest people, when in the past

2    the Ferguson police would likely have just run out and done

3    something.  So there is definitely a consistency.  Also, I

4    would say that all the officers were wearing their nameplates

5    this time at the protest in Ferguson, which was very unusual

6    before the Consent Decree.  It appeared that they had a solid

7    chain of command this time, which was unusual before the

8    Consent Decree.  You know, a lot of things have changed.

9    Q    I'm going to direct your attention to the affidavit you

10   signed or -- I'm sorry -- the declaration that you signed.

11   A    Yes, sir.

12   Q    Paragraph 5 -- and maybe we should back up.  Well,

13   paragraph 5, it says, "Shortly thereafter, an unlawful" --

14   we're talking about the unlawful assembly declaration.

15   A    Yes.

16   Q    "An unlawful assembly was declared by Sergeant Brian

17   Rossomanno with the police department.  The reason for

18   declaring the assembly unlawful was that it was impeding the

19   flow of traffic.  The flow of traffic was not impeded,

20   however, because police had blocked the street in all

21   directions hours earlier and, thus, there was no traffic."

22        Okay.  Do you see that?

23   A    I do.

24   Q    So is it you sort of giving an opinion there as to

25   whether or not you were actually violating -- there's an

1    ordinance that makes it unlawful to block traffic; correct?

2    You're aware of that?

3    A    I'd have to see it.

4    Q    Okay.  But you're saying that -- you're saying that

5    because the police had actually blocked the traffic off you

6    weren't impeding traffic?

7    A    That's correct.  There was no traffic to impede.

8    Q    So is it your position then that before the police could

9    ask you to disperse -- excuse me.  Before the police can ask

10   you to disperse for blocking traffic, they have to let the

11   traffic get to you, and then and only then can they tell you

12   that you're blocking traffic; is that your position?

13   A    I'm sorry.  I don't understand the question.  Are you --

14   can you rephrase the question?

15   Q    Well, the police blocked off the traffic in this

16   situation, right, because of the protests, I'm assuming;

17   right?  Is that your impression?

18   A    Yes.  The police block off traffic for things like

19   parades, marches, protests.

20   Q    And in this occasion, it was for the protest that you

21   were engaged in?

22   A    I believe it was.

23   Q    Okay.  And -- and at some point, police -- in this case,

24   Sergeant Rossomanno gives an order saying that you're blocking

25   traffic; right?

1   A    Yes.

2   Q    But you say, "Well, we're not blocking traffic because

3   it's actually the police who are blocking traffic; they've got

4   traffic blocked off"; right?

5   A    Yes.

6   Q    So is it your position that you don't -- that's not --

7   that's not something you have to obey or heed because it's

8   just not true that you're blocking traffic because it's

9   actually the police?  I'm trying to understand the relevance

10  or the point that you're trying to make in your affidavit in

11  paragraph 5.

12  A    I see.  So if the question was were there cars coming,

13  the answer is no because the police were blocking those cars.

14  The police had preemptively blocked those cars, knowing that

15  there would be a protest and that there would be cars trying

16  to use that road.  So as opposed to answering a question of

17  law, what I was merely pointing out was the fact of the

18  situation, which was that there were not cars driving through.

19  There were not people banging on the hoods of cars because

20  these cars were trying to go through.  It was merely the cars

21  were not there, and I wanted to point that out in my

22  declaration.

23  Q    Okay.  And I guess what I just want to know from you is

24  before somebody can point out to you or say, "Hey, you're

25  blocking traffic; move away," is it your position or your

1    feeling that they need to unbarricade those streets and

2    actually let the cars get to you to the point where the cars

3    are coming up against you and you're banging on the cars and

4    stuff like that?  Is that a prerequisite for somebody telling

5    you you're blocking traffic?

6    A    No.  Personally, I don't --

7    Q    In your mind?

8    A    Personally, I don't think that that would be necessary.

9    Q    Okay.

10           MR. RELYS:  I've got no further questions.

11           THE COURT:  Redirect.

12                     REDIRECT EXAMINATION

13   BY MR. ROTHERT:

14   Q    Mr. Rose, drawing your attention back to Plaintiffs'

15   Exhibit 31, page 2, this picture of a -- the picture that's in

16   your declaration, was there a -- also a line of -- I -- I --

17   what appear to be police with bicycles at that time that's not

18   in the picture?

19   A    Oh, okay.  So the question is did -- were they there that

20   day?

21   Q    Yes.

22   A    Yes.

23   Q    Okay.  And at the time you were taking this picture, had

24   they formed a line as well, if you recall?

25   A    Yes.

1    Q    All right.  And where was that?

2    A    So using the perspective of the photo, it would be to the

3    right.  So if I had turned my body to the right, in front of

4    the current Police Academy, old police headquarters.

5    Q    Okay.

6    A    On the -- I guess -- I believe it was like near the

7    sidewalk right on the other side of Clark.

8    Q    Okay.  And were those police officers facing you?

9    A    Yes.

10   Q    When dispersal orders are given in the city of St. Louis,

11   who gives those?  Is it a different person every time, or is

12   it generally the same person?

13   A    Over the years, it's been different people, but the most

14   consistent person is Sergeant Brian Rossomanno.

15   Q    Okay.  And specifically with Mr. Rossomanno, when he

16   orders you to disperse, do those dispersal orders specify how

17   far away you need to go?

18   A    I don't recall ever hearing one that specified how far

19   away you need to go.

20   Q    How do you judge how far you need to be away before --

21   before you've gone far enough that you've dispersed?

22   A    Well, I think the practical -- the practical way of doing

23   it is often you wait until they stop telling you to continue.

24   Q    But do you know -- other than that, do you know of any

25   other way of trying to judge when you've gone far enough?

1   A    No.  Honestly, it's just as far as you're being

2   continually told.

3   Q    All right.  And when there's a dispersal order, does

4   it -- does the dispersal order tell you how long you have to

5   be gone?  I mean, if there's a dispersal order, what is

6   your -- does it tell you, "And you can't be back here for at

7   least another hour," or does it -- how do you --

8   A    That has never been included in a dispersal order.

9   Q    Okay.

10  A    They've never put a time on it.

11  Q    How do you know when you're allowed to be back in the

12  vicinity?

13  A    Whenever they stop telling you you need to be gone.  I

14  mean there -- because they put no time on it, because they

15  really don't define it very well, it's just left to it's a

16  feeling and it continues until -- until they stop telling you.

17  Q    It was established on cross-examination that in the vast

18  majority of protests you participate in in the city of

19  St. Louis, you're not arbitrarily arrested or pepper sprayed.

20  You agree with that, that most of the time you're not?

21  A    Yes.

22  Q    And is that good enough, do you think, to not be

23  arbitrarily pepper sprayed or arrested the vast majority of

24  the time?

25  A    No.  And I will say the protests that stand out most in

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 101 of 333 PageID #:
4210
Keith Rose Redirect Examination                              Volume 1

101

1   my memory are the ones where I was arbitrarily arrested and

2   pepper sprayed and tear-gassed and beaten, and the mere fact

3   that it was a minority of the time doesn't make it -- does not

4   diminish the pain that I went through because of it.

5   Q    Has it happened in any protests you've participated in --

6   to you, have you been pepper sprayed or arrested arbitrarily

7   that it did not involve protesting against the police or the

8   justice system in some way?

9   A    No.  I've been to protests on many topics -- on the

10  environment, on women's rights, LGBTQ rights, immigrants'

11  rights, and the only times I've ever been subject to chemical

12  weapons and arrests have been when protesting against police

13  brutality or for black lives, and often that's similar

14  messages at the same protest.

15  Q    And is your behavior different at these protests than it

16  is at the other kind of protests?

17  A    No.  I feel like I conduct myself pretty consistently at

18  those protests.

19  Q    We talked earlier about the Women's March in January.

20  Did that march block traffic?

21  A    Yes.

22  Q    How long do you think it blocked traffic?

23  A    Hours.

24  Q    Okay.  Was there an unlawful assembly declared for

25  impeding the flow of traffic?

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 102 of 333 PageID #:
4219
Keith Rose Redirect Examination                          Volume 1

102

1   A    No.

2   Q    You mentioned the LGBTQ March in February.  Did that

3   march block traffic?

4   A    Yes.

5   Q    How long do you think?

6   A    Hours.

7   Q    Okay.  Was an unlawful assembly declared for impeding

8   traffic?

9   A    No.

10  Q    The Immigrants' March you participated in -- did that

11  march block traffic?

12  A    Yes.

13  Q    How long?

14  A    Probably 45 minutes.

15  Q    Okay.  Was an unlawful assembly declared at that march or

16  that protest?

17  A    No.

18  Q    You mentioned that you saw one person break a windshield

19  of a police car?

20  A    Yes, sir.

21  Q    Okay.  Was that -- was that one person acting, or was

22  that a mob of people that you observed?

23  A    It was very clearly one person acting and a bunch of

24  reporters taking pictures, but it wasn't a group of people all

25  throwing things.  It wasn't -- it wasn't people coming

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 103 of 333 PageID #:
1220
Keith Rose Recross-examination                                    Volume 1

103

1   together and agreeing to do it.  It was just one, maybe two

2   people who broke the windshield.

3   Q    And then what happened to those people?  Were they

4   arrested?

5   A    As far as I know, they were never arrested.

6   Q    I have no further questions.

7            MR. RELYS:  Briefly, Judge?

8            THE COURT:  You may.

9                       RECROSS-EXAMINATION

10  BY MR. RELYS:

11  Q    Mr. Rose, I think you just told us that you've been to a

12  bunch of different protests on all sorts of different topics

13  and your behavior is always the same; right?  Essentially?

14  A    Yes.

15  Q    Okay.  But you think that -- you've sort of been able to

16  put together what you see as a correlation between protests --

17  the behavior of police officers responding to protests

18  relating to black lives or police brutality versus other types

19  of protests; right?

20  A    Yes.

21  Q    Okay.  Let's just take the Immigrants' March.  Did

22  anybody throw bottles at the police at that march?

23  A    Not that I recall.

24  Q    Did anybody jump up on a police vehicle and try to damage

25  it at that march?

1    A    No.

2    Q    Did anybody try to jump over a secure fence or tear down

3    a secure fence during that march?

4    A    No.

5    Q    How about at the Women's March?  Anybody throw bottles at

6    the police during that march?

7    A    No.

8    Q    Anybody jump on a police vehicle during that march?

9    A    No.

10   Q    How about tear down or tear down or jump behind a secure

11   fence line?

12   A    No.

13   Q    No?  None of that?

14   A    No.

15   Q    Okay.  And you were saying that -- I think you were

16   testifying or telling us that you think that dispersal orders

17   that tell you to leave the area -- those are -- you don't

18   really know how to deal with those except for that you just

19   stop walking when the police stop telling you to keep

20   walking --

21   A    Correct.

22   Q    -- essentially; right?  So "Leave the area" to you means

23   walk as far as the police let you and then stop?  Is that what

24   you're telling us?

25   A    I think that's the minimum.  Like, that's the way to find

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 105 of 333 PageID #:
1222
Keith Rose Recross-examination                    Volume 1

105

1    the perimeter.

2        I don't think that everyone must leave the area by

3    walking as far as the police say and stop.  I do think that

4    once they tell you to stop walking you have, in their minds,

5    left the area.

6    Q    Okay.  So you think that you'd be in compliance with an

7    order to leave the area so long as you walk as far as the

8    police let you walk with -- and then stop -- they stop

9    directing you to go further?

10   A    Right.

11       And I think that's only a necessary conclusion to make

12   because the police are not giving us any perimeters.  They're

13   specifically just saying, "Leave the area," and so we have to

14   infer while we're out there at the time that this is what they

15   mean by that.

16           MR. RELYS:  I have no further questions.

17           THE COURT:  All right.

18           You may step down.

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  You may call your next witness.

21           MR. ROTHERT:  Our next witness will be Steven

22   Hoffmann.

23           THE COURT:  Are you Mr. Hoffmann?

24           All right.

25           Step right up here to the clerk to be sworn, sir.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 106 of 333 PageID #:
4223
Steven Hoffmann Direct Examination                    Volume 1

106

1                          **STEVEN HOFFMANN**,

2     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3     FOLLOWS:

4                          DIRECT EXAMINATION

5     BY MS. STEFFAN:

6     Q     Good morning, Mr. Hoffmann.  Could you please tell us

7     your name?

8     A     Steven Hoffmann.

9     Q     Are you familiar with an organization called the National

10    Lawyers Guild?

11    A     Yes.

12    Q     What is your familiarity with that organization?

13    A     So I'm a dues-paying member and a volunteer, and I am a

14    legal observer coordinator through their legal observer

15    program.

16    Q     And what does it mean to be a legal observer coordinator?

17    A     So I also just am a legal observer.  We go out and we

18    observe police activity at protests.  We make notes and take

19    films of it, and then I also do kind of an administrative role

20    of scheduling other legal observers to go to protests.

21    Q     Okay.  And if you can direct your attention to

22    September 15th of this year, did you go to the Central West

23    End neighborhood on that evening?

24    A     Yes.

25    Q     And why did you go there?

1  A    I heard that there was a church that was surrounded by

2  police officers, and then I also heard that there were --

3  there was a significant police presence there.  So I went to

4  go observe.

5  Q    And what time did you arrive in that neighborhood?

6  A    I got into the neighborhood at 11:15 p.m.

7  Q    Were you driving?

8  A    Yes.

9  Q    Where did you park your car?

10  A    I parked my car at the intersection of Delmar and Euclid,

11  in front of an apartment complex, and then I walked south on

12  Euclid.

13  Q    Okay.  And how far down Euclid did you walk?

14  A    I walked several blocks.  I mean I don't know if it was

15  four, five, six blocks, but it was to a street called

16  Pershing.

17  Q    Okay.  At that point, was traffic flowing normally on

18  Euclid Avenue?

19  A    Yes.

20  Q    What did you see on Euclid as you were walking down the

21  sidewalk?

22  A    There were people who were leaving restaurants, eating

23  inside of restaurants.  There was a lot of -- there was

24  movement both ways on the street with people.  People were

25  going in both directions, and there were cars.  I remember

1    cars on McPherson that were driving.  I remember some cars on

2    Euclid, but then the -- the police had formed a line across

3    Euclid so there wasn't traffic south of -- of Pershing that I

4    could see.

5    Q    Okay.  And the line of police you are talking about,

6    that's near the intersection of Euclid and Pershing, across

7    Euclid?

8    A    Yes.  It went across from the edge of the sidewalk to the

9    other edge of the sidewalk.  There was a complete line of

10   police who were wearing what I would call riot gear.

11   Q    What is riot gear?

12   A    In opposition to like a soft uniform, it's like a hard

13   uniform with some armor and shields, batons, and face masks.

14   Q    Okay.  When you got to where that police line was, what

15   happened?

16   A    Well, there was about, I would say, you know, 20, 25

17   people who were on the sidewalks mostly.  There might have

18   been one or two people who were crossing the street, and

19   people were kind of at a standstill.  The police were facing

20   them, and they were facing the police.  And the police started

21   to -- just about as soon as I got there, the police started to

22   tap their batons on the ground, and you could tell there was

23   just a change in their demeanor, and so I decided that I

24   didn't want to be there because it seemed like something was

25   about to happen, and so I said to somebody, "You know, we need

Steven Hoffmann Direct Examination                    Volume 1

1   to -- we should get out of here real quick," something like

2   that.

3   Q    When you're talking about a change in demeanor, did you

4   see any pedestrian do anything that caused that change?

5   A    No.  The people who were there were acting the same as

6   when I got there.

7   Q    Did you see anyone committing any act of violence?

8   A    No.

9   Q    Did you see anyone destroying any property?

10   A    No.

11   Q    Were you committing any act of violence --

12   A    No.

13   Q    -- or destroying any property?

14   A    No.

15   Q    Were you committing any crime?

16   A    No.

17   Q    After there was a change in demeanor, what happened next?

18   A    So I looked down at myself, and I saw that there were

19   like a laser pointer, like a sight on a gun that was on my

20   chest and my stomach, and I kind of moved out of the way, and

21   it followed me there, and that's when I really decided I

22   needed to get out.  I think I got behind a tree for a second,

23   and then I decided to just -- to just run out of the

24   situation.

25   Q    And which way did you run?

Steven Hoffmann - Direct Examination                    Volume 1

110

1    A    I ran north on Euclid.

2    Q    And what happened after or while you were running?

3    A    I could hear this clicking noise behind me.  It was a

4    click, click, click, click, click, and then I could hear what

5    sounded like balls or pellets kind of hitting the ground all

6    around me.

7    Q    And do you have some understanding of what those noises

8    were?

9    A    Yes.  I think that they were -- because I could -- I

10   could smell a little bit after those were hitting the ground,

11   and I believe that they were like PepperBalls, some kind of a

12   ball filled with a liquid that kind of burns.

13   Q    Did you feel any effects from the -- what you think were

14   PepperBalls?

15   A    None of them hit my body, so no.  I mean --

16   Q    Okay.  You said --

17   A    It didn't get on my skin.

18   Q    You said you could smell it?

19   A    Uh-huh.

20   Q    What does it smell like?

21   A    Well, it smells like -- it smells like when people get

22   pepper sprayed, when crowds of people get pepper sprayed.

23   It's the same kind of smell.

24   Q    So this is the evening of September 15th?

25   A    Yes.

Steven Hoffmann - Direct Examination                    Volume 1

1  Q    After you ran north on Euclid, did you speak to any

2  police officers after that point?

3  A    Yes.  It was -- after the situation I just described, it

4  was maybe a half an hour later when things had calmed down and

5  the police had moved their line farther -- even farther south

6  than Pershing, and I went back up the street.

7  Q    Are you saying the police went first north on Euclid and

8  then south again?

9  A    Uh-huh.

10  Q    Okay.  Moving as a line?

11  A    Yes.

12  Q    Okay.  And your -- when you spoke to the police officers,

13  that was after that point, after they had moved back south

14  again?

15  A    Yes.

16  Q    Okay.  What -- tell us about the conversation.

17  A    Well, they had closed -- they had -- they were saying

18  that the sidewalk was closed because they were -- there was an

19  armored vehicle that was up in the street, and that line of

20  police was kind of behind the armored vehicle because the

21  police were doing something on the other side.  And I told a

22  couple of police officers that I wanted to walk on the

23  sidewalk up there so that I could record, video record what

24  was happening, and they said, "The sidewalk is closed," but

25  then they let some other people by.  So I challenged them and

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 112 of 333 PageID #:
4228
Steven Hoffmann  Direct Examination                          Volume 1

112

1    said, "Well, why are you letting other people walk on the

2    sidewalk and you won't let me?"  So they eventually did let me

3    walk a little farther, and then a white-shirt officer, who I

4    think is a commander or some higher rank, approached and said,

5    "Is there a problem?"

6         And I said, "Well, yes, there's a problem," and I was

7    upset because of the tear gas that had happened at the corner

8    earlier after I had ran, and I said, "You shot tear gas at us

9    without giving us any warning."

10        And then he said back, "Well, I don't have to give you

11   any f'ing warning."

12   Q    And when you say "tear gas," what you described before

13   was what you thought were pepper pellets; right?

14   A    Yes.

15   Q    Was there also tear gas?

16   A    Yes.

17   Q    Or was it one or the other?

18   A    There was both.  After I had gotten to the corner of

19   McPherson, after the police line moved to McPherson, I had

20   gone west on McPherson and kind of went behind some cars, and

21   then they were shooting tear gas canisters into the -- or

22   throwing them -- I don't know -- into the intersection there

23   at Euclid and McPherson.

24   Q    If you -- if you had to estimate, how many police

25   officers did you see in the Central West End neighborhood when

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 113 of 333 PageID #:
4236
Steven Hoffmann Direct Examination                        Volume 1

113

1   you arrived that evening?

2   A    There were hundreds.  There could have been -- there were

3   officers from the County.  There were officers from the City.

4   And there was more than just that one riot line that I

5   described.  There were other lines of police officers.  So in

6   the hundreds.  Maybe 400, three or four hundred officers.

7   Q    And you mentioned you also saw a tactical vehicle?

8   A    Yes.

9   Q    What does that look like?

10  A    It's a big, black, armored, kind of van-shaped, you know,

11  truck, car, machine.

12  Q    Okay.  Have you -- in your capacity as a legal observer

13  or as a legal observer coordinator, have you observed any

14  other protests in the city of St. Louis?

15  A    Yes, many.

16  Q    Have you ever observed the police deploying a chemical

17  agent against protestors before September 2017?

18  A    Yes, definitely.

19  Q    When did you see that?

20  A    Well, going back to -- around October of 2014 would have

21  been the first time that I saw that.

22  Q    And where did -- where was that located?

23  A    That was at a QuikTrip at the intersection of Vandeventer

24  and Chouteau.

25  Q    And what were you doing there?

1    A    I was observing the arrest of maybe 14 or 15 people that

2    happened in the parking lot.

3    Q    Were you in the parking lot?

4    A    No.  I -- I had been in the parking lot, but I moved to

5    the sidewalk when police told everyone to leave, and I went --

6    and I was watching what was happening from the sidewalk.

7    Q    On that occasion in October of 2014, near that QuikTrip

8    parking lot, did the police warn you before deploying a

9    chemical agent?

10   A    No.  They -- they ordered me to cross the road and go to

11   the other side of the street, and as I was about in the middle

12   of the intersection, they either shot or threw a tear gas

13   canister at me.

14   Q    When you say the middle of the street, are you talking

15   about Vandeventer?

16   A    Yes.

17   Q    Okay.  You were crossing from the east side of

18   Vandeventer to the west side of Vandeventer?

19   A    That's correct.

20   Q    Okay.  On the evening of September 15th of 2017, did the

21   police warn you before they deployed pepper pellets or tear

22   gas?

23   A    No.

24   Q    Have you observed the police deploying chemical agents

25   against observers or protestors without warning on any other

1  occasion besides those two times?

2  A    Yes.

3  Q    When did that happen?

4  A    So there was at the intersection of Grand and Arsenal

5  in -- I believe it was November of 2014, and then there was

6  also at the city workhouse.  There was a protest at the

7  medium-security institution where they pepper sprayed us

8  without warning.  And then there was another situation in the

9  Fountain Park neighborhood in August of 2015.  Was very

10 similar.

11 Q    On all of those occasions, were you committing any crime

12 at the time chemical agents were deployed?

13 A    No, absolutely not.

14 Q    Were you posing a danger to any other person or to any

15 police officer?

16 A    No.

17 Q    Have you attended any protests in the city of St. Louis

18 since Friday, September 15th?

19 A    Yes, I have.

20 Q    Did you attend a protest on Tuesday, October 3rd?

21 A    Yes.

22 Q    Were you there participating in the protest or observing?

23 A    No.  I was just observing the protest on Jefferson

24 Avenue.

25 Q    And just describe what you did on that evening?

1   A    Well, there was some protestors that had gone onto the

2   highway.

3   Q    I'm sorry.  This is Highway 40/64?

4   A    Yes.

5   Q    Okay.

6   A    And I waited at the overpass because I had heard that

7   they were going to come off the highway at Jefferson, and so I

8   was waiting there, and I met up with the crowd.  I stayed on

9   the sidewalks.  I just kind of watched what was happening, and

10  they had turned down Jefferson, going north.  It was, you

11  know, a crowd of people.  And the police, again, formed one of

12  those riot lines.  All the protestors moved to the sidewalk on

13  the east side of the street, of Jefferson.  And then police

14  were kind of -- they waited for a little while.  County moved

15  in from the other side, blocking a way out for people so

16  people couldn't go anywhere.

17  Q    And you were standing on the sidewalk adjacent to

18  Jefferson Avenue, north of Highway 40/64?

19  A    Yes.  I was standing on the sidewalk on the north -- on

20  the east side of Jefferson.

21  Q    Okay.

22  A    Correct.

23  Q    Were you on the highway?

24  A    No.

25          THE COURT:  So you weren't on the overpass over the

Steven Hoffmann - Cross-examination                    Volume 1

117

1   highway?  You were north of the highway?

2           THE WITNESS:  I had been standing -- when -- I had

3   been standing on the overpass, on the sidewalk on the overpass

4   while people were farther down on the highway, and I was

5   watching them, and then they came up and turned, and then I

6   was on the sidewalk on Jefferson.

7           THE COURT:  And at that time, were there people still

8   on the highway?

9           THE WITNESS:  No.

10          THE COURT:  Okay.

11  Q   (By Ms. Steffan) So while you were standing on the

12  highway -- I'm sorry.  While you were standing on the sidewalk

13  on the east side of Jefferson, north of the highway, were you

14  arrested?

15  A   Yes.

16  Q   Were you told why you were arrested?

17  A   They said that I was -- had trespassed on the highway.

18          MS. STEFFAN:  I have no further questions.

19          THE COURT:  Cross-examination.

20                      CROSS-EXAMINATION

21  BY MR. MCDONNELL:

22  Q   Good morning, Mr. Hoffmann.

23  A   Good morning.

24  Q   When you arrived in the Central West End, it was about

25  11:15 on Friday night?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 118 of 333 PageID #:
1236
Steven Hoffmann   Cross-examination                              Volume 1

118

1    A    Yes.

2    Q    Were you aware that immediately prior to that that the

3    Mayor's house, near the intersection of Waterman and Lake, had

4    been vandalized by the protestors?

5    A    No, I didn't know that at the time.

6    Q    At the time, did you know that the protestors had injured

7    some police officers in front of Mayor Krewson's house?

8    A    No.

9    Q    Would it be fair to say, sir, that you can't shed any

10   light to this Court on what type of warnings were given at or

11   near the intersection of Waterman and Lake by the police to

12   the protestors regarding illegal assembly or orders to

13   disperse?

14   A    I was not at that intersection.

15   Q    You don't -- you're not aware that the police used a PA

16   system to announce this situation?

17   A    They didn't do it when I was there.

18   Q    Okay.  You weren't there; correct?

19   A    At Waterman?

20   Q    Waterman and Lake.

21   A    No, I was not there.

22   Q    Okay.  And are you aware that the protestors, when they

23   began to disperse, were forced down towards where you were on

24   Euclid?  Correct?

25   A    I don't know where those people came -- the people came

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 119 of 333 PageID #: 1236
Steven Hoffmann Cross-examination                    Volume 1

119

1    from.

2    Q    And that's just a mystery, huh?  You don't know?

3         THE COURT:  Are you asking what he knew at the

4    time --

5    A    I'm not sure what you're asking me because I --

6         THE COURT:  -- or what he knows --

7    A    -- I didn't see them.

8         THE COURT:  Are you asking -- are you -- hold on a

9    second.  Hold on.

10        THE WITNESS:  I'm sorry, Your Honor.

11        THE COURT:  Are you asking what he knew at the time

12   or what he knows today from reading the newspaper?  Because

13   I'm not really interested in what he read in the newspaper.

14   Q    (By Mr. McDonnell) No.  What you knew at the time.  You

15   didn't know where these protestors came from?

16   A    No, I didn't know.

17   Q    Okay.  You talk about Grand and Arsenal back in -- when

18   was that?  2014?

19   A    Yes.

20   Q    There was extensive damage, property damage there;

21   correct?

22   A    Yes.  There were broken windows.

23   Q    Okay.  Did you hear any warnings there prior to use of

24   chemical munitions?

25   A    No.

1   Q    This summer at the workhouse, did you see any criminal

2   activity there?

3   A    Umm, I saw at least one person who was pushing on the

4   fence earlier, about 45 minutes before they used the pepper

5   spray.  Other than that, no.

6   Q    You didn't see them trying to tear down the fence?

7   A    No.

8            MR. MCDONNELL:  No further questions.

9            THE COURT:  Any redirect?

10           MS. STEFFAN:  No.

11           THE COURT:  You may step down.

12           You may call your next witness.

13           MR. ROTHERT:  Next witness will be Chris Sommers.

14           THE COURT:  Mr. Sommers.

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  If you'll step up here to the

17  clerk to be sworn please.

18                        **CHRIS SOMMERS**,

19  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

20  FOLLOWS:

21                      DIRECT EXAMINATION

22  BY MR. ROTHERT:

23  Q    Good morning, Mr. Sommers.

24  A    Good morning.

25  Q    Could you state your name for the record, please?

1   A    Chris Sommers.

2   Q    And you're here today because you were subpoenaed by

3   Plaintiffs' attorneys; is that correct?

4   A    Correct.

5   Q    All right.  Mr. Sommers, what do you do for a living?

6   A    I own Pi Pizzeria and some other restaurants.

7   Q    Now, prior to the middle of 2017, did you and your

8   businesses have any interactions with police officers, regular

9   interactions?

10  A    Yeah.  From the -- yes.  From the day I opened, I have

11  been a supporter of the police.  Have friends who are police

12  officers.  Am personal friends with the former chief, friends

13  with Captain Hayden, friends with city attorney, former city

14  attorney Winston Calvert.  Have been, you know, feeding and

15  donating to police charities for nearly 10 years.

16  Q    And when you say "feeding," do you offer a discount to

17  police officers?

18  A    It's generally 50 percent or more to uniformed officers.

19  Q    Now, do you have any Pi Pizzeria locations in the city of

20  St. Louis?

21  A    Yes.  I have three.

22  Q    All right.  And do you have one located in the Central

23  West End?

24  A    Yes, at the corner of Euclid and McPherson, 400 North

25  Euclid.

1   Q     Is outdoor seating available at that location?

2   A     Yes, on the sidewalk of McPherson and on Euclid.

3   Q     Did you have occasion to be at the -- your Pi Pizzeria

4   location on the northeast corner of McPherson and Euclid on

5   the evening of Friday, September 15th, 2017?

6   A     Yes, I was there.

7   Q     Okay.  What time in the evening did you go there

8   approximately?

9   A     I arrived there just as the peaceful protest was

10  approaching our restaurant.  I was observing from my home, on

11  Twitter, and realized that it was headed north.  So my wife

12  and I agreed it would be a good idea to get up there and hand

13  out water to police and protestors and sort of create a human

14  interaction with those to hopefully diffuse any situation,

15  protect my business, my guests, my team.  So we did just that,

16  and the protest then moved elsewhere, towards the Mayor's

17  house.  Then I sat on the corner.

18  Q     Let's go back.

19  A     Yes.  Sure.

20  Q     Let's go back to when you arrived.  Did you observe a

21  peaceful protest when you arrived?

22  A     Yes.  That's all I saw.

23  Q     And how many people were -- do you estimate there were in

24  that protest?

25  A     Hundreds.

Chris Sommers Direct Examination                          Volume 1

```
 1   Q    All right.  And were there police around?

 2   A    Yes.  There were, I believe, police leading, like ahead

 3   of the protest at that point, but then that -- they passed

 4   quickly, and then it was protestors.

 5   Q    Okay.  And was there any incident when the protests went

 6   by?

 7   A    None.

 8   Q    Were your customers able to continue dining during -- the

 9   customers who were outside able to continue dining and eating

10   while the protest went by?

11   A    Some of them stayed out on the patio.  Others stayed

12   inside.  And then after the protest passed, then other guests

13   came back and sat both inside and outside on the corner

14   because there was no sign of any protest.

15   Q    Okay.  Did you witness any property damage?

16   A    I did not.

17   Q    To your own property?

18   A    No.

19   Q    Any other property around yours?

20   A    No.

21   Q    Did you stick around after the -- that protest march had

22   gone by?

23   A    Yeah.  For probably an hour, I sat on the corner with a

24   friend and a couple of Jesuit priest friends of his who I had

25   never met before.
```

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 124 of 333 PageID #:
1241
Chris Sommers Direct Examination                              Volume 1

124

1   Q    Okay.  And when you say you sat on the corner, that's

2   your restaurant corner?

3   A    The very corner of Euclid and McPherson at the most

4   corneresque table, and I sat there for probably -- I don't

5   know -- 60 to 75 minutes.

6            THE COURT:  And what time of night was this?

7            THE WITNESS:  It was probably between -- around 10:00

8   to 11:00 because I left, I believe, at like five after 11:00.

9            THE COURT:  Okay.  Thank you.

10           THE WITNESS:  And the time stamps on my videos

11  confirm, I believe, it was between five and 10 after when I

12  saw the line of police.

13  Q    The stuff that's coming up --

14  A    Yes.  Sorry.

15  Q    -- was at 11:00?  Okay.  So this was -- when -- did you

16  first get there a couple hours before?

17  A    I'm going to guess it was between 8:00 and 9:00.  I don't

18  know exactly.

19  Q    All right.  Now, drawing your attention back to that time

20  when the protest had gone by and you're sitting outside, did

21  anything seem amiss in your neighborhood that you were sitting

22  out in?

23  A    No.  Quite the contrary.  Then that's why I decided it

24  was safe to leave my business and my team and go home and join

25  my family at home, and that's what I had just done.  I went to

1    grab my -- my van.

2    Q    Okay.  Where were you parked?

3    A    I was parked just west of Euclid on McPherson, about 75

4    feet west of the intersection.

5    Q    So you walked to your car?

6    A    I walked to my van actually, yeah.

7    Q    Van.  Sorry.  Did you see anything out of the ordinary

8    when you were walking to your van?

9    A    Not as I was walking to my van.  It was only after I

10   drove east on McPherson.  I looked south, and I saw the wall

11   of police with shields and guns and masks, and I immediately

12   pulled over my van just east of Euclid, and there happened to

13   be a spot right there, and I ran back to the corner and stood

14   on the corner of Euclid and McPherson.  That's when I began

15   recording, though I did first try to ascertain whether there

16   was a reason for them coming in such force and in that type of

17   line because I assumed there had to be protestors or some

18   reason or justification for that tactic.

19   Q    Was there anything you saw?

20   A    None.

21   Q    When you were -- when you were returning to your

22   restaurant, was the vehicular traffic on McPherson -- was that

23   impeded in any way?

24   A    None whatsoever.  Cars were moving freely, stopping at

25   the stop sign, and then proceeding through without impedance.

1   Q    What about pedestrians?

2   A    Pedestrians were around.  I mean people had begun --

3   had -- were seated at our tables outside.  So it was a very

4   peaceful corner.  I would not have left my team and my

5   property if I had felt in any way that it was threatened.

6   Q    Okay.  Can you describe that line of police that was

7   marching north on Euclid that you saw?

8   A    Yeah.  It was probably 20 to 30 wide.  It seemed to take

9   the whole street and the sidewalk.  Marching north.  I

10  couldn't tell exactly how deep it was, but I later realized

11  that it was several officers deep.  So it was probably 75 plus

12  officers.  I really don't know.

13  Q    How were they dressed?

14  A    In tactical gear, with masks and shields and guns, both

15  probably, you know, firearms as well as what I later came to

16  know were pepper pellet guns.

17  Q    Do you know if they had sticks, nightsticks?

18  A    I don't know if they had them.  I mean I really don't

19  know.  They probably -- probably did.  You can see that they

20  have some type of long device in the video that some of

21  them -- there's a couple of them that are orange-tipped, which

22  I believe are the pepper pellet guns, and the rest of them, I

23  believe, were just firearms.

24  Q    Okay.  Did there come a time when they arrived at -- that

25  police line arrived at Euclid and McPherson?

1    A    Yes.  They arrived on the south side of the intersection,

2    as I hear them saying, "Get back.  Get back.  Get back."  But

3    I don't know to whom they're directing that command because

4    there aren't really people around.  And when they reach that

5    line of the intersection, sort of parallel with the doors of

6    Left Bank Books and the corner of Mission Taco, they start

7    firing what I later learn are pepper -- I believe are pepper

8    pellets.  It appears that they're shooting them up in the air,

9    and that's when I became very upset and started, you know,

10   questioning them verbally, and they didn't like that.

11   Q    How -- what makes you think they didn't like that?

12   A    Because they shot at -- shot the -- one of those pepper

13   pellet guns at me and threw a tear gas canister at us.

14   Q    You were recording the police when this happened?

15   A    Correct.

16   Q    Was there any dispersal order that you heard?

17   A    I don't believe so, and I don't have anything on video

18   other than as they're approaching they're saying, "Get back.

19   Get back."  But I'm across the street, directly in front of my

20   business, on property that I pay the City for, for our outdoor

21   dining.  So I mean there's nowhere that I would go, and of

22   course, I can legitimately stand in front of my business, but

23   I don't really know to whom they're talking, and I think you

24   can kind of tell on the video that as they get to the corner

25   they sort of realize, "What are we doing here?"  They had some

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 128 of 333 PageID #:
1245
Chris Sommers Direct Examination                           Volume 1

128

1    bad intel, or they realized that their presence there was

2    unwarranted.

3    Q    Okay.  Did they give any warning that chemical munitions

4    were going to be --

5    A    Not to my recollection or that I could hear.

6    Q    Okay.  I'm going to show you a couple of recordings now

7    on that screen that's -- that's there.  We'll start with

8    Plaintiffs' Exhibit 6.  Let me try and get rid of this yellow

9    line or red line.  Okay.

10        (Video playing.)

11   Q    (By Mr. Rothert) Okay.  As this starts, can you -- can

12   you describe what we're seeing here?

13   A    This is video that I took, standing outside one of our

14   doors on the corner, as the police are marching towards the

15   corner of Euclid and McPherson.  I had just returned from my

16   vehicle.  I was on my way home, of course, when I -- when I

17   saw them coming.  I returned to check on my business and to

18   record this because I thought it was atrocious.

19   Q    Okay.  What did you think was atrocious about this?

20   A    Well, their presence in that tactical gear and the line

21   of them trying to, in my mind, threaten, intimidate absolutely

22   nobody who was protesting either peacefully or an agitator,

23   but in the end, they were just intimidating anybody who was,

24   you know, attending the businesses in the area and my

25   employees, my team, myself.

Chris Sommers Direct Examination                    Volume 1

129

1    Q    Okay.  I was going to ask if you saw anyone do anything

2    illegal, but I just saw a car run through a stop sign.

3    A    No.

4    Q    Other than a car running through a stop sign --

5    A    I probably would have done the same to get away from

6    them.

7    Q    -- oh, there's another one -- did you see anyone -- any

8    illegal activity anywhere that you could see?

9    A    No.  And I had not previously either.

10   Q    Okay.  And so would you agree the police are just milling

11   around here for a little bit?

12   A    Yeah.  They look kind of clueless, like they don't

13   understand why they're there themselves.

14   Q    All right.  So nothing happens for a little while here;

15   right?

16   A    Yeah.

17   Q    Okay.

18   A    When they -- I'm sorry.  When they did arrive, though,

19   they did shoot upon hitting that parallel there at the

20   crosswalk.

21   Q    Okay.  At this point, had you -- you hadn't said anything

22   to them yet; is that correct?

23   A    Oh, no.  I'm sure I had criticized them verbally, yeah.

24   Q    For having --

25   A    For being there and for intimidating and for shooting and

Chris Sommers Direct Examination                              Volume 1

130

1   otherwise threatening.  And there's somebody shooting right

2   there.  For otherwise threatening the peaceful existence of my

3   business, my team, and my guests.

4   Q    Okay.  And --

5        THE COURT:  Just so I'm clear, you said you saw them

6   shooting into the air before you started videoing.  Is that

7   right?

8        THE WITNESS:  No.  I have -- there's another clip

9   where I --

10        MR. ROTHERT:  Well, he --

11        THE COURT:  Before that clip?  Were they shooting

12   into the air before that clip we just saw?

13        THE WITNESS:  As part of that clip, yes.  When they

14   arrived, the moment they get to the parallel crosswalk there,

15   that's when they start shooting, and then they take a break a

16   little bit, and I think they shoot maybe a couple other times

17   before they shoot in my direction.

18   Q    (By Mr. Rothert) And if we could look at -- and then this

19   video was taken on your phone; correct?

20   A    Yeah.

21   Q    And so it stopped after a certain period of time.  Did

22   you immediately start recording again?

23   A    Umm, I -- yes.  After -- after -- so what happened is

24   after they shot in my direction, threw the tear gas, a guy who

25   was standing next to me, who I did not know and still do not

1  know, picked up the canister and threw it back in their

2  direction.

3  Q    Okay.  Okay.  Let's get to that.

4       (Video playing.)

5  Q    (By Mr. Rothert) All right.  So now I'm showing you

6  Plaintiffs' Exhibit 7.  This was immediately after the video

7  we just watched; is that correct?

8  A    Yes.  I'm still -- it looks like I'm still seeing the

9  original one or the first one.

10          THE COURT:  Are you saying this is --

11  Q    (By Mr. Rothert) No.  It's the second one.

12  A    Oh, this is it?  Okay.  Sorry.  Okay.

13  Q    There are not as many cars.  By this time, are you

14  confident that you were offering your criticisms to the police

15  officers?  Is that correct?

16  A    Yes.

17  Q    All right.  Will you tell us when you see someone

18  spraying, sending pepper pellets if you do?

19  A    Yeah, I will.  There's something being shot there, but I

20  don't think that was at my direction at that point.  They are

21  shooting, but it's not -- there it goes.

22  Q    Okay.  That's --

23  A    You can tell by the -- you can see the person, the cop,

24  turn, shoot in our direction, and then I think there comes the

25  tear gas.  The guy in the orange shirt then picks it up and

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 132 of 333 PageID #:
1248
Chris Sommers Direct Examination                           Volume 1

132

1   throws it back at them, and I don't know his motivation, if he

2   was pissed, if he wanted to get it away from himself, if he

3   wanted to get it away from my business.  I don't think it

4   really matters.  If he hadn't done it, I probably would have

5   myself.

6   Q    And then you went into the restaurant?

7   A    And then, yeah, that's -- that's after -- I'm in my

8   restaurant there because the police charged at -- in my

9   direction after that gentleman had thrown the canister back in

10  their direction.

11  Q    Did they arrest anyone?

12  A    No.

13  Q    Okay.

14  A    What happens, which is not exactly on video, is that I've

15  locked myself and my team and everybody into the restaurant

16  within inches of the cops getting to the door, and then they

17  really quickly turned and walked away.  So they -- if they had

18  wanted to arrest somebody, they could have, but there's three

19  other doors to the restaurant.  They could have easily walked

20  in, but I think, you know, particularly, because it was on

21  video, they recognized the error of their ways.

22  Q    And do Exhibits 6 and 7 accurately depict the events that

23  you testified about earlier?  Are those --

24  A    Are those the exhibits we just saw?

25  Q    Yeah.  Yes.

Chris Sommers Direct Examination                    Volume 1

133

 1   A    I'm sorry.  Yes.  Sorry about that.

 2            MR. ROTHERT:  I'd move for admission of Exhibits 6

 3   and 7.

 4            THE COURT:  6 and 7 are received into evidence.

 5   Q    (By Mr. Rothert) Okay.  And now I'm going to show you on

 6   that same screen --

 7   A    Uh-huh.

 8   Q    -- a declaration that's been marked as Plaintiffs'

 9   Exhibit 24.  Do you see that?

10   A    Yes.

11   Q    And this is a four-page declaration.  Is that your

12   signature on the --

13   A    It is.

14   Q    -- fourth page?

15   A    Yes.

16   Q    Okay.  Do you remember signing this declaration,

17   reviewing and signing this declaration?

18   A    Yes.

19   Q    And is everything that's in this declaration true?

20   A    Yes.

21            MR. ROTHERT:  Okay.  I'd move for admission of

22   Plaintiffs' Exhibit 24.

23            THE COURT:  Exhibit 24 is received into evidence.

24            MR. ROTHERT:  And I have no further questions of this

25   witness.  The City may have some questions for you.

1          THE COURT:  All right.  Cross-examination.

2                      CROSS-EXAMINATION

3    BY MR. RELYS:

4    Q    Good afternoon, Mr. Sommers.

5    A    Good afternoon.

6    Q    So we just watched some video, and you told us about your

7    experiences there on -- what was it?  Friday night?

8    A    Friday, the 15th of September.

9    Q    So to the best of your knowledge, you -- the police are

10   marching around in Central West End on that Friday night in

11   tactical gear shooting at nobody?

12   A    Well, I don't know what was happening elsewhere in the

13   West End, but I know what I witnessed and videotaped, as you

14   just saw, on my corner.

15   Q    So on that location, you said, basically, there was

16   nobody there for them to shoot at, but they were shooting

17   anyway?

18   A    That's what it appears.

19   Q    Okay.  Are you aware that just down the block in the

20   direction that they were shooting that there were protestors

21   who had been engaging the police with rocks?

22   A    Which direction?

23   Q    Further north on Euclid.  Were you aware of that?

24   A    I'm not aware of it.  I didn't witness that.

25   Q    Okay.  And you said that the police officers shot tear

1   gas.  Are you able to distinguish between tear gas and smoke?

2   A    Well, I -- I am by the effects of it.  So I'm not sure if

3   it was the pepper pellet or smoke or tear gas or whatever

4   you're calling it that affected both me and my guests and my

5   team, but it was a chemical agent.

6   Q    Okay.  But the -- one of the munitions that were shot

7   toward your direction could have been smoke?

8   A    It's possible.

9   Q    You did hear the -- the officers shouting, "Get back," I

10  think you said, when they arrived at the location?

11  A    Uh-huh.

12  Q    And their first shot was when they arrived at the

13  location and formed that line; correct?  Correct?

14  A    To my knowledge.  They could have shot while I was in my

15  car, but I wouldn't have heard it.

16  Q    That was the first that you saw?

17  A    Yes.

18  Q    Okay.  How long after the -- the video that we saw there

19  just now -- how long after that did the police leave the area?

20  A    Ten minutes.

21  Q    Okay.  And they just turned around and walked the other

22  direction?

23  A    Yeah.  I believe they all departed south on Euclid.  I

24  went into the group of cops, and I asked them, "Who shot me?"

25  And nobody would admit it.

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 136 of 333 PageID #:
4253
Chris Sommers Cross-examination                         Volume 1

136

1   Q    So you went back out and engaged these police officers

2   later?

3   A    Yeah, I went -- I went in, yes, and I asked them, and

4   nobody would admit it.

5   Q    All right.

6   A    So then they stayed for five or so minutes -- I don't

7   know -- five or 10 minutes, but they all went what I believe

8   was south on Euclid.

9   Q    So you actually went and talked to these police officers

10  after five or 10 minutes after the video that we saw?

11  A    Correct.

12  Q    You had mentioned earlier that earlier in the evening on

13  this Friday there had been a peaceful demonstration outside in

14  this area?

15  A    Correct.

16  Q    And that that demonstration had ended and folks had went

17  over to the Mayor's house?

18  A    That was my understanding.

19  Q    What was that understanding based on?

20  A    Just chatter as I was sitting on the corner.  And I -- as

21  I've mentioned to others, I merely texted the Mayor, who's

22  been a longtime friend of mine, to say, "Hey, people are

23  saying that protestors are going to your house.  Heads-up."

24  But then I realized, well, of course, the police would have

25  better intel than I would.

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 137 of 333 PageID #:
4254
Chris Sommers Cross-examination                          Volume 1

137

1    Q    Are you aware that the protestors did converge on the

2    Mayor's house and cause some property damage there?

3    A    I am aware of that, yeah.

4    Q    And are you aware that, in engaging those protestors, the

5    various police officers had been injured during the night?

6    A    I've understood that things were thrown at police

7    officers.  I don't know the timing of that, though.

8    Q    So in the intervening time period between when you first

9    saw the protestors engaged in a peaceful protest in front of

10   your store and the video that we've watched here in court

11   today, there were some events at the Mayor's house and some

12   confrontations between police and protesters?

13   A    Yes.  I understand when the police were unable to protect

14   the Mayor's house that the agitators or police escalated,

15   however you like to see the -- like to interpret it.

16           THE COURT:  Had you heard that that night?

17           THE WITNESS:  Pardon me?

18           THE COURT:  Did you know that that night when you

19   decided to leave?

20           THE WITNESS:  Yeah, I was already aware that things

21   had gone to the Mayor's house.  At that time, I don't think I

22   knew what had happened there, but I knew that they had gone

23   there.

24           THE COURT:  Okay.

25           THE WITNESS:  And I -- then afterwards, I knew that

1    things were going on at Central Reform Congregation at

2    Kingshighway and Waterman as well as there were still people

3    down at Maryland and Euclid, but from what I could read on

4    Twitter, everything was headed the opposite direction, and

5    that's why I felt safe to leave.

6    Q    (By Mr. Relys) So you had some knowledge about the chaos

7    that had been occurring around the Central West End earlier

8    that evening?

9    A    Absolutely.  I was following it on Twitter, and my wife

10   was following it at home, and we were texting to make sure

11   that it was safe to go home, and she was helping keep me

12   informed of what was going on elsewhere.

13           MR. RELYS:  Okay.  I have nothing further at this

14   time.

15           THE COURT:  Any redirect?

16           MR. ROTHERT:  No redirect, Your Honor.

17           THE COURT:  You may step down.

18           THE WITNESS:  Thank you.

19           THE COURT:  All right.  I think we'll take a lunch

20   break now, and so we'll resume at 1:15.  Court's in recess.

21       (Court recessed for lunch from 12:17 p.m. until 1:20p.m.)

22           THE COURT:  All right.  You may proceed.

23           MR. ROTHERT:  Plaintiffs' next witness is Megan

24   Green.

25           THE COURT:  Ma'am, would you step right up here to

1    the clerk to be sworn?

2                          **MEGAN GREEN**,

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5                          DIRECT EXAMINATION

6    BY MS. STEFFAN:

7    Q    Good afternoon, Ms. Green.  Could you please state your

8    name for the record?

9    A    It's Megan Green.

10   Q    I'm going to direct your attention to September 15th,

11   2017.  On that day, did you have occasion to go to the Central

12   West End neighborhood?

13   A    Yes, I did.

14   Q    What time did you arrive there?

15   A    Right around 7:00.

16   Q    And what did you do in that neighborhood?

17   A    I joined in the protest.

18   Q    Why did you feel the need to participate in that protest?

19   A    I've been pretty active in the protests since 2014 and --

20   and had been kind of vocal in -- in my support of the Black

21   Lives Matter movement.

22   Q    Did you participate in a march with other protestors on

23   that evening?

24   A    Yes, I did.

25   Q    After that march, did you encounter any police officers?

140

1    A    Yes, I did.

2    Q    Where?

3    A    On -- right around Lake and Waterman where

4    Mayor Krewson's house was all the way to Central Reform

5    Congregation and Kingshighway.

6    Q    Did you, at some point, go inside the Central Reform

7    Congregation synagogue?

8    A    Yes, I did.

9    Q    What time did you go inside?

10   A    It was probably about 9:30, 10:00.

11   Q    And why did you go in there?

12   A    We were trying to vacate the neighborhood and got to a

13   place where we were boxed in by police officers, and the only

14   place that we really could go to avoid being tear-gassed or

15   get out of the way of police was into the Central Reform

16   Congregation.

17   Q    And that is on Kingshighway?

18   A    At the corner of Kingshighway and, I think, Waterman.

19   Q    Okay.  Did others go into the synagogue along with you?

20   A    Yes.  There were probably about 100 to 150 people inside.

21   Q    How long did you stay inside?

22   A    At least an hour.  Probably closer to an hour and a half.

23   Q    At some point, you left the synagogue?

24   A    Correct.  The officers that had been surrounding the

25   synagogue eventually dispersed, and a group of about 10 of us

Megan Green Direct Examination                                     Volume 1

141

1    decided to try to make our way back to our vehicles, which

2    were south of Lindell.

3    Q    And what were you going to do once you got to your

4    vehicle?

5    A    Go home.

6    Q    So when you decided to leave the synagogue and you did

7    that, what happened next?

8    A    We headed south on Kingshighway and approached a police

9    line at the property line of the Chase Park Plaza.  We went up

10   to the officers and asked for permission to cross that line,

11   explaining that our vehicles were at Euclid and Laclede and we

12   needed to get back there in order to leave, and we were given

13   permission to cross that line, albeit mocking statements were

14   made at us as we crossed that line, and then we turned left

15   onto Lindell in order to get back to our vehicles.

16   Q    So when you got near your vehicle, what did you see?

17   A    We were about halfway down the block on Lindell, by the

18   entrance to the theater, and all of a sudden, an MRAP came

19   speeding around the corner from Euclid.  It was going south on

20   Euclid and turned onto Lindell.  When that happened, I yelled

21   to the group that I was with to take cover.  I had seen this

22   behavior from MRAPs before in 2014 with MoKaBe's coffee shop

23   and knew that that vehicle coming toward us was likely going

24   to tear-gas us.

25   Q    And when you say an MRAP, what is that?

Megan Green Direct Examination                    Volume 1

142

1   A     An armored vehicle.  Large.  Almost tank-looking vehicle.

2   Q     So did you interact with the MRAP at all?  Did it do

3   anything?

4   A     So we -- we first tried to take cover up alongside where

5   the theater was but really couldn't get out of the way.  The

6   MRAP passed us initially and did not engage with us, and then

7   it came to a stop at about the corner of Lindell and

8   Kingshighway, at which time our group crossed to the south

9   side of Lindell, again, to get closer to our cars.  It was at

10  that time that the MRAP then did a U-turn, came back past us,

11  and dispersed tear gas.

12  Q     Did you hear anyone from the vehicle give you any warning

13  that it was about to disperse tear gas?

14  A     No, there was no warning.

15  Q     At that time, were you committing a crime?

16  A     No.

17  Q     Did you see anyone else committing a crime?

18  A     I did not.  There were very few other people out on the

19  street besides the -- the maybe 10 people that I was with.

20  Q     Did you see anyone who posed a threat to an officer's

21  safety or to your safety?

22  A     Absolutely not.

23  Q     I'm going to show you a document that has been marked as

24  Plaintiffs' Exhibit 25.  Do you recognize this affidavit?

25  A     Yes, I do.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 143 of 333 PageID #:
Megan Green Cross-examination                                        Volume 1
4260

143

1    Q    You agree that it consists of three pages?

2    A    Yes, I do.

3    Q    And this signature at the end is your signature?

4    A    Yes, it is my signature.

5    Q    Have you had an opportunity to review your affidavit for

6    accuracy?

7    A    Yes, I have.

8    Q    Does everything that you said in that affidavit remain

9    true?

10   A    Yes, it does.

11              MS. STEFFAN:  I would move for admission of

12   Plaintiffs' Exhibit 25.

13              THE COURT:  Exhibit 25 is received in evidence.

14              MS. STEFFAN:  That's my last question, Your Honor.

15              THE COURT:  Cross-examination.

16              MR. MCDONNELL:  Thank you, Judge.

17                          CROSS-EXAMINATION

18   BY MR. MCDONNELL:

19   Q    Good afternoon, Ms. Green.

20   A    Good afternoon.

21   Q    When you arrived in the Central West End at Waterman and

22   Lake, approximately what time was that?

23   A    Probably about 9:30.

24   Q    Okay.  Was that before, during, or after the Mayor's

25   house had bricks thrown at it?

1    A    I had been with the protest the entire time, from the

2    time that it started at Maryland and Euclid all the way to

3    marching and ending up at the Mayor's house.

4    Q    Did you see any acts of violence or any criminal

5    activities at the Mayor's house?

6    A    No, I did not.

7    Q    You didn't see anybody throwing any bricks?

8    A    I did not see anybody throw anything.

9    Q    You didn't see anybody throw any paint?

10   A    I did not see anybody throw anything.

11   Q    So just to be clear, Ms. Green, the entire time you were

12   near Waterman and Lake, you saw no violent activity --

13   A    I --

14   Q    -- no property damage?

15   A    I did not.

16   Q    And how many protestors were there?

17   A    Probably close to 800 to a thousand.

18   Q    Okay.  Did you ever hear, when you were at Waterman and

19   Lake, the police on a PA system, giving a warning?

20   A    No, I did not.

21   Q    When you were walking down Lindell, were you aware of any

22   activity that occurred there prior to you walking down Lindell

23   where protestors were causing property damage and violence?

24   A    No, I was not.

25        MR. MCDONNELL:  No further questions.

```
 1              THE COURT:  So you didn't see any broken windows?

 2              You didn't see anybody throw anything the whole

 3   night?

 4              THE WITNESS:  No, I did not.

 5              Like I said, there were a thousand people there, and

 6   I think it's impossible to see everything that happens.

 7              THE COURT:  Okay.

 8              Redirect?

 9              MS. STEFFAN:  No, Your Honor.

10              THE COURT:  You may step down.

11              THE WITNESS:  Thank you.

12              MR. ROTHERT:  Plaintiffs' next witness is Demetrius

13   Thomas.

14              THE COURT:  Mr. Rothert, I understand this witness

15   didn't have an ID when he tried to enter the building, and we

16   allowed him to come in on your say-so, but I hope you will

17   tell all of your witnesses they must have an ID.  I'm not

18   going to let anybody else in without an ID.

19              If this is some kind of a protest or act of civil

20   disobedience, it's not appropriate.

21              MR. ROTHERT:  It is not.

22              This is a lost driver's license situation.

23              THE COURT:  Okay.  Okay.

24              Mr. Thomas, would you step right over here to the

25   clerk to be sworn.
```

1                    **DEMETRIUS THOMAS**,

2   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3   FOLLOWS:

4            THE COURT:  All right.  Are you chewing gum?

5            THE WITNESS:  I'm taking it out right now.

6            THE COURT:  Yeah.  Thank you.

7                    DIRECT EXAMINATION

8   BY MR. ROTHERT:

9   Q    Mr. Thomas, good afternoon.  Could you state your name

10  for the record please?

11  A    Demetrius Thomas.

12  Q    Okay.  And are you a videographer, Mr. Thomas?

13  A    Yes.

14  Q    Okay.  What kind of videography work do you do?

15  A    I shoot mostly weddings, documentaries, and commercials.

16  Q    Were you driving your vehicle in the city of St. Louis on

17  the evening of September 17th, 2017?

18  A    Yes.

19  Q    Were you alone or with a friend?

20  A    I was with a friend.

21  Q    All right.  Did anything attract your attention and cause

22  you to stop that evening?

23  A    Yes.  We were driving through downtown St. Louis, and I

24  saw what looked like a parade of police officers with riot

25  shields and military gear.  So I stopped the car, and that's

Demetrius Thomas Direct Examination                              Volume 1

1    when I got my camera and started walking.

2    Q    Where did you park?

3    A    I parked about a block from the nail shop.

4    Q    Okay.  Do you know what street that was on?

5    A    I want to say Olive.

6    Q    Did you proceed to walk around the downtown area?

7    A    Yes.

8    Q    Okay.  Did any -- did you see any police officers while

9    you were downtown?

10   A    Yes.

11   Q    Okay.  Did any of them give you any directions?

12   A    No.

13   Q    Did you hear any dispersal orders from any police

14   officers?

15   A    No.

16   Q    Any warning that chemical munitions might be fired or

17   used?

18   A    Only when I tried to go to my car.

19   Q    Okay.  We'll get to that in a moment.  Did you see any --

20   did you see any damage, property damage, downtown?

21   A    I saw about two flower pots tossed over, and two

22   buildings had the windows busted out.

23   Q    Okay.  And do you know if the person who did that had

24   been arrested?

25   A    I had heard that they had arrested the vandal -- the

Demetrius Thomas Direct Examination                          Volume 1

148

```
 1   person vandalizing like two hours before.

 2   Q    Okay.  Was there any damage that occurred while you were

 3   in the area?

 4   A    No.

 5   Q    Did you witness anything?

 6   A    No.

 7   Q    Did you hear any exchange of words between police

 8   officers that made you decide to leave?

 9   A    When I had tried to approach my car, I was blocked by a

10   parade of police, and I heard an officer -- I was maybe four

11   feet away from the officers, and I heard the police tell the

12   other police that everyone's going to jail and --

13   Q    How close were you to the officer?

14   A    I was about four feet away.

15   Q    Would you have been able to hear him if you were farther

16   away?

17   A    No.  I was the only one that was not a police that was

18   close to them --

19   Q    Okay.

20   A    -- at that time.

21   Q    But you were heading to your vehicle at that time?

22   A    Right.

23   Q    Okay.  So did you continue to your vehicle?

24   A    I tried to go another route to my vehicle because I had

25   got cut off by the police going to the vehicle.  So I tried to
```

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 149 of 333 PageID #:
4266
Demetrius Thomas Direct Examination                    Volume 1

149

1    go the opposite way, and that's when I was not allowed to my

2    vehicle.  They were standing next to my vehicle.

3    Q    Okay.  How close do you think you got to your vehicle

4    before you got turned around the last time?

5    A    Two feet.

6    Q    Okay.  Did you follow all the directions you received

7    from police officers that evening?

8    A    Yes.  I never received any.  Well, they told me that I

9    can keep filming, just don't go into the street.

10   Q    Okay.  So -- so after you were turned back from your car

11   that last time, what happened?

12   A    I turned back around.  I started walking back towards the

13   intersection, and they pretty much had every street blocked

14   off.  That was the only way we could go.  And the police

15   officers told us that we needed to exit a certain direction.

16   So we all started walking that direction, but once we got to

17   the police blocking that street, they told us to move back,

18   and they started chanting, "Move back" and held their bikes up

19   like a barricade.

20   Q    Uh-huh.

21   A    And that's when they started -- we turned around, and

22   that's when all the tear gas and them macing us started

23   happening.

24   Q    Okay.  So you were sprayed with -- with some kind of mace

25   or --

Demetrius Thomas Direct Examination                     Volume 1

150

1   A    Yes.

2   Q    Okay.  How far away were the people who sprayed you?  Who

3   sprayed you?

4   A    Maybe a few inches.

5   Q    Okay.  Were you fully complying with the police officers'

6   directions?

7   A    Yes.

8   Q    After they closed -- closed in on you, were you directed

9   to do anything, lay on the ground or get on the ground?

10  A    They just told us to get on the ground.

11  Q    Okay.  Did you do so?

12  A    Yes.

13  Q    Okay.  Were you sprayed -- did the spraying stop then

14  once you had gotten on the ground?

15  A    Well, at that time, they kind of pushed us on the ground.

16  Q    Okay.

17  A    Like, they said, "Get on the ground," but they were

18  already pushing us on the ground.

19  Q    Okay.

20  A    And I just laid on the ground and got carried away by

21  four police.

22  Q    Okay.  And you were eventually pulled away from the

23  group?

24  A    Yes.

25  Q    Okay.  What happened to your recording equipment?

1   A    One -- there was one police officer.  He took my camera

2   from me before I got on the ground.

3   Q    Uh-huh.

4   A    And I was -- I had my drone in a bag.  I was able to keep

5   the drone on me.  And they pretty much carried it to the -- to

6   the van that they transported us away in, and they just put it

7   down until I got it in evidence.

8   Q    Okay.  And is it fine?

9   A    No.

10  Q    Okay.  What's wrong with it now?

11  A    My lens is cracked on half of it.  It won't focus at all

12  now.  And I just got a brand-new camera, and it's got a bunch

13  of scratches from the concrete where we hit the ground hard.

14  Q    Would you have left the area if there had been a

15  dispersal order?

16  A    Yes.

17  Q    Why?

18  A    Because I wasn't there to -- for anything but to see what

19  was going on.  I was wondering why was -- why was so many

20  police out there.

21  Q    How long do you think you were in the area before --

22  before you wound up being arrested?

23  A    Maybe about an hour.  An hour to an hour and a half.

24  Q    Looking back on it now with the benefit of hindsight, can

25  you think of anything you could have done differently on

 1    September 17th not to be sprayed or arrested?

 2    A    I wish I would have asked the police, "What are you doing

 3    here?" or "Am I allowed to be here?" or, you know, "Am I going

 4    to get in trouble if I film?"

 5    Q    Why do you -- prior to this, you had observed and

 6    recorded at other protests; correct?

 7    A    Say that one more time.

 8    Q    You've observed and recorded other protest activity

 9    before, before this?

10    A    No.

11    Q    Okay.  This was your first time?

12    A    Yes.

13    Q    Okay.  And why -- why did you think you should record

14    what was happening?

15    A    Usually, I always see it on the news or I hear it across

16    my Facebook feed, and I always feel like because I -- I'm

17    always documenting everything else, why am I not documenting

18    stuff that's happening in my own city, and I felt -- once I

19    drove by and I saw the police, I felt that I was supposed to

20    be there, like I was supposed to be there to capture it for

21    whatever reason.

22    Q    Okay.

23    A    I wasn't there to take sides of anyone.

24    Q    Can we show -- I'd like to show you what's been marked as

25    Plaintiffs' Exhibit 8 on that screen right over there.

1   A    Okay.

2   Q    Can you describe what is happening once it starts?

3        (Video playing.)

4   A    Okay.  That's me walking to my car.  My car is the red

5   car on the left.

6        That's when the police waved a can of mace at me --

7            THE COURT:  We can't -- stop it.

8        (Video stopped.)

9            THE COURT:  Okay.  We couldn't hear what he said.  So

10  he said something, but it's not on the record.

11           MR. ROTHERT:  Yeah.  Can we turn down the volume?

12  A    That -- that clip that just played showed me.  That was

13  my red car parked on the left side of the police.  The police

14  were blocked from one side of the street all the way across

15  where you could not go past, and the cop -- he waved his can

16  of mace and told me, "Move.  Go the other way."  So I didn't

17  give him any talk back.  I just turned around, and I started

18  walking the other way, and at the time, I thought I would just

19  come around the building and go the back way to my vehicle.

20           MR. ROTHERT:  Okay.  Could we resume playing?  Start

21  here please.

22       (Video playing.)

23  Q    (By Mr. Rothert) Is what we just watched -- Exhibit 8 --

24  is that a -- that's a video you took?

25  A    Yes.

1    Q    And does that truly and accurately depict what you saw

2    when that was happening?

3    A    Yes.

4    Q    Were you able to find any way out of -- you know, back to

5    your car so that you could leave?

6    A    Not at all.

7    Q    Okay.  On that same screen, if you would look now,

8    there's a document that has been previously marked as

9    Plaintiffs' Exhibit 33, and it's three pages.  Do you agree

10   with me?

11   A    Yes.

12   Q    Okay.  And it has your electronic signature at the end.

13   Is this the declaration that you completed earlier in this

14   case?

15   A    Yes.

16   Q    And have you had a chance recently to review that to make

17   sure it's accurate?

18   A    Yes.

19   Q    And does everything in there remain true?

20   A    Yes.

21        MR. ROTHERT:  I move for admission of Plaintiffs'

22   Exhibits 8 and 33.

23        THE COURT:  Exhibits 8 and 33 are received into

24   evidence.

25        MR. ROTHERT:  And I have no further questions of this

Case: 4:18-cv-00308-JCH  Doc. #:  126-3  Filed: 01/30/20  Page: 155 of 333 PageID #: 1272
Demetrius Thomas Cross-examination                        Volume 1

155

1    witness.

2            THE COURT:  All right.  Cross-examination.

3                    CROSS-EXAMINATION

4    BY MR. RELYS:

5    Q    Good afternoon, Mr. Thomas.

6    A    Hello.

7    Q    Hello.  So as I understand it, you didn't show up on the

8    evening of September 17th to protest?

9    A    No.

10   Q    You were just passing by?

11   A    Yes.

12   Q    And you saw a bunch of cops in tactical gear?

13   A    Yes.

14   Q    And you decided that that would be a good thing for you

15   to stop and observe?

16   A    Yes.  They were walking in the middle of the street, and

17   it looked like they were going to save something or like they

18   were going to do something big.

19   Q    And so you stopped your car and got out and had a look

20   around?

21   A    Yes.  I got out, and I grabbed my camera and instantly

22   started recording.

23   Q    Okay.  And so, obviously, the video footage we just saw

24   is just a tiny portion of the video footage that you would

25   have shot that evening?

```
1    A    Yes.  That's the point of when we got arrested.

2    Q    And I think you told us that you were actually there for

3    about an hour and a half before you were arrested?

4    A    Yes.

5    Q    And your testimony is that in that entire time you were

6    there, in that entire hour and a half you were there, you

7    didn't hear a single warning?

8    A    No.

9    Q    No one ever -- you didn't hear any warnings to disperse

10   whatsoever?

11   A    No.

12   Q    What prompted you to go back to your car or attempt to go

13   back to your car at that time that we saw on that video?

14   A    Once I heard them tell the police that everyone's going

15   to jail, I just figured, okay, I'm not going to be one of the

16   ones going to jail and I'm going to my car.

17   Q    But, again, until you heard that comment that you said

18   you were only -- the only reason you heard that comment is

19   because you were close by?

20   A    Right.

21   Q    And you said until you heard that comment that you had no

22   inkling that anyone might be arrested?

23   A    No.

24   Q    No as in that's correct?

25   A    I had no clue no one was getting arrested.
```

Demetrius Thomas Cross-examination                    Volume 1

157

1  Q    You did say that you did see some broken windows and some

2  turned over planters?

3  A    Yes.

4  Q    Where did you see those?

5  A    As soon as I parked.

6  Q    Just in the general area there?

7  A    Yeah.  The damage was on the sidewalk, on, I believe,

8  Olive.

9  Q    Okay.

10 A    All the damage was at one place.  The two businesses that

11 had damage -- they were next door to each other.

12 Q    Did you -- you said when you saw the -- when you got out

13 of your car initially, you didn't know what was going?

14 A    Right.

15 Q    But by the time you were arrested, you had come to -- you

16 had come to understand that there had been property damage

17 done by protestors in a crowd; correct?

18 A    Right.

19 Q    That's -- that's knowledge that you had by the time you

20 were arrested?

21 A    Well, once I got out and got around other people, it

22 took -- it took a few blocks of walking before I saw other

23 people, and that's what I was hearing other people say, that

24 the people vandalizing had got arrested and the protestors

25 that were there had -- had left.

Demetrius Thomas Cross-examination                    Volume 1

158

1   Q    Okay.  I noticed a lot of people in the video wearing

2   masks and bandanas, things of that nature.

3   A    Uh-huh.

4   Q    Was that pretty -- pretty common amongst the crowd that

5   you saw?

6   A    No.  I saw maybe a total of seven to 10 people with masks

7   on throughout the whole night.

8   Q    Does that include during the time when the police closed

9   in?

10  A    Yes.

11  Q    All right.  And you say you got down -- you were ordered

12  to get down?

13  A    Yes.

14  Q    You don't know if other people were complying with

15  orders, do you?

16  A    The orders to get down?

17  Q    Correct.

18  A    Yes.  I saw a few people get down before I got down.

19  Q    But you don't know if other people decided not to get

20  down?  Other -- other -- let me rephrase that for you.  Other

21  people might have -- might have refused those orders or not

22  complied with those orders; correct?

23  A    I'm not sure.

24  Q    You can't say one way or the other?

25  A    Right.

1          MR. RELYS:  I have nothing further.

2          THE COURT:  Redirect?

3          MR. ROTHERT:  No redirect, Your Honor.

4          THE COURT:  You may step down.

5          THE WITNESS:  Okay.

6          MR. ROTHERT:  Next witness will be Pat Mobley.

7          THE COURT:  Mr. Mobley, would you step over here to

8    the clerk to be sworn?

9                    **WILLIAM PATRICK MOBLEY**,

10   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

11   FOLLOWS:

12                         DIRECT EXAMINATION

13   BY MR. PRAISS:

14   Q    Good afternoon, Mr. Mobley.  Could you state your full

15   name for the record please?

16   A    William Patrick Mobley.

17   Q    Mr. Mobley, I want to focus you on the evening of

18   September 17th, 2017.  What were you doing that evening?

19   A    I was downtown observing the protest.

20   Q    Okay.  Was that your first protest that you were

21   observing?

22   A    No.

23   Q    Okay.  That evening, what exact area were you located at?

24   A    Earlier in the day, I had been in front of the police

25   station when the protest was there.  When it went downtown, I

1    hung back, didn't go with the group, but I eventually made it

2    downtown, and that was where the incident happened.

3    Q    Okay.  Before we go to the incident, exactly, could you

4    identify the streets, the location you were at?

5    A    The Police Headquarters is on Olive, I believe, and I

6    don't remember the route that -- that the group or I took

7    downtown, but I wound up heading back west to my car on -- it

8    was at Tucker and Pine where I -- I began to film the police.

9    Q    Okay.  Were you filming the police --

10          THE COURT:  So excuse me.  I'm confused.  So you went

11   west from the Police Headquarters and ended up at Tucker and

12   Pine?

13          THE WITNESS:  No.  Sorry.  Sorry.  I went east from

14   the Police Headquarters --

15          THE COURT:  Right.

16          THE WITNESS:  -- and was downtown for a few minutes,

17   and then I was headed back west on -- I think I came up Wash.

18   Ave. or something, and then I was headed west on Tucker and

19   Pine going back to my car when the incident happened.

20          THE COURT:  Okay.  And can you pull the mike or get a

21   little closer to it?  I'm having trouble hearing you.

22          MR. PRAISS:  Sure.  Will do.

23   Q    (By Mr. Praiss) Before you went to Pine and Tucker, you

24   were with a group of people?

25   A    Well, yes, I was in the group in front of the police

William Patrick Mobley Direct Examination          Volume 1

161

1   station.  I had come there with one friend, and the two of us

2   had hung back when the group went ahead and headed downtown.

3   I was by myself, heading back to meet him at the car.

4   Q    If I may ask, why did you not join the group when they

5   went further?

6   A    As it was heading downtown, I wanted to hang back just

7   because it was -- it was mobile and I didn't want to get into

8   a situation where I'd be arrested.

9   Q    Okay.  Were you recording the whole time that evening?

10  A    No.  I didn't start until I saw the police arresting two

11  young people.

12  Q    Okay.  Where did you see the police arresting the two

13  young people?

14  A    That was approximately 10 to 20 yards west of Tucker on

15  Pine.

16  Q    Okay.  And could you describe for the Court approximately

17  where you were standing with respect to where you saw the

18  police officer arresting the two young children?

19  A    Yes.  So I was walking west on Pine.  I was on the north

20  side of the street.

21       THE COURT:  Okay.  Hold on a second.  Were these two

22  young children you saw being arrested?

23       THE WITNESS:  Young people.  I'd say they were 18 or

24  19 years old.

25       THE COURT:  Is that who you're referring to as two

William Patrick Mobley Direct Examination          Volume 1

162

1   young children?

2             MR. PRAISS:  Yes.

3             THE COURT:  Come on.

4             MR. PRAISS:  Okay.

5             THE COURT:  Okay.  All right.  Go ahead and tell us

6   what you saw.

7   A    So I was on the north side of Pine, and the two people

8   were handcuffed.  They had their hands cuffed behind their

9   backs and were seated on the south side of Pine and were

10  interacting with the officers on the south side of the street,

11  and that is when I took out my phone and began to record the

12  arrest.

13  Q    (By Mr. Praiss) What would you say was the distance

14  between you and the scene where the officers were arresting

15  the two individuals?

16  A    Like I said, I was on the north side of the street.

17  There was an officer in the street, probably 15 feet away from

18  me, and the arrest was another 15 feet beyond that.  I think

19  about 10 yards, however wide the street is.

20  Q    Okay.  Were there any protestors or any activity going on

21  in the street other than what you were recording at the time?

22  A    No.  There were two women who were standing on the

23  sidewalk in the same place I was, but otherwise, there was no

24  one aside from the people who were being arrested and the

25  police there.

William Patrick Mobley Direct Examination          Volume 1

163

1  Q    Were you the only one, the only person recording the

2  arrest?

3  A    Yes.

4  Q    Okay.  Were you in any way interfering with the police

5  officers' ability to conduct the arrest?

6  A    No.

7  Q    Okay.  Were you talking to the police or harassing them

8  while they were doing it?

9  A    No.  I didn't say anything to the police.

10  Q    What do you recall happened next?

11  A    I was filming, and a police officer in a white shirt and

12  a riot helmet approached me quickly and grabbed my phone

13  without any warning.  He grabbed it from me and handed it to a

14  plainclothes officer, who was in jeans and a red polo shirt

15  and a bulletproof vest.

16  Q    The officer literally physically grabbed your cell phone

17  from you?

18  A    Yes.  He took it from me and, at some point, handed it to

19  the -- to the other officer.

20  Q    Before taking it, did the officer warn you that for some

21  reason he believed you weren't allowed to record him or tell

22  you that unless you stopped recording him he was going to take

23  your phone from you?

24  A    No.  The -- I'm not sure he said a single word to me

25  before he took my phone.

1    Q    How did you respond?

2    A    I complied with all of his orders.  He demanded to see my

3    identification, which I provided.  They asked me to sit on

4    the -- on the ground with my legs straight out in front of me,

5    which I did, and so my reaction was to comply because, like I

6    said, I didn't want to get arrested.

7    Q    Did you ever tell the officer whether you believed he had

8    the right to hold your phone and do anything with it?

9    A    No.  When I saw -- after he handed the phone to the

10   officer in the red polo shirt, I noticed that he was accessing

11   my phone.  I asked him -- I said, "Please don't use my phone,"

12   and he said, "Why would I use your phone?  I have my own f'ing

13   phone."

14   Q    Did the officer use your phone in any way, to your

15   knowledge?

16   A    Yes.  I saw him accessing it, and when I got my phone

17   back, the video that I had been filming was gone.

18   Q    Okay.

19        THE COURT:  And was this the white-shirt police

20   officer or the plainclothes?

21        THE WITNESS:  This was the plainclothes who I saw

22   accessing my phone.

23        THE COURT:  Okay.

24   Q    (By Mr. Praiss) And what happened next?

25   A    I was detained for roughly 20 minutes, I think.  When I

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 165 of 333 PageID #:
1282
William Patrick Mobley Direct Examination          Volume 1

165

1   gave the officer my ID -- again, my name is Mobley, and he

2   said, "Well, unfortunately for you, there's someone named

3   Mosley who's wanted, so we're going to have to run your

4   information to make sure that you don't have any outstanding

5   warrants," and I said, "Well, my name is Mobley," and he said

6   something like, "That's what I meant."  He gave my

7   identification to an officer in a squad car.  I followed

8   directions and sat with my legs in front of me.

9        Like I said, it was about 20 minutes.  During those 20

10  minutes, multiple officers told me that they would arrest me

11  or could arrest me for interfering.  The plainclothes officer

12  accused me of having been downtown breaking windows, which

13  I -- I denied, and at a certain point, after he had asked me

14  several questions, I stopped answering his questions.  He

15  searched -- the plainclothes officer in the red polo shirt

16  searched my bag without my consent.  He said he was looking

17  for a hammer.  He told me that -- when I denied having -- when

18  I denied having broken any windows downtown, he said that they

19  would just take me to jail and find someone who would say that

20  I was.  Another officer came and yelled at the top of his

21  lungs at me that he was arresting me for property damage and

22  resisting arrest, and I don't remember which officer whispered

23  something to him that I didn't hear, and then that officer

24  walked away from me and didn't interact with me again.

25  Q    Did you at any time do any property damage like the

1   officer threatened you?

2   A    No.

3   Q    Did you have a hammer or any weapons in your possession?

4   A    No.

5   Q    Okay.  Did you at any point interfere with any of what

6   the police officers were doing or what they requested you to

7   do that evening after --

8   A    No.  Like I said, I was on the other side of the street

9   from where it was taking place, and after he grabbed my phone

10  and started giving me orders, I complied.

11  Q    Did the police officers arrest you?

12  A    No.

13  Q    How did -- what happened at the end then?

14  A    So, like I said, I was seated, and I don't remember which

15  officer, but one of them handed my identification to, again,

16  the plainclothes officer in the red polo shirt.  He knelt down

17  next to me, and he handed me my ID, and he said -- and I'll

18  omit the profanity.  He said something to the effect of, you

19  know, "You're going to take this, and you're going to put it

20  back in your wallet, and you're going to stand up, and you're

21  going to grab your phone.  You're going to walk away.  And if

22  you turn around, I'll arrest you because I'm not in the mood."

23  Q    Did you comply and walk away?

24  A    Yes.  I got up and I grabbed my phone and put my phone

25  and my wallet in my pocket, and I walked away.  I was -- like

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 167 of 333 PageID #:
1284
William Patrick Mobley Direct Examination          Volume 1

167

1   I said, I didn't want to get arrested, so I didn't turn

2   around.

3   Q     Okay.  How did that incident affect you?

4   A     I have not been to a protest since.  I --

5   Q     Why not?

6   A     That night, you know, I was walking back to my car.  I

7   was not in a group of people.  I was not at a protest even

8   when the police decided to take my phone, you know, delete the

9   video, detain me, harass me, and, you know, I don't want that

10  to happen again.

11  Q     I'll show you, if I could, a copy of a declaration.  Do

12  you recall submitting a declaration in this matter?

13  A     I do.

14  Q     Okay.  I'm just going to -- okay.  And your

15  declaration -- do you recall -- is three pages long?

16  A     Yes.

17  Q     And we have an electronic signature here.  Did you have a

18  chance to review this declaration at or about the time that we

19  submitted it to the Court?

20  A     I did.

21  Q     And have you read it since?

22  A     Yes.  I read it earlier today.

23  Q     And is the information in your declaration true and

24  accurate?

25  A     Yes, it is.

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 168 of 333 PageID #: 1385
William Patrick Mobley Cross-examination                    Volume 1

168

1          MR. PRAISS:  Okay.  I'd like to at this time, Your

2    Honor, submit Plaintiffs' Exhibit 32.

3          THE COURT:  I assume that was the declaration you

4    just saw --

5          MR. PRAISS:  Yes.

6          THE COURT:  -- because you didn't identify it for the

7    record.

8          MR. PRAISS:  I'm sorry.

9          THE COURT:  32?

10         MR. PRAISS:  Yes.

11         THE COURT:  32 is received into evidence.

12         MR. PRAISS:  Thank you.  I have no further questions.

13         THE COURT:  Cross-examination.

14                         CROSS-EXAMINATION

15   BY MR. RELYS:

16   Q    Good afternoon, Mr. Mobley.  This incident that you just

17   told us about -- where is it?  Somewhere on Pine?  Pine and

18   Tucker --

19   A    Yes.

20   Q    -- approximately?  Besides the police officers you've

21   described being present during that, was anybody else a

22   witness to that?

23   A    There were two women who were on the same side of the

24   street as I was, and there were the two people who were being

25   arrested who were on the opposite side of the street.

1  Q    Okay.  Do you know who any of those people were?

2  A    No.

3  Q    Didn't get any of their contact information?

4  A    No.

5  Q    Was there anything strange about the arrest that you were

6  witnessing that made you want to film it?

7  A    It was away from the protest.  That was the only unusual

8  thing.

9  Q    You were just curious about what was going on?

10  A    Yes.

11  Q    But nothing unusual except for the fact that it was away

12  from the protest?

13  A    Right.

14  Q    You were -- you say you were accused of breaking windows?

15  A    Yes.

16  Q    Were you aware that windows had been broken?

17  A    Yes.

18  Q    How were you aware of that?

19  A    I had -- like I said, I'd been on Washington Avenue, and

20  I saw some broken windows.

21  Q    Did you see anybody breaking the windows?

22  A    No.

23  Q    Did you see anybody doing any kind of acts of property

24  damage?

25  A    No.

1    Q    Any type of violent actions that you witnessed by the

2    protestors?

3    A    Not by the protestors.

4    Q    And you mentioned that the reason you were leaving at

5    this time was because the crowd was -- I think you said

6    something along the lines of the crowd was mobile and you

7    didn't want to do anything to get yourself arrested?

8    A    That's why I hung back when they headed downtown, and

9    it's why I was -- I was headed to my car after I saw the

10   broken windows.

11   Q    You understood that in a situation where a crowd had been

12   busy breaking windows in downtown St. Louis that continuing to

13   be with that crowd may result or expose you to the risk of

14   arrest?

15   A    Yes.

16        MR. RELYS:  Nothing further.  Thank you.

17        THE COURT:  Anything further?

18        MR. PRAISS:  (Shakes head from side to side.)

19        THE COURT:  You may step down.

20        THE WITNESS:  Thank you, Judge.

21        THE COURT:  You may call your next witness.

22        MR. ROTHERT:  Next witness of the Plaintiffs will be

23   Dillan Newbold.

24        THE COURT:  Sir, would you step right over here to be

25   sworn?

1          THE WITNESS:  Yes, ma'am.

2                      **DILLAN NEWBOLD,**

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5                      DIRECT EXAMINATION

6    BY MR. ROTHERT:

7    Q    Good afternoon.  Could you state your name for the record

8    please?

9    A    It's Dillan Newbold.

10   Q    All right.  Mr. Newbold, when did you move to St. Louis?

11   A    I moved here three years ago now for medical school.

12   Q    Okay.  2014?

13   A    It would be 2014.

14   Q    Okay.  Are you still attending medical school?

15   A    I am.

16   Q    Do you sometimes participate in protests?

17   A    Yes.

18   Q    Do you?

19   A    Yes, I have.

20   Q    Okay.  Is there a particular kind of protest that you

21   participate in, or have you participated in different types?

22   A    I've protested, I guess, two different issues in general.

23   I went out once for the immigration ban that happened earlier

24   this year, and otherwise, I've been to a few protests related

25   to the Black Lives Matter movement.

1    Q    Were you in town on Friday, September 15th, when the

2    acquittal of Mr. Stockley was announced?

3    A    No.  I was out of town from Friday until about Sunday

4    night.

5    Q    Okay.  And when you returned on Sunday night, what did

6    you do?

7    A    So I had been out of town, sort of watching the protest

8    from a distance and kind of wishing I was here.  So as soon as

9    I got back, I went downtown right away, hoping to join the

10   protest.

11   Q    Did you -- were you alone, or did you go with another

12   person?

13   A    I went with a person who works in a lab with me.  He's a

14   postdoc.

15   Q    When you went downtown with your colleague, where did you

16   park?

17   A    I parked right on Washington and Tucker.  It's about 10

18   feet away from where I was eventually arrested.

19   Q    Do you know approximately what time you arrived there?

20   A    I think that was 11:00 or so.

21   Q    Okay.  How long -- well, eventually, you get arrested;

22   right?

23   A    Right.

24   Q    So how long after you arrived were you arrested?

25   A    That must have been about -- it couldn't have been more

1    than 30 to 40 minutes.

2    Q    Okay.  Were you -- when you came downtown, were you

3    looking for a protest?

4    A    Yeah.  I was hoping that I would, you know, get to march

5    and chant and protest.

6    Q    What was the atmosphere like when you arrived?

7    A    It wasn't what I was hoping for.  It looked like maybe

8    everything had sort of died out or something.  When I got

9    there, all I saw was a lot of people standing on the sidewalk,

10   kind of just standing around, watching the police, and that's

11   about all that was happening.

12   Q    Okay.  Was it calm?

13   A    Yeah, very calm.  It -- it was as dead as downtown

14   St. Louis usually is on a Sunday night, I guess.

15   Q    But there were police around; is that correct?

16   A    Yeah.  So when I -- when I pulled up, I saw some police

17   lights, and then as I was wandering around, I also saw a

18   little group of police on bicycles who were sort of herding

19   people around.

20   Q    Okay.  During the time you were there, did you observe

21   anything illegal happening?

22   A    I saw a lot of assaults.  All of the assailants were

23   police officers.

24   Q    Okay.  Other --

25   A    So outside of activity of the police, I did not see

Dillan Newbold Direct Examination                        Volume 1

174

1    anything that was illegal.  Like I think people were even

2    nervous because there were so many police.  Like they wouldn't

3    cross the street unless the signal was telling them to do so.

4    Q    Okay.  So it appeared a law-abiding group to you?

5    A    Very much so, yeah.

6    Q    When you were there, did you hear any order to disperse?

7    A    No.

8    Q    Did you hear any warning that chemical agents might be

9    used?

10   A    Definitely not.

11   Q    Have you ever been to a protest where you have heard

12   orders to disperse?

13   A    Yes.  So I've -- I've been at other protests where,

14   apparently, something illegal had happened and the police

15   declared the group an unlawful assembly.  They told us that

16   over a megaphone.  I think they even repeated that, and they

17   told people to leave, and people left.

18   Q    Okay.  And you didn't hear anything like that on the

19   17th?

20   A    No, I didn't.

21   Q    So what happened?

22   A    So when I got there, I just kind of walked around for a

23   little while.  Like I said, all I really saw was people kind

24   of standing around, watching the police.  So I guess I joined

25   in on that.  I was standing on a corner, watching these bike

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 175 of 333 PageID #:
1281
Dillan Newbold Direct Examination                         Volume 1

175

1   cops sort of herd people around.  And then eventually, I heard

2   a bunch of people screaming from an alleyway, and I went over

3   there to see what was happening, and there was a line of riot

4   police marching down the alleyway.  And then I kind of ran

5   over, back toward the intersection of Washington and Tucker,

6   and by the time I got there, I think I saw that there was

7   another line on the other side of Tucker, and then there was a

8   line of police on bicycles on the east side of the

9   intersection on Washington, and at that point, I really wasn't

10  sure what was happening.  I -- I guess I thought they were

11  maybe eventually going to make people leave single file or

12  something like that, and it looked like it was still open down

13  Washington going west.  I'm not sure if it was or not.  There

14  could have been police further down.  I just couldn't see them

15  at that point.  But maybe five to 10 minutes after that, I

16  realized there was definitely a line of police with shields

17  coming down Washington.  And at that point, we were completely

18  enclosed.  And around that time, they also started beating

19  their sticks in unison and sort of, I guess, trying to build

20  up this intimidation or something.

21  Q    When they started closing in on you, did you start

22  recording what was happening?

23  A    Yeah.  So around the time that I realized that we were

24  completely closed in, I took a short video to try to capture

25  that, and then later -- so after they closed us in, they had

1    us completely boxed in the intersection.  Then one line came

2    in and really wrapped us together tight, and at that point, it

3    was really frightening.  I didn't know what was going to

4    happen.  So I pulled out my phone again and tried to record

5    that as well.

6    Q    Okay.  Did anything happen that caused you to stop

7    recording at any point?

8    A    Yeah.  I was told to put my phone away by a police

9    officer.  He -- this is after we were all sort of just sitting

10   down on the ground very calmly, and they were beginning to

11   arrest people, and I was just filming that, and an officer was

12   jabbing a can of pepper spray in my face and said, "Put the

13   phone away," and then he sprayed a little bit of it on my

14   face, and so I put it away.

15   Q    That -- that first spraying, were you wearing anything

16   that lessened the effects of that spray?

17   A    Yeah.  So right around the time that they had us like

18   really packed together tight, we all got down and put on a

19   bandana and some goggles.  Worried that something like this

20   could happen.

21   Q    Yeah.  Why did you have a bandana and goggles with you?

22   A    Umm, I've brought that stuff with me to protests in the

23   past.  I've seen police often seem to use chemical agents when

24   it probably isn't necessary, and so I was prepared for that as

25   a possibility that night.

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 177 of 333 PageID #:
1284
Dillan Newbold Direct Examination                              Volume 1

177

1  Q    Okay.  After you were sprayed, though, you stopped

2  recording; is that correct?

3  A    Yes, sir.

4  Q    And did you comply with all instructions?

5  A    Yeah.  So, at that point, I sort of just got down, like

6  in a fetal position.  I was really disoriented really quickly

7  by the spray, and then I was just sitting there, waiting to be

8  arrested, I guess.

9  Q    Did you resist in any way?

10  A    Not at all.  And while I was down like that, an officer

11  ripped off my goggles and pulled my bandana down and then

12  grabbed me by the pants and pulled me out in the street really

13  hard, actually almost pulled my pants down, and as he was

14  doing that, another officer sprayed pepper spray all over my

15  newly exposed face, and I did not put up any resistance at all

16  throughout all of this.

17  Q    Were you able to -- I mean that irritant that was on your

18  face -- were you able to remove it?

19  A    No.

20  Q    Why not?

21  A    Essentially, immediately after they sprayed me, they

22  zip-tied my hands behind my back very tightly, and I shouted

23  for help from all of the officers around me.  I told them

24  about how much this hurt, and I asked maybe a dozen people if

25  they could help me remove this and --

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 178 of 333 PageID #:
1290
Dillan Newbold Direct Examination                        Volume 1

178

1   Q    And did you receive any help?

2   A    No.  And --

3   Q    When you got to the station, did you ask again for help?

4   A    Oh, I did, yes, and I was told over and over again either

5   "This is your fault" or "You deserve this" or "Next time,

6   don't protest."

7   Q    Okay.  After you got out of --

8        THE COURT:  So I mean -- so you were taken to the

9   police station?  You were arrested?

10       THE WITNESS:  Yes, ma'am.

11       THE COURT:  Okay.

12  Q    (By Mr. Rothert) And have any charges been filed against

13  you?

14  A    No.  I think I just found out today that I would not --

15  there was supposed to be a hearing today where we were maybe

16  going to be charged, but I think that's not happening now.

17  Q    After you got out of jail, where did you go?

18  A    So I had been really concerned while I was in jail that I

19  maybe had some sort of nerve damage.  It was a concern that I

20  expressed to officers multiple times while I was being

21  arrested, but my zip ties were so tight that in about 15

22  minutes after they put them on me, I couldn't feel anything in

23  my hands, and within 45 minutes, I couldn't even tell when I

24  was moving my own hands, and they -- those stayed on my hands

25  for maybe an hour and a half, and so I was really concerned

Dillan Newbold Direct Examination                        Volume 1

179

1    that I'd had some sort of nerve damage, that my hands were

2    still hurting all throughout the time I was in jail.  There

3    were certain spots where I couldn't feel anything.  So I went

4    to a student health clinic at my school.

5    Q    Okay.  Were they able to help you?

6    A    No.  There, I saw a nurse who told me this was sort of

7    out of her scope.  So she sent me to the Emergency Department

8    at Barnes.

9    Q    Okay.  Did you receive any diagnoses at the emergency

10   center at Barnes?

11   A    Yeah.  So they gave me two diagnoses.  One is

12   neuropraxia.  It's a temporary dysfunction of nerves.  They

13   explained to me that was caused by -- it's sort of -- it's

14   called a crush injury from the zip ties, and that caused some

15   bleeding inside of the nerve, which was causing it not to

16   function.  That's why I couldn't feel things.  And they also

17   diagnosed me with neuralgia, which is nerve-damage-induced

18   pain, and that was probably from the ischemia in my hands, and

19   that was sort of causing this weird -- it was like a

20   hypersensitivity to heat, where my hands felt like they were

21   burning at room temperature, and if I tried to hold my phone

22   or type on my laptop, I just couldn't do that because those

23   things were too hot.

24   Q    And how long did you experience symptoms?

25   A    So that hypersensitivity to heat that I was describing

1   went away after about a day and a half.  I'm not sure if that

2   was a natural course or if that was because they gave me a

3   medication called gabapentin that's meant to treat nerve pain

4   like this, but as far as the loss of sensation, there are

5   still parts of my hands that have no feeling.  Some of my

6   fingertips have diminished feeling, and areas on the back of

7   my hand have nothing at all.

8   Q    Can you think of anything you could have done differently

9   on September 17th to avoid being arrested, being sprayed?

10  A    I mean I think just as soon as I showed up there I was

11  bound to get arrested.  I didn't -- I certainly didn't do

12  anything to provoke it.  So I think if I wanted to avoid this

13  in the future the only way would be to avoid going to protests

14  altogether.  I think I could have avoided the worst treatment

15  that I received by not filming the police.  It really seemed

16  like the pepper spray and the overly tight cuffs were in

17  retaliation for filming.

18  Q    And has that -- you know, what happened on the 17th --

19  has that changed your willingness to participate in protests

20  in the city of St. Louis?

21  A    Yeah.  So it's sort of had two opposing effects on me.

22  One, it's really motivated me to care about these issues more

23  than ever now, having a personal encounter with them.  But at

24  the same time, I'm also fearful of something like this

25  happening again.  I had to promise my mother and fiancée, as

Dillan Newbold Direct Examination                      Volume 1

1   soon as I got out, that I would not attend anything like this,

2   at night at least.  I settled for that.  But yeah.

3   Q    If you could look at the screen next to you.  The other

4   way.  Yes.

5        Do you see what's been marked as Plaintiffs' Exhibit 37

6   there?

7   A    I do.

8   Q    Okay.  Do you recognize this document?

9   A    Yes.

10  Q    What is it?

11  A    This is an affidavit that I helped draft, I helped draft

12  and sign.

13  Q    Okay.  And on page 4, is that your signature?

14  A    That is.

15  Q    Okay.  Kind of hard to read.

16  A    Yeah, my signature is messy.

17  Q    All right.  Have you had an opportunity to review this

18  since you signed it?

19  A    Uh-huh.

20  Q    And is everything in there true?

21  A    Yes, it is.

22       MR. ROTHERT:  Okay.  I move for admission of

23  Plaintiffs' Exhibit 37.

24       THE COURT:  Exhibit 37 is received into evidence.

25       MR. ROTHERT:  No further questions.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 182 of 333 PageID #:
1288
Dillan Newbold Cross-examination                        Volume 1

182

1          THE WITNESS:  Thank you.

2          THE COURT:  Cross-examination.

3                      CROSS-EXAMINATION

4   BY MR. MCDONNELL:

5   Q    Good afternoon, sir.

6   A    You too.

7   Q    When you arrived at Tucker and Washington around 11:00,

8   11:00 p.m., Sunday night --

9   A    Uh-huh.

10  Q    -- you wouldn't be able to give us any information to the

11  Court about any warnings that were given to the crowd prior to

12  11:00; is that correct?

13  A    No.  I didn't hear any.  I wasn't there for that, so I

14  can't.

15  Q    You weren't there; correct?

16  A    That's correct.

17  Q    Okay.

18       And in the past when you've attended protests in the city

19  of St. Louis, I think you told us that you've heard the police

20  officers give warnings to the protestors.  Is that correct?

21  A    Yeah.

22          THE COURT:  Was that in the city because I don't

23  think you previously said where it was?

24          THE WITNESS:  Those were multiple locations.  Once

25  downtown.  Once on Florissant, out in Ferguson.  Those were

1   both back in 2012.  Things in general were very different

2   then.  People were free to move around.  People were free to

3   leave.  It was very different this time.  We couldn't go

4   anywhere.

5   Q    (By Mr. McDonnell) Okay.  But can we agree, Mr. Newbold,

6   that in the past when you've attended protests in the city of

7   St. Louis, you've actually heard police officers give an

8   announcement warning the protestors to disperse or they're

9   going to be arrested and munitions are going to be used;

10  correct?

11  A    I've never heard a warning that chemical munitions will

12  be used, but I have heard warnings that we should disperse or

13  be arrested.

14  Q    All right.

15       Now, you told us you arrived around 11:00 that evening.

16  You said you were disappointed.  Why?

17  A    Well, I was hoping to come out and, you know, march and

18  chant and hold up signs and maybe get media attention and help

19  stir up a national conversation, and when I got there, I just

20  found a bunch of people standing around.

21  Q    And you told us when you -- when you prepared to go to

22  this protest you equipped yourself with goggles --

23  A    That's true.

24  Q    -- and a bandana; correct?

25  A    Uh-huh.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 184 of 333 PageID #:
1301
Dillan Newbold Cross-examination                              Volume 1

184

1   Q    And is that normal gear that you bring to protests?

2   A    Yeah.  I've been to protests before where these chemical

3   agents have been used, sometimes without any sort of warning,

4   no obvious cause, and so I came ready for something like that

5   to happen.

6   Q    In the process on Washington and Tucker where the

7   officers were telling people they were being arrested, you

8   said you -- initially, you were sitting down?

9   A    Yeah.

10  Q    Okay.  Did the officers tell you to lay down on the

11  ground?

12  A    After they had drug me out in the street and pepper

13  sprayed me, they did, yes.

14  Q    Did you notice any other people being arrested that were

15  not complying or resisting arrest?

16  A    No, not at all.

17          MR. MCDONNELL:  No further questions.

18          THE COURT:  Redirect?

19          MR. ROTHERT:  No redirect, Your Honor.

20          THE COURT:  All right.

21          You may step down.

22          THE WITNESS:  Thank you.

23          MR. ROTHERT:  Next witness will be Tony Rice.

24          THE COURT:  Mr. Rice, if you'll come over here to the

25  clerk to be sworn.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 185 of 333 PageID #: 1302
Tony Rice Direct Examination                                              Volume 1

185

1        **TONY RICE**,

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                         DIRECT EXAMINATION

5    BY MS. STEFFAN:

6    Q    Good afternoon, Mr. Rice.  Could you tell us your name?

7    A    Tony.  Tony Rice.

8    Q    And, Mr. Rice, where do you live?

9    A    In Ferguson.

10   Q    I'm going to direct your attention to the evening of

11   Sunday, September 17th, 2017.  Did you have occasion to go

12   downtown St. Louis on that night?

13   A    Excuse me.  Say that again.  I couldn't hear you clearly.

14   Q    I'm sorry.  On Sunday, September 17th, 2017, did you have

15   occasion to go to downtown St. Louis?

16   A    Yes.

17   Q    What were you doing there?

18   A    I guess it depends on what time you ask me, but if I'm

19   assuming right, I was going down there looking and trying to

20   locate where protestors were.

21   Q    And at that point when you were looking for where the

22   protestors were, what time was it approximately?

23   A    I would have to say I may have started riding my bike

24   roughly like 8:00.

25   Q    Okay.

```
 1    A    And I was just riding around downtown streets, kind of

 2    looking for them.  I heard some chanting, but I was never able

 3    to find them.

 4    Q    Okay.  Did you see any police officers downtown?

 5    A    That -- during that time of me riding my bike, yes.

 6    Q    Okay.  So this is between -- sometime after 8:00?

 7    A    Yes, yes.

 8    Q    Okay.

 9    A    Yeah.

10    Q    How many police officers would you say you saw during

11    that evening after 8:00 p.m.?

12    A    More than 300.

13    Q    And how many protestors did you see?

14    A    Oh, well, that's -- you may have to ask that a little

15    better --

16    Q    Okay.

17    A    -- because there were people who were my friends.  They

18    are protestors, but if you ask me how many people I saw

19    protesting at that particular time, I didn't see any.

20    Q    Okay.  At some point, did you come to the intersection of

21    Washington and Tucker?

22    A    Yes.

23    Q    At what time did you arrive at that intersection

24    approximately?

25    A    Well, I probably came to that intersection more than once
```

1    because I was on my bike.  So, you know, I passed back and

2    forth past Washington and Tucker several times.  So it's

3    really hard to say what time did I actually stay there and

4    just continue to talk to people who I knew.  So it's really

5    hard to say, but if you force me to come up with an answer, I

6    would say after 10:00.

7    Q    Okay.  And you were still riding your bike around at this

8    time?

9    A    Oh, yeah.

10   Q    When you got to that intersection for the last time that

11   evening, what happened?

12   A    I remember riding my bike, and I heard some police

13   commands over the intercom.  After a while, they just started

14   sounding blurred, just -- you know, it was just some commands

15   coming over, and I realized that at a certain point I was just

16   riding in a circle inside the block of Washington and Tucker.

17   Q    Uh-huh.

18   A    And, you know, I just kind of kept doing that for a while

19   because I kind of didn't have anywhere else to go.

20   Q    Why didn't you have anywhere else to go?

21   A    The police had the streets blocked off.  Well, from a

22   distance, it looked like there were cars with police lights on

23   it.  So they were just blocked off in that sense, but at a

24   certain point, you know, you could see men dressed in clad at

25   this point standing in front of the police cars.

1   Q    Okay.  And when you saw those police officers standing in

2   front of the police cars, where were those officers standing?

3   A    They were both on the north and south of Tucker and also

4   east and west on Washington.

5   Q    Okay.  Did the police at that intersection say anything

6   to you?

7   A    Not directly to me, but I think I can remember when --

8   well, I guess at that intersection, no.  No, not at that

9   intersection.

10  Q    Where had police said anything to you?

11  A    I want to say one block south of Tucker, and I think the

12  street is St. Charles.  It was a line of police over there,

13  and they was just asking us to exit St. Charles going west.

14  Q    Okay.  Did they tell you to go west?  Is that what you're

15  saying?

16  A    Yes.

17  Q    Okay.  Toward Tucker?

18  A    Just west.

19  Q    Okay.  When you're at the intersection of Washington and

20  Tucker, as you testified, and you're riding your bike in a

21  circle, is that when you saw police blocking --

22  A    Yes.

23  Q    -- all four streets?

24  A    Yes, that's when I saw them blocking all four streets.

25  Q    After all four streets were blocked off, did you hear the

1  police officers do or say anything at that point?

2  A    No.  I just heard, you know, boots on the ground.  It

3  sounded like clubs hitting the pavement, but I didn't hear

4  any -- at that -- at a certain point, I really didn't hear any

5  commands.  I just kind of heard, you know, people moving

6  toward us.  You know, it was -- you know, it's kind of still a

7  loud intersection, and downtown is loud.  So I couldn't make

8  out a lot of sounds at the distance that we were from them.

9  Q    Okay.  At any point, did you hear the police officers say

10 anything?

11 A    Not until they got extremely close to us and pushed us to

12 the northeast corner of that block.

13 Q    Okay.  And what did you hear them say at that point?

14 A    Well, they was really loud, and there was a lot of them

15 hollering and screaming, but mostly, they were saying, "Get

16 down.  Get down."

17 Q    Okay.  Did you comply with that directive?

18 A    Oh, yes, I did.

19 Q    And what did you do exactly?

20 A    Well, I was -- well, I was really caught in the middle.

21 So people were like gravitating toward the center.  So I

22 really didn't have a place to get down because I had my bike.

23 So my bike was flat.  So I was kind of on my knees because I

24 couldn't lay across my bike.  So I really didn't have a place

25 to lay down.

1  Q    Okay.  So at that point, you're off your bike, but you

2  still have your bike with you?

3  A    Yes.

4  Q    Okay.  And you got down on your knees next to your bike?

5  Is that what you're saying?

6  A    Yes.  Yeah.  And my bike is also laying flat too.

7  Q    Okay.

8  A    It's not on the kickstand, standing up, or anything like

9  that.

10  Q    Okay.  What, if anything, did the police do after that

11  point, after you were kneeling next to your bike and your bike

12  was laying flat?

13  A    Well, the first thing that happened to me was like -- I

14  still had my phone in my hand, and it was really weird because

15  I was looking at my phone and trying to send out a text or a

16  tweet, and one officer slapped the phone out of my hand.

17  That -- that did happen to me.

18  Q    Okay.  And after that point, what happened?

19  A    It was a lot of yelling and saying, "Hey, get off your

20  phone," and then it was some, I guess, pepper spray being

21  sprayed.  So at that time, I didn't think it was directed at

22  me, but it was in the air, and some did get on me at the time,

23  and, you know, I was kind of coughing and, you know, finding

24  it a little hard to breathe at this time.

25  Q    Okay.  And after that point when you could feel the

1    pepper spray but nothing had been sprayed at you directly,

2    were you still kneeling next to your bike at that point?

3    A    Yes.  I was kind of now slightly leaning on my bike,

4    making a full attempt to try to lay down, but of course, it

5    was just a little too difficult to lay on my bike.

6    Q    Okay.  What happened after that point?

7    A    Well, after that point, you know, I -- I kind of thought

8    we were going to get arrested.  So I tried to locate a couple

9    of officers, and by raising my hand, I was like, "You can just

10   go ahead and arrest me now because I really don't have

11   anyplace to lay down," and that's when it just felt like

12   something just hit me in my back, and it felt like two

13   officers were just on my back and that I was pressed against

14   my bike, and even before that, one officer just tear-gassed me

15   and just sprayed me.  I couldn't see him.  It wasn't

16   face-to-face.  He was kind of on the right side.  So it was

17   coming like to the back of my head and like pouring down my

18   arm.  The pepper spray, I should say.  Yeah.

19   Q    So when you said tear gas, you meant pepper spray?

20   A    Yes.  I mean pepper spray.  Sorry.

21   Q    What did the pepper spray feel like?

22   A    It really burned really bad.

23   Q    And you're saying it was on your face?

24   A    Not so much my face as the back of my head.

25   Q    Okay.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 192 of 333 PageID #: 2309
Tony Rice Direct Examination                                    Volume 1

192

1    A    And like a little bit toward the front of my face, but

2    not like directly in my eyes at that point.

3    Q    Did it go anywhere else on your body?

4    A    It just ran down my arm mostly, and I guess that, what

5    was in the area, felt like it was in my eyes.  At that point,

6    my eyes were closed so tight I couldn't tell.  It was burning

7    too much to even open them or even -- I mean my hands were

8    behind my back, so I couldn't even wipe my eyes at that point.

9    So it could have been on my face.  It was just burning all

10   over.  It was just hard to tell.

11   Q    And tell me what position you were in at this point.

12   A    I was just slightly on my knees and somewhat prone on top

13   of the bike.

14   Q    Okay.  At any point, did you resist being arrested?

15   A    No, I didn't.

16   Q    Did you fail to comply with any of the commands you heard

17   from police officers?

18   A    I did not.

19   Q    Were you committing a crime at the time you were

20   arrested?

21   A    I was not.

22   Q    And you were arrested?

23   A    I was arrested.

24   Q    Were you carrying a weapon?

25   A    I was not.

Preliminary Injunction Hearing Volume 1

193

1   Q    Did you throw anything at the police?

2   A    I did not.

3   Q    I'm going to show you a document we have previously

4   marked as Plaintiffs' Exhibit 26.  Look there on the screen.

5   Do you recognize this affidavit?

6   A    Yes, I do.

7   Q    Is it your affidavit?

8   A    Yes, it is.

9   Q    On page 4, is that your signature there?

10  A    Yes, it is.

11  Q    Did everything you say -- have you had a chance to review

12  the affidavit?

13  A    Yes.

14  Q    And does everything that you said in the affidavit remain

15  true?

16  A    It remains true, yes.

17          MS. STEFFAN:  I would move to admit Plaintiffs'

18  Exhibit 26.

19          THE COURT:  Exhibit 26 is received into evidence.

20          MS. STEFFAN:  That's all, Your Honor.

21          THE COURT:  Cross-examination.

22                       CROSS-EXAMINATION

23  BY MR. RELYS:

24  Q    Good afternoon.

25  A    Hi.

Tony Rice Cross-examination                                     Volume 1

194

1  Q     Hi.  Mr. Rice, you said you could actually hear some

2  commands on the intercom while you were at this intersection?

3  A     Yes.

4  Q     What were the -- what was the content of those commands?

5  A     More directional.

6  Q     More directional?  Tell me what it was.

7  A     Meaning asking us to move north or move west.

8  Q     Okay.  Did you do that?

9  A     No.

10  Q     You didn't?  You heard the -- you heard the commands to

11  do, but you didn't do it?

12  A     No, I didn't move west or north.

13  Q     Okay.  And the commands were given over an intercom?

14  A     Yeah, I would say that's an intercom they use.  I'm not

15  really sure what it is, but --

16  Q     PA system of some type?

17  A     Yeah.  Yes.

18  Q     And you said you had -- it was difficult for you to say

19  exactly what time you arrived there because you were sort of

20  back and forth between that intersection and other places?

21  A     Uh-huh.  Yes.

22  Q     But I think you said you sort of settled in there around

23  10:00.  Is that fair?

24  A     Yes.

25  Q     All right.  So from 10:00 on, you were mostly at that

1    intersection?

2    A    Yes.

3    Q    All right.  And one of the places where the police told

4    you to leave was -- you said you were one block south of

5    Tucker and Washington and some officers told you to leave on

6    St. Charles going west?

7    A    Yes.

8    Q    And you didn't do that?

9    A    Oh, yes, yes, I did.

10    Q    You did go?  You did go on St. Charles going west?

11    A    Yes.

12    Q    What happened?

13    A    As far as you asked me what happened about what?  I mean

14    I just rode my bike west.

15    Q    You didn't leave the area, though?

16    A    This is a really small street.  So I rode my bike west,

17    and when I rode it west, I ended up on Tucker.  Yeah.

18    Q    Where were you at the intersection of -- where were you

19    when you heard this command?

20    A    I'm believing -- I'm believing the street is called

21    St. Charles.

22    Q    Uh-huh.

23    A    It's a small street one block south of Washington.

24    Q    And you went west on that, and you ended up at Tucker?

25    A    Yes.

1   Q    Okay.  But you heard other commands telling you to leave

2   the area, and you didn't do so?

3   A    Correct.

4   Q    All right.  Now, you said that at the time that you --

5   first of all, you got -- you got hit with some overspray or

6   some indirect mace at some point?

7   A    Yeah.  Yes.

8   Q    And you said that you didn't think that that was

9   necessarily directed at you originally; right?

10  A    Correct.

11  Q    And then you said you got hit more directly --

12  A    Yeah.

13  Q    -- after you -- you sort of -- you were trying to lie

14  down, but you couldn't lie down?

15  A    Yes.

16  Q    And then you decided to try to get the police's attention

17  by sitting up?

18  A    Well, no.  I was already kind of on my knees, and as they

19  kept saying, "Lie down, lay down," kind of yelling, I was

20  like, "I can't -- look, you know, I can't lie down."  That's

21  what I was saying.  So I was assuming that we were going to

22  get arrested.  So I was asking to be arrested right away

23  because I didn't have anywhere to lay down.

24  Q    So you sort of -- but you did sort of raise up a little

25  bit to get the officers' attention?

1   A    I was already up.

2   Q    You were already up?

3   A    Because I could not lay flat on my bike.  You know, it

4   was in my way.

5   Q    And that's when the officers came by and maced you?

6   A    Yeah.

7   Q    I'd like to draw your attention to your affidavit,

8   paragraph -- start with paragraph 11.  Paragraph 11 says, "The

9   officers shouted, 'Get down.  Get down.  Get down.'"

10  A    Yeah.

11  Q    And paragraph 12 says, "There were different commands

12  from different police officers.  They were all -- they were

13  not all consistent."

14  A    Yeah.

15  Q    Paragraph 13 says, "Some police said, 'Get down on your

16  knees.'"

17       14 says, "I immediately laid down on my bike and complied

18  with the directive to get down to my knees."

19  A    Yeah.

20  Q    15 says, "Police officers deployed chemical agents

21  against me and other people caught in the intersection."

22       That's what you were talking about before?

23  A    Yes.

24  Q    With the indirect spray?

25  A    Yes.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 198 of 333 PageID #:
4315
Tony Rice Cross-examination                                    Volume 1

198

1   Q    You said it burns your skin?

2   A    Oh, yeah.

3   Q    17 says, "There was no room to get down any further

4   because the police officers were squeezing in on me and the

5   other people in the intersection."

6        And 18 says, "Because I thought I needed to get down

7   farther to comply with the police officers' directives, I laid

8   down on top of my bike."

9   A    Yeah.

10  Q    All right.  You don't include anything in your affidavit

11  about the part where you actually try to get the police

12  officers' attention and you get pepper sprayed, did you?

13  A    I guess if it's not there, I didn't.

14  Q    Okay.  So the account that you gave today is a little bit

15  different than what you put in your declaration, isn't it?

16  A    Yeah.  Yes.

17  Q    Okay.  And you understand that when you made the

18  declaration it was under oath?

19  A    Yes.

20  Q    So which is it?  Did you get pepper sprayed after you

21  were trying to lie flat on your bike, or did you get pepper

22  sprayed after you rose up and tried to get the officers'

23  attention?  Which one is that?

24  A    Both.

25  Q    Both?

Tony Rice Cross-examination                                    Volume 1

199

1   A    Yes.

2   Q    But you agree that you didn't put in the affidavit or

3   your declaration that you had raised up and tried to get the

4   officers' attention?

5   A    Correct.

6   Q    Now, did you see anybody doing any property damage during

7   this evening?

8   A    No.

9   Q    Any -- any violent acts by the crowd?

10  A    No.

11  Q    Any evidence of property damage that you were aware of?

12  A    Yes.

13  Q    What did you see?

14  A    Turned over flower pots and broken windows.

15  Q    Okay.  Whereabout?

16  A    I would say Washington Avenue for sure.  That's one

17  street I know for sure.  But I was riding around the streets

18  and saw other things.  So I don't know which streets they were

19  on.

20  Q    When you said -- I think you said that -- someone asked

21  you -- you were asked earlier about whether or not you were in

22  the streets here protesting, and I think you said no one was

23  protesting.

24  A    Right.

25  Q    Right.  It was more like everyone was just kind of

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 200 of 333 PageID #: 4317
Tony Rice Cross-examination                                    Volume 1

200

1    hanging out, loitering at that point?

2    A    Yeah, toward the end, yes.

3    Q    All right.  In the middle of the street, downtown

4    St. Louis, taking up an intersection?

5    A    They wasn't in the middle of the street.

6    Q    They weren't in the middle of the street?

7    A    No.

8    Q    You're denying that before you were arrested that you

9    were in the middle of the street?

10   A    I was almost --

11        THE COURT:  Are you talking about when he -- right

12   before he was arrested?  He already said he was in the street,

13   on the ground, on top of his bike.

14        MR. RELYS:  I'm talking about --

15        THE COURT:  So let's get your timeline.  You need to

16   be a little more precise in your question, Counsel.

17   Q    (By Mr. Relys) Sure.  You were there for about an hour

18   ahead of time before you were arrested?

19   A    Probably a little more.

20   Q    A little bit more?

21   A    Yeah.

22   Q    And during that time period, you were in the street?

23   A    On my bike, in the street, yes.

24   Q    And other people were out in that intersection, in the

25   street as well?

1          THE COURT:  The whole hour?  I mean you're again --

2     Q    (By Mr. Relys) Just generally speaking and during that

3     hour.  I'm not --

4     A    The people I seen in the street was one person on

5     St. Charles Avenue when the police asked us to leave.

6     Q    And your testimony is that until the police closed in,

7     except for one person who you saw around St. Charles Avenue,

8     everyone else was -- was on the sidewalk?

9     A    On the sidewalk or on the median in the road, yes.

10         MR. RELYS:  Nothing further.

11         THE WITNESS:  Okay.

12         THE COURT:  Redirect?

13         MS. STEFFAN:  No, Your Honor.

14         THE COURT:  You may step down.

15         THE WITNESS:  Thank you.

16         THE COURT:  You may call your next witness.

17         MR. ROTHERT:  Next witness is Iris Nelson.

18         THE COURT:  Ma'am, would you step over here to the

19    clerk to be sworn?

20                    **IRIS NELSON**,

21    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

22    FOLLOWS:

23                    DIRECT EXAMINATION

24    BY MR. ROTHERT:

25    Q    Good afternoon, Ms. Nelson.  Could you state your name

1  for the record please?

2  A    Iris Nelson.

3  Q    Okay.  Ms. Nelson, until recently, you were using a

4  different last name; is that correct?

5  A    Yes.

6  Q    What was the name you were going by earlier?

7  A    Iris Maclean.

8  Q    All right.  Could you spell that last name?

9  A    M-A-C-L-E-A-N.

10  Q    All right.  What's the occasion that caused you to change

11  your name?

12  A    I was married.

13  Q    How long have you lived in St. Louis?

14  A    Since January of 2017.

15  Q    What caused you to move here?

16  A    My husband.

17  Q    Okay.  Is he from St. Louis?

18  A    He's not originally from here, no.

19  Q    Okay.  What was he doing here?

20  A    He works at Scott Air Force Base.

21  Q    Okay.  And what's his name?

22  A    Alex Nelson.

23  Q    Can you tell me -- I don't want to know the exact address

24  where you live, but what intersection do you live at?

25  A    13th and Washington.

1  Q     Were you aware of protests happening in the St. Louis

2  area starting on September 15th, 2017?

3  A     Yes.

4  Q     And did you observe any protests downtown that first day,

5  on September 15th?

6  A     I did.

7  Q     And how did you come to observe those?

8  A     At some points, it was in the vicinity of where I live.

9  So I saw it passing my apartment, and I went outside and saw

10 it happening.

11 Q     Now I'm going to draw your attention to the evening of

12 September 17th, that Sunday.  Were you home that evening?

13 A     Yes.

14 Q     Who was with you?

15 A     Alex, my husband.

16 Q     Okay.  What were you doing that evening?

17 A     Preparing for the week.

18 Q     All right.  Did there come a time when you went to the

19 roof of your building?

20 A     Yeah.  We went up to our roof around 9:00ish because we

21 had our window open and we heard commotion outside and saw

22 people running.  So we went downstairs, and someone told us

23 that the police, undercover police, were pepper spraying and

24 arresting people, and so we decided to go to the roof and see

25 what we could see up there.

204

1    Q    Okay.  And how long do you think you stayed on the roof

2    watching things?

3    A    Forty-five minutes maybe.

4    Q    Okay.  Did there come a time when you went downstairs and

5    outside?

6    A    Yeah.

7    Q    Okay.  And you went onto the sidewalks outside your

8    building?

9    A    Right.

10   Q    Why?

11   A    We were just curious about what was going on.

12   Q    As you walked around downtown, did you remain on the

13   sidewalks?

14   A    Yes.

15   Q    Did you cross the streets at intersections?

16   A    Yeah, we crossed the street legally.

17   Q    Okay.  Did you walk by any police officers while you were

18   walking around downtown?

19   A    Yes.

20   Q    Okay.  Several or --

21   A    Yeah.  They were scattered throughout downtown, just

22   standing around.

23   Q    Okay.  Did any police officer say anything to you?

24   A    No.

25   Q    Did any police officer tell you that you weren't allowed

1    to be there?

2    A    No.

3    Q    Did any police officer order you to disperse?

4    A    No.

5    Q    Did any police officer warn you that you might be

6    subjected to chemical munitions?

7    A    No.

8    Q    What was the atmosphere like on the street that evening

9    when you were down there?

10   A    It was pretty calm.  We saw people that were walking home

11   from the gym, or I saw a guy with a baby, and everyone was

12   kind of just dispersed around downtown, kind of like any other

13   normal night downtown.

14   Q    Did you -- when you were walking around, did you see

15   any -- any evidence of property damage?

16   A    We did see the damage that occurred earlier in the night

17   before we ever went outside, at the -- I think it's like a

18   watch or a jewelry store, and the overturned flower pots.

19   Q    Okay.  And do you know what street that was on?

20   A    I don't remember.  I think it's maybe Olive.  It was like

21   six or seven blocks away from where we live.

22   Q    You've been to my office; correct?

23   A    Correct.

24   Q    That damage to those windows -- was that in the same

25   building as my office?

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 206 of 333 PageID #: 1323
Iris Nelson Direct Examination                                    Volume 1

206

1    A     It was near there.

2    Q     Okay.  Were the police officers that you observed while

3    you were walking around doing anything other than just

4    standing around?

5    A     No.

6    Q     Did you see any --

7    A     They were --

8    Q     Okay.

9    A     They were just standing around, like how they always do

10   downtown.

11   Q     Okay.  Were there more of them than usual?

12   A     Yeah, it seemed like it.

13   Q     Did there come a time when you heard the police direct a

14   small group to move north on Tucker?

15   A     Yeah.  We were standing on the sidewalk on Tucker by

16   Locust, and east, across the street, there's like a parking

17   lot, kind of pushed back away from Tucker, and the police, the

18   bike police, had formed a line of about maybe 15 of them, and

19   then there were about 15 to 20 people in front of them, taking

20   photos and talking to them, and that was -- at that point, we

21   did hear someone order them to disperse by either going north

22   on Washington or west on Locust, which is the direction that

23   we were observing with other journalists and people.

24   Q     Okay.  And did you believe -- did it seem to you like

25   that order applied to you?

1    A    No.  It was definitely directed at the people like across

2    the street with the police.

3    Q    So even though you didn't believe it applied to you, did

4    you continue to walk north on Tucker like the directive was?

5    A    We did.

6    Q    Okay.  Why?  Why did you go north on Tucker?

7    A    It's kind of the direction of where we lived.  So we were

8    just making our way that direction.

9    Q    Okay.

10   A    And we thought we'd be careful and go that way just in

11   case.

12   Q    All right.  When you reached Washington and Tucker, what

13   did you -- what did you do?

14   A    We continued to observe for a little while because there

15   were a lot of police cars on Tucker.

16   Q    Okay.  Did you eventually decide to go home?

17   A    We did.

18   Q    Okay.  And so from Washington and Tucker, what do you do

19   to get to your home?

20   A    You can -- you can either go down St. Charles, which is

21   kind of an alley, or you can go down Washington, and our

22   building is that direction either way to the west.  So we

23   chose to go down Washington.

24   Q    Okay.  Did you make it home?

25   A    We did not.

1  Q     Why not?

2  A     When we were probably about 60-70ish feet away from our

3  building is when a line of riot police closed in from our

4  street, 13th Street, across Washington, by Rosalita's, and

5  they completely blocked our building.  They were right in

6  front of it.

7  Q     Okay.  So what did you -- what did you do?

8  A     We saw that there were a few people closer to them than

9  we were, and they were yelling at them to get back even though

10 they were not doing anything, and so that was a little bit

11 scary for us.  So we decided not to approach them, rather go

12 the other way and find a different way to go home.

13 Q     Okay.  Were you able to find a different way to go home?

14 A     No.  When we got back to the intersection of Washington

15 and Tucker, we realized that we were closed in on four sides.

16 Q     Okay.  And closed in by what?

17 A     Police officers in riot gear.

18 Q     Had you been doing anything illegal?

19 A     No.

20 Q     What about your husband?  Did you see him do anything

21 illegal?

22 A     No.

23 Q     So you then become surrounded by the police; is that

24 correct?

25 A     Yes.

1  Q    On all four sides?  Where did that happen?

2  A    Washington and Tucker.

3  Q    Okay.  And how far away is that from your house?

4  A    One block.

5  Q    Were you subjected to pepper spray?

6  A    Yes.

7  Q    Okay.  Do you know why?

8  A    No.

9  Q    Did the spraying continue even after other -- everyone

10 was fully complying?

11 A    Yeah.  To me, it looked like everyone the entire time was

12 being compliant, and people had their hands up, and then we

13 were told to get on the ground.  Everyone was getting down on

14 the ground, and we were being showered with pepper spray

15 indiscriminately.

16 Q    Were you eventually pulled away from the group?

17 A    Yes.

18 Q    When you were pulled away from the group, is that the

19 first time you were separated from your husband that night?

20 A    Yes.

21 Q    Okay.  And did you -- were you able to turn and check on

22 him before you left?

23 A    Yes.

24 Q    And what did you see?

25 A    I saw three to four police officers dragging him across

1   the ground and kicking him and shoving his face into the

2   ground while they pepper sprayed him, and he was already

3   zip-cuffed at that point.

4   Q    And you were arrested; correct?

5   A    Yes.

6   Q    Yes?

7   A    Yes.

8   Q    Okay.  And are there any charges pending against you as

9   far as you know?

10  A    Not to my knowledge.

11  Q    I'm going to show you what has been previously marked as

12  Plaintiffs' Exhibit 40.  Do you see that on the screen?

13  A    Yes.

14  Q    All right.  And on the third page of this, that's your

15  electronic signature; correct?

16  A    Yes.

17  Q    Okay.  You reviewed this before it was filed with the

18  court?

19  A    I did.

20  Q    And signed it?

21  A    Yes.

22  Q    Have you had an opportunity since then to review it

23  again?

24  A    Yes.

25  Q    And is everything accurate that's in this declaration?

Iris Nelson Direct Examination                          Volume 1

211

1    A    Yes.

2         MR. ROTHERT:  I move for admission of Plaintiffs'

3    Exhibit 40.

4         THE COURT:  Exhibit 40 is received into evidence.

5    Q    (By Mr. Rothert) Looking back with the benefit of

6    hindsight, is there anything you think you could have done

7    differently on the evening of September 17th other than not

8    going to observe protests?  Anything you could have done

9    differently to avoid being pepper sprayed or arrested?

10   A    No.

11        MR. ROTHERT:  I have no further questions.

12        THE COURT:  I have a question.  When you said --

13   he -- you said something like eventually you were pulled away

14   from the group or something like that.  How did you leave the

15   group?  What happened to you?

16        THE WITNESS:  I had been zip-cuffed while I was still

17   on the ground, and then they left me there for a minute or so,

18   and at that point, they were going after people around me.  So

19   I heard a police officer say, "Get her out of there" because

20   they were leaning over my body, and they picked me up and

21   moved me away to go be like with the others that were already

22   zip-tied.

23        THE COURT:  And then what happened?

24        THE WITNESS:  And then we were -- a photograph was

25   taken of us, and our name was put down, and we were loaded

1    into vans to go to the Justice Center.

2              THE COURT:  So you were arrested?

3              THE WITNESS:  Well --

4              THE COURT:  You were taken to jail?

5              THE WITNESS:  -- I believed I was arrested.  No one

6    told me if I was arrested or not even though I asked, but,

7    yeah, I was taken to jail.

8              THE COURT:  And when did you get out?

9              THE WITNESS:  9:30 p.m. the next night.  So I was

10   held there for about 20 hours.

11             THE COURT:  Okay.  All right.  Cross-examination.

12             MR. RELYS:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14   BY MR. RELYS:

15   Q    Good afternoon, Ms. Nelson.  You say that you went up on

16   your roof at around 9:00 to look down and see what was going

17   on below?

18   A    Yes.

19   Q    And at that time, you were aware that there had been some

20   violence and some property damage?

21   A    I did not know that the property damage had happened yet.

22   Q    Okay.  When did you come to know that there had been

23   property damage?

24   A    Later that evening when I saw it for myself.  And then I

25   looked at the news.

```
 1   Q    Okay.  Were you aware -- so you were aware prior to your

 2   arrest that there had been property damage?

 3   A    Yes.

 4   Q    And you say you stepped out.  You were up on your roof

 5   from about 9:00 for -- about 9:00; right?

 6   A    Yes.

 7   Q    And then about 45 minutes later, you decided to go down

 8   and walk around?

 9   A    Yes.

10   Q    So around 9:45, give or take, is the approximate time

11   that you went out into the streets?

12   A    Yes.

13   Q    All right.  And you -- you didn't stay just in the

14   intersection of Washington and Tucker?

15   A    No.

16   Q    You walked around a little bit?

17   A    Yes.

18   Q    And one of the reasons you decided to walk around is

19   because you wanted to see what was going on in downtown that

20   night?

21   A    Correct.

22   Q    Specifically with relation to the protesting and the

23   police; right?

24   A    Yes.

25   Q    And you actually wore -- took a mask with you when you
```

1    went out of your house, didn't you?

2    A    No.

3    Q    You didn't have a mask with you?

4    A    I did not take a mask out of my house, no.

5         THE COURT:  Did you have one later when you were

6    arrested?

7         THE WITNESS:  After we had been closed in on all four

8    sides, I found one on the ground, and I picked it up.

9    Q    (By Mr. Relys) So at some point, you did come into

10   possession of a mask?

11   A    Yes.

12   Q    And you say that that was only after you were closed in

13   on all four sides?

14   A    Right.  Yes.

15   Q    Have you watched the video posted by a live-streamer by

16   the name of Rebelutionary Z?

17   A    Yes.

18   Q    And you recognize yourself in that video?

19   A    Yes.

20        MR. RELYS:  All right.  I'm going to play you a

21   portion of that.

22        THE COURT:  And what exhibit number is this?

23        MR. RELYS:  This is -- it's Plaintiffs' -- it hasn't

24   been entered yet, Judge, but it's Plaintiffs' L.

25        THE COURT:  Well, just give me something for the

1    record so we're not just showing an unknown video to the --

2            MR. RELYS:  It's Plaintiffs' Exhibit L.

3            THE COURT:  All right.

4            MR. RELYS:  Is that right?  I think that's right.

5            To their motion for preliminary injunction.

6            THE COURT:  Okay.

7    Q    (By Mr. Relys) I've put a still frame up there from a

8    video, Ms. Nelson.  Do you recognize yourself in that video?

9    A    Yes.

10           MR. RELYS:  And for the record, we're at the 5:43

11   mark in the video.  I'm going to back it up just -- just a

12   little bit to the 5:26 mark and start playing.

13       (Video playing.)

14   Q    (By Mr. Relys) At the 5:41 mark, do you recognize

15   yourself there in that photo --

16   A    Yes.

17   Q    -- or that still frame?  Is that a yes?  I'm sorry.

18   A    Yes.

19   Q    It looks like you have a mask already at that point.

20   A    At that point, we were closed in on four sides.

21   Q    Why are you walking -- at this point, you're walking west

22   on Washington; correct?

23   A    Yes.

24   Q    And earlier, you told us that you walked west on

25   Washington in an attempt to get to your building; right?

1    A    I had already walked west on Washington, and I had moved

2    back toward the intersection to find a way out and couldn't.

3    So I was walking around because I was confused and in shock.

4    Q    So this was the second time you had walked west on

5    Washington?

6    A    Yes.

7    Q    And you say you just found this mask on the ground?

8    A    Yes.

9    Q    And you say -- you testified earlier that you heard --

10   that you heard orders to disperse given by police to some

11   protestors; correct?

12   A    Yes.

13   Q    But you didn't think those orders applied to you?

14   A    No.  They also gave orders to go to the intersection we

15   were arrested at.

16   Q    Okay.  And how long were you away from the intersection

17   of Washington and Tucker?

18   A    At what point?

19   Q    You went other places besides Washington and Tucker.  How

20   much of the time that you were out and about were you away

21   from that intersection?

22   A    I'm not sure.

23   Q    So it's possible that during the time while you were gone

24   from that intersection orders to disperse could have been

25   given during that time period?

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 217 of 333 PageID #:
1334
Alex Nelson Direct Examination                              Volume 1

217

```
 1   A    I don't know.

 2   Q    It's possible?

 3   A    Yes.

 4        MR. RELYS:  All right.  I have no further questions

 5   at this time.

 6        THE COURT:  Redirect.

 7        MR. ROTHERT:  No questions.

 8        THE COURT:  All right.  You may step down.

 9        You may call your next witness.

10        MR. ROTHERT:  My next witness is Alex Nelson.

11        THE COURT:  If you'll come over here to the clerk to

12   be sworn, Mr. Nelson.

13                        ALEX NELSON,

14   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15   FOLLOWS:

16                     DIRECT EXAMINATION

17   BY MR. ROTHERT:

18   Q    Good afternoon, Mr. Nelson.

19   A    Good afternoon.

20   Q    Could you state your name for the record please?

21   A    Yes.  It is Alex Nelson.

22   Q    All right.  And how are you employed, Mr. Nelson?

23   A    I'm in the United States Air Force, doing cybersecurity.

24   Q    What's your rank in the United States Air Force?

25   A    First Lieutenant.
```

1    Q    How long have you served?

2    A    Been in for a little over four years.

3    Q    Okay.  And where are you currently stationed?

4    A    I'm stationed over at Scott Air Force Base, Illinois.

5    Q    And how long have you been stationed in this area?

6    A    I got to St. Louis in September of 2015.

7    Q    Do you live in the city of St. Louis?

8    A    I do.  I live on Washington Avenue.

9    Q    All right.  How long have you lived in the city of

10   St. Louis?

11   A    Since I actually -- since I got here in September.  I

12   purchased a house on Washington Avenue.

13   Q    Do you live alone?

14   A    I do not.  I live with my wife, Iris.

15   Q    You mentioned you live on Washington.  What's the cross

16   street at that intersection?

17   A    13th and Washington.

18   Q    Now I want to draw your attention to September 17th of

19   this year.  Were you at home that evening?

20   A    I was.

21   Q    Were you alone?

22   A    I was not.  I was with my wife, Iris.

23   Q    And you and Ms. Nelson -- what were you doing that

24   evening?

25   A    So we kind of do like a meal prep for the week.  So we

219

1    had been cooking meals for the rest of the week so, you know,

2    we don't have to do it during the week.  And we were, yeah,

3    just at the home, cooking, eating, hanging out.

4    Q    Okay.  Did anything happen that caused you to leave your

5    home?

6    A    Yeah.  We heard some commotion outside of our window, and

7    so we looked out, looked out, didn't really see much going on.

8    So we walked down to our lobby and were about to walk outside,

9    and we -- a man came up to us and said that there was police

10   activity on the street and that we shouldn't go outside.  So

11   we went up to our roof, and we observed for about an hour and

12   a half, and once we didn't see anything, you know, of concern,

13   we decided to go outside.

14   Q    Okay.  And why did you -- you decided to go downstairs

15   and go out on the street?

16   A    Yeah.  We saw -- we saw a bunch of police officers that

17   were at our intersection, and after they left, we didn't see

18   any -- you know, any concern or any reason for danger.  So we

19   decided to, you know, take a walk on our street like we

20   normally do.

21   Q    Yeah.  And is that a common thing that you do?

22   A    Yeah, we do it on -- you know, we're pretty active

23   people.  So we do that almost daily, if not multiple times a

24   day.

25   Q    Okay.  And then were you interested in what was

220

1    happening, or was this just for -- just for the purpose of a

2    walk?

3    A    Yeah.  Kind of the way I've been thinking about it is if

4    there's -- you know, if you live in suburbia and there's

5    activity on your street, you want to go see what's on your

6    street, and, you know, this is our neighborhood, and this is

7    my street.  So I wanted to, you know, observe what was

8    happening.

9    Q    Okay.  When you got outside, did you see any police

10   officers about on the streets?

11   A    We did.  We saw some at Washington and Tucker.  I didn't

12   really count how many, but there were -- there were a few.

13   Q    Okay.  And did any of them say anything to you as you

14   walked by?

15   A    No.  We -- we kind of -- we were not really close to

16   them.  So, you know, we were kind of on the opposite side of

17   the street of the police officers that we did see, but we were

18   never -- you know, we never interfaced with any police

19   officers.

20   Q    What was the atmosphere like on the street?

21   A    Pretty much calm.  We saw a lot of people milling about.

22   We saw our neighbors who lived in our building.  We saw people

23   walking their dogs.  I saw a man with a baby and a stroller.

24   It was just like a very typical weekend evening with just

25   quite a few police officers that were kind of spread about.

221

1   Q    Did you eventually -- did you go by any -- did you see

2   any property damage while you were walking about?

3   A    We did.  We walked to a car accident that we heard about

4   down on 8th and Pine, and we saw some people cleaning up some

5   glass that was broken, but that looked like the owner of the

6   establishment.  You know, they were -- it looked like they

7   were reinstalling a pane of glass, and that's all we saw.

8   Q    Okay.  Did you eventually decide to start walking toward

9   home?

10  A    We did.  We were at the intersection of 8th and Pine,

11  observing the car accident, and after, you know, a few minutes

12  of observing and nothing really interesting going on, we

13  decided to walk home, and we started to do that.

14  Q    So how did you get -- get back toward home?

15  A    Sure.  I think it was either Olive or Pine Street.  We

16  walked all the way back.  It would be west to Locust, and then

17  we started to head north on Tucker.

18  Q    Okay.  Did you -- did you make it home?

19  A    So we got to the intersection of Tucker and Locust where

20  we saw a line of police across the street, and we stood there

21  and observed them for a few minutes.  There was about 10 or 15

22  protestors who were across the street, who were just kind of

23  milling about over across the way, and we just kind of

24  observed for 15, 20 minutes.  We were standing next to some

25  reporters with, you know, big shoulder cameras, and we just

1    kind of stood there and watched.  And after not really seeing

2    anything interesting, we started to head north again on Tucker

3    towards the intersection of Washington and Tucker.

4    Q    Okay.  And then what did you do when you got to -- did

5    you eventually try to go west on Washington and Tucker?

6    A    We did.  So after -- after being on that intersection for

7    10 minutes or so, we decided to head home.  You know, being in

8    the military, I wake up at 6:30, and I wanted to prep my

9    uniform for work the next morning.  So, you know, it was

10   getting late, and we were ready to go home.  So we started to

11   head west on Washington towards our house.

12   Q    All right.  And you didn't make it home?

13   A    No.  So there was a line of police officers that

14   marched -- it would be north on 13th Street -- that cut us off

15   from heading to our apartment building, which was about 80 or

16   so feet away, and they told us and yelled, and they were

17   beating their batons on their uniforms like a storm trooper

18   cadence, and it was very obvious that they did not want us to

19   go that way.  So we turned around, and we walked backed

20   towards the intersection of Washington and Tucker.  And at

21   that point, we realized that police officers had come up on

22   all other sides of the street to create a corral.  I later

23   learned the term is a kettle, but they created this corral,

24   and we were unable to leave.

25   Q    Okay.  Were you surprised that this was happening?

1   A     Very much so.  You know, my wife, Iris, she started

2   sobbing immediately when we realized what was happening.  I

3   was trying to console her.  I was telling her, "Hey, we've

4   done nothing wrong.  We're going to be allowed to leave.

5   We're going to just, you know, return to our house.  It will

6   be fine."  And it was pretty apparent that it wasn't fine.

7   Q     Okay.  Eventually, did those four lines close in on you?

8   A     It did.  They basically surrounded us into a small, maybe

9   like 20-, 40-square-foot area, and once we realized -- you

10  know, I heard someone say, "The police are going to perform a

11  mass arrest," and so at that point, I realized like, "Okay.

12  This is pretty serious."  So I told Iris, "Okay.  We're going

13  to get on the ground, and we're going to put our hands behind

14  our back, and we're going to keep our head down and just

15  comply."

16  Q     And why were you -- where did you learn that?

17  A     So being a member of the military, I have had training at

18  entry control points in how to subdue a person, and I

19  understand how you use flexicuffs, how to restrain someone who

20  is, you know, being arrested, and I kind of anticipated.

21  Q     And so is lying down the best thing you can do if

22  someone's arresting you?

23  A     Yeah.  Due to the people in the small area, my gut

24  instinct told me that we needed to get on the ground because I

25  didn't want to present any sort of reason to -- for the police

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 224 of 333 PageID #: 1341
Alex Nelson Direct Examination                                    Volume 1

224

1    to think I was resisting.

2    Q    All right.  And were you resisting in any way?

3    A    I was not.

4    Q    Now, were the directions -- were you able to understand

5    directions on what you were supposed to do?

6    A    So it was very loud.  The storm trooper cadence was

7    incredibly overwhelming, and there were a lot of people

8    that -- you know, like I said, there were mostly people from

9    the neighborhood.  So no one really understood what was going

10   on.  It was essentially pandemonium in that small kettle.  So

11   there was a lot of people that were just very scared.  So it

12   was really hard to hear direction.  I never like actually was

13   told by a police officer to do this or do that.  I just, you

14   know, used my own instinct to get on the ground.

15   Q    All right.  So I mean you weren't -- were you pepper

16   sprayed then?

17   A    I was.  Once I was on the ground and my head was -- you

18   know, I got as close as I could to the ground.  A police

19   officer came up and somehow was able to like lift my head or

20   manipulate my head back and sprayed pepper spray in my eyes,

21   multiple bands across my eyes when they were open.  I wasn't

22   really expecting that to happen.  So I didn't have my eyes

23   closed.  And from that point on, I was blind for the next

24   several hours because I was hit pretty hard in the eyes.

25   Q    Okay.  Now, did you pick anything up to try to -- to try

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 225 of 333 PageID #:
Alex Nelson Direct Examination                              Volume 1

225

1    to protect yourself from any chemical spray at some point?

2    A    I did.  I found a mask on the ground, and once I was on

3    the ground, I held it against my mouth to protect any of

4    the -- you know, the chemicals coming.  I have a heart

5    condition, and I need to, you know, protect myself from

6    elevated heart rates, and I wanted to just, you know, protect

7    myself by holding this mask against my mouth.

8    Q    Okay.  Were you -- were you pulled away from that group

9    on the ground at some point?

10   A    I was.  So after I was pepper sprayed, I couldn't see who

11   or how many, but a group of officers grabbed me by my cuffs

12   and shoulders, neck somehow, and drug me across the concrete

13   on my forehead, my shoulder, and my knee.  They ripped through

14   my clothes and bloodied me up pretty good.

15   Q    Okay.  And what were you doing to resist?

16   A    I wasn't.  I was just laying on the ground.  I couldn't

17   see.  So there was nothing I really could do to resist even if

18   I had wanted to.

19   Q    Speaking of zip ties, were those put on you before or

20   after you were sprayed in the face?

21   A    They -- so once -- once I was on the ground and the

22   pepper spray hit me in the eyes, then they -- excuse me --

23   then they took the cuffs, and they -- they didn't just put

24   them on me.  They cinched them down as tight as they could.

25   Q    Okay.  And is that -- based on your experience and

Case: 4:18-cv-00308-JCH  Doc. #:  126-3  Filed: 01/30/20  Page: 226 of 333 PageID #: 1343
Alex Nelson Direct Examination                                Volume 1

226

1  training, is that the right way to use those?

2  A    No, that is not.  That is not a standard protocol for --

3  Q    What would be standard protocol for how to use the zip

4  ties?

5  A    So you would use those in a large loop in a way that the

6  person did not have their circulation cut off, especially as I

7  was not resisting and not any sort of threat.  Yeah, it was

8  definitely excessive force.

9  Q    Is there ever a time, based on your training, that you

10  would use -- that you would tighten it like that?

11  A    Yeah.  It's reminiscent of counterterrorism tactics.  You

12  would use that if you were concerned that the individual that

13  you were detaining was capable of harming yourself or a large

14  group of people.

15  Q    Did you -- were you hit in the head at all?  Your --

16  your -- if your wife -- your wife testified to seeing you hit

17  in the head.  When did that happen?

18  A    That was after I was placed in cuffs and when I was drug

19  across.  I couldn't see, obviously, but there was some sort of

20  implement used, and once I was drug, my head was re-slammed

21  down into the concrete, and I believe it was a police officer

22  using his knee or his body in some way to like hold me down as

23  they were doing this.

24  Q    Okay.  Did any police officers say anything to you during

25  this?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 227 of 333 PageID #: 1341
Alex Nelson Direct Examination                                    Volume 1

227

1    A    Yes.  A police officer, in a laughing tone, said, "Do you

2    like that, cocksucker?  We'll see you again tomorrow night."

3    Q    Did any of this that happened to you hurt?

4    A    Yeah.  The pepper spray was incredibly painful.  I've --

5    you know, I've had a lot of surgeries due to the heart issue,

6    and this is -- was definitely one of the more painful

7    experiences I've ever had.

8    Q    Were you able to clean it off pretty quickly?

9    A    I wasn't.  The members of my cell -- we kind of took

10   turns.  Since I was bleeding quite a bit and I had all the

11   pepper spray in my eyes, they kind of rallied behind me and

12   helped me.  They used like a rag to like rinse it off in the

13   little sink in the cell to help try and get the blood and

14   pepper spray out of my eyes.

15   Q    Did you -- was there any effect from the cuffing on your

16   hands?

17   A    Yeah.  I currently do not have full feeling back, and I'm

18   in physical therapy right now because there is some concern

19   about gaining full mobility back in my hand.

20   Q    Do you -- were you looking to be arrested that night?

21   Was that part of your goal?

22   A    No.  So due to the fact that, you know, I have a Top

23   Secret/SCI clearance, it's very important for me to -- you

24   know, to never be arrested, and you know, this is something --

25   I've never been arrested before.  I've only ever, you know,

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 228 of 333 PageID #:
Alex Nelson Direct Examination                                    Volume 1
1343

228

1   had a speeding ticket.  That's, you know, the biggest

2   interaction I've ever had with the police, and I would never

3   have put myself in a situation that I anticipated being

4   arrested or any sort of danger to my wife or myself.

5   Q    How long were you in jail?

6   A    I got out around 1730 on the night of the 18th.

7   Q    Okay.

8   A    So that's around 5:30.

9   Q    5:30 p.m.?

10  A    Uh-huh, 5:30 p.m.

11  Q    And did you seek medical treatment after your release

12  from jail?

13  A    I did.  The next morning, I went to the ER because I was

14  like kind of delirious in my cell, and my head was hurting

15  pretty bad from where I -- the impact to the ground.  And the

16  numbness and the -- like the loss of feeling in my hand was

17  also a concern.  So I went to a physical therapist, and my

18  doctor recommended I get there immediately to try and prevent

19  any further damage.  I'm trying to regain that.

20  Q    Now, the 20 hours you were in the jail, what medical

21  treatment did you receive there?

22  A    I didn't receive any medical treatment.  I even annotated

23  on a little sheet, like, hey, I've got a medical condition.

24  You know, the only time I ever saw was a nurse who just said,

25  like, "All right.  What are your injuries that you sustained?"

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 229 of 333 PageID #:
Alex Nelson Direct Examination                                Volume 1
4348

229

1    And I told her what happened, and she's like, "All right.  Go

2    back to your cell."

3    Q    Other than, you know, not going on a sidewalk in the

4    United States, do you know of anything that you could have

5    done to avoid being sprayed with chemicals, arrested, and

6    beaten by the police on September 17th?

7    A    Not that I know of.  I -- we didn't commit any crime.  We

8    were just walking, and, you know, it's really hard for me to

9    understand why this happened to me and my wife as we complied

10   to the police when we were told.  You know, when the kettle

11   was closing, even before then, we never -- a police officer

12   never told us to go home.  We didn't hear any, you know,

13   commands that, you know, indicated, "Hey, you're not supposed

14   to be here," and -- but it was quite shocking to me for this

15   to happen.

16   Q    Does this experience make you less likely to observe --

17   try to observe protests in St. Louis in the future?

18   A    Yeah.  I'm never going back.

19   Q    All right.  I'm going to show you on the screen to your

20   left -- on the screen to your left, there is a document that's

21   been previously marked Plaintiffs' Exhibit 38.  Do you see

22   that?

23   A    I do.

24   Q    And do you recognize this document?

25   A    I do.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 230 of 333 PageID #: 1347
Alex Nelson Cross-examination                           Volume 1

230

1   Q    And is this the declaration you filed in this case?

2   A    Yes, that's correct.

3   Q    Have you had a chance since this was filed to review it

4   and make sure it's accurate?

5   A    I have, yes.

6   Q    And is everything in there true?

7   A    It is accurate.

8        MR. ROTHERT:  I move for admission of Plaintiffs'

9   Exhibit 38.

10       THE COURT:  38's received into evidence.

11       MR. ROTHERT:  I have no further questions.

12       THE COURT:  Cross-examination.

13                   CROSS-EXAMINATION

14  BY MR. RELYS:

15  Q    Afternoon, Mr. Nelson.

16  A    Afternoon.

17  Q    So you and your wife went out for a walk on Sunday night;

18  right?

19  A    That's correct.

20  Q    And you say that you normally go on walks, so it's not

21  unusual for you to have gone on a walk that night?

22  A    That's correct.

23  Q    Most nights -- this is not a typical night in a couple of

24  ways, though; right?  There were -- there had been property

25  damage in the area; correct?

1   A      Yes, there was.

2   Q      There had been protests in the area?

3   A      That's correct.

4   Q      There had been -- there was a ton of police cars and

5   police officers in the area?

6   A      That's correct.

7   Q      And none of that stuff would be typical of a -- on a

8   normal night that you would have been going for walks in the

9   neighborhood?

10  A      We often -- you know, living downtown, we often see

11  police officers.  There was nothing that I saw to indicate any

12  sort of danger.

13  Q      There were more police officers, though, than normal a

14  night?

15  A      That's correct.

16  Q      And there were protestors?

17  A      That's correct.

18  Q      And there was property damage?

19  A      That's correct.

20  Q      And before you went out, you were aware that there had

21  been protests?

22  A      Uh-huh.

23  Q      And you were aware that there were a bunch of police

24  officers in the area; correct?

25  A      That's correct.

1  Q    And were you aware also of the property damage at that

2  point?

3  A    Not when we went outside, no.

4  Q    But after you went outside, you were aware?

5  A    Once we had passed it on the street and we saw the glass

6  being cleaned up, then we, you know, assumed that that was

7  from the protest.

8  Q    Did you see any other signs of property damage?

9  A    I saw like a plant potter that was cracked, and that's

10 it.

11 Q    Okay.  And were you aware that -- had there been any

12 violence or physical violence directed at the police earlier

13 that day to the best of your knowledge?

14 A    I am unaware of any.

15 Q    All right.  You say that -- at the time you were

16 arrested, you and your wife were both arrested; correct?

17 A    That's correct.

18 Q    She had a mask on; correct?

19 A    She did, yes.

20 Q    And -- and she told us that she picked that mask up off

21 the ground.

22 A    That's correct.

23 Q    She didn't come out of the house with it?

24 A    No.

25 Q    Out of the building with it, I guess?

1   A     No, she did not.

2   Q     And you also found a mask on the ground?

3   A     I did, uh-huh.

4   Q     So neither one of you had those masks when you left?

5   A     That's correct.

6   Q     But you both just happened to find the masks on the

7   ground before you were arrested?

8   A     That's correct.

9   Q     You say that you -- when you realized you were going to

10  be arrested, you laid down on the ground?

11  A     Yes.

12  Q     What position did you lie down?

13  A     So there was a lot of people in this small area, but I

14  got down to the point where my knees and my forehead was able

15  to touch the ground.  My stomach was not all the way on the

16  ground, and I was able to just get as close as I could in the

17  small area that we were all in.

18  Q     Okay.  And I think that you -- you recently gave an

19  interview to the *Post-Dispatch*, did you not?

20  A     I did.

21  Q     And you described in that interview that everyone around

22  you was complying with the police directives?

23  A     Yes.  To the best of my knowledge, I did not see a single

24  person who was resisting arrest.  The only thing I did see was

25  a police officer saying, "Get down on the ground" to someone,

1    and they were trying to get down closer to the ground, but

2    there was just so little room that you couldn't get all the

3    way to the ground.  It was like trying to put more surface

4    area, you know, in a smaller surface.

5    Q    But you had your head down on the ground, did you not?

6    A    I did.

7    Q    So you wouldn't have had a good view of everything going

8    on around you at that point?

9    A    That's correct.

10   Q    You didn't spend all of your time on your walk at this

11   intersection of Tucker and Washington, did you?

12   A    We did not.

13   Q    So you -- I think you testified that you didn't hear any

14   warnings at that intersection to leave.

15   A    We did not, no.

16   Q    You did hear a warning nearby?

17   A    Yes.  When we were at the intersection of -- it's Locust

18   and Tucker -- we heard a police squad car say something to the

19   effect of -- on a bullhorn -- "Move north on Tucker or west on

20   Locust."  So we were already on Locust west.  That was

21   directed at the protestors who were across the street.  So we

22   were already in compliance with that demand.

23   Q    Okay.  You didn't think, though, that that applied to

24   you?

25   A    So we did move north on Tucker after -- you know, to --

Alex Nelson Cross-examination                           Volume 1

1    as we were heading -- that was the direction of home.  So we

2    were like, "Well, we'll just head north on Tucker anyways"

3    because that's how we head home.

4    Q    Okay.  So whether or not it applied to you, that's the

5    way you were going to go?

6    A    Yes.

7    Q    All right.  You don't know if during the time that you

8    were away from that intersection any other commands to

9    disperse were given?

10   A    I do not know, no.

11   Q    And I think you mentioned you have a -- what's the -- I'm

12   not very well-versed in security clearances.  You said you had

13   a security clearance of some type?

14   A    I do.  I have a TS/SCI.

15   Q    And I don't -- I don't know what that means, but that's

16   okay.  You said that your employer was the Air Force; correct?

17   A    That's correct.

18   Q    And they take an interest in whether a person such as

19   yourself with security clearances like you have get arrested?

20   A    They do.

21   Q    So this is something that you've had to report to your

22   employer?

23   A    I have.  When I was in the jail cell, I specifically

24   told -- her name was Officer Jones -- that I needed to make a

25   phone call to my supervisors to let them know.  It's important

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 236 of 333 PageID #:
1353
Alex Nelson Cross-examination                                        Volume 1

236

1    with security clearances to let supervisors know when you are

2    not able to show up at work.  It's considered going AWOL, and

3    it's, you know, a natural security situation, and the Officer

4    Jones told me that I was denied a phone call and that I would

5    be not allowed to report that to my chain of command.

6    Q    Are there repercussions in the Air Force if you -- if

7    you're arrested?  Are there potential repercussions for you?

8    A    It depends.

9    Q    And what does it depend upon?

10   A    It depends on -- I mean there's a lot of factors.  It

11   depends on the charges.  It depends on the nature of the

12   crime, what I was doing.  It's just very situationally

13   dependent.  You know, there's a lot of factors in it.

14   Q    So the answer is it could be a problem but too early to

15   tell?

16   A    That's correct.  My leadership has been very engaged with

17   me.  I have, you know, been upfront with everything about that

18   night with them, and they have supported me through this

19   entire process.

20            MR. RELYS:  Okay.  I have no further questions at

21   this time.

22            THE COURT:  Anything further?

23            MR. ROTHERT:  Nothing further.

24            THE COURT:  All right.  You may step down.

25            THE WITNESS:  Yes, ma'am.

237

1          THE COURT:  We're going to take a recess at this

2    time.  From the Plaintiffs, about how many more witnesses do

3    you have?

4          MR. ROTHERT:  Exactly two.

5          THE COURT:  Okay.  And how long do the Defendants

6    think they'll take?

7          MR. RELYS:  A couple hours.

8          THE COURT:  Okay.  If you think that's what it will

9    do, we'll keep going and try to get this finished tonight.

10          MR. RELYS:  That would be our preference.

11          THE COURT:  So we need to plan obviously.

12          Okay.  Court will be in recess for 15 minutes.

13      (Court recessed from 3:24 p.m. until 3:44 p.m.)

14          THE COURT:  You may call your next witness.

15          MR. ROTHERT:  Plaintiffs next witness is Joshua

16    Torrez Wedding.

17          THE COURT:  Mr. Torrez Wedding, would you step right

18    over here to the clerk to be sworn?

19                    **JOSHUA TORREZ WEDDING**,

20    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

21    FOLLOWS:

22                    DIRECT EXAMINATION

23    BY MR. PRAISS:

24    Q    Good afternoon, Mr. Wedding.

25    A    Good afternoon.

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 238 of 333 PageID #:
4355
Joshua Torrez Wedding Direct Examination                    Volume 1

238

1   Q    Could you state your full name for the record?

2   A    My first name is Joshua.  My middle name is Townsend.  My

3   last name is Torrez Wedding.  No hyphen.

4   Q    What is your occupation?

5   A    I am a high school history teacher.

6   Q    Okay.  Which high school do you teach?

7   A    I teach at Gateway STEM High School in St. Louis Public.

8   Q    Following the acquittal of Officer Stockley, did you

9   participate in any protests?

10  A    I did.  I did not intend to, but I had to drop off some

11  paperwork downtown.  I heard on NPR that there was a protest.

12  So I thought I'd see what was happening.

13  Q    Okay.  And do you recall what day this was?

14  A    This was the day of the trial, which I believe was the

15  16th.

16  Q    So do you remember if it was September 15th, 2017?

17  A    I'm sorry?

18  Q    The verdict was issued September 15th, 2017.

19  A    That sounds right, yeah.

20  Q    Okay.  Do you recall approximately what time you were

21  involved in any protests?

22  A    I believe about 3:30 I joined the protestors, and we

23  marched for maybe an hour and a half and then came back to the

24  area right in front of the courthouse.

25  Q    Okay.  Were you by yourself after school doing this, or

1   were you a group of people?

2   A    I was by myself.  I did bump into some other teachers

3   that I knew from a previous job.

4   Q    Okay.

5   A    But, yeah, I went by myself.

6   Q    Okay.  Was there a reason at some point why you left the

7   protest?

8   A    The protest was over.  So it was dispersing.  The leaders

9   or the organizers said, "Let's meet up at the Central West

10  End," and it was over.  So I started to leave.  My wife had

11  gotten off work, driven downtown to meet me.  So I was walking

12  a few blocks to where my wife was parked.

13  Q    Okay.  Do you recall which direction you were heading to

14  meet your wife?

15  A    My cardinal directions are pretty bad, but I was heading

16  down Tucker.  I guess that would be north on Tucker.

17  Q    And do you recall approximately what time this was?

18  A    I'd say 5:15 approximately.

19  Q    Okay.  Did anything unusual happen along the way?

20  A    Yes.  So the protest had dispersed, and everybody was

21  leaving.  After I'd walked maybe 75 yards down Tucker and I

22  was still next to City Hall, I see a MetroBus, and off the

23  MetroBus gets, I would say, 25 to -- I don't know -- 35 police

24  in full tactical gear.

25  Q    Okay.  Where were you in relation to where this bus was

1    with the officers?

2    A    I was on the sidewalk directly next to the bus and the

3    officers.

4    Q    Okay.  Were there any protests in that area?

5    A    No.

6    Q    Was there anything going on at all other than this bus

7    with police officers and you?

8    A    No.

9    Q    Okay.  What did you do?

10   A    Well, I -- I was very surprised.  I couldn't understand

11   why they were going to a protest that seemed, from my

12   perspective, to be totally over.  So I -- I started to walk

13   away to go get my wife, but then I thought -- I was very

14   curious, and I was worried.  I was concerned.  So I decided to

15   follow behind the police, and I went into the parking lot of

16   City Hall, which is fenced in, and I videotaped what was

17   happening with my cell phone.

18   Q    Okay.  When you say you were in the parking lot, just so

19   I can visualize, what separated you between you and where the

20   police were?

21   A    There's a -- there's a fence, and then there's an

22   archway.  So, initially, I was -- there's an iron fence, a

23   cast-iron fence.  So the police were in the street in front of

24   the police station, and I was on the other side of the fence,

25   in the parking lot of City Hall.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 241 of 333 PageID #: 4358
Joshua Torrez Wedding Direct Examination                    Volume 1

241

1   Q    Okay.  So at that time, you started recording the

2   activities that you saw of the police officers?

3   A    Yes.

4   Q    Okay.  What happened next?

5   A    What happened next was I walk out into the archway where

6   the parking lot meets the sidewalk, and I was immediately

7   pepper sprayed directly in the face, and then I was in

8   terrible pain.

9   Q    Okay.  Did anybody say anything to you before they

10  sprayed you with pepper spray?

11  A    No.

12  Q    Were you in any way in the path of the police officers at

13  the time?

14  A    No.  I did not go into the street.  I was in the archway

15  that connects the parking lot to the sidewalk.  I did not go

16  off the sidewalk at all.

17  Q    Were you in any way harassing the police officers,

18  talking to them?

19  A    No.  I did not say anything to them.  I just had my cell

20  phone and was videotaping.

21  Q    Were you doing any damage to property or committing any

22  other crimes?

23  A    No.

24  Q    Okay.  Was this the first time in your life you've been

25  sprayed, pepper sprayed?

1    A    Yes.

2    Q    Okay.  How did that feel?

3    A    It was, without a doubt, the worst physical pain of my

4    life.  I felt like my eyes were on fire.  I -- I fell down to

5    the ground, and I -- I -- it's a little embarrassing because I

6    scream profanities in the videotape, which I would normally

7    never do.  I'm a high school history teacher, you know, but it

8    was incredibly painful.  I was blinded, and I just screamed

9    until a medic came and helped me.

10   Q    I'd like to show you what's been marked for

11   identification purposes as Plaintiffs' Exhibit 4.  Do you see

12   that image?

13   A    Yes.

14   Q    Okay.  When was this picture taken in relation to when

15   you were pepper sprayed?

16   A    My estimation would be that was probably, I'd say, 20 to

17   30 minutes after.

18   Q    Okay.  And did you take the picture, or did someone else

19   take the picture?

20   A    My wife took the photo.

21   Q    Okay.  And could you describe what we're seeing here?

22   A    So we took the photo just to document the condition of my

23   face.  My skin is very red from the agitation from the pepper

24   spray.  There's also some white residue on my face, which is

25   from one of the protest medics who -- I didn't even see who

1   they were because I couldn't see anything, but they poured, I

2   think, Maalox on my face to --

3   Q    When did this individual pour the Maalox on your face?

4   A    Just maybe a minute after I'd started screaming and fell

5   on the ground.

6   Q    Was that person close by at the time you were recording?

7   Do you recall?

8   A    I don't know.  I don't know who they were.

9   Q    Okay.  I'm going to show you what's been marked for

10  identification purposes --

11         MR. PRAISS:  Before that, I'd like to move

12  Plaintiffs' Exhibit 4 into evidence.

13         THE COURT:  Exhibit 4 is received into evidence.

14         MR. PRAISS:  Thank you.

15  Q    (By Mr. Praiss) I'd like to show you at this time what's

16  previously been marked as Plaintiff's Exhibit 23, which is a

17  copy of your declaration.  Do you recall submitting a

18  declaration in this case?

19  A    I do.

20  Q    Okay.  And your declaration is two pages long; is that

21  correct?

22  A    That sounds correct.

23  Q    Okay.  And the copy that we submitted to the Court, you

24  see, was an electronic signature.  Did you have a chance to

25  review that --

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 244 of 333 PageID #:
4361
Joshua Torrez Wedding Direct Examination          Volume 1

244

1    A    I did.

2    Q    -- declaration before we submitted it to the court?

3    A    I did.

4    Q    Have you had an opportunity to review it since then?

5    A    I have.

6    Q    And is all of the information stated in your declaration

7    true and accurate?

8    A    Yes.

9         MR. PRAISS:  Okay.  At this time, what I'd like, Your

10   Honor, is to play the video of the recording, and I believe

11   that's Plaintiffs' Exhibit 5.

12        THE COURT:  All right.  You may do so.

13        (Video playing.)

14        THE COURT:  Is there supposed to be sound with this?

15        MR. ROTHERT:  Yes.

16        THE COURT:  Okay.  Why don't you stop it and see why

17   we don't have sound.

18        (Video playing.)

19   Q    (By Mr. Praiss) The video we just saw -- is that an

20   accurate depiction of what you recorded on that afternoon of

21   September 15th, 2017?

22   A    Yes, it is.

23        MR. PRAISS:  Okay.  I'd like to move into evidence

24   Plaintiffs' Exhibit 5.

25        THE COURT:  Exhibit 5 is received into evidence.  I

Joshua Torrez Wedding Cross-examination                    Volume 1

245

1     assume you want 23 in evidence also.

2              MR. PRAISS:  Yes.

3              THE COURT:  It's received as well.

4              MR. PRAISS:  Thank you.

5              THE COURT:  Cross-examination.

6                          CROSS-EXAMINATION

7     BY MR. RELYS:

8     Q    Good afternoon, Mr. Torrez Wedding.

9     A    Hello.

10    Q    Hello.  So you sort of -- I think you told us earlier

11    that your -- it hadn't been your plan on this day to

12    participate in protests?

13    A    It had not.

14    Q    But once you got downtown, you did march around with the

15    demonstrators?

16    A    I did.

17    Q    And it was actually -- what were you -- remind me; what

18    were you doing at the time when we pick up the video?  You

19    were planning on going home, or you were planning on leaving

20    at that point?

21    A    Yeah.  I was going to meet my wife, and then I walk maybe

22    a hundred yards, and I see all these police in full riot gear,

23    and I couldn't understand what was happening.  So I made a

24    decision, which was a bit of an existential crisis because

25    I -- I didn't know what was happening and I was going to meet

1   my wife so -- but I decided I should go back and videotape.

2   Q    Okay.  And so this video was taken along Clark Street;

3   right?

4   A    Yes, Clark and Tucker.

5   Q    And you're in the City Hall parking lot there?

6   A    Correct.

7   Q    And you're looking -- if you're looking straight at the

8   fence in front of you, that would be south; correct?

9   A    Correct.

10  Q    And across the street would be the Police Academy

11  building?

12  A    That's right.

13  Q    All right.  Just to sort of keep us oriented in terms of

14  where this occurred at.

15  A    Uh-huh.

16  Q    And you've described there's a fence.

17  A    Yeah.

18  Q    And at the edge of the fence, at the intersection of

19  Clark and Tucker, on the northwest corner, there's a gate;

20  right?

21  A    An archway.

22  Q    An archway.  A point of entrance into the City Hall

23  parking lot?

24  A    Correct.

25  Q    All right.  Now, you can -- you've -- we all watched the

1    video just now.  You can clearly hear the officers in the

2    video yelling, "Move back"; correct?

3    A     They are.  It is not clear from my perspective that

4    they're talking to me, though.  It seems like they're here,

5    there's a line, and they're talking to people who are directly

6    in the street.

7    Q     So they were talking to the people who are in front of

8    that line?

9    A     That was my perspective at the time, yes.

10   Q     And you didn't get pepper sprayed while you were

11   alongside that line, while you were looking through the fence,

12   did you?

13   A     No.  I got pepper sprayed when I walked to the archway.

14   Q     Which was directly in front of the police line; right?

15   A     No.  It was on the sidewalk, not in the street.

16   Q     I'm going to --

17   A     It was in the sidewalk, parallel to where the police

18   were.

19   Q     You were physically -- the officers in the line -- at the

20   time that you got pepper sprayed, you were in front of them;

21   correct?

22   A     No.

23   Q     Off to the side but in front of them?

24   A     I was off to the side.

25   Q     But in front of them?

1    A     I was off to the side of them.

2    Q     Looking -- if they were looking forward left and right,

3    they would see you at that point?

4    A     If they were looking to their periphery, yes, they would

5    see me.

6    Q     Okay.  But just to be clear, you didn't get pepper

7    sprayed until you stepped through that archway and into the

8    point where they could see you in their peripheral vision?

9    A     Yes, that's true.

10   Q     Okay.  And there's also -- in the background, you can

11   hear some type of dispersal order or some type of order being

12   given, I guess?

13   A     Yes.

14   Q     Do you remember what order was being given at that point?

15   A     I believe they said something along the lines of -- I

16   remember thinking that it was in a voice that reminded me of

17   the movie *RoboCop*, and it -- I believe they said, "This is an

18   unlawful assembly.  Please move north on Tucker" is, I

19   believe, what it said.

20   Q     Okay.  And you had heard that before you got maced?

21   A     Yes.

22   Q     All right.  So you heard the "Move back," and you also

23   heard the "This is an unlawful assembly" command?

24   A     Yeah.

25         But, again, the "Move back," I certainly didn't think was

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 249 of 333 PageID #:
4368
Joshua Torrez Wedding Cross-Examination                    Volume 1

249
1    directed towards me.  I was in the parking lot.

2    Q    Did you see anybody engaged in any property damage that

3    day while you were out?

4    A    No.

5    Q    Anybody engaged -- you see anybody engaged in any sort of

6    violence, throwing bottles or rocks at the police?

7    A    I saw one or two rocks.

8    Q    Being thrown at the police?

9    A    Yes.

10          But what was interesting was the police got into a full

11   phalanx formation, and then it seemed that I saw a rock or two

12   being thrown.  So it struck me as curious that they were in

13   this formation before -- and, of course, it's possible I

14   didn't see things, but it seemed like they got into this

15   formation before rocks were thrown, not afterwards.

16   Q    Okay.  But you did see rocks being thrown?

17   A    One or two.

18              MR. RELYS:  All right.

19              No further questions.

20              THE COURT:  Anything further?

21              MR. PRAISS:  Nothing further.

22              THE COURT:  You may step down.

23              THE WITNESS:  Thank you.

24              THE COURT:  You all may call your next witness.

25              MR. ROTHERT:  Jon Ziegler.

1                          **JONATHAN ZIEGLER**,

2   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3   FOLLOWS:

4                          DIRECT EXAMINATION

5   BY MR. PRAISS:

6   Q    Good afternoon, Mr. Ziegler.

7   A    Hello.

8   Q    Could you state your full name for the record?

9   A    Yes.  Jonathan Ziegler.

10  Q    Mr. Ziegler, what is your occupation?

11  A    I'm an independent journalist.

12  Q    Okay.  And as an independent journalist, could you

13  describe what type of things you do?

14  A    Yes.  For the last five years, I've covered and

15  documented and live-streamed various social movements,

16  including back in Ferguson, Standing Rock, and now back here

17  in St. Louis.

18  Q    Okay.  And have you been present at the recent protests

19  in St. Louis since the acquittal of Officer Stockley?

20  A    Yes, I have, just about every night.

21  Q    Okay.  I want to focus your attention specifically on the

22  evening of September 17th, 2017.  Okay.  Were you present at

23  the protest that evening?

24  A    Yes, I was.

25  Q    Where were you?  Could you describe a little bit the

1  sequence of events, where you were that evening starting off?

2  A    Yes.  I arrived at the Police Headquarters downtown, here

3  in St. Louis, just at the end of the protest that was being

4  held in front of the police station there.

5  Q    What time would that be that you arrived?

6  A    Approximately 7:30 that evening.

7  Q    Can you describe what you observed at that time?

8  A    When I arrived on scene, I had just heard reports that an

9  undercover police officer had backed his car into some

10  protestors, raising the tensions.  It was a peaceful protest,

11  but now people were a little bit angrier at that time.

12  Q    Okay.  At the time that you arrived, did you see any

13  violent activities by the protestors?

14  A    No, I did not.

15  Q    Okay.  Did you stay in that area?

16  A    No.  The protestors then began to march away from the

17  Police Headquarters.

18  Q    Okay.  Did you join them?

19  A    As an independent journalist, that's what I do.  Yes.

20  Q    During this whole time, are you recording the events that

21  you're seeing?

22  A    Yes.  I was live-streaming the entire time.

23  Q    Okay.  What do you use to live-stream?

24  A    I use my phone.  It live-streams straight to a cloud and

25  then instantaneously goes to five different platforms.  So

1    it's saved right away and timestamped.

2    Q    Okay.  Do you use any other devices to record?

3    A    That night, yes.  I also had an HD camera on top of my

4    tripod.  So I was recording simultaneously with both.

5    Q    Back to where you were with the protests, so where were

6    you heading at that time?

7    A    At that time, again, we were heading away from the police

8    station.  A group of maybe a couple hundred people heading

9    towards downtown.

10   Q    Okay.  What time was that approximately?

11   A    8:00.

12   Q    Okay.  I want to fast-forward to later in the evening.

13   Where were you after, let's say, around 11:00 that night?

14   A    At that time, I was at the intersection of Washington and

15   Tucker.

16   Q    Okay.  And do you recall what transpired around that

17   time?

18   A    Yes.  Actually, I was about to go down for the evening.

19   It appeared everything had died down.  People were leaving.  I

20   then brought my live-stream back up because I noticed people

21   were heading towards me from another corner, and at that

22   point, I did hear a -- I believe it was Officer Rossomanno in

23   his SUV give a dispersal warning from that intersection for

24   people to move north on Tucker, which is what people did at

25   that point.

Jonathan Ziegler Direct Examination                    Volume 1

253

1    Q    Okay.  So were you compliant also with that request?

2    A    Yes, I was.  You can see it on my live-stream along with

3    the other people.  They were marching or moving.  There was a

4    group of 20 or so people heading in the direction the police

5    told them to go.

6    Q    Okay.  Prior to that order of dispersal, did you hear any

7    other orders of dispersal?

8    A    That was the only dispersal order I heard all -- the

9    whole entire evening.

10   Q    Okay.  And approximately what time do you think that

11   order of dispersal was made?

12   A    It was -- well, it was about -- it was 40 minutes before

13   they kettled and arrested us.  So I would have to say around

14   9:45, 10:00.

15   Q    Okay.  Let's go back to -- so at this point, you and

16   about -- you said 20 or so other people were walking north on

17   Tucker?

18   A    Correct.

19   Q    Okay.  And how far did you go?

20   A    I ended up making it to Washington and Tucker.  I didn't

21   keep track of the other people that had dispersed from that

22   previous intersection.  When I arrived at Washington and

23   Tucker, I noticed there was -- there was county police.  There

24   were other police just stationed there.  We were even talking

25   to them.  There were residents from the neighborhood.  There

1  were people that were out eating and wanting to see what was

2  going on.  It was very calm.

3  Q    Okay.  Did you see any criminal activity, any violence by

4  protestors at that time?

5  A    Not at all, no.

6  Q    Were people stopping there, or did the dispersal order

7  tell them to keep going further down?

8  A    Some people were stopping there.  Some people were

9  leaving.  It was very unclear what the police wanted.  Again,

10  that was the last communication anybody received from them.

11  Most people at Washington and Tucker never even heard that,

12  that warning.

13  Q    Okay.  What happened next?

14  A    It was pretty clear once we got to Washington and Tucker.

15  Again, it seemed calm both on the side of the protestors,

16  civilians in the area, and people who lived there and also the

17  police.  And then all of a sudden, we -- we realized we were

18  trapped on three sides, and people were coming back to us,

19  saying that they were trying to leave and they got pushed back

20  to Washington and Tucker.  And then we finally saw riot cops

21  marching in on Washington, and then the -- then we were closed

22  off on three sides.  And so at that point, people were

23  panicking.  People didn't know what was going on.  Again, this

24  was a group -- a mixed group of people.  And started walking

25  down Tucker, I believe.  And we saw the final phalanx of riot

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 255 of 333 PageID #: 4372
Jonathan Ziegler Direct Examination                     Volume 1

255

1    cops coming our way, and that's when I realized we were closed

2    off on all four sides.

3    Q    Before this happened, did the police give a warning that

4    they were literally going to trap everybody together and

5    corral them in a kettle?

6    A    No.  Again, the last communication from the police was

7    that dispersal warning at the previous intersection, which

8    people did comply with.

9    Q    What did you do when you, for the first time, realized

10   that you were almost trapped on all four sides?

11   A    I, along with many other journalists and people that were

12   trapped there at the time, started looking at the various

13   corners of where the police were boxing us in to see if they

14   were maybe giving us a recourse to leave, if there was an

15   opening that they were trying to funnel us to.  "Hey, you have

16   to go this way."  We were getting no communication from the

17   police, and every -- every wall of riot police was giving us

18   no communication.  "Can we go this way?  Where can we go?"

19   Q    Approximately how many people would you say were

20   corralled by the police on all four sides?

21   A    From my perspective at the time, I mean, it seemed like

22   at least 50 to 60 of us that were around me directly.

23   Q    Okay.  At any point, did the police give any commands as

24   they moved in closer?

25   A    The only command I heard was -- when we were finally --

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 256 of 333 PageID #: 4373
Jonathan Ziegler Direct Examination                          Volume 1

256

1   the group that was finally encircled -- was to get on the

2   ground, which at that point most people were already standing

3   there with their hands up.  And when they said, "Get on the

4   ground," everybody complied, and most people were already on

5   the ground before they even gave that order.

6   Q    Did you comply with the command to get on the ground?

7   A    Yes, I did as best I could.  We were in a very tight

8   group.  I was able to crunch down on my knees, and I had my

9   tripod, and I didn't want to smash people with it.  So I was

10  on my knees and kind of holding it like this but in a

11  compliant stature.

12  Q    Okay.  What happened when you were on the ground?

13  A    Before I even made it to the ground, they had already

14  misted the entire crowd with pepper spray for what at the time

15  appeared to be no reason.  They continued to shoot various

16  people with pepper spray, including myself.  They finally were

17  yelling at me to put my camera down, and I was trying to tell

18  them, "I'm trying."  And I'm trying to fold up my tripod

19  because I didn't want to hit the people that were next to me.

20  Again, we were very tightly packed together.  And every time I

21  was trying to communicate with them, "I am trying to fold up

22  my camera," I would get shot in the face with pepper spray.

23  Q    Did the police give any warnings to you and other people

24  in the crowd that they were going to use pepper spray?

25  A    Again, there was no communication from the police at all.

1    Q    Okay.  Approximately how many times do you think you got

2    sprayed, pepper sprayed that -- at that time?

3    A    Myself, at least six times because after I was then

4    cuffed -- again, on my video, you can hear me complying with

5    the officer after I was cuffed -- I was shot again in the

6    face, right near my mouth.

7    Q    Okay.  What happened after you were cuffed?

8    A    So I -- you can hear me in the video complying with the

9    officer.  I'm cuffed.  You can hear my arresting officer call

10   me superstar, which I found out after my live-stream went off

11   that that's what the police refer to me as because I document

12   the police.  They've known me in St. Louis for a while, and I

13   guess I didn't know how well they watched my live-streams and

14   talked about me in their on-duty and off-duty time, but -- so

15   they shot me in the face with pepper spray.  They called me

16   superstar.  The stream went down, and they started -- they

17   continued mocking us, calling me names, taking selfies with me

18   as I'm just dripping in snot, and mocking the legal observers

19   that were next to me.

20   Q    Did you observe the police officers engaging in similar

21   conduct to other individuals in the group in terms of pepper

22   spraying them in the face?

23   A    Yes.  I saw multiple people around me being pepper

24   sprayed.  I do remember Officer Brian Rossomanno that was

25   right up at the front of the line -- although I never

1    witnessed myself him pepper spraying me or anybody directly

2    because I got blinded pretty soon after, he was right there,

3    and him being a commanding officer kind of sets the tone for

4    the other people around him, and I think that's what gave the

5    green light for his -- the rest of the guys to treat us like

6    that because they were getting -- the commanding officers were

7    not telling them how to behave or how not to behave.

8    Q    Did you observe whether it was just one police officer

9    pepper spraying the people or whether it was multiple police

10   officers doing this, engaging in this conduct?

11   A    I -- with my own eyes, I saw at least three officers use

12   their big blue cans of mace.

13   Q    Okay.  And we have -- you took at least two videos that

14   night; correct?  One, the live-stream, and then there's the

15   HD?

16   A    The ones we're submitting, yeah.  It's the final videos,

17   the last 45 minutes there.

18        MR. PRAISS:  Your Honor, we have one video, which is

19   Exhibit #9.  It's, I believe, about 45 minutes long.  What we

20   would propose, especially with the time, is to just play the

21   last five minutes, and we can try and move to that end point,

22   but we would like to present that to the Court.

23        THE COURT:  All right.  So, in other words, you want

24   to introduce into evidence the whole 45 minutes, but you want

25   me to watch it on my own the rest of the time?

 1          MR. PRAISS:  Yes.  I know the City has a copy of that

 2   video we presented to them.

 3          THE COURT:  And so you're going to -- for right now,

 4   you're going to play the last five minutes?

 5          MR. PRAISS:  Yes, Your Honor.

 6          THE COURT:  Okay.  That's fine.

 7          MR. PRAISS:  Thank you.  I apologize.  That's

 8   Exhibit 10.  I misspoke the number.

 9          THE COURT:  Okay.  This is Exhibit 10.  All right.

10   Go ahead.

11      (Video playing.)

12          MR. PRAISS:  I'd like to move into evidence

13   Exhibit 9.  Has that been admitted?

14          THE COURT:  Yeah.  Or was that Exhibit 10?

15          MR. PRAISS:  10.  That was 10.  I misspoke again.

16          THE COURT:  Exhibit 10 is received into evidence.

17          MR. PRAISS:  Okay.  We also -- Your Honor, just for

18   time efficiency, we've previously submitted with his

19   declaration, I believe, Exhibit 9, and the City has a copy of

20   that.  It's a very short, five-minute one.

21          THE COURT:  Right.

22          MR. PRAISS:  I, again, would just ask to get that

23   admitted and save the Court some time watching it.

24          THE COURT:  Okay.  So Exhibit 9, yeah, I've looked at

25   that one.  That's the shorter one; right?

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 260 of 333 PageID #: 1377
Jonathan Ziegler Cross-examination                    Volume 1

260

1          MR. PRAISS:  Yes.

2          THE COURT:  Okay.  It's received into evidence.

3          MR. PRAISS:  Thank you.

4    Q    (By Mr. Praiss) And finally, if I may, Mr. Ziegler, I'm

5    going to show you what's previously marked as Plaintiffs'

6    Exhibit 30.  Do you recall submitting an affidavit --

7    A    Yes, I do.

8    Q    -- in connection with this matter?

9    A    Yes.

10   Q    And your affidavit is three pages long, and is that your

11   signature on the bottom?

12   A    Yes, it is.

13   Q    Okay.  And is all the information in your affidavit still

14   true and accurate today?

15   A    Yes.

16         MR. PRAISS:  Okay.  I have no further questions.  I'd

17   like to move into evidence Plaintiffs' Exhibit 30, please.

18         THE COURT:  Exhibit 30 is received into evidence.

19   You may cross-examine.

20                    CROSS-EXAMINATION

21   BY MR. MCDONNELL:

22   Q    Good afternoon, sir.

23   A    Hello.

24   Q    Sir, I noticed on your affidavit you were in the Central

25   West End on Friday night.

Jonathan Ziegler Cross-examination                    Volume 1

261

1    A    Correct.

2    Q    Where were you?

3    A    On Friday night, I was, like usual, following the

4    protestors and live-streaming.

5    Q    What streets were you on?

6    A    I -- I had -- that particular night, I met up with the

7    march late.  I don't know what street I first met up with them

8    on, but I did march back to Delmar.

9    Q    Okay.  At any time, were you at the intersection of Lake

10   and Waterman near the Mayor's house?

11   A    Yes, I was.

12   Q    Did you see any violence, rock throwing, brick throwing

13   at the Mayor's house?

14   A    I did not see anything, no.

15            THE COURT:  Did you hear it?

16            THE WITNESS:  I did hear it.

17            THE COURT:  You could hear glass breaking?

18            THE WITNESS:  I did hear glass breaking, yes.

19   Q    (By Mr. McDonnell) And it was your understanding that it

20   was the protestors who were throwing the rocks and the bricks

21   at the Mayor's house?

22   A    It was my understanding that someone did.  It could have

23   equally been an undercover police officer.

24   Q    So you're saying the police threw the rocks and the

25   bricks?

1    A    I'm saying it's just as likely it was that as anybody

2    else because I have no evidence.  Nobody has evidence of who

3    exactly it was that I'm aware of.

4    Q    Did you hear any warnings over the PA system of the

5    police near Lake and Waterman that evening?

6    A    About half an hour after that, I did.  They had split the

7    crowd up.  So there was maybe 20 or less people where I had

8    split -- been split into.  I heard dispersal warnings, and we

9    started marching down the street.

10   Q    And exactly what were the warnings you heard?

11   A    Just a standard dispersal, "Leave the area."  There was

12   only one way for us to go.  So people were walking in that

13   direction.

14   Q    And I don't mean what -- I don't know what you mean by

15   "standard dispersal order."  What do you mean?

16   A    Standard "Please leave the area.  Arrests are possible."

17   That type of dispersal warning.

18   Q    Sir, you're like a professional videographer that records

19   these protestors; correct?

20   A    I have an independent journalism website.  It just

21   started.  So I mean it's -- yeah.

22   Q    And how many of these protests have you videotaped?

23   A    I've -- I've lost count.  My videos are in the thousands

24   at this point.

25   Q    And on the evening of Sunday night, near Washington and

Jonathan Ziegler Cross-examination                    Volume 1

263

1   Tucker, did you hear dispersal orders that evening?

2   A     Near Washington and Tucker?  At Washington and Tucker, I

3   did not.

4   Q     What about -- where at any other place that evening?

5   A     The only dispersal warning I heard was a block to the

6   south, telling the people that were at that intersection to

7   move north on Tucker.

8   Q     And did you see some people comply?

9   A     Yes, I did.

10  Q     And did you see some people ignore the order?

11  A     I walked with the people complying.  I didn't see anybody

12  still lingering at that intersection myself.  I decided to --

13  I saw most people walking away from there, and so I went with

14  that crowd to videotape them.

15  Q     When you were being arrested later that evening, did you

16  see people next to you not complying with the police officers'

17  orders?

18  A     No.  Everyone was already on the ground even -- I mean

19  you saw in the video we were all on the ground by the time

20  they told us to get on the ground.

21  Q     Okay.  But when you were on the ground, you couldn't see

22  what the other people were doing; correct?

23  A     I -- not after they maced me in the face, if that's what

24  you're asking.  No, I couldn't see anything at that point.

25  Q     But when you're laying on the ground, you can't see what

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 264 of 333 PageID #: 7381
Jonathan Ziegler Cross-examination                    Volume 1

264

1   people are doing behind you, next to you, in front of you;

2   right?

3   A    No, but my camera did, and we all saw that.

4   Q    Your camera went blank for a while; correct?

5   A    After they dragged me away and turned my phone off, yes.

6        MR. MCDONNELL:  No further questions.

7        THE COURT:  Any redirect?

8        MR. PRAISS:  None.

9        THE COURT:  You may step down.

10       All right.  You all may proceed.

11       MR. ROTHERT:  No further witnesses from Plaintiffs.

12       THE COURT:  All right.  The Defendants may proceed.

13       MR. RELYS:  Defendants call Lieutenant Timothy Sachs.

14       THE COURT:  Is this your -- I asked you earlier did

15  you have a representative in the courtroom, and you never told

16  me anybody, and I assume this is the person.  Oh, no.  She's

17  going to get the witnesses?

18       MR. RELYS:  Yes, yeah.

19       THE COURT:  Okay.  I thought that was the witness

20  coming up.

21       MR. ROTHERT:  No, Your Honor.

22       THE COURT:  So you don't have a corporate

23  representative or an entity representative?

24       MR. RELYS:  We do not.  No, we do not.

25       THE COURT:  Okay.  Fine.  I thought that was the

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 265 of 333 PageID #: 1382
Timothy Sachs Direct Examination                                 Volume 1

265

1   witness, and I didn't understand why she'd been sitting here

2   the whole time.

3             MR. ROTHERT:  She's with us but not with us.

4             THE COURT:  All right.  And what's the name of the

5   witness?  Lieutenant Timothy Sachs, S-A-C-H-S.

6             Okay.  Lieutenant Sachs, would you step over here to

7   the clerk to be sworn.

8             THE WITNESS:  Afternoon, Judge.

9                         **TIMOTHY SACHS**,

10  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

11  FOLLOWS:

12                     DIRECT EXAMINATION

13  BY MR. RELYS:

14  Q    Afternoon, Lieutenant.  Could you please state your name

15  for the record?

16  A    Timothy Sachs.

17  Q    And what's your occupation, Mr. Sachs?

18  A    I'm a police lieutenant in the city of St. Louis.

19  Q    Okay.  So it'd be Lieutenant Sachs?

20  A    Correct.

21  Q    All right.  How long have you held the rank of

22  lieutenant?

23  A    Seven years.

24  Q    And how long have you been a police officer?

25  A    Thirty-five years.

1    Q    How many of those 35 years have been with the St. Louis

2    Police Department?

3    A    All of them.

4    Q    All right.  Tell me what your -- you're currently a

5    lieutenant.  What's your current assignment?

6    A    I command the Tactical Operations Division, which

7    includes the K-9 Division, Aviation, Mobile Reserve, SWAT, and

8    the CDT.

9    Q    And CDT -- could you tell us what that stands for?

10   A    Civil Disobedience Team.

11   Q    Tell us a little bit about what CDT entails.

12   A    The CDT unit actually responds to any large callouts for

13   any type of civil disobedience, anything that would overwhelm

14   normal district operations where they don't have enough

15   manpower.

16   Q    Okay.  And you said -- did you say SWAT before?

17   A    Correct.

18   Q    Okay.  Tell us what SWAT entails.

19   A    Where our unit -- that part of the unit actually handles

20   any special weapons or tactical operations, again, over --

21   exceeding what normal district operations were.  We also

22   execute the search warrants in the city of St. Louis, the

23   high-risk warrants.  We have more of the tools and equipment

24   needed over and above what a district officer will have.

25   Q    Okay.  So is -- is the term "tactical team" sometimes --

1  is SWAT sometimes referred to as tactical team and vice versa?

2  A     Yes, sir.

3  Q     Have you had occasion to be involved in the police

4  response to the protests that have occurred since the

5  announcement of the Stockley verdict?

6  A     Yes, sir, I have.

7  Q     Okay.  And those protests started, I believe, on

8  September 15th, which was a Friday?

9  A     Yes, sir, it was.

10  Q     Could you tell us; were you involved in the response to

11  protests that day?

12  A     Yes, sir, I was.

13  Q     In what capacity?

14  A     I was a tactical operations commander, okay, which I

15  actually have the control of any of the tactical deployments

16  of the CDT teams or the SWAT operation, tactical operation of

17  that, and I'm at the direction of the scene commander or the

18  incident commander.

19  Q     Okay.  And could you tell us how that -- how that day

20  developed for you?

21  A     Originally, we were in very early in the morning getting

22  ready to execute search warrants, and we were informed that

23  the verdict was going to be rendered that day.  We put

24  everything on hold.  The verdict was rendered, and we actually

25  had to start calling people in from home, and we got geared up

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 268 of 333 PageID #:
1385
Timothy Sachs Direct Examination                    Volume 1

268

1    basically, and then our response was to move from Police

2    Headquarters down to the Police Academy, and then we actually

3    staged at the Police Academy with some of the tactical

4    operations officers, and then the CDT officers were called in,

5    and they actually staged at the Police Academy.

6    Q    So the first response was to sort of get your people in

7    place?

8    A    Yes, sir.

9    Q    And you did that around the Police Academy building?

10   A    Yeah.  It was on 300-315 South Tucker is where the Police

11   Academy was, and then we actually staged some people on buses

12   just so we could move them wherever we needed to move anywhere

13   in the city.

14   Q    And you gave us an address there, but could you tell us

15   the approximate intersection that that's at, the Police

16   Academy where you were staging?

17   A    It's at Tucker and Clark.

18   Q    Clark and Tucker?

19   A    Yes, sir.

20   Q    Okay.

21   A    Just south of there.  It's between Clark and Spruce on

22   Tucker.

23   Q    Okay.  So you got your assets in place or your people in

24   place.  What happens next?

25   A    Oh, we start getting information.  I had actually staged

1    an observation -- I had staged four observation teams in

2    different parts of an area right by the court building, right

3    across the street, and they were actually starting to feed us

4    information of what they were observing, and they started

5    seeing large groups of people gathering outside of the court

6    building, moving into the streets, and then eventually

7    blocking the streets, blocking the intersections.  And from

8    there, the crowds started to gather a lot.  I mean there was

9    quite a few people.  They started blocking streets, and they

10   started demonstrating.  They moved from there to City Hall and

11   then started moving south on Tucker.

12   Q    Okay.  So you were expecting protests?

13   A    Yes.

14   Q    After the verdict came back as not guilty?

15   A    Either way, we expected something, yes.

16   Q    And those protests did materialize?

17   A    Yes, they did.

18   Q    How quickly did they materialize?

19   A    Within an hour, I believe, of the actual verdict.  It was

20   about 9:30 or 10:00 in the morning we started getting our

21   assets in place, and around 11:00, I had observation teams up,

22   and they were already reporting people there.  Most of it was

23   centered around, I guess, lunchtime.  You know, so that's when

24   a lot of everything started.

25   Q    Around lunchtime?  Okay.  And you've told us a little bit

Timothy Sachs Direct Examination                              Volume 1

1    about how you got the teams in place.  You did some

2    observation.  Did you -- did you immediately engage, or did

3    your officers immediately engage with the protestors?

4    A    Oh, absolutely not.  There was no reason to immediately

5    engage them for anything.  You know, they were allowed to

6    demonstrate, and then the demonstration turned into some more

7    overt protesting, and they were still allowed just to keep the

8    intersection.  We allowed them to have the street and all --

9    the only thing the agency did -- and I didn't have too much to

10   do with this, but they actually used Traffic Safety to block

11   off streets to keep vehicles from driving through the crowds.

12   Q    Okay.  And when you say "let them have the intersection,"

13   what intersection are you talking about?

14   A    Originally, it was Tucker and Market, up right by the

15   court building there.

16   Q    Okay.  And so you let them have the street there at

17   Tucker and Market.  What happens next?

18   A    The crowd starts to get a little more rambunctious, and

19   they start moving toward City Hall.  There's a demonstration

20   there, and the crowd as a group went from Market all the way

21   down to Clark.  Now, in between there, there's City Hall.

22   There's the old police station, the old police headquarters

23   that still says "Police" on it, but it's not occupied.  And

24   then there's the Justice Center that's in between on the

25   opposite side of the street.  So the crowd started growing and

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 271 of 333 PageID #: 1389
Timothy Sachs Direct Examination                              Volume 1

271

1  moving into and in front of those.  And eventually, a large

2  group of them actually went west on Clark and started to go

3  onto the highway.  Now, they were blocked at the highway ramp

4  right before 14th Street and prevented from going onto the

5  highway, and as they were coming back, again, towards 12th

6  Street, we started seeing a lot more agitation and things

7  being thrown.  A lot of -- a lot more, I guess, you know,

8  problems with the crowd now that it's later in the afternoon

9  and we're starting to have issues with them.

10  Q    About what time are we talking now?

11  A    It was --

12  Q    If you know.

13  A    I don't know exactly, to be honest.  Again, I wasn't --

14  we weren't deployed at that time.  So I wasn't actually part

15  of that.  I was just monitoring the traffic that was going on

16  with the Bicycle Unit response and the Traffic Safety

17  response.

18          THE COURT:  So where were you?

19          THE WITNESS:  I was at the Police Academy.

20          THE COURT:  You were at the academy?

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  When you say you were monitoring it, I

23  don't know if you mean you were watching it or people were

24  reporting to you what was going on.

25          THE WITNESS:  Both.  I was able to see from the

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 272 of 333 PageID #: 1389
Timothy Sachs Direct Examination                          Volume 1

272

1   academy parking garage.  We're on the first floor.  We were

2   actually out on the sidewalk in front of it for a while.  So

3   we could see all the way up Tucker to Market Street, and we

4   could see the crowd coming down, and then I was monitoring it

5   on the radio also.

6          THE COURT:  Okay.

7   Q    (By Mr. Relys) So you had some actual personal knowledge

8   from being able to visualize some of this stuff?

9   A    Yes, sir.

10  Q    And you also were monitoring the radio traffic?

11  A    That's correct.

12  Q    All right.  So some of the protestors tried to block the

13  highway, you said?

14  A    Yes.

15  Q    And were they able to do that?

16  A    They weren't able to get up on the highway, no.

17  Q    How -- why was that?  How did that --

18  A    The bicycle response team was able to basically beat them

19  onto the ramp, and then they formed the safety line up on the

20  ramp and prevented them from going up onto the highway.

21  Q    Okay.  What happened after the protestors were turned

22  away from the ramp there at Clark and 14th Street?

23  A    They moved back towards 12th and Tucker or 12th and

24  Clark, and we had two buses or, actually, four buses initially

25  staged on the east side of the street in front of fire alarm,

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 273 of 333 PageID #: 1330
Timothy Sachs Direct Examination                              Volume 1

273

1   and that's where we had our CDT officers because there's not

2   enough room in the academy garage.  So we had them sitting on

3   there with the air conditioners going, just placed, waiting

4   for them.

5        They started surrounding the buses.  They're now throwing

6   things.  They're throwing water bottles.  Some of the folks

7   had actually climbed up on top of the bus stop.  They were

8   climbing up on top of that.  They wound up -- wind up --

9   they're getting more agitated.  So we made the decision -- the

10  colonel and I made the decision we're going to pull the CDT

11  officers back, at least out of sight.  That way, we're not,

12  you know, giving them anything to look at or being agitated

13  with.  All they have are buildings.  We were able to get

14  actually two buses away before the crowd --

15  Q    I'm going to stop you there for a second --

16  A    Yeah.

17  Q    -- because you gave us a lot of information.  You said

18  you and the colonel had made a decision.

19  A    Colonel Gerald Leyshock.

20  Q    Okay.  So is he with you during this time period?

21  A    Yes.  Yeah.

22  Q    He's also in the academy building there?

23  A    Yes, he is.

24  Q    And are you able to see physically some of this stuff

25  happening?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 274 of 333 PageID #:
1381
Timothy Sachs Direct Examination                                Volume 1

274

1   A     Yes.  This is right across the street.  We're actually on

2   the sidewalk.  We're only a half a block down from Tucker and

3   Clark.

4   Q     Okay.  So the events that you're describing now, you

5   actually physically saw with your own two eyes?

6   A     That's correct.

7   Q     All right.  And you said that there was four buses?

8   A     Initially, there were four buses, yes, sir.

9   Q     And those buses were full of officers or some of them

10  were?

11  A     Yes.

12  Q     Some of them or all the four buses?

13  A     All four of the buses had officers on them at one point.

14  Q     Okay.  And the reason for those officers being on the

15  buses was what?

16  A     Well, there wasn't room in the Police Academy.  We --

17  there was two buses for each CDT team.  I had one north, one

18  central, and one south.  We had one group staging in the

19  Police Academy, and then each one of the other two teams had

20  two buses, and it was more for convenience's sake to be able

21  to move them.  It was a little warm that day.  So we had air

22  conditioners going too.  So we had the officers on the buses.

23  Q     Okay.  So you said -- I think you had said that the

24  decision was made to get the buses with the CDT officers out

25  of that area.

Timothy Sachs Direct Examination                           Volume 1

275

1    A    That's correct.

2    Q    Tell us again why that was that decision was made.

3    A    These -- the protestors now were getting very violent,

4    and we just didn't want to give them anything that they could

5    actually take action against.  The buses had civilian drivers

6    on them.  They had the Metro drivers.  They weren't police

7    officers, and we didn't want to have any issues with anybody

8    or anything getting tore up.  So we just, you know, removed

9    any type of issue from the area.

10   Q    Okay.  And when you say that the protestors had become

11   violent, what do you mean?

12   A    Well, not only were they yelling -- excuse me -- yelling

13   and screaming; they were throwing things now at this time.

14   They were throwing water bottles, throwing pieces of rock.  It

15   was getting a little more hostile than originally it was at

16   Market and Tucker or, yeah, Market -- yeah, Tucker and Market,

17   yes.

18   Q    And the decision was made -- the decision -- you could

19   have deployed the CDT at that point?

20   A    Oh, absolutely.

21   Q    And CDT -- just to be clear, right, the CDT are the

22   officers that have the riot shields and the helmets and the

23   armor; right?

24   A    They have the protective gear, the protective helmets,

25   the leg and arm protection, and then the plastic shields, yes.

Timothy Sachs Direct Examination                          Volume 1

276

1    Q    But those folks at this point have not been deployed?

2    A    That's correct.

3    Q    They're sitting on these buses?

4    A    Yes, sir.

5    Q    And the decision that you guys make is to try to get

6    these buses out of there?

7    A    Yes.

8    Q    To try to diffuse the situation?

9    A    Yes.  Yeah.

10   Q    Once that decision is made to try to get these buses out

11   of there with these CDT officers on them, what happens?

12   A    Well, we're de-escalating a lot of whatever future

13   confrontation would be.  So we were able to get two of the

14   buses actually driven away.  And at one point, I guess someone

15   saw, you know, the officers leaving.  So they surrounded the

16   remaining two buses, and they started throwing water bottles

17   and rocks and things at the buses themselves.

18   Q    All right.  And, again, were you able to see this, this

19   happen?

20   A    Yes, sir.  It's right across the street from where I was

21   at.

22   Q    So when you say the people were throwing things, this is

23   something that you personally witnessed?

24   A    I did.  And at that time, we moved from the sidewalk,

25   inside the academy parking garage, closed the garage doors.

1    Now, the garage doors have windows on them.  So we're still

2    able to see out.  And then we went to the front of the Police

3    Academy, which has got glass doors.  We're standing in the

4    lobby, watching that.  Not all of us were, you know, available

5    to see that, but that was part of what my duties were.  So I

6    had to monitor what was going on.

7    Q    Okay.  So the officers or the two buses make it away, and

8    two buses get surrounded; right?

9    A    That's correct.

10   Q    And what happens next?

11   A    They're -- some of the protestors are throwing things at

12   the bus, beating on the bus to the point where we were afraid

13   that something was going to happen; windows were going to be

14   broken or something.  So we asked the officers to get off the

15   buses, move these people away from the buses so we can get the

16   buses out of there.  We were going to put those folks, you

17   know, the CDT officers, still back on the bus and move them

18   out, and we still couldn't do that.

19   Q    Did you feel like you could move the buses without having

20   taken the teams off the bus?

21   A    No, not at that time, we could not.  They were completely

22   surrounded, and the officers -- again, they were sitting on

23   the bus.  They were helpless to do anything.  So we had to

24   move them out just to move the buses.

25   Q    So you took the officers or you ordered the officers off

278

1    the bus?

2    A     That's correct.

3    Q     And then what happens?

4    A     We asked them just to fan out away from the bus, just to

5    where we can get, you know, a little space in between the

6    demonstrators, the protestors, and us.  And then eventually,

7    we're still not able to get them far enough away.  We actually

8    had to form a skirmish line that went all the way across

9    Tucker.

10   Q     Okay.  And were the CDT officers under your command the

11   only officers involved in this response?

12   A     Yes, sir, at that time.

13   Q     Okay.  Did the bike team eventually get involved?

14   A     Yeah, eventually, they did, but --

15   Q     Tell me how that developed where we get to the bike folks

16   showing up as well.

17   A     As the officers were getting off the buses, we

18   actually -- the Bike Unit is under the CDT umbrella, but it's

19   commanded by another lieutenant.  So they came -- after they

20   were able to secure the ramp, they actually came back around

21   and were addressing the crowd on the east side of Clark at

22   Tucker, and they filtered down towards us to help get the

23   officers off the bus.  They just couldn't walk their way off

24   the bus.  They actually had to have some officers, the bike

25   officers, actually trying to move some of the crowd away just

1    so they can get off the bus.

2    Q     So the CDT people couldn't even get off the bus without

3    the help of some bike officers; is that correct?

4    A     That's correct.  Oh, yes.  Yeah.

5    Q     Okay.  So once we have the bikes and the CDT, the bikes

6    in the area and the CDT off the bus, what happens next?

7    A     We actually moved some of the or most of the protestors

8    back north towards City Hall.  There were skirmishes back and

9    forth.  We actually withdrew or brought some of the CDT

10   officers back on the south side of Clark, and then we were

11   holding right there at Clark.  We brought some buses in in

12   case we had to make arrests, and they were actually staged on

13   Clark at Spruce.

14          THE COURT:  Can you tell me -- yeah, I'm going to

15   stop you there.

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  When you say, "Okay.  We formed a

18   skirmish line.  We're moving the protestors north," I need

19   some time on this, some chronology.  About what time did

20   all -- what time did the people get off the buses maybe is a

21   good question.  Approximately.

22          THE WITNESS:  Judge, I really don't -- I wasn't

23   involved after --

24          THE COURT:  Okay.  It wasn't 10:00 in the morning?

25          THE WITNESS:  No, ma'am.  This is later.

Timothy Sachs Direct Examination                              Volume 1

280

1           THE COURT:  It wasn't 7:00 at night?

2           THE WITNESS:  No.  This was later in the afternoon,

3   after 2:30, 3:00.

4           THE COURT:  Okay.  That's -- I just wanted a general

5   idea.

6           THE WITNESS:  Okay.  Yes.

7           THE COURT:  Thank you.  Go ahead.

8   Q    (By Mr. Relys) Okay.  So you were telling us about you

9   had some buses come in in case you needed to make arrests?

10  A    Yes.

11  Q    And what else?  What happens next?  How does the

12  situation develop from there?

13  A    We're actually, you know, asking and telling, ordering

14  the -- the protestors to move back away.  Some of them did not

15  do that.  We've actually -- we had to make a couple of arrests

16  there.  We moved the people, took them from the line and moved

17  them back onto the buses.

18  Q    And when you say --

19  A    Prior --

20  Q    When you say you're ordering them to move back away,

21  who's ordering --

22  A    The officers on --

23  Q    Who's ordering who to move back away from where?

24  A    Okay.  The officers on the line are ordering the

25  protestors to move back away from them, and then they have

Timothy Sachs Direct Examination                              Volume 1

281

1    supervisors behind them giving them direction on which way we

2    want to move the line and what we tell these people.  So we're

3    trying to move the group north of Clark, away from the buses,

4    far enough to where we could turn the buses around, which we

5    eventually did.

6    Q    So the objective here is -- remains free the buses?

7    A    Yeah, just to get the buses out so we can get the CDT

8    officers pulled back.

9    Q    Were any chemical munitions used during this particular

10   incident?

11   A    No, sir, we did not deploy chemical munitions.

12   Q    How about mace?

13   A    Yes.  Now, individual officers and bike officers deployed

14   mace.

15   Q    And did you see any of that?

16   A    I did not, no, sir.

17   Q    Okay.  Were your officers and the bike officers

18   eventually successful in freeing those buses?

19   A    Yes, we were.

20   Q    How long -- how long do you think the whole thing took?

21   A    Forty-five minutes, maybe an hour.

22   Q    All right.  And were any officers injured during that

23   operation?

24   A    Yes, sir.

25   Q    How many?  Or do you know how many?

1    A    I don't know.  I don't have the number for you.

2    Q    Do you know how they were injured or the nature of their

3    injuries?

4    A    It's my understanding that they were struck by

5    projectiles or things being thrown at them.

6    Q    And were any arrests made?

7    A    Yes, sir.

8    Q    Do you know about how many arrests?

9    A    I don't, no.  I wasn't in charge of the arrest portion of

10   that.

11   Q    And without -- without sort of -- I'm not asking you for

12   the specific legal citation to what they were charged with,

13   but do you know what the arrests were made for?

14   A    There was failing to disperse, blocking the street,

15   resisting arrest is what I believe it was.

16   Q    Okay.  Were orders given to disperse during this time

17   period?

18   A    Yes, sir.

19   Q    All right.  What happens after the buses are free?  What

20   do the officers -- what do your officers do, or what do you --

21   what do you tell them to do at that point?

22   A    We're actually just holding a line and staying on Tucker

23   south of Clark.  Some of the protestors had moved on.  Later

24   on in the day, we had a police vehicle that was jumped on and

25   damaged.  Again, we didn't quite address that.  We just kind

Timothy Sachs Direct Examination                                    Volume 1

283

1    of held the line.  Afterwards, we saw what was going on.  We

2    moved a group of bicycle officers up that way, and the people

3    fled.

4    Q    Okay.  So did your officers stay in the area after the

5    bus incident?

6    A    Yes.  Yeah.

7    Q    Okay.  And at some point, there started to be an issue

8    with some destruction of a police vehicle?

9    A    Yes.

10   Q    Is that what you said?

11   A    That's correct.  Yes.

12   Q    Okay.  Tell me how -- tell me how that developed, and

13   approximately, if you could -- you know, I think you said

14   earlier this is -- this is early afternoon or maybe 3:00,

15   2:00.  Could you give us a --

16   A    This is -- this is early evening --

17   Q    Okay.

18   A    -- 4:30, 5:00.  It was right before we were able to

19   secure our detail.  There was a group that was actually --

20   now, this is in front of the police station.  So I can't see

21   around the corner, but this is west of Tucker on Clark.  We

22   had some police vehicles parked along where the old police

23   station was, and one of the officers were unable to move it

24   prior to all the protestors coming down, and that vehicle got

25   jumped on, and I believe there's some video of it or whatever,

1    and windows got broken out of it.

2    Q    Okay.  You've seen that video since?

3    A    I have.

4    Q    Okay.  What was the -- did the police respond to that --

5    that damage done to that vehicle?

6    A    Yes.

7    Q    And how did the police respond?

8    A    We actually went up to the vehicle.  People fled from

9    that vehicle, and then we were able to find the officer who

10   had the keys, and we actually moved the vehicle.  I had him

11   drive it away.

12   Q    Okay.  And who -- what officers were involved in that

13   response?

14   A    I don't know.

15   Q    Was it officers under your command?

16   A    No, sir, it was not.

17   Q    Was it the bike -- bike --

18   A    I believe it was the bikes, but I don't know.  It was not

19   my CDT line.

20   Q    All right.  Were you monitoring that radio traffic?

21   A    Yeah.  Oh, yes, sir.  It was all on the same radio

22   frequency.  Yes.

23   Q    Okay.  How long did it take to deal with the vehicle

24   situation there on Clark in front of the academy?

25   A    That was about 20 minutes.

1   Q    Okay.  And do you know what -- do you know what they did

2   in terms of -- did they move the protestors anywhere from that

3   location?

4   A    They were eventually moved north from there, back towards

5   Market, and the group had actually calmed down quite a bit.

6   The assaults on the officers had ceased.  There wasn't

7   anything else being thrown at us.  And the officer or the

8   protestors actually moved up back again towards the front of

9   the court building.  So we just remained -- we actually pulled

10  the line off the street, opened up Clark or opened up Tucker

11  south of Clark, and then we remained there until later on in

12  the evening.

13  Q    Okay.  And based on your monitoring of the radio traffic

14  and whatever you might have been able to see out the front of

15  that garage, do you know if -- during the incident involving

16  the damaged police vehicle -- whether any officers were -- had

17  objects thrown at them during that time?

18  A    Oh, I saw objects being thrown, yes, sir.

19  Q    What sort of objects?

20  A    Pieces of concrete.  One looked like a broken sewer lid

21  because I saw after it landed it was flat, thin.  It was a

22  piece of broken sewer lid.  And then there were bottles of

23  water.  A couple of them were frozen bottles of water, but

24  mostly, you know, water bottles, that type of thing.

25  Q    Okay.  Any injuries during that period of time, officer

1  injuries?

2  A    I know there were some reported.  I don't know exactly

3  what or who it was.  They weren't reported to me.  We had

4  another group that was actually taking all of that

5  information.

6  Q    I think you told us that eventually all of this -- you

7  were able to get the folks moved north on Tucker?

8  A    That's correct.

9  Q    And you opened up the streets again?

10 A    Yes, sir, we did.

11 Q    All right.  And was that the -- were there any other

12 notable incidents involving violence or engagement with

13 protestors downtown that day?

14 A    No, sir.

15 Q    Okay.  Any more incidents -- well, the protest eventually

16 moved to the West End; correct?

17 A    Correct.  It did.

18 Q    And were you involved in the police response or assisting

19 or directing the police response to those protests in the West

20 End?

21 A    Yes, sir, I was.

22 Q    Tell me about that.

23 A    We had actually moved a lot of our people, most all of

24 our assets into Forest Park.  There is -- it's West Pine or

25 Pine Drive right off of -- between Lindell and Kingshighway,

1    there's a little loop there.  We moved our assets in there.

2    At one time, there was a large group of protestors now

3    gathering in the Central West End, around Euclid and Maryland.

4    There was no tactical response.  There was no CDT response.

5    And the group was just being monitored.  That group actually

6    tried to get on Highway 40, and they were turned away by the

7    Highway Patrol.

8    Q    Whereabouts did they try to get on Highway 40, if you

9    know?

10   A    Right at Kingshighway and 40.

11   Q    Okay.

12   A    Now --

13        THE COURT:  That's -- that's -- okay, but they were

14   at Euclid and Maryland.  There's a distance between Euclid and

15   Maryland and Kingshighway.  So how'd they get from one to the

16   other?

17        THE WITNESS:  They walked down there.

18        THE COURT:  Okay.  So they started at Euclid and

19   Maryland, and then they went to Kingshighway; is that what

20   you're saying?

21        THE WITNESS:  That's correct.  Yes, ma'am.

22        THE COURT:  Okay.  Thanks.

23        THE WITNESS:  Yeah.  And they were blocking --

24        THE COURT:  Kingshighway and 40/64?

25        THE WITNESS:  Yes, towards Kingshighway and 40.  They

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 288 of 333 PageID #:
1465
Timothy Sachs Direct Examination                                    Volume 1

288

1  were in the southbound lanes, and they were blocking the

2  entire lanes the whole time.  They stopped in front of the

3  emergency room exit at Barnes just momentarily, and we were

4  able to get them moved away from there, you know, and I,

5  obviously, realized that, you know, you can't block the

6  entrance to the hospital.

7  Q    (By Mr. Relys) How was it conveyed to them that they

8  couldn't hang out in front of the emergency room?

9  A    We had officers in marked cars telling them, "Hey, keep

10 going.  You know, you can't stop here."  You know, they did

11 momentarily.  And this was from radio traffic that I was

12 monitoring.  But the Traffic Safety Division was able to, you

13 know, move them from -- you know, just tell them, "Hey, you

14 can't stay in front of the hospital here."  And they continued

15 south towards Kingshighway.

16      In the interim from that, we actually had the Bicycle

17 Unit, again, get on the MetroLink, and they got off at Barnes

18 Hospital Plaza, and they were riding their bikes down towards

19 the highway.  We had Traffic Safety assisting, trying to,

20 basically, beat the protestors down to the highway, and then

21 we were able to get the Highway Patrol down there.

22 Q    Okay.  So it sounds like mostly the police response at

23 this point is monitoring and doing a little bit of light

24 coaching?

25 A    Coaching and directing traffic.  And that's all it was at

Timothy Sachs Direct Examination                          Volume 1

289

1    that point.

2    Q    Any type of response during this period of time from the

3    CDT teams or the SWAT?

4    A    No, not at all.

5    Q    So the folks that are or the police response to the

6    protestors at this point is just bikes and traffic?

7    A    Traffic control, yes, sir.

8    Q    Okay.  And what time period are we talking about now?  So

9    are we talking early evening?

10   A    This is early evening.  It's --

11   Q    Is it dark yet?

12   A    No, it's not dark yet.  It's rush hour, right after

13   rush-hour traffic, 5:30, 6:00, maybe 7:00.

14   Q    This is a Friday; right?

15   A    Yes.

16   Q    All right.  And so these protestors were marching up and

17   down Kingshighway, and no one's -- no one's engaging them or

18   preventing them from marching on Kingshighway?

19   A    That's correct.

20   Q    Other than to tell them they can't be in front of the

21   emergency room?

22   A    Right, you know.

23   Q    So where do these protestors ultimately march to?

24   A    They march back to Maryland and Euclid, and then we had

25   information that now the formal or group of protestors

Timothy Sachs Direct Examination                          Volume 1

290

1    indicated, "We're done for the evening," and that's when a

2    small number of those people left, went in whatever direction.

3    Now, a large group that was at Maryland and Euclid now started

4    going north on Kingshighway and then west on Waterman.

5    Q    Okay.  And you're aware of this because you're monitoring

6    the traffic?

7    A    That's correct.

8    Q    Okay.  So you get information that -- you say -- I think

9    you referred to it as the sort of formal -- quote, unquote --

10   "formal" demonstrations.

11   A    Yes.  We had people, you know, that were able to give us

12   information of what was being talked about in the crowds, and

13   there was a group that said, "The formal demonstration is

14   over.  You know, we're going to regroup tomorrow."  And that

15   was all the information that was passed on to me.

16          THE COURT:  To your information, were there leaders

17   of the protests?  I mean who was the group that's saying,

18   "It's over now, and we'll come back tomorrow" or directing

19   where people went?

20          THE WITNESS:  The information that was relayed to me,

21   Judge, was that was a group of clergy that had said that.

22   Now, I don't know for a fact, but that was what was relayed to

23   me --

24          THE COURT:  Okay.

25          THE WITNESS:  -- was there were some clergy leaders

1    that had told them, "Okay.  We are done with the formal

2    protest."

3                THE COURT:  Okay.  Go ahead.

4    Q    (By Mr. Relys) So what happens?  You hear this

5    information that the formal protests are done.  You hear that

6    this is from the clergy.  And then you also hear information

7    that a group of protestors are headed, you say, west?

8    A    North on Kingshighway.

9    Q    Okay.

10   A    And, again, this group is just being monitored, and now

11   they're going from north on Kingshighway.  And when I say

12   they're going, they're in the street.  They're not on the

13   sidewalk.  They're blocking traffic.  They wound up blocking

14   both sides, north and southbound traffic.  It was a large

15   group.  It was well over 500 people still left.  They went

16   north on Kingshighway, and then they went west on Waterman.

17   Q    All right.  Any sort of police response to this group at

18   this point?

19   A    Not at that time.  Again, all we were doing was -- you

20   know, the Traffic Division was blocking vehicular traffic so

21   that nobody got run over.

22   Q    All right.  And what happens next?

23   A    The group actually goes to Waterman and Lake.  We know

24   that that's an area where the Mayor of St. Louis lives.  There

25   were two officers that were sitting, attending to the Mayor's

1    house.  They were told to leave before the group even got

2    close.  So the officers actually left from in front as to not

3    garner any attention or give someone something to react to.

4    So those two officers left, and the group actually winds up

5    going to Waterman and Lake and then south on Lake to 502 Lake.

6    Q    Okay.  And are you concerned at this point?

7    A    Yes.  I mean we have 500 plus people.  They're going to a

8    targeted location.  We know that this is not part of the

9    formal protest.  So we have no idea what's going on at this

10   time.

11   Q    Okay.  And --

12   A    Again, it's just heightened concern.  We don't have any

13   type of response to it yet.  We're just, again, monitoring

14   what's going on.

15   Q    At some point, you did have -- the police did have a

16   response to the -- these individuals who had sort of converged

17   on the Mayor's house; right?

18   A    That's correct.

19   Q    Tell us how that sort of came about.

20   A    There were 911 calls coming in, and then there was

21   officers that actually responded.  We had six Special

22   Operations officers that work in the Special Operations Unit.

23   They were just in police uniform -- dark blue pants, light

24   blue shirts.  And they responded to calls of windows being

25   broken, objects being thrown, and someone trying to get into

Timothy Sachs Direct Examination                        Volume 1

293

1    the house.

2    Q    And so when you say objects being thrown, windows being

3    broken, you're talking about the area of the Mayor's house?

4    A    That's correct.

5    Q    And these are Special Operations officers responding?

6    A    Yes.  There were six of them.

7    Q    Did they have these guys outfitted with tactical gear?

8    A    No, sir.

9    Q    Riot shields, things like that?

10   A    Nothing.  And they made that very clear that when they

11   got there -- their response -- they were overwhelmed by the

12   crowd.  They were -- I'm sorry.

13   Q    How many people were in the crowd?  Do you know?

14   A    Over 500.  Well over 500.

15   Q    Okay.  At this point -- and you're in Forest Park for all

16   of this, right --

17   A    That's correct.

18   Q    -- monitoring the traffic?  And what's the -- what

19   response do you have at this point, if any?

20   A    At this time, when they say, "Hey, they are calling for

21   assistance.  We need some help" -- and clearly, they put on

22   the radio, "We don't have any equipment.  We need some

23   help" -- so now I looked to the colonel.  Colonel says, "Okay.

24   Let's go ahead and bring the team up there," meaning the Civil

25   Disobedience Team.  So we deployed from Forest Park with the

1   three City Civil Disobedience Teams and one team from

2   St. Louis County.

3   Q    So you've got three CDT teams from the City and one

4   County CDT team?

5   A    That's correct.

6   Q    And, again, when we talk about CDT teams, we're talking

7   about the folks with the armor and the tactical gear?

8   A    These are folks that have the protective equipment -- the

9   knee pads, the leg pads, the plastic shields, and helmets --

10  yes, sir.

11  Q    They didn't get deployed until windows got broken at the

12  Mayor's house and the Special Ops guys who were there in plain

13  clothes or not plainclothes but just regular uniforms called

14  for assistance?

15  A    That's correct.

16  Q    Okay.  Did you go with the CDT teams when they were

17  deployed?

18  A    I did.

19  Q    Okay.  Tell us -- tell us what happened.

20  A    We actually traveled north on Kingshighway, west on

21  Waterman in our police vehicles, and then the CDT teams were

22  in buses.  We actually kind of beat them there.  We were a

23  little bit quicker than the buses.  As we were deploying, the

24  initial deployment was not a tactical response.  I actually

25  went up with just body armor on.  I didn't have a gas mask,

1    didn't have a helmet.  We were just responding to the officers

2    asking for assistance.  We got there, and we were completely

3    overwhelmed.  As soon as responding officers started showing

4    up, the group turned from the Mayor's house and started

5    approaching the intersection of Lake and Waterman, and that's

6    as close as I got, and we --

7    Q    So you couldn't actually get to the intersection of Lake

8    and Waterman initially?

9    A    Not in my vehicle.  No.  I had to stop almost in the

10   50 hundred block of Waterman and then walk west to Lake

11   because of the police vehicles, the people that were there.

12   We were walking past -- there was so much there.  We couldn't

13   get a vehicle up there if we had to.

14   Q    All right.  And you said -- you made a comment that this

15   wasn't a tactical response at this point, and then you said

16   you didn't have -- you didn't have a helmet or anything else

17   on.

18   A    No, I did not.

19   Q    Could you explain what you mean by that?

20   A    A tactical civil disobedience response is bringing the

21   CDT teams up in an organized fashion and then making line

22   deployments and actually having an organized plan to do

23   anything.  We didn't have that type of response.  We didn't

24   know what kind of crowd we had or what we were going to

25   encounter.  We were just actually deploying on Waterman.  We

Timothy Sachs Direct Examination                           Volume 1

296

1    used that almost as a staging area, where the Forest Park was

2    a jump-off point.  We left Forest Park and went to Waterman.

3    We were going to stage there and see what type of a response

4    we needed, and before that happened, we were completely

5    overwhelmed.

6    Q    So you showed up, and it turned out that it was a bigger

7    crowd and a bigger deal than you had thought?

8    A    Yeah.  They were much more agitated.  They had already

9    thrown bottles, bricks, pieces of pavers, and, you know, rocks

10   from gardens, whatever they were able to get their hands on.

11   Q    All right.  And did -- when you -- so you're on the

12   ground or you're on the street here on Waterman yourself?

13   A    Yes, sir.

14   Q    And you're walking with your team?

15   A    No.  I actually beat the team up.  I was with four or

16   five other officers.

17   Q    Okay.  So you're alone with four or five other folks?

18   A    Correct.

19   Q    And you're headed west on Waterman?

20   A    That's correct.

21   Q    And are you -- is any violence being directed against you

22   and your officers at that point?

23   A    No.  It looked like most everything was focused on the

24   intersection at Lake and Waterman.  Now, when I got to Lake

25   and Waterman, there were incoming objects.

Case: 4:18-cv-00308-JCH Doc. #: 126-3 Filed: 01/30/20 Page: 297 of 333 PageID #: 1414
Timothy Sachs Direct Examination                                    Volume 1

297

1   Q    So when you got there, then you started getting some

2   fire?

3   A    That's correct.

4   Q    And when you say "incoming objects," what kind of objects

5   are we talking about?

6   A    Water bottles, rocks, bricks, broken pieces of brick, you

7   know, and then eventually, there was paint being thrown.  I

8   don't know what type of containers because it was breaking,

9   but there was red paint and some type of chemical in it.

10  Whatever it got on, it kind of burned a little bit.  So we had

11  those issues to contend with.

12  Q    Okay.  And what happened?  So you get to this

13  intersection; you start taking this incoming fire, projectiles

14  of one type or another.

15  A    Right.

16  Q    What happens after that?

17  A    The CDT officers get there, and immediately one of the

18  County officers was struck in the head.  And dropped him.  So

19  I looked.  You know, I told them immediately to form an

20  emergency line, which is a tactic we use.  It's -- we form

21  lines to be able to establish some type of a control area

22  where we can move officers in and out of, but this is not a

23  staged line.  This is an emergency line that we actually had

24  to establish.  The City established an emergency line facing

25  east.  County established an emergency line facing west.  And

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 298 of 333 PageID #: 1415
Timothy Sachs Direct Examination                              Volume 1

298

1    then the north end, there wasn't -- there weren't any

2    protestors or anything there.  We actually were able to park

3    some police vehicles that had come around, I believe, from

4    Delmar or the next street north.  Then most of the protestors

5    were around the intersection of Lake and Waterman and then

6    farther down Lake still by, you know, 502 Lake.

7              THE COURT:  So when you say north, so north -- where

8    was the north area where people were parked?  Was that on

9    Lake?

10             THE WITNESS:  They were parked on Lake.  Most of

11   them --

12             THE COURT:  But north of the Mayor's house?

13             THE WITNESS:  That's correct, yeah.

14             THE COURT:  Okay.

15             THE WITNESS:  North of Waterman.

16             THE COURT:  Yeah.

17             THE WITNESS:  Between -- I think it's McPherson is

18   the next street up.

19             THE COURT:  Yeah.

20             THE WITNESS:  I'm not -- but they were -- you know,

21   we were able to get some of our vehicles down on Lake from

22   McPherson, but between Waterman and Portland Place, we

23   couldn't get -- they were all -- that was all people.

24             THE COURT:  Okay.  Go ahead.

25   Q    (By Mr. Relys) Okay.  So it sounds like you were able to

1   sort of take control of that intersection at Lake and

2   Waterman?

3   A    Yes.

4   Q    And push east and west on Waterman?

5   A    Yes, we did.

6   Q    With the County going west and the City going east?

7   A    That's correct.

8   Q    All right.  Were you part of either one of those two

9   groups going west or east?

10  A    I commanded the group going east.  There was a St. Louis

11  County commander that took care of his group, and he had

12  responsibility for his line going west from there.

13  Q    All right.  At any point, were chemical munitions ever

14  deployed during this incident?

15  A    Yes, sir.

16  Q    Okay.  And have we gotten to the point where those

17  chemical munitions were deployed yet?

18  A    We're just a little bit past that.  So if I can back up

19  just a minute.

20  Q    Yeah.  Please do.

21  A    When the officer was struck in the head, we actually

22  formed an immediate emergency line.  I'm giving the order to

23  form an emergency line, which is the signal for one of my

24  sergeants -- wound up being Brian Rossomanno -- to start

25  giving the commands for, you know, dispersal orders.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 300 of 333 PageID #: 1417
Timothy Sachs Direct Examination                              Volume 1

300

1   Dispersal order comes, and right away, because we have an

2   emergency line, chemical munitions could be imminent.  So that

3   order was being given right at that time.

4   Q     How was it being --

5   A     Over the PA of his vehicle.

6   Q     Okay.

7   A     So he had gotten there before I did.  He was actually

8   monitoring the group ahead of us.  He was kind of one of the

9   folks that were out in the crowd or monitoring ahead of us.

10  So his vehicle was actually there.

11  Q     So he was able to use the PA on his car --

12  A     That's correct.

13  Q     -- or on his -- did he have a car, or did he have a

14  Tahoe?

15  A     It's a Tahoe, yes.

16          THE COURT:  And so what is he actually saying?

17          THE WITNESS:  It's one of the dispersal orders.

18          THE COURT:  Is it a recording?

19          THE WITNESS:  No.  It's -- he actually has to say it

20  over his loudspeaker.

21          THE COURT:  And so what did he say?

22          THE WITNESS:  Judge, I don't know exactly what he

23  said.

24          THE COURT:  Okay.

25          THE WITNESS:  You know, it is the dispersal order

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 301 of 333 PageID #: 1418
Timothy Sachs Direct Examination                                    Volume 1

301

1    that we have written down, and then the colonel who was now

2    with me contacted the dispatcher and had her mark the time on

3    the radio so we know when the order to disperse was given.

4    Q    (By Mr. Relys) I know you can't remember the exact

5    verbatim order, but if you could give us sort of the broad

6    outlines of what those orders generally contain as a matter of

7    sort of a general script.

8    A    Sure.  In general, "This is an unlawful assembly.  You're

9    being ordered to disperse.  You know, if you do not disperse,

10   you know, you'll be subject to arrest and/or the chemical

11   munitions being deployed.  Again, we are telling you you have

12   to leave.  This is an unlawful assembly."

13   Q    Okay.  Would it refresh your recollection -- you say you

14   don't remember the exact --

15          THE COURT:  He doesn't know which -- what he

16   testified to was he doesn't know which one was given.  So

17   you're now asking him what -- will it refresh his

18   recollection, but he doesn't know which -- you're going to

19   show him three or four of those things and say, "Does this

20   refresh your recollection?" but --

21          MR. RELYS:  Well, we have sort of a standard

22   dispersal order with a script.  Would it help you --

23          THE COURT:  Is there more than one, or is there --

24          THE WITNESS:  There's two, Judge.  There's one that's

25   a dispersal order, and then there's one that's a dispersal

Timothy Sachs Direct Examination                        Volume 1

302

1    order with the caveat that chemical munitions will be

2    deployed.

3            THE COURT:  Okay.  And when you say chemical

4    munitions, what are you talking about?

5            THE WITNESS:  Okay.  That is the CS gas.

6            THE COURT:  What is that?

7            THE WITNESS:  It's -- it's --

8            THE COURT:  Is it what people call tear gas, or is

9    that something else?

10           THE WITNESS:  Yeah.

11           THE COURT:  Okay.

12           THE WITNESS:  For lack of a better term, it's a name

13   I can't pronounce.  It's hard to spell.

14           THE COURT:  Oh, I know what.  Yeah.

15           THE WITNESS:  But it's a chemical agent that causes

16   an irritant, and usually, it's either deployed by dispersion

17   or it just comes out of a can, or the can actually has to burn

18   and smoke comes out, and the chemical is carried in the smoke.

19           THE COURT:  Okay.  And what's the other thing besides

20   that?

21           THE WITNESS:  We used inert gas or inert smoke, which

22   is just white smoke.  It's basically the same thing.  It burns

23   only there's no chemicals in it.

24           THE COURT:  Okay.  Thank you.  Sorry.  Go ahead.

25           THE WITNESS:  I'm sorry.  And there's one more.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 303 of 333 PageID #:
1420
Timothy Sachs Direct Examination                                    Volume 1

303

1          THE COURT:  Okay.

2          THE WITNESS:  There's what we call PepperBalls.  It's

3    a plastic or a ball with the same thing as we use as mace, the

4    OC spray, only it's in a ball, and we actually use an air

5    projectile to actually deploy that.

6          THE COURT:  And so when -- and mace -- who carries

7    mace and -- and --

8          THE WITNESS:  Every one of the officers are issued

9    mace.  Every officer is issued that.

10         THE COURT:  Right.  And so when you -- you -- so you

11   don't warn people before mace; you just warn them before --

12         THE WITNESS:  No, ma'am.

13         THE COURT:  -- chemical munitions?

14         THE WITNESS:  That's correct.  And, you know, mace

15   being also the larger foggers, that's also just OC spray.

16   It's just in a larger fogger.  And, no, we don't give orders

17   for any of that.  It's only the CS gas, the inert smoke, and

18   the PepperBalls that we give the orders for.  That's what we

19   consider chemical munitions.

20         THE COURT:  All right.

21   Q    (By Mr. Relys) So the handheld mace is not included in

22   the category of chemical munitions?

23   A    That's correct.

24   Q    All right.  So were those -- you said there's two basic

25   types of orders.  There's a munitions order, and then there's

Timothy Sachs Direct Examination                    Volume 1

304

1   a dispersal order?

2   A    Yeah.  Well, there's two dispersal orders, but in the

3   second dispersal order, there's also the caveat that chemical

4   munitions are imminent.

5   Q    All right.  And which -- if you recall, which dispersal

6   order was given at --

7   A    It was the chemical munitions order --

8   Q    Okay.

9   A    -- because once we form an emergency line, chemical

10  munitions are imminent.  We're going to deploy them.

11  Q    And did you tell us yet -- I forget -- were chemical

12  munitions deployed at this point?

13  A    Initially, no.  Again, let me back up just a minute.  We

14  gave the order.  We formed an emergency line, and then we

15  deployed the inert smoke.  Okay.  That's, again, a secondary

16  warning, hey, something is coming.  We don't tell people, but,

17  you know, there is no chemical in the first go-around.  It's

18  just white smoke.  You can see it.  It floats through the

19  crowd, and later on it will help carry whatever chemical

20  agents we deploy further, but this is just a white smoke.

21  Q    Okay.  And who deployed -- if you know, who deployed the

22  smoke, and what direction?

23  A    Sergeant Rossomanno deployed for the City-side eastbound,

24  and Sergeant Randy Jemerson deployed for St. Louis County

25  westbound.

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 305 of 333 PageID #: 1422
Timothy Sachs Direct Examination                                    Volume 1

305

1  Q    Okay.  Is there a reason why Sergeant Jemerson was

2  deploying smoke for the County?

3  A    The County didn't have their tactical team with them.  So

4  we actually assumed that role and assisted them with the

5  chemical deployment.

6  Q    Okay.  After the smoke was deployed east and west by

7  Sergeants Jemerson and Rossomanno, any other munitions used at

8  that point?

9  A    At that point, no, sir.

10  Q    Okay.  What -- tell us -- so now we've gotten to the

11  point where we've got lines going east and west.  We've got

12  the dispersal orders being given with the munitions.  We've

13  got the smoke having been deployed.  What happens after that?

14  A    We have a helicopter up in the air because we have

15  unknown people on a rooftop and, again, had high ground on us.

16  We don't know what they were doing.  So now we have the

17  helicopter overhead.  They're reporting what these people are

18  doing, and the order is now given to start moving the people

19  east and west, just trying to disperse them, get them out of

20  the area.  You know, not even some type of resolution but just

21  a de-escalation.

22  Q    All right.  And you said that you had a helicopter and

23  you knew that you had some people that had -- quote/unquote --

24  "high ground" on you.  Tell us what that means or why that

25  would be concerning to you.

1    A     It's very concerning to us because we can't see these

2    people, one, and we know that things are deployed from a high

3    ground to effect whatever type of movement or anything that,

4    you know, the police department or any of the protestors or

5    the demonstrators could encounter.  We didn't know who was up

6    there or what their intentions were.  So, again, that's a big

7    concern for us.

8    Q     Okay.  So now you're starting to push people east and

9    west; is that right?

10   A     That's correct.

11   Q     And you're going east?

12   A     Yes.

13   Q     Tell me about your trip, your travels east.

14   A     There are some folks that are actually dispersing.  Very

15   few.  There is a large group that is staying just out of

16   our -- you know, just out of range of us, and they're still

17   continually throwing rocks, bottles.  People are getting --

18   the officers are getting hit.  The shields are getting hit

19   with rocks and bottles.  Cars are being damaged as they're

20   going east.  So we deploy more chemical agent and now the

21   PepperBalls.

22   Q     And who deployed those?

23   A     Officer Ronnie Allen deployed the PepperBalls for my

24   team, and then Sergeant Rossomanno, again, was deploying the

25   smoke or the gas at that point.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 307 of 333 PageID #: 1424
Timothy Sachs Direct Examination                                    Volume 1

307

1    Q    All right.  Did that cause people to disperse at all?

2    A    Yeah.  Again, there were some -- you know, all the way

3    down, there were people that were leaving, but there was still

4    a group that did not leave.

5    Q    So some people were sticking around?

6    A    Oh, that's correct.  Absolutely.

7    Q    And so you -- do you continue to press east at this

8    point?

9    A    Yes.  We're --

10   Q    What happened?

11   A    We're now going into the 50 hundred block, and we're,

12   again, continually getting rocks, bottles, frozen water

13   bottles thrown at us.  We're getting officers injured.  We get

14   to a point where there's two -- there's a church and a church

15   school north and south, right before you get to Kingshighway.

16   A lot of people were starting to go into those buildings.  You

17   know, those people were allowed to go into those buildings.

18   Again, we're just trying to de-escalate and disperse the

19   crowd.  So we're continually walking.  These folks are inside.

20   The line is now up to that point, and one of the officers gets

21   struck in the head with a large piece of concrete.  It winds

22   up breaking her jaw.

23   Q    So a female officer ends up taking a jaw -- a brick or a

24   piece of concrete to the jaw?

25   A    That's correct.  Well, to the top of the helmet, and it

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 308 of 333 PageID #: 1425
Timothy Sachs Direct Examination                                    Volume 1

308

1   breaks her jaw.

2   Q    Okay.  Did you see that happen?

3   A    I saw when she fell.  I didn't see the actual object

4   coming towards us, but I saw her fall.  The line closed in

5   around her, and then they brought her back, and then we

6   started having medical attention, you know, taken to her.

7   Q    Is that common to be hit with something but not see the

8   projectile coming ahead of time?

9   A    Yes.  Especially, again, now we're talking it's dark.

10  You can't see anything.  It's nighttime.

11  Q    Any other officer injuries during this march east on

12  Waterman?

13  A    There were several officers injured there, you know,

14  quite a few.

15  Q    Did you see any property damage?

16  A    I did not see the property damage, no.  I was -- I was

17  very focused on what was right in front of us.  I was walking

18  past all kinds of vehicles, people.  There were folks up on

19  the -- you know, on their porches.  And, honestly, when I got

20  to my vehicle, I actually had to stop, change body armor, put

21  my helmet on, get my gas mask because up until that time I

22  didn't have that equipment.

23  Q    Right, because you had left your car parked west or east

24  on Waterman and tried to get to Clark and Lake without your

25  armor?

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 309 of 333 PageID #:
1426
Timothy Sachs Direct Examination                              Volume 1

309

1  A     That's correct.

2  Q     And so when you finally marched back east, you were able

3  to get that stuff?

4  A     Yes.  Yeah.

5  Q     And you availed yourself of that opportunity?

6  A     I did.

7  Q     Okay.  All right.  So, eventually, Waterman ends up at

8  Kingshighway; right?

9  A     That's correct.

10 Q     And that's where these folks went into these -- the

11 synagogue and church there?

12 A     Yeah.  I don't know exactly which, but there's one on the

13 north side, one on the south side of the street.

14 Q     You don't know which one's the synagogue and which one's

15 the church?

16 A     I do not.  I'm sorry.

17 Q     Okay.  But people were going into those two buildings?

18 A     That's correct, yes.

19 Q     All right.  And did you see any officers chasing them?

20 A     We had officers walk up towards the doors, but they

21 didn't go inside, didn't shake the doors, didn't try to pull

22 anybody.  Again, we're not arresting anyone.  We're just

23 trying to disperse and de-escalate.

24 Q     What's -- yeah.  What's -- remind us of what your

25 objective or your goal is at this point.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 310 of 333 PageID #:
1427
Timothy Sachs Direct Examination                                    Volume 1

310

1    A    It's just dispersal of the crowd.  It's so large.  You

2    know, we were just trying to move people out of the area and

3    to regain some semblance of order so we can assess what's

4    going on and then later on go back, do an investigation, see

5    if we can identify anybody who was, you know, causing any of

6    this damage or any of the criminal activity, but at this

7    point, we're not locking anybody up.

8    Q    It's too chaotic to do that?

9    A    Very much so, yes.

10   Q    You get to Kingshighway.  What happens next?

11   A    Again, we used chemical munitions.  There are some people

12   that are going south towards Maryland.  We have some people

13   that are going north.  And, again, I think it's McPherson, but

14   I know Delmar is up there.  So they're going north towards

15   Delmar.  There's, again, a main group of agitators that we

16   were mostly concerned with that are still throwing things.  I

17   have a CDT team at Kingshighway, on Kingshighway -- excuse

18   me -- south of Waterman, and they were taking rocks and bricks

19   at the time.  They're telling us they need some assistance,

20   they need some chemical munitions deployed there.  We couldn't

21   get to them quick enough, but the main group of these folks

22   actually now go onto Hortense Place.

23   Q    And tell us where Hortense is.

24   A    It's essentially Waterman Avenue, but on the east side of

25   Kingshighway, it changes names of streets.  Now, this is

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 311 of 333 PageID #: 1428
Timothy Sachs Direct Examination                              Volume 1

311

1    all --

2    Q    Lieutenant, I'm going to put up a --

3    A    Okay.  I'm sorry.

4    Q    -- a Google Map for you because we're talking about so

5    many easts and wests and norths and souths.  Let me get a map.

6          THE COURT:  On the left, if you look to your left,

7    there should be one that makes it a little easier to see.

8          THE WITNESS:  Oh, I got you.  Oh, great.  Oh, yeah,

9    it's right here.  Okay.

10          MR. RELYS:  I think if you touch the map, you can

11    mark on it.

12          THE WITNESS:  Okay.  That's Kingshighway and

13    Waterman.

14    Q    (By Mr. Relys) Okay.  That's Kingshighway and Waterman.

15    So that's where you guys are at?

16    A    That's where we're at right now, yes, sir.

17    Q    Okay.  And where do you go?  You say -- I think you just

18    told us you were going to continue on Hortense.

19    A    Yeah.  The main group of the problem people actually

20    moved onto Hortense.  So they're going east on Hortense.  We

21    have folks that were leaving the area went north or south on

22    Kingshighway.  As we're going on Hortense, right before we get

23    there, there is a shot fired, clearly, a shot fired.  It's a

24    gunshot.  You know, it couldn't have been anything else.  We

25    didn't do anything about that.  You start announcing, "Shots

1    fired," and there's a whole different tactic we go into, and

2    it wasn't any reason.  We didn't see any issues, didn't even

3    see a muzzle flash.  You just heard the shot being fired.  And

4    then we actually start --

5    Q    Was it concerning, though?

6    A    Absolutely.  And then we start getting -- you know, in

7    addition to the rocks and things that are still being thrown

8    at us, now there's some type of a chemical munition that is

9    being used against us.  We don't know what it was, but it was

10   something that started burning the officers' skin and actually

11   got into one officer's mask.

12   Q    And why do you -- why are you sure that the chemical

13   munition was used against you and it wasn't just your own

14   munitions coming back at you?

15   A    Well, the --

16        THE COURT:  Members of the public, you need to be

17   quiet.  Okay.  We're listening.  I'm trying to listen.  I

18   don't want to hear you all talking to each other.

19        Go ahead.

20   A    The munitions we use actually has an odor to it.  It's a

21   fruity odor.  That's what the CS gas has.  And this had no

22   odor at all.  It was you walked into it and your eyes started

23   watering and your skin started burning, and what we used

24   doesn't burn the skin.  So it's just an irritant where this is

25   more than an irritant.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 313 of 333 PageID #: 1430
Timothy Sachs Direct Examination                          Volume 1

313

1   Q    (By Mr. Relys) So you're on Hortense.  What's the

2   lighting conditions on Hortense?

3   A    It's much --

4   Q    Can you tell us about that?

5   A    Yeah.  It's much different than Waterman.  It's a

6   small -- for lack of a better term, it's a gated street, and

7   it has different street lighting.  As a matter of fact, most

8   of the lighting comes from the houses or the lamps they have,

9   the different lighting they have in their yards.  So it's a

10  much darker street, and again, there is a gate at Kingshighway

11  and a gate on the other side when you get down to Euclid.  So

12  it's much more tight-knit.  The lawns are very well-manicured.

13  They're larger homes, two-and-a-half-, three-story, and

14  they're all the larger homes there.

15  Q    Okay.  And so it's darker.  You've heard gunshots.

16  You're taking some type of chemical irritant from the

17  protestors who you're chasing after?

18  A    Yes, sir.

19  Q    What else happens as you press eastward on Hortense?

20  A    We're continually getting rocks.  We're getting items

21  thrown at us.  We get information that there are vehicles

22  being damaged.  Now, I did see one car that had a broken

23  window.  It was on the north side of the street.  We wind up

24  moving to Hortense and Euclid, and at that point, the group --

25  now, Hortense -- and I think Hortense turns into Lenox.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 314 of 333 PageID #: 1431
Timothy Sachs Direct Examination                              Volume 1

314

1   Again, it's a gated street, but that street -- that gate

2   wasn't open for vehicular traffic.  There was only a -- I

3   guess a pedestrian gate, for lack of a better term.

4   Q    Sure.

5   A    Some of the people actually went down onto Lenox and went

6   back.  We couldn't see them again.  We didn't see most of

7   these people.  I didn't see hardly any of them.  I had a line

8   in front of me, but it was so dark off to the sides; I

9   couldn't see too many of these people.  We get down to Euclid,

10  and then because they couldn't move continually moving east,

11  the group split north and south on Euclid.

12  Q    Okay.  All right.  When you guys -- and you guys got to

13  Euclid as well?

14  A    Yes.

15  Q    And what did you do when you got to Euclid?

16  A    As we're getting to Euclid, now there's another gunshot

17  fired on what we believe is Lenox.  It's to the southeast of

18  us.  We hold.  We, meaning myself and the South Patrol CDT.

19  We hold at Lenox and Euclid or Hortense and Euclid.  We strike

20  a line going diagonally across the street.  Now, we still have

21  protestors on Lenox, on the corner, and south of us on Euclid.

22  And then there's another group that had split off going north

23  on Euclid.  They weren't leaving the area.  They were still

24  throwing rocks and bottles, a couple of the larger discs -- I

25  don't know -- some kind of a metal disc back at the officers.

1   So, at that time, we actually split the team, and Sergeant

2   Rossomanno took the North Patrol CDT and moved north on Euclid

3   from Hortense, and I stayed with my group right there at

4   Hortense and Euclid.

5   Q    Okay.  And we talked a little bit about North Patrol CDT.

6   How many CDT teams do we have here?

7   A    There's three -- North, Central, and South.

8   Q    And they're named by the different directions -- North,

9   Central, and South CDT?

10  A    They're actually named by the patrol divisions -- North

11  Patrol, Central Patrol, and South Patrol.  And it's easier for

12  me to set them up North, Central, and South so that I can keep

13  track of them as we're doing different movements, that type of

14  thing.

15  Q    So North went north?

16  A    That's correct.

17  Q    And they were commanded at that time by Sergeant

18  Rossomanno?

19  A    That's correct.

20  Q    Okay.  And you held there at Hortense and Euclid?

21  A    That's correct, yes, sir.

22  Q    All right.  Do you know -- do you know what happened with

23  the North CDT team as they went, pressed north there?

24  A    I know that they were continually engaging some people,

25  and I sent the officer who was using the PepperBall munitions

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 316 of 333 PageID #: 1433
Timothy Sachs Direct Examination                              Volume 1

316

1    and one of my grenadiers with him along with three -- three of

2    my SWAT officers, you know, just as force protection, but the

3    grenadier and the PepperBall officer also went with him north.

4    Q    Do you know if munitions --

5              THE COURT:  What's a grenadier?

6              THE WITNESS:  That's a person who actually deploys

7    the gas other than the handheld gas.  These are the ones that

8    we actually launch.  It beats calling him the gas man.

9    Q    (By Mr. Relys) And do you know if any munitions were

10   applied north of there on Euclid?

11   A    Yeah.  It's my understanding there was a handheld triple

12   phaser deployed by Sergeant Rossomanno, and there was also --

13   the grenadier deployed a 75-yard launchable, and then there

14   were some PepperBalls deployed, and I think it's right around

15   the area of McPherson as they were going north.

16   Q    Right about where Pi Pizza is?

17   A    Yes.  Yeah, I believe that's McPherson there.

18   Q    And do you know, were they encountering protestors at

19   that time?

20   A    They had encountered them, yes, and they actually moved

21   them north of McPherson from, you know, Euclid and McPherson.

22   They were actually -- the protest group had moved north, and

23   then the officers remained on the south side of McPherson.

24   Q    Remind us all again.  Why was it that you sent this North

25   team north from the intersection of Hortense and Euclid?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 317 of 333 PageID #: 1434
Timothy Sachs Direct Examination                                    Volume 1

317

1   A    Again, we're just trying to disperse the crowd.  We're

2   not making arrests.  We're -- you know, if we can identify

3   people, fine, but we're just trying to disperse the crowd to

4   get some type of order back into what was going on the entire

5   evening.

6   Q    At some point, did the North team rejoin you?

7   A    Yes.

8   Q    How long -- how long did they deploy north from your

9   position before they came back?

10  A    Maybe 10, 15 minutes.  I asked if they were able to

11  secure what they had, and Sergeant Rossomanno's reply was,

12  "Let's give it a few more minutes.  It's looking pretty good."

13  So they stayed up, you know, probably five minutes after I had

14  talked to him, and then they came back and joined us.

15  Q    So they came back after they were satisfied that the

16  folks that they were dealing with had been dispersed?

17  A    That's correct.

18  Q    All right.  So they rejoined you, and what happens after

19  that?

20  A    We still have this group at Lenox, Hortense, Euclid, and

21  then that group had started -- not -- I don't want to say

22  thinning out, but they had elongated themselves, and they were

23  moving back into the Central West End towards Maryland.

24  Q    Okay.  So they were moving -- is that -- would that be

25  south?

Timothy Sachs Direct Examination                        Volume 1

318

1   A     Yeah, that would be south on Euclid.

2   Q     And did you end up moving, moving south as well?

3   A     We did.  Now, prior to that, St. Louis County had

4   finished their push on Waterman, and they joined the Missouri

5   State Highway Patrol CDT team and my Central Patrol team that

6   was actually on Kingshighway.  They actually moved all the way

7   up to Maryland, and then the Central Patrol held on Maryland

8   and Kingshighway, and St. Louis County and the State Highway

9   Patrol moved east on Maryland towards Euclid but didn't get

10  all the way down to Euclid.

11  Q     So just to remind the Court what you're talking about,

12  when you say the County CDT, when we last talked about the

13  County CDT, they're the ones who pushed west from Waterman and

14  Lake?

15  A     That's correct.

16  Q     And eventually, they rejoined you guys down in this area?

17  A     Yeah, that's -- the next information I had from them was,

18  "We completed.  Where do you need us?"

19        You know, "Supplement Highway Patrol on Maryland" is what

20  their next, you know, structure was.

21  Q     So sort of similar to the North Patrol going north and

22  satisfying themselves that the protestors had been dispersed,

23  the County CDT team had satisfied themselves that their

24  objective had been met going west?

25  A     That's correct, yes.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 319 of 333 PageID #: 1436
Timothy Sachs Direct Examination                                    Volume 1

319

1   Q    Okay.  Okay.  What happens after that?

2   A    We're moving south on Euclid.  Again, we're still

3   encountering objects being thrown, and as we're progressing

4   south, we're seeing damage to businesses, to mostly windows

5   being broken.  There were some trash cans that were thrown in

6   the street, that type of thing, and we're coming up on

7   Maryland Plaza now.

8   Q    Any other property damage that you saw besides what you

9   described there?

10  A    I mean the broken windows, and there was -- there was one

11  bench that was thrown in the street.  Later on in the evening,

12  now, there was a dumpster fire that was set, that type of

13  thing, but right at that time, there were broken windows and

14  just the debris that had been thrown at us and other debris

15  that was just left in the street.

16  Q    Okay.  So where are you guys at at this point in the

17  narrative?

18  A    We're coming up on Maryland Plaza.

19  Q    Okay.

20  A    And then the State Highway Patrol and St. Louis County

21  are on Maryland.  They're west of Euclid, just preventing

22  anybody from going west on Maryland Plaza.  They're not

23  moving.  They're not -- you know, all they did was strike a

24  line and prevent anybody from moving west.  So small, small

25  portions of these folks went east on Maryland Plaza, and there

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 320 of 333 PageID #: 1437
Timothy Sachs Direct Examination                                    Volume 1

320

1    was still a contingent of maybe 50 or 75 folks that went

2    through the intersection and were continually throwing things

3    at us, that were still just staying far enough away from us

4    that, you know, they weren't leaving.  We don't know what

5    their intent is still, so we're going to move them farther

6    south from Maryland.

7    Q    So when you say that they're still going, you mean

8    they're still traveling south?

9    A    Yeah.  They're walking, but they're not walking with a

10   purpose.  They're not trying to walk away.  They're standing

11   in the street.  They're agitating.  They're throwing.  They're

12   yelling.

13   Q    They're staying a calculated distance away from you?

14   A    Yes, very much.

15   Q    Are you engaging any of these people with mace?

16   A    No.

17   Q    Why not?

18   A    Well, one, they're too far away, and, you know, as we're

19   advancing, you know, they're advancing or they're retreating a

20   little bit.  Now, once they got into south of Maryland, then

21   we had to make another munitions deployment.  We were in

22   between two large buildings, and we were getting things thrown

23   down from the balconies and then the rooftop of the parking

24   garage.

25            THE COURT:  Okay.  So this is after you cross

Case: 4:18-cv-00308-JCH   Doc. #:  126-3   Filed: 01/30/20   Page: 321 of 333 PageID #:
1438
Timothy Sachs Direct Examination                        Volume 1

321

1    Lindell?

2            THE WITNESS:  No, ma'am.  No.  This is before we --

3            THE COURT:  Okay.  After you cross Maryland?  Okay.

4            THE WITNESS:  After we cross Maryland, before we get

5    to Lindell.

6            THE COURT:  Okay.  That's when things are being

7    thrown down from balconies is what you're saying?

8            THE WITNESS:  Yeah.  They're actually -- that large

9    apartment complex, people are dropping stuff off, and then

10   there was a group that we identified or we didn't, but

11   somebody, Special Operations identified as being on the

12   parking garage that were throwing things down onto us.

13           THE COURT:  Oh, the parking garage above the library?

14           THE WITNESS:  I believe it's the library, yes, ma'am.

15           THE COURT:  Yeah.

16           THE WITNESS:  I'm not a hundred percent sure.

17           THE COURT:  Okay.

18           THE WITNESS:  So we're moving these people south, and

19   then there's a large alleyway before you get to Lindell.  I

20   believe the bank there uses it for one of their

21   drive-throughs.  And there were two more shots fired there.

22   Again, now I have to take some of my tactical team, place them

23   there in support of -- to keep anything from happening to the

24   CDT team.  So I have a tactical team deployed there with

25   lethal, less lethal, and chemical munitions.  They held there.

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 322 of 333 PageID #:
1439
Timothy Sachs Direct Examination                              Volume 1

322

1    They didn't deploy anything.  We marched past that, and we

2    stopped.  The CDT team stopped.

3    Q    (By Mr. Relys) And where are you at when you stop?

4    A    We're at the alley.  We're at the mouth of the alley.  We

5    didn't cross the alley.

6    Q    Right pretty much --

7               THE COURT:  Can you show me this on the map?

8               THE WITNESS:  Yes, ma'am.

9               THE COURT:  If you clear that map and then maybe

10   move -- I think you need to move it a little.

11              MR. RELYS:  Yeah.  Let me clear the map, Lieutenant.

12              THE WITNESS:  Sure.

13              MR. RELYS:  And then you can mark on it again.

14              THE COURT:  And then maybe you need to -- well,

15   actually, this is all the map that you have.  Yeah.  Never

16   mind.  You're past the map, aren't you?

17              MR. RELYS:  Well --

18              THE WITNESS:  Yes, if that's just it because it's

19   actually farther down.  I mean now we're --

20              THE COURT:  Yeah.  It's not on this map.  I

21   understand.  Yeah.

22              THE WITNESS:  Now we're into the Central West End.

23              THE COURT:  Yeah.

24              MR. RELYS:  I thought I had another map.  Let me just

25   check.

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 323 of 333 PageID #:
Timothy Sachs Direct Examination                                      Volume 1
4449

323

1          THE COURT:  This is south of -- I mean they're south

2     of this map according to his testimony.

3          THE WITNESS:  We're just north of -- you know, we're

4     between Maryland and Lindell.

5          THE COURT:  Right.

6          THE WITNESS:  So if you have a --

7     Q    (By Mr. Relys) Sorry.  I thought I had another map.  So

8     you're -- if you go a little bit further south on this map on

9     Euclid, you would eventually come to Lindell; right?

10    A    That's correct, yes.

11    Q    Okay.  And are you at Lindell yet?

12    A    No, no.  We never got to Lindell with the CDT team.

13    Because of the debris and the items being thrown and now

14    dropped on us, we actually stopped and pulled the team back,

15    and then I had a ballistic vehicle drive -- we actually spread

16    the team apart.  We had a ballistic vehicle drive south on

17    Euclid, and then they were deploying PepperBalls from there to

18    the remaining group who turned south or turned west on

19    Lindell, and then the vehicle went west on Lindell out of my

20    sight.  They deployed PepperBalls there to the point where

21    that group had dispersed enough, and then the vehicle came

22    back around.

23    Q    Okay.  And was it your order for the tactical vehicle to

24    to go deploy those PepperBalls?

25    A    Yes.

324

1    Q    Okay.  And explain, explain to the Court why, why you

2    gave that order for the tactical vehicle to go around that

3    corner and do that.

4    A    The PepperBalls are more effective than a chemical

5    munition, and it doesn't affect as many people.  The object

6    is -- it's either indirect or direct fire.  We can actually

7    skip them off the ground and hope they break on the ground and

8    what's inside splatters, or we shoot them against a wall,

9    hoping what's inside splatters, and the chemical irritant will

10   go out.  Or we can actually direct impact.  We can shoot the

11   arms or legs, and they'll actually hit and deploy, and there

12   will be a slight pain.  We're hoping for pain compliance but

13   slight pain and then the ball will break and the chemical

14   irritant will go out.  And just trying to get, again, the

15   people out of there.  We're trying to get them to leave.  This

16   is still the main agitating group that stayed the entire time.

17   Q    Was this deployment of these PepperBalls by the tactical

18   vehicle aimed at innocent people happening by on the street?

19   A    Absolutely not.  No.  This was the group that actually

20   moved.  We were able to see them move from Lindell north on

21   Kingshighway, and it wasn't, "Hey, come on up here."  I mean

22   the tactical vehicle was right behind us.  So I said, "Okay.

23   Bring the bear up," which is a ballistic tactical vehicle.

24   Q    Okay.  And after you deployed the tactical vehicle to

25   shoot these PepperBalls, what happened after that?

Case: 4:18-cv-00308-JCH   Doc. #: 126-3   Filed: 01/30/20   Page: 325 of 333 PageID #: 1442
Timothy Sachs Direct Examination                            Volume 1

325

1   A    Pretty much that was the dispersal.  I mean we were able

2   to get some type of semblance of order again.  Most everybody

3   had left that area.  Now, we know for a fact that people went

4   on the other side of Lindell.  They went east and south on or

5   east and south on Lindell and then went south on Euclid,

6   across Lindell, but we didn't chase them any longer from

7   there.  They had dispersed enough to where, you know, we were

8   able to gain control of what was we going on.  So we brought

9   all the teams back.  We met on Euclid and Maryland, and we

10  walked all the way back to Waterman and got in our vehicles.

11  Q    So you withdrew?

12  A    Yes.

13  Q    You went all the way back to basically where you started

14  at, which was near Lake and Waterman?

15  A    That's correct.

16  Q    And you got in your vehicles and left?

17  A    Yeah.  And then we went back and, you know, not restaged,

18  but we met back in Forest Park.

19  Q    Was that the end of activities for that evening?

20  A    There was an arrest made.  There were two arrests made on

21  Kingshighway way prior to this as we were crossing.  People

22  that would not obey an order, and they were standing in the

23  street.  And then I know there was one arrest made for an

24  arson.  There was a dumpster fire that the bicycle officers

25  were able to locate a person setting a dumpster fire, make an

Timothy Sachs Direct Examination                          Volume 1

326

1    arrest there.

2    Q    Other than that?

3    A    No.  That was it.  We had the helicopter do a final

4    fly-by, and we didn't see any large groups.  He said he saw

5    several groups of four, five, six people but no large groups

6    of people congregating anywhere, and that's when the colonel

7    actually disbanded and sent everybody back.

8    Q    I want to talk briefly, briefly about Saturday, the 16th.

9    Were you on duty?

10             THE COURT:  Hold on a second.  I mean I'm not --

11             MR. RELYS:  Yeah.

12             THE COURT:  -- going to be able to -- we're not going

13   to finish this today.  Okay.  I can't stay this late.  I mean

14   we'll be here until 10:00.  I can tell, and we're not going to

15   do that.  So tell me how much you have left with this witness'

16   direct approximately in terms of -- I know you told me two

17   hours, and you've only had about an hour and a half, right, so

18   far, but nevertheless --

19             MR. RELYS:  I underestimated.  That's true.

20             THE COURT:  Yeah, well, that's -- we've got

21   cross-examination as well.  I can't imagine that that's going

22   to be short, but -- so approximately how much more do you have

23   on direct with this witness?

24             MR. RELYS:  Probably 40 minutes.

25             THE COURT:  Okay.  And then how many other witnesses

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 327 of 333 PageID #:
4474
Preliminary Injunction Hearing Volume 1

327

1    do you have?

2         MR. RELYS:  We have four other witnesses.

3         THE COURT:  Okay.

4         MR. RELYS:  We might -- depending on how the other

5    first four go, the last one might get cut loose depending

6    on -- because I don't want to give repetitive testimony.

7         THE COURT:  Right.  Okay.  Well, here's the thing.

8    We've got a lot of incidents.  This has been a lot of

9    evidence, and obviously, you're entitled to present it.  So

10   we're going to have to resume, and I think we'll resume

11   tomorrow at 12:30 and hope we can get it finished by then.

12   I've got something I have to do in the morning, so I can't be

13   here for the -- until then.

14        MR. RELYS:  Okay.

15        THE COURT:  And we'll try to move as quickly, and I

16   think we're going to just go ahead and stop because you've got

17   more to go.

18        THE WITNESS:  Yes, ma'am.

19        THE COURT:  And then there's cross-examination.  So

20   what time did I tell you to be here?  12:30.  Let's be here at

21   noon.  I can get here by noon.

22        MR. RELYS:  Okay.

23        THE COURT:  Hold on a second.  Let me check one

24   thing.  Maybe I can get here sooner than that.  We have a

25   court event that I can't miss or I can't miss all of it.

1              Let's start at noon.  So we'll be here at noon.

2    Okay?

3              MR. RELYS:  Okay.  We can do that.

4              THE COURT:  And, you know, we'll take a couple of

5    15-minute breaks as we go through the afternoon, but we'll try

6    to get it done.  Okay?

7              MR. RELYS:  I think that's possible.

8              THE COURT:  And I'm going to want to hear argument

9    also.  I just want you all to think about -- you can step

10   down.

11             THE WITNESS:  Thank you, Judge.

12             THE COURT:  And just be back there at noon tomorrow.

13             THE WITNESS:  Yes, ma'am.  Thank you.

14             THE COURT:  Here's the things I want the lawyers to

15   think about.  In reading your briefs, I have a number of

16   questions.  Let me find them and give them to you, and you can

17   think about them tonight because I'm going to want to hear

18   about this tomorrow.  Obviously, some of this is going to

19   depend on the evidence.

20             For both sides, you know, how does this relate to the

21   injunction that the City is still under from the *Templeton*

22   case?  And from the Plaintiffs' side, I mean, one of your

23   witnesses was the Plaintiff in that case or was one of them.

24   Why aren't we seeking to enforce that injunction instead of

25   getting a new one?  How is it going to be different?

Case: 4:18-cv-00308-JCH  Doc. #: 126-3  Filed: 01/30/20  Page: 329 of 333 PageID #:
4440
Preliminary Injunction Hearing Volume 1

329

1          And from the -- well, obviously, I'm going to want to

2    hear -- after I've heard more about the kettling, et cetera --

3    I'll hear more evidence about that, but obviously, I'm going

4    to have questions about that.

5          And I -- I guess the *Templeton* order -- so is it the

6    City's position that the *Templeton* order doesn't apply to --

7    you don't have to give a warning before mace?

8          MR. RELYS:  That's correct.

9          THE COURT:  You only have to -- was that -- is that

10   specified in Judge Jackson's order?  Is it defined?

11         MR. RELYS:  I'm not positive as I stand here before

12   you.  I can -- that will be something I --

13         THE COURT:  Well, I've got it here.  I'll look at it

14   again.  I just -- so there's a difference between -- and are

15   there rules on mace?  Because in your exhibits, you gave me a

16   bunch of orders and things.  Are there -- there's a rule on --

17         MR. RELYS:  It would be the general order on the use

18   of force, which we didn't include in its entirety.  We can

19   have -- it's been our plan to have some of our officers, one

20   or two of our officers, testify as to the contents of that

21   order.

22         THE COURT:  Yeah.  So there's a chemical agent order

23   on the mace.  I'm going to want to hear more about mace.  I

24   want to hear if it's the policy of the City to spray people

25   directly in the face with mace when they're complying with

1   your orders because I've heard an awful lot of testimony about

2   that.

3           MR. RELYS:  Okay.

4           THE COURT:  And to tell me that it's okay to do that

5   because other people earlier in the night were being really

6   violent -- yeah, it sounds like they were, but those -- I'm

7   concerned with the people who have testified in this case and

8   what they were doing because that's what they're talking

9   about, and you can't -- obviously, the City knows they can't

10  just retaliate against random protestors for what others did

11  earlier; right?

12          MR. RELYS:  That's a fair statement.

13          THE COURT:  And nobody's going to argue that that's

14  okay.

15          And I guess the -- for the Plaintiffs, I mean I'm

16  going to have to hear a lot about how in the world you think,

17  you know, any of what you're asking for is any more

18  enforceable than what you already got by agreement in

19  *Templeton*, and if it's still happening in *Templeton*, why are

20  you asking for another injunction?  And I'm supposed to tell

21  them -- it seems to me this is an injunction that says, "And

22  this time, we really mean it."  And, you know, that doesn't

23  seem to make sense to me because I -- I think -- and I'm not

24  sure exactly what the remedy is.

25          And then, obviously, the legal issues about -- that

1   the government -- I mean that the City has raised about

2   municipal liability, and I'm not too concerned about standing

3   on a preliminary injunction, but you can argue it.  I

4   understand your argument, but the -- you know, I'll hear that

5   too, but I'm a little concerned more about the -- the relief

6   being sought from the Plaintiffs is -- I'm just -- I'm a

7   little uncertain how any of this is really going to make a lot

8   of sense.

9           And I -- I know you said that a lot of those -- a lot

10  of the things you're asking for, you said, are similar to

11  what's in the Ferguson Consent Decree, and some of them are,

12  and some of them aren't.  Of course, the Ferguson Consent

13  Decree was a negotiated settlement and agreement, and this is

14  not.

15          So those are some of the legal questions.  I'm going

16  to have -- I'm going to have some more, but, you know, how

17  much are you asking me to micromanage things?  And in

18  particular, there's one provision you're asking for I'm very

19  concerned with where it's that this Court would have to

20  approve prosecution.  You know, I mean that's -- that's pretty

21  unusual, and theoretically, if people are prosecuted, some --

22  there's -- someone somewhere has made a finding of probable

23  cause, and I haven't heard anything that says that other

24  courts aren't competent to do whatever kind of due process is

25  required for actual prosecution.  I also haven't heard

1   anything about anybody being prosecuted.

2          So if there's any parts of your -- you didn't give a

3   proposed order, which Judge White didn't order you to, but you

4   did include in your motion and in your proposed findings and

5   conclusions the relief that you want, and one of them in

6   particular says that I'm supposed to be -- you know, I'm

7   supposed to be approving prosecutions, and that seems like --

8   I've never seen that kind of a provision in a consent decree

9   of this sort, but maybe they do exist, but it basically is

10  assuming that the state courts are not competent to oversee

11  prosecution in the state courts, and that seems pretty

12  far-reaching to me, and, you know, so I'm concerned about the

13  amount of micromanaging and then also just the enforceability

14  and why what you're asking for here is any more enforceable

15  than what you've already got in *Templeton*, I think, but maybe

16  there's something I don't know about that case.

17         So those are some of the things, but obviously,

18  there's -- I mean a lot of this testimony here today is very,

19  very concerning, and so I'm going to need to hear, you know,

20  further evidence and further arguments about that.  So I will

21  see you all at noon tomorrow, and we'll continue.

22         MR. RELYS:  Thank you, Judge.

23         THE COURT:  Okay.  Thank you, all.

24      (Court adjourned at 5:45 p.m.)

25

333

<u>CERTIFICATE</u>

       I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

       I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

       I further certify that this transcript contains pages 1 through 332 inclusive.

       Dated at St. Louis, Missouri, this 19th day of November, 2017.


_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter