UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


MALEEHA S. AHMAD, et al.,        )
                                 )
                Plaintiffs,      )
                                 )
     v.                          )  No. 4:17-CV-2455-CDP
                                 )
CITY OF ST. LOUIS, MISSOURI,     )
                                 )
                Defendant.       )



PRELIMINARY INJUNCTION HEARING
VOLUME 2


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


OCTOBER 19, 2017



**APPEARANCES:**
For Plaintiffs:      Anthony E. Rothert, Esq.
                     Jessie M. Steffan, Esq.
                     Omri E. Praiss, Esq.
                     **AMERICAN CIVIL LIBERTIES UNION**
                     **OF MISSOURI FOUNDATION**
                     906 Olive Street, Suite 1130
                     St. Louis, MO  63101-1448

For Defendant:       H. Anthony Relys, Esq.
                     Thomas R. McDonnell, Esq.
                     **ST. LOUIS CITY COUNSELOR'S OFFICE**
                     1200 Market Street, Room 314
                     St. Louis, MO  63103

*REPORTED BY:        Gayle D. Madden, CSR, RDR, CRR*
                     *Official Court Reporter*
                     *United States District Court*
                     *111 South Tenth Street, Third Floor*
                     *St. Louis, MO  63102       (314) 244-7987*
            (Produced by computer-aided mechanical stenography.)

**EXHIBIT E**

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 2 of 248 PageID #: 4452
Preliminary Injunction Hearing Volume 2

2

## INDEX

*Witnesses:*

**TIMOTHY SACHS**
  Direct Examination by Mr. Relys . . . . . . . . . Page   3
    (continued from 10/18/2017)
  Cross-examination by Mr. Rothert . . . . . . . . Page  57
  Redirect Examination by Mr. Relys . . . . . . . Page  94

**MATTHEW KARNOWSKI**
  Direct Examination by Mr. McDonnell . . . . . . Page 111
  Cross-examination by Mr. Rothert . . . . . . . . Page 131

**BRIAN ROSSOMANNO**
  Direct Examination by Mr. Relys . . . . . . . . Page 146
  Cross-examination by Mr. Rothert . . . . . . . . Page 209
  Redirect Examination by Mr. Relys . . . . . . . Page 243

3

1        (Proceedings commenced at 12:03 p.m.)

2            THE COURT:  All right.  Lieutenant Sachs, you can

3    resume the stand.  And, Mr. Relys, can you tell me how you

4    pronounce your last name?

5            MR. RELYS:  Relys.

6            THE COURT:  Relys.  Okay.

7            MR. RELYS:  Yes, Your Honor.

8            THE COURT:  I keep look at the spelling and then

9    having trouble with it.

10           MR. RELYS:  That's all right.  You're not the only

11   one.

12           THE COURT:  Yeah.

13           THE WITNESS:  Good afternoon, Judge.

14           THE COURT:  Good afternoon.  And, Lieutenant Sachs,

15   you understand you're still under oath from yesterday;

16   correct?

17           THE WITNESS:  Yes, ma'am.

18           THE COURT:  All right.  You may proceed.

19                       **TIMOTHY SACHS**,

20   HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED

21   AS FOLLOWS:

22                     DIRECT EXAMINATION

23                   (continued from 10/18/2017)

24   BY MR. RELYS:

25   Q    Good morning, Lieutenant.

4

1    A    Good morning.

2    Q    Yesterday, I think we were just about done talking about

3    the events on the evening of September 15th, 2017, in the

4    Central West End.  Do you recall that?

5    A    Yes, sir, I do.

6    Q    All right.  And I was just about to ask you about the

7    following evening, which was Saturday, September 16th.

8    A    Yes, sir.

9    Q    Were you involved in any -- were there protests on that

10   night?

11   A    Yes, sir, there were.

12   Q    Or, I guess, on that day?

13   A    Yes.

14   Q    Were you involved in the police response to those

15   protests?

16   A    The evening response, yes, sir, I was.

17   Q    Okay.  Tell us a little bit about what your involvement

18   was on Saturday.

19   A    That portion of the protest and the demonstrations were

20   actually in St. Louis County, in University City.  The City

21   CDT team was just supplementing the St. Louis County response

22   team that evening.

23   Q    And where about?  You say St. Louis County.  Where was it

24   in St. Louis County?

25   A    It was in The Delmar Loop, on the far west end.

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 5 of 248 PageID #: 4455
Timothy Sachs Direct Examination                    Volume 2

5

1   Q     So near the city line?

2   A     Yes.  Oh, yeah, it did border the city.  We actually

3   wound up coming into the city later that evening.

4           THE COURT:  Okay.  But when you say it was on the far

5   west end of The Loop, is that the city line?  I thounght that

6   was the east end of The Loop.

7           THE WITNESS:  The city is the east end, but --

8           THE COURT:  Right.

9           THE WITNESS:  -- we were supplementing St. Louis

10  County, and the demonstrations had started in the west end.

11          THE COURT:  Okay.  So it started at the far west

12  end --

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  -- and then it moved?

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  Okay.

17  Q     (By Mr. Relys) Okay.  And you normally don't have

18  jurisdiction in the county; right?

19  A     That's correct.

20  Q     But I'm assuming there's some type of agreement that gets

21  worked out prior to these things?

22  A     Yes, sir, there is.

23  Q     Okay.  And so you had some freedom to operate inside the

24  county?

25  A     Yes, we did.

1   Q    All right.  And so tell us -- tell us about sort of how

2   events unfolded on Saturday night.

3   A    It was later in the evening.  It was dark out.  St. Louis

4   County had responded to calls from University City that they

5   had protestors in the streets that were blocking streets, and

6   then windows were starting to be shattered in businesses.  So

7   St. Louis County took their CDT response team to the far west

8   end, and then all we did was supplement them.  They didn't

9   have as many officers as we did.

10       They actually struck a line and started moving protestors

11  east on Delmar, and they were using their ballistic vehicle to

12  make announcements for dispersal all the way down the street.

13  They continued to engage these people and walk them east into

14  the city of St. Louis, and all we did was follow them.

15  Basically, we were just supplemental people in case they

16  needed something.

17       Once they reached the city limits, St. Louis County

18  stopped.  They opened up their lines, and then we went

19  forward.  We struck our line directly in front of them, and

20  then we walked these people to the intersection of Skinker and

21  Delmar.  Again, we're asking them to disband.  Some of the

22  people went north.  Some of the people went south on Skinker,

23  but the main group stayed on Delmar.  We walked across Delmar

24  and then walked a block and a half east into the city just

25  past -- I believe it's The Pageant.

7

1    Q     Sure.

2    A     And then the group started disbanding.  We stayed in the

3    street there for a while, and once the group disbanded, we

4    just collapsed our line into the street and called for the

5    buses and actually had the officers board the buses there in

6    the middle of the street, and we left the area.

7    Q     You made a mention earlier of some property damage?

8    A     Yes, sir.

9    Q     What was that?

10   A     There was broken windows in businesses that I saw, but I

11   didn't see it happening.  Again, we were behind St. Louis

12   County.

13   Q     Any -- we talked yesterday about rocks and bottles,

14   things of that nature being thrown at police in the West End.

15   A     Yes, sir.

16   Q     Anything like that going on in The Loop area on that

17   Saturday?

18   A     Not that I observed, no, sir.

19   Q     Okay.  So relatively calm night?

20   A     Much more calm than the evening prior, yes.

21   Q     But still some property damage?

22   A     Yes.

23   Q     And what time -- I think you said that you had helped in

24   the evening.  What time frame are we talking about for this?

25   A     It was later in the evening, maybe 9:00, somewhere around

1    there.

2    Q    Dark out?

3    A    Yeah.  Oh, yes, it was.  Yes.

4    Q    All right.  Had there been demonstrations during the day?

5    A    There were, but there was no CDT response to those

6    demonstrations.

7    Q    Okay.  And you're the -- that would be -- CDT response is

8    what you would know the most about?

9    A    Yes.  That's all I actually had anything to deal with,

10   yes, sir.

11   Q    Okay.  So that you weren't necessarily monitoring those

12   earlier demonstrations?

13   A    No, sir.  We were staged again inside of Forest Park.  So

14   we didn't respond to anything until we were called.

15   Q    Does the fact that you don't know much about the

16   demonstrations that occurred on Saturday, September 16th, tell

17   you anything about the relative peacefulness or violence of

18   those protests?

19   A    There was none, or otherwise we would have been called.

20   Q    There was no violence?

21   A    That's correct.

22   Q    Okay.  All right.  I'd like to talk then about -- move on

23   to Sunday, the 17th of September.

24   A    Yes, sir.

25   Q    Were there protests on that day?

9

1    A    Yes, sir, there were.

2    Q    And were you involved in the police response to those

3    protests?

4    A    Yes, sir, I was.

5    Q    All right.  Tell us about how Sunday unfolded for you.

6    A    There were some protests in the late afternoon and

7    evening, relatively uneventful at the time, but a lot of it

8    circled and formed downtown to the point where there was

9    larger groups gathering downtown, and we started monitoring

10   calls for service that there were groups moving up and down

11   Olive, Locust, and there began to be property damage in the

12   evening.  Windows were being broken.  A dumpster was set on

13   fire.  There were trash cans and benches being thrown in the

14   street.

15   Q    And what time of the day are we talking about here?

16   A    This is about 8:00, 8:00 in the evening, 8:30, something

17   like that.

18   Q    Okay.  And the protest had been going on before this?

19   A    Yes.

20   Q    Okay.  Had you been in -- had the CDT or the tactical

21   team been involved in responding to any of those protests?

22   A    No, sir.

23   Q    Do you know anything about where those protests were or

24   what they -- what they -- anything about those protests?

25   A    No, sir, I don't.

Timothy Sachs Direct Examination                          Volume 2

10

1    Q    Okay.  And that's -- could you tell us -- tell us why you

2    wouldn't know about that.

3    A    Once again, unless there's property damage, violence, or

4    officers being assaulted where there would need to be a

5    tactical response or a CDT response, my team or nothing that I

6    had anything to do with would be responding to that.  There

7    would be a bike officer response if there were large crowds,

8    but the bicycles would handle most of whatever they had to do

9    as far as traffic control or something, but as far as a CDT

10   response, no, sir.

11   Q    So the police were -- police may or may not have been

12   involved earlier in the day, but it wasn't your guys?

13   A    That's correct.

14   Q    All right.  So it sounds like around 8:00 or 9:00, your

15   tactical squads or your CDT squads did get involved.

16   A    That's correct.

17   Q    Tell me how that -- tell me what happened.

18   A    Again, we were monitoring air traffic that the Special

19   Operations group and the bicycles were encountering people

20   breaking windows in the downtown area, and there were larger

21   groups moving through the downtown areas, and there needed to

22   be some type of response to try to move these people out of

23   downtown.

24   Q    And you say you heard that.  Where'd you hear that?

25   A    Over the radio.

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 11 of 248 PageID #: 1461
Timothy Sachs Direct Examination                              Volume 2

11

1   Q    And where were you located when you heard this?

2   A    Originally, we were staged on Jefferson and Scott.

3   Q    Okay.

4   A    Yeah, just outside the immediate downtown area.

5   Q    All right.  And what did you do when you heard that

6   information and -- and -- what'd you do when you heard that

7   information?

8   A    I met with the incident commander, Colonel Leyshock.  He

9   had CDT and my tactical squad meet him in front of City Hall.

10  Our CDT teams were actually responding from Highway 44 and

11  Hampton area.  So it took them a little while, but the St. or

12  the State Highway Patrol had a team closer.  So we had the

13  State Highway Patrol team meet us in front of City Hall at

14  Tucker and Market.

15  Q    So you meet up with Colonel Leyshock, and you have --

16  who's with you as far as your folks?

17  A    It's just the SWAT team, my tactical team at the time,

18  and then the colonel, the deputy commander of his bureau, his

19  aide, and then the Missouri State Highway Patrol.

20  Q    Okay.  And you meet up at City Hall, and what happens

21  next?

22  A    We're still monitoring traffic.  There were large groups

23  of people moving through the downtown area.  They're

24  actually -- some of them are throwing rocks, bottles,

25  different items at the officers in the downtown area.  We're

1    trying to get them moved out or investigate the property

2    damage.  So the colonel asked that we take a squad and just

3    move closer in to the downtown area.  So my squad -- the

4    tactical team from the City supplemented the Highway Patrol.

5    We started working north on Tucker, and this was not a

6    skirmish line.  They were walking two at a time, just up the

7    sidewalks, and as we were moving north, we could see large

8    groups of people coming off of Olive and off of Locust into --

9    they were actually going west of Tucker from the downtown

10   area.  One group actually stopped in front of the bank at

11   Olive and Tucker, and as we approached, they started putting

12   on goggles, masks.  They were reaching into their backpacks.

13   We didn't know what they were doing, but it was a much larger

14   group than we had originally thought we were going to

15   encounter.  So the colonel right away said, "We're going to

16   have to disperse these people."  I had a sergeant that was

17   operating inside the tactical vehicle we had.  I told him to

18   make the announcement to disperse and the chemical munitions

19   order immediately.  He made that.  Some of the people looked

20   up at us.  I got the finger from a couple of the folks.

21   Obviously, they saw it, but they weren't moving at all.  I

22   told them, "Hey, make the announcement a second time."

23   Q    I'm going to stop you there for a second.

24   A    Yes, sir.

25   Q    When you say you're making the announcement, tell me the

Timothy Sachs Direct Examination                              Volume 2

13

1   nature of these warnings that are given.

2   A    This is the dispersal order with the caveat that there

3   will be chemical munitions deployed --

4   Q    Okay.

5   A    -- because my team deploys the chemical munitions.  So

6   when we make that announcement, that's what that is.

7           THE COURT:  And so it just says what -- "You have to

8   leave"?

9           THE WITNESS:  Yeah.

10          THE COURT:  It doesn't tell them where to go.  It

11  just says, "Leave.  And if you don't, there's going to be

12  chemical agents or arrests."  Is that right?  Because we've

13  heard so much different things about dispersal orders, I kind

14  of want to know what the words were.  And if you need to have

15  the document, that's okay, but I need to know what was

16  actually said.

17          THE WITNESS:  And, Judge, I would.  I didn't read it.

18  I just gave the order over the radio because you can't hear

19  anything from inside that vehicle.  So I had to make -- have

20  him do it from the radio, and he was making the announcement

21  as I was talking to the crowd.

22          THE COURT:  So you don't know what he said?

23          THE WITNESS:  No, not exactly.  No, ma'am.

24  Q    (By Mr. Relys) Can you remember the -- can you remember

25  the exact script for the dispersal order?

Timothy Sachs Direct Examination                     Volume 2

14

1   A    No, I cannot.

2   Q    Would it refresh your recollection if I let you look at

3   the script?

4   A    Yes, sir.

5        MR. RELYS:  Okay.  Permission to approach, Judge?

6        THE COURT:  Yes.

7        THE WITNESS:  Thank you.

8   Q    (By Mr. Relys) Have you had a chance to review that?

9   A    Yes.

10  Q    Okay.  You don't need to read off of it, but having had a

11  chance to review that, is your recollection refreshed as to

12  the general content of these dispersal orders?

13  A    Yes, sir.

14  Q    And can you tell us what it is?

15  A    That they were given an order to disperse and leave the

16  area.  They were given a direction to leave.  They were told

17  why they were being, you know, told to leave and that if they

18  didn't leave that chemical munitions were imminent.

19  Q    Okay.  Is that -- having looked at that order and having

20  your memory refreshed, is that essentially the script that's

21  followed when these dispersal orders are given?

22  A    Yes.

23  Q    Okay.

24       THE COURT:  But you don't know what they told them

25  about why or the direction they were told to leave in because

Timothy Sachs Direct Examination                              Volume 2

15

1    you couldn't hear it; right?

2            THE WITNESS:  No, ma'am.  You're correct there, yes,

3    ma'am.

4            THE COURT:  So when you give this order, do you tell

5    them anything specific, or is it just the discretion of the

6    sergeant in terms of --

7            THE WITNESS:  It's the discretion of the sergeant

8    there, you know, inside the vehicle.  He can see.  They sit up

9    a lot higher than I can see.

10           THE COURT:  Right.

11           THE WITNESS:  So it's, you know, at their discretion

12   which way we want them to go.  Now, if we have areas already

13   blocked off, then he would already know that.

14           THE COURT:  Right.  But you couldn't hear what he

15   actually said?

16           THE WITNESS:  No, ma'am.

17           THE COURT:  You just told them to say it?

18           THE WITNESS:  Yeah.  I --

19           THE COURT:  Okay.

20           THE WITNESS:  -- you know, give the dispersal order.

21           THE COURT:  Give the warning.

22   Q    (By Mr. Relys) I want to be clear.  How is he -- the

23   dispersal order -- how is it being given?

24   A    It's being given over the loudspeaker inside the vehicle.

25   Q    So you could -- you could -- at the time, you could hear

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 16 of 248 PageID #:
1468
Timothy Sachs Direct Examination                          Volume 2

16

1    it?

2    A    I could hear it, yes, but the actual wording, I don't

3    remember, no.

4    Q    You don't remember it?

5    A    Correct.

6         THE COURT:  But you don't know if he said, "You need

7    to leave because this is an unlawful assembly" or "You just

8    need to leave"?  You don't know if he said, "You need to go

9    west; you need to go north"?  That's what you're telling me?

10        THE WITNESS:  Yes, ma'am.

11        THE COURT:  Okay.

12        THE WITNESS:  I don't know the verbiage he used.  It

13   was --

14        THE COURT:  Yeah, but you don't -- even aside from

15   the exact words, when you say "verbiage," even aside from the

16   exact words, you don't know the substance of what he said

17   except "Disperse or chemical agents will be used"?  You don't

18   know the substance of where he told them to go or why he told

19   them to do it, which you told me were -- you said there were

20   four things -- order to disperse, the direction to go, why,

21   and if you don't, chemical agents will be used.  But you've

22   told me you only remember or know two of those things.  You

23   don't know what else he said?

24        THE WITNESS:  That's correct.

25        THE COURT:  He said disperse or chemical agents will

1    be used?

2           THE WITNESS:  Yes, ma'am.

3           THE COURT:  And you don't know the direction or what

4    he said about why?

5           THE WITNESS:  No.

6    Q    (By Mr. Relys) And you would have known that at the time?

7    A    I observed which direction that some of them left.  Yes.

8    Q    Sure.  And I mean you would have -- you would have heard

9    the dispersal order, though, at the time?

10   A    Yes.

11   Q    All right.  And how many warnings do you think were given

12   at that point?

13   A    There were two initial, and then we actually had to

14   deploy the vehicle to get these people to move before we

15   actually took incoming rocks or any type of missiles.

16   Q    Okay.  And --

17          THE COURT:  And so where were you in the vehicle when

18   you gave this, when this warning was given?

19          THE WITNESS:  I was on the street, ma'am.  I was on

20   the sidewalk, out walking.

21          THE COURT:  So you weren't inside the vehicle?

22          THE WITNESS:  No, ma'am.  No.

23          THE COURT:  Where was the vehicle?

24          THE WITNESS:  Right next to me in the street.

25          THE COURT:  Yeah, but -- but what street?

Case: 4:18-cv-00308-JCH Doc. #: 126-4 Filed: 01/30/20 Page: 18 of 248 PageID #:
1468
Timothy Sachs Direct Examination                                    Volume 2

18

1              THE WITNESS:  Oh, I'm sorry.

2              THE COURT:  At City Hall --

3              THE WITNESS:  No.  We were --

4              THE COURT:  -- or at Tucker and Olive?

5              THE WITNESS:  We were on Tucker.

6              THE COURT:  And where on Tucker?

7              THE WITNESS:  We were just past Pine, moving up to

8    Olive.

9              THE COURT:  Okay.

10   Q    (By Mr. Relys) And where were the folks that you were

11   directing the order to?

12   A    They were on Olive, on the north side of the street, west

13   of Tucker.  The large group that we were concerned with, they

14   were all along the bank wall there.

15   Q    Okay.  And tell us again why it was that that group

16   concerned you.

17   A    It was a much larger group, but this group stopped and

18   then, you know, again, was taunting or whatever when we were

19   approaching.  They started putting on goggles and their masks.

20   Some of them already had masks covering their faces, and they

21   were reaching into their backpacks.  Don't know for what.

22   So --

23   Q    And you had seen them coming from which direction?

24   A    From the east.  They actually came across Tucker Avenue

25   from Locust and Olive.

1   Q      And did you have any reason to believe that they were

2   potentially affiliated with the group that had been causing

3   damage over there?

4   A      Yes, because the bicycles were actually still in the

5   downtown area trying to move people out.

6   Q      Okay.  So you give the warnings, and what happens next?

7   A      There's no dispersal.  Some people started moving north

8   and west from us, up 13th Street and then farther east on

9   Olive or west on Olive towards 14th Street, but there was a

10  group of concern right there.  So I asked that the ballistic

11  vehicle go around the corner and deploy the PepperBalls.

12  Q      And did they do that?

13  A      Yes, they did.

14  Q      And what was -- did that have any effect on the crowd?

15  A      Most of them left.  They started running.  Some of

16  them -- you know, there was five or six probably stayed.  Most

17  of them went north from that location.  And then the ballistic

18  vehicle continued west on Olive and then north on 14th Street.

19  During that time, the sergeant inside was continually giving

20  an order to leave, the dispersal order.

21  Q      Okay.

22  A      You can hear the -- you know, you can hear him on the

23  loudspeaker as the vehicle is going away.

24  Q      You could hear him like with your own ears --

25  A      Yes.

1   Q     -- as he was going north and west?

2   A     Yeah, until he got to 14th Street on -- when the library

3   was between us, I couldn't see or hear it any longer.

4   Q     Okay.  All right.  So after -- so that group of

5   protestors ultimately dispersed north, you said?

6   A     Most of them.  Now, we were -- we took several of them

7   into custody at that time.  I believe there was five or six

8   arrests that were made at that time.  And as we were making

9   the arrests, the State Highway Patrol struck a line across

10  Tucker on the north side of Olive, and all they did was hold

11  their line on Tucker.  The Central Patrol CDT team had finally

12  arrived from 44 and Hampton, got off the buses, and they

13  actually were deploying.  We had them strike a line on 13th

14  Street, and they walked up just one block, just on the other

15  side of the church, to Locust, and they held there at Locust.

16  We didn't go any farther at that time.

17  Q     Okay.  And you said the CDT team arrived.  I just want to

18  remind -- could you remind us?  The CDT team -- I think you

19  told us earlier.  They were coming from a further away

20  location than you were originally?

21  A     Yes.  Yeah.

22  Q     They were summoned at the same time, but they didn't get

23  there until some of the stuff had happened?

24  A     Yes.  Yeah, that had already happened.  We were only

25  coming from Jefferson and Market or Jefferson and Scott, which

21

1   is a couple blocks down.  Excuse me.  But the CDT team wasn't

2   staged on the buses.  They were at a rally point.  So we had

3   to get them on the buses and then have the buses driven from

4   44 and Hampton area.

5   Q    So CDT team finally arrives.  It sounds like the

6   protestors were sort of in the process of dispersing by that

7   time anyway?

8   A    Yeah, the City CDT team, yes.  Because of all the issues

9   that were happening downtown and the radio transmissions, the

10  lieutenant colonel didn't want to wait for them to get there.

11  That's why we moved up with just the Highway Patrol at that

12  time.

13  Q    Got it.  Now, what happens after -- after -- after what

14  you've talked about already here?

15  A    We actually held just five, six minutes.  After there was

16  no further activity, the colonel asked that the lines be

17  collapsed.  We actually had the Highway Patrol collapse.  They

18  went back to their vehicles.  The City CDT team came back.  We

19  got on the buses.  They started back towards 44 and Hampton,

20  and then my tactical team and I, we responded back to

21  Jefferson and Scott, and then the arrest teams had taken

22  people into custody.  They were already moving to the Justice

23  Center.

24  Q    So you all retreated back to your original location?

25  A    That's correct.

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 22 of 248 PageID #: 4472
Timothy Sachs Direct Examination                          Volume 2

22

1  Q    All right.  Was that the last of your involvement with

2  the protesters that evening?

3  A    No, sir, it was not.

4  Q    Okay.  What happened next that got you involved or the

5  folks under your command involved?

6  A    The radio transmissions from the bike officers -- there

7  was larger groups now starting to regather, and they were

8  gathering in the intersection of Washington and Tucker.  That

9  became problematic as there continued to be other issues in

10 the downtown area that were affiliated with the entire group.

11 The colonel called us all back down.  This time, he asked us

12 to meet him at 13th and Olive, where we had originally

13 disbanded, and we actually started staging at 13th and Olive

14 there, and we brought all three of the City tactical teams,

15 and the bicycle squad was already downtown.  So we actually

16 utilized them.

17 Q    Okay.  And about what time is this?

18 A    This is about 10:00, 10:10, 10:15, something like that.

19 Q    10:00 hour?

20 A    Yeah, it's around 10:00, yes, sir.

21 Q    And once you get downtown and you bring the CDT teams

22 downtown and you stage there at 13th and Olive, what happens

23 after that?

24 A    We had actually had Sergeant Rossomanno and Sergeant

25 Jemerson along with Lieutenant Boyher engaging the people

Case: 4:18-cv-00308-JCH  Doc. #:  126-4  Filed: 01/30/20  Page: 23 of 248 PageID #: 1473
Timothy Sachs Direct Examination                          Volume 2

23

1    downtown, telling them they have to leave.  They were giving

2    dispersal orders again at that time.  You could hear the

3    loudspeaker.  Couldn't hear the actual order themselves, but

4    you could hear people talking on the loudspeaker.  Talked to

5    the colonel, and we developed a plan to either disperse as

6    many people as we could, and anybody that would be remaining

7    would be taken into custody.

8    Q    Okay.  And you talked about some dispersal commands given

9    by -- over the loudspeaker.  You were at 13th and Olive?

10   A    Yes.

11   Q    And where -- from where were these dispersal commands

12   being given?

13   A    They were on Tucker.

14   Q    Okay.  On Tucker about where?  Do you know?

15   A    There was one, I know, given at Locust because I could

16   see the vehicle there, and then they went farther north

17   towards Washington.

18   Q    Okay.  So between Locust and Washington on Tucker?

19   A    Yes.

20   Q    And these commands were given by loudspeaker?

21   A    Yes.  The ones I heard were by loudspeaker, but we know

22   for a fact that we had two of our sergeants out engaging

23   people on the street, talking to them, because you can hear

24   some of their conversations actually key their microphones and

25   that.

Timothy Sachs Direct Examination                        Volume 2

24

1    Q    Okay.  And sort of we've gotten a general idea of where

2    the commands were given from and how they were given over

3    loudspeakers.  To whom were they being given?

4    A    The large groups of people that remained in the streets

5    and that were blocking the streets and not responding to any

6    of the -- you know, any of the requests or the commands to

7    disperse.

8    Q    Any particular group of people or was it people that --

9    was there any particular crowd of people, or where were the

10   people, generally speaking, that the orders were being

11   directed to?

12   A    They were between -- they were -- the largest crowd was

13   on Tucker, between Tucker and -- or between Locust and

14   Washington Avenue, and then the majority now were on

15   Washington Avenue or right in that intersection of Washington

16   and Tucker.

17   Q    How far away were you from the -- from the location where

18   the commands were being given?  How many blocks is that?

19   A    Olive, Locust, St. Charles.  Four.

20   Q    Four blocks?  And you could hear that commands were being

21   given?

22   A    Yes.

23   Q    And you talked a little bit about -- so you talked about

24   the commands being given over these loudspeakers.  How many

25   commands did you hear?

Timothy Sachs Direct Examination                            Volume 2

25

1   A    Five or six.

2   Q    Were you able to make out exactly what was being said?

3   A    No, sir, I wasn't.

4   Q    Would it have followed the script that you've told us

5   about?

6   A    Yes.

7   Q    You also told us about you had a couple sergeants talking

8   to the crowd?

9   A    Yes.

10  Q    Tell us about that.

11  A    Just to ensure -- these two sergeants in particular work

12  with the CDT more than I do.  I only command when there is an

13  incident, but they actually train with these folks, and

14  they've been involved in other incidences.  So they know some

15  of the protestors by name and by sight and who may or may not

16  be in charge -- not in charge but a leader in the group.  So

17  they would go up and talk to these people and see if they

18  could get cooperation, you know, that they were leaders of

19  this group.  They asked these people to disperse.  They know

20  them by sight.

21  Q    Okay.  And you said there's two sergeants?

22  A    Yes.

23  Q    What are their names?

24  A    Brian Rossomanno and Randy Jemerson.

25  Q    All right.  And your understanding is that during this

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 26 of 248 PageID #:
4470
Timothy Sachs Direct Examination                                    Volume 2

26

1   time period Sergeants Jemerson and Rossomanno were engaging

2   the people who were hanging around?

3   A   Yes, sir.

4   Q   Okay.  How do you know that?

5   A   By radio transmissions and then speaking with the

6   commander, the lieutenant colonel.  They work directly for him

7   at times, and they were in communication with him also, and I

8   believe he's the one that actually sent them up there because

9   I didn't send them.

10  Q   Okay.

11          THE COURT:  Where was the lieutenant colonel himself

12  physically?

13          THE WITNESS:  He was physically with me at 13th and

14  Olive.

15          THE COURT:  Okay.

16          THE WITNESS:  He and I were kind of joined at the hip

17  that evening.

18          THE COURT:  Okay.

19  Q   (By Mr. Relys) Okay.  So you heard four or five

20  announcements, or you say you heard about four or five

21  announcements?

22  A   Yes, sir.

23  Q   Maybe you said five or six.  I don't recall what you

24  said.  How many announcements about did you hear?

25  A   Over five.  I know that five, six, something like that,

1   and just on the loudspeaker.  I wasn't, you know, close enough

2   to hear when they were engaging these people.

3   Q    And these announcements are being -- I think you told us

4   earlier that the plan was to try to get people to disperse but

5   to arrest anyone who doesn't disperse?

6   A    Anyone that remained, yes, sir.

7   Q    Okay.  And who came up with that plan?

8   A    Well, the plan was mine, and then I got it okayed by the

9   lieutenant colonel.  You know, he had asked, you know, that we

10  have to do something.  We can't allow people back into

11  downtown.  We can't allow any further property damage.  We're

12  either going to have to have them dispersed or arrested.

13  Q    Why did you think that if people were allowed to continue

14  to hang out in that particular area that property damage would

15  occur?

16  A    That's what had happened the three days prior, and just

17  from that evening, you know, we were able just to get the

18  groups out of the downtown area.  Had they not been engaged by

19  the police, I believe there would have been a lot more damage,

20  and had we left them there, I believe there still would have

21  been a lot more damage.  We didn't want anything happening any

22  worse than had already occurred.

23  Q    Did you think that the folks who were congregated in that

24  general area of Washington and Tucker, Locust and Tucker were

25  the same people who had been chased around earlier in the day

Timothy Sachs Direct Examination                          Volume 2

28

1   by the police?

2   A    I do, yes, sir.

3   Q    Why do you think that?

4   A    They were, you know, again, in the area.  They were

5   wearing the backpacks.  They were wearing masks and goggles,

6   indicating to me that they wanted some type of confrontation,

7   and the information that we were getting was that was the

8   description of some of the people that were seen leaving the

9   areas by the bike officers and the officers from the Special

10  Operations Unit.

11  Q    So you had information that some of the people were the

12  same people?

13  A    Yes.

14  Q    Not everybody necessarily?

15  A    No, no, but, you know, there were quite a few of them

16  that were chased from the downtown area.  And the officers

17  were giving descriptions as best they could, and we were

18  hearing that, and lot of these people matched -- not a lot but

19  several of the people matched the descriptions.

20  Q    Okay.  So we've talked a little bit about the warnings

21  that you heard and the outreach that was done by the

22  sergeants, Jemerson and Rossomanno?

23  A    Yes, sir.

24  Q    And you told us basically that this is -- the plan is --

25  is that -- to effect a mass arrest at the -- at the end of the

Timothy Sachs Direct Examination                           Volume 2

29

1   situation if people don't disperse; is that right?

2   A    Yeah.  Our goal was still initially to disperse.  You

3   know, we wanted as few arrests as possible, but anybody who

4   did remain was going to be taken into custody at this time.

5   Q    Understood.  Yeah.  I don't want to put words in your

6   mouth there.  The goal, as I understand it, wasn't necessarily

7   to make the arrests but to disperse --

8   A    That's right.

9   Q    -- but the plan was if people did not disperse there

10  would be arrests?

11  A    That's correct.  Yes, sir.

12  Q    All right.  At some point, was the decision made to

13  effect a mass arrest?

14  A    Yes.

15  Q    Okay.  And who made that decision and about when?

16  A    We, the colonel and I, had discussed this.  There was a

17  final announcement made about 11:00, you know, and at about --

18  Q    When you say a final announcement, what do you mean?

19  A    A final dispersal announcement by Sergeant Rossomanno was

20  made about 11:00.  The colonel and I had talked about that.

21  Right beforehand, he said, "Well, we're going to give one more

22  dispersal order.  Make sure that, you know, we get that, and

23  then we'll go ahead and move the teams in."  So the dispersal

24  order was given about 11:00.  We got the teams set up and

25  situated.  I had them move to different locations in the

1    buses, and I assured that the Bicycle Unit was now on

2    Washington Avenue preventing anyone from going east on

3    Washington.

4    Q    I want to put up a map of this general area for you.

5    Okay.  That's a Google Map of Washington and Tucker.

6    A    Uh-huh.

7    Q    Is that too close?  I'm going to ask you -- I want you to

8    tell us about where you positioned the teams.  That may be too

9    close in, isn't it?

10   A    Yeah.  Again --

11   Q    I'll put up a different one.

12   A    There you go.  Okay.  That's fine.

13   Q    Okay.  So about 11:00, you said the final dispersal order

14   was given?

15   A    Yes, sir.

16   Q    And then -- and then what happened?  You said -- tell us

17   what happened next.

18   A    I assured that Lieutenant Boyher had his team on

19   Washington Avenue, east of Tucker, right there.

20   Q    And Lieutenant Boyher is who?

21   A    He is the commander of the bicycle response team.

22   Q    Okay.  So the bicycles went to that location east of --

23   east of Tucker on Washington?

24   A    On Washington, yes, sir.

25   Q    And what were they directed to do at that location?

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 31 of 248 PageID #:
1481
Timothy Sachs Direct Examination                              Volume 2

31

1    A    Just hold the street, you know, not let anybody back into

2    the downtown area.

3    Q    Okay.  So to form a line, basically, not letting people

4    go east past them?

5    A    That's correct.

6    Q    Okay.  Would they let people go west past them?

7    A    Yes.  Yeah.

8    Q    Okay.  And then what was the next -- what was the next

9    movement?

10   A    I asked -- we had -- my -- where I was at, at 13th and

11   Olive, I had the South Patrol CDT team.  So we actually moved

12   out onto Olive.  There we go.  I asked the North Patrol CDT

13   team -- they got in the buses, and they actually drove up to

14   Dr. King and Tucker.

15   Q    Okay.

16   A    And they got out at Dr. King.

17   Q    So North Patrol team is at Dr. King and Tucker?

18   A    That's correct.

19   Q    South Patrol team is with you at Olive and Tucker?

20   A    Right.

21   Q    Okay.  What happens after that?

22   A    North Patrol or -- I'm sorry -- Central Patrol stayed at

23   13th and Olive.

24   Q    And can you link this up for us?  We said 11:00 is the

25   last dispersal order.  Can you give us an approximation for

1    how these things are unfolding in terms of time?

2    A    Between 11:00 and 11:10, we got the teams in place, and

3    then once I got word that everybody was in place and off the

4    buses, it was about a quarter after, you know, 11:15, that I

5    actually had the officers start moving into position.

6    Q    Okay.

7              THE COURT:  Can I ask you?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  So what you're saying based on -- and

10   you've made little marks on this map.

11             THE WITNESS:  Yes, ma'am.

12             THE COURT:  So you're saying you were with what you

13   called the south team, and they were at that intersection of

14   Tucker and Olive.

15             THE WITNESS:  Yes, ma'am.

16             THE COURT:  And then what you called the north team

17   were one block west of that at 13th and Olive?

18             THE WITNESS:  No.  That's Central.  Central.

19             THE COURT:  Central team?

20             THE WITNESS:  Yes.  And then north --

21             THE COURT:  Okay.  And north team is up at Martin

22   Luther King?

23             THE WITNESS:  Yes, ma'am.

24             THE COURT:  Yeah.  Okay.  So central is there.  So

25   you've got those two in the same -- basically on the same

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 33 of 248 PageID #:
1483
Timothy Sachs Direct Examination                              Volume 2

33

1    street?

2              THE WITNESS:  Correct.  Yes, ma'am.

3              THE COURT:  Okay.

4              THE WITNESS:  Yeah.

5    Q    (By Mr. Relys) And the bicycles are holding a line on

6    Washington, east of Tucker?

7    A    Yes.

8    Q    All right.  What happens after that?  What's the next

9    movement?

10   A    At quarter after, you know, I verified with the

11   lieutenant or the lieutenant colonel, "Okay.  We're ready to

12   go.  Are we ready?"

13        And he said, "Yes.  Go ahead."

14        So I had the north team start moving south.  Oop.

15             MR. RELYS:  I'm not sure how to make that go away.

16             THE COURT:  Well, you can.  You can take away just

17   the very last thing.

18             MR. RELYS:  What button is that?

19             THE COURT:  Try the bottom one.

20             MR. RELYS:  There we go.

21   A    Okay.  Let's see if I can do this again.  The North

22   Patrol team actually started moving south.  The South Patrol

23   was moving north.  And Central Patrol was still moving north

24   on 13th Street.  We got -- it took us a few minutes to get to

25   that point.  We continued north with the South Patrol to

Timothy Sachs Direct Examination                    Volume 2

34

1    St. Charles, and we held there.  The North Patrol was actually

2    moving down past -- which would be Missouri Bar and Grille

3    now.  They were past Convention and coming up on Missouri Bar

4    and Grille.  And the Central Patrol team had moved up to

5    St. Charles.

6    Q    (By Mr. Relys) Why is the Central Patrol moving in

7    parallel with the South?

8    A    I was going to have them move to the west side of the

9    protest group but not yet.  We still had to give them egress,

10   and I had to have a couple streets cleared before I was

11   comfortable with moving everybody up.

12   Q    Okay.  Are the bikes doing anything?

13   A    No.  They're still holding.  All they're doing is holding

14   there.  They may have moved up a half a block closer to the

15   intersection, but at that time, you know, they were -- all the

16   bikes did was actually hold and keep people from going east.

17   Q    Okay.  All right.  So at this point, approximately -- and

18   again, I'm not -- I don't expect you to know down to the

19   minute, but do we have a sort of idea of what time --

20   A    It would be --

21   Q    -- the picture that you've painted so far -- what time --

22   what this is?

23   A    It may be about 20 after.  It may have taken us five

24   minutes to get this far.

25   Q    Okay.  And so at about, again, approximately, give or

Timothy Sachs Direct Examination                                    Volume 2

35

1    take, 20 after --

2    A      Sure.

3    Q      -- we've got the North Patrol team down to just south of

4    Convention Plaza?

5    A      Correct.

6    Q      We've got the South Patrol team up at around St. Charles?

7    A      Correct.

8    Q      We've got the bikes holding a line east on Washington?

9    A      That's correct.

10   Q      And we've got the Central Patrol team that's at

11   approximately --

12   A      13th.

13   Q      Help me out with that.

14   A      13th and St. Charles.

15   Q      13th and St. Charles.  Thank you.  Okay.  What happens

16   after that?

17   A      As we're holding all three of these positions, I asked

18   the Central Patrol team to come east on St. Charles Avenue,

19   and St. Charles there is more of an alley than it is a street,

20   and we wanted to make sure that there was nobody hiding in

21   there because there are several dumpsters.  So we didn't want

22   anybody having any issues or anything like that.  And we still

23   wanted to allow time for people to go west on Washington.  So

24   I had Central Patrol actually clear the St. Charles Street as

25   everybody else was holding their positions.

1    Q    Okay.  So the Central Patrol clears St. Charles Street

2    between 13th and Tucker?

3    A    That's correct.

4    Q    And everyone else holds?

5    A    Yes.

6    Q    And you mentioned that you wanted to allow -- continue to

7    allow people to go west on Washington at this point?

8    A    Yes.

9    Q    So at this point, you said -- how many -- you told us a

10   bunch of dispersal orders had been given before this period of

11   time.

12   A    Yes, sir.

13   Q    Are people still free to leave?

14   A    Oh, absolutely.

15   Q    Okay.

16   A    We would rather have them leave than have to deal with

17   them, to be honest.

18   Q    Okay.  Is anybody -- are you noticing -- are you able to

19   see from your vantage point if anyone is leaving at this

20   point?

21   A    I couldn't see, no.  I could not.

22   Q    Okay.  All right.  What happens next?

23   A    After they, Central Patrol, cleared 13th Street, I asked

24   them to move back and then told them once they get to 13th

25   Street, move up to Washington Avenue and let me know when they

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 37 of 248 PageID #:
1487
Timothy Sachs Direct Examination                                    Volume 2

37

1    got there.  So they actually walked back.  It's only, you

2    know, a block, and then they moved through and moved up to

3    Washington Avenue.  Once they turned east on Washington

4    Avenue, they advised me that they were on Washington; they

5    were ready to move towards the intersection.  At that time,

6    they struck a line west across the street or -- I'm sorry --

7    north and south across the street.  And then I gave the

8    command, and all -- the North Patrol actually moved down to

9    the intersection of Washington and Tucker.  The South Patrol

10   moved up to the intersection and held there.  And Central

11   Patrol moved east and held at the corners of the building.

12   Q    Okay.

13   A    And because of the geographic design of downtown and

14   that, we actually just stopped on the corners of the

15   intersections and held the CDT lines there.

16   Q    Okay.  At this point, can people leave?

17   A    No, no.  Once we got halfway down the block between 13th

18   and 12th, the line was struck from building to building, and

19   everybody that remained was now being detained.  They were no

20   longer free to leave.  They were going to be arrested.

21   Q    Okay.  And in your mind, what was the basis for the

22   arrest?

23   A    There was still no dispersal.  They were still blocking

24   the intersections.  They were still a problem in the area.  We

25   couldn't leave them there.  We didn't know what they were

38

1    going to do.  But the biggest thing is they wouldn't disperse.

2    Q    Okay.  And so when you said that the -- when you were

3    going west on or -- I'm sorry -- east on Washington, you're

4    talking about that sort of marking the -- marking the closing

5    of this maneuver by the progress of that Central CDT team?

6    A    Yes.  Yeah, they were the last ones to actually close off

7    because, again, we left an egress as long as we could, and

8    then North and South -- excuse me -- got to the intersections,

9    and then Central got there, and that's when, you know,

10   obviously -- excuse me -- we closed the streets off.

11   Q    Okay.  All right.  So once the -- once all four points of

12   the intersection at Washington and Tucker are closed off by

13   the three CDT teams and the bike line --

14   A    Yes, sir.

15   Q    -- what happens after that?

16   A    This was about 25 after, and the protest group, on their

17   own, kind of migrated to the northeast corner of the

18   intersection.  At that time, I asked that all the arrest teams

19   move in, start taking people into custody.  And then the

20   arrest teams -- I ensured that they actually came through the

21   lines because as our -- as the teams are formed, the arrest

22   teams stay behind the line that's struck.  So we actually open

23   up a space, and then the arrest teams move in from behind the

24   line.  So they moved in and started taking people into

25   custody, giving them commands to sit down, lay down, put their

1   hands behind their back, and, you know, demanding compliance

2   at that time.  Again, they were arrestees.  They weren't

3   bystanders.  They weren't -- they were being detained pending

4   their arrest.

5   Q    Okay.  And where were you present?  Were you present

6   during these arrests?

7   A    I was.

8   Q    Okay.  Where were you?

9   A    I was in the intersection, about 35, 40 feet south and

10  west.  Again, I wasn't responsible for the arrest teams.  I

11  just had to ensure that they were maneuvering into place and

12  doing what they were supposed to, and then we had to, again,

13  still secure the perimeter, and I also had force protection

14  that I had to ensure that was being taken care of.

15  Q    Okay.  Did the arrest teams move into place?

16  A    They did.

17  Q    Did they effect the arrests?

18  A    They did.

19  Q    All right.  I'm sure you're aware that in this case

20  there's allegations that pepper spray and such was used during

21  these arrests.

22  A    I am.

23  Q    Did you see any pepper spray being used during the

24  arrests?

25  A    I did at one point, yes.

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 40 of 248 PageID #:
1480
Timothy Sachs Direct Examination                              Volume 2

40

1    Q     Tell us about that.

2    A     There was a uniform sergeant that had two people that

3    were standing up, and most other people were either sitting or

4    most of them were laying, and he had actually deployed a

5    pepper fogger at the two people that were standing up.

6    Q     And tell us what a pepper fogger is.

7    A     All it is is a larger can of the OC pepper spray that the

8    individual officers carry, only it comes out in a little bit

9    larger mist, and it's a larger can of it than the smaller

10   stream spray that the officers carry on their belts, but it's

11   oleoresin capsicum.  It's -- it's pepper spray is what it is.

12   Q     Did you witness -- well, you're familiar with the

13   department's use-of-force policy?

14   A     Yes, sir, I am.

15   Q     And the policy on the use of pepper spray?

16   A     Yes, sir, I am.

17   Q     Anything about the use of that pepper spray that you saw

18   that you thought violated or was problematic under the policy?

19   A     No, sir, not at all.

20   Q     Explain why the use of that pepper spray in that instance

21   that you saw was acceptable?

22   A     The use of the pepper spray in the force continuum is

23   right after the officer is giving commands and not getting

24   compliance.  It's -- the force continuum to that point is just

25   officer presence and then the officer giving commands, and

Timothy Sachs Direct Examination                      Volume 2

41

1    then when their commands are not met, they are authorized to

2    use pepper spray to gain compliance before they go hands-on

3    with anyone.

4    Q    And based on what you saw in that instance, tell us why

5    pepper spray would have been appropriate.

6    A    There was noncompliance by several people, and, you know,

7    obviously, there were some people that were complying that had

8    no issues at all, and there were some people that were not

9    complying that they had to, you know, again escalate the force

10   continuum and use the pepper spray.

11   Q    How many people were in that intersection, you know,

12   police officers and arrestees included?  I mean if you know

13   approximately.

14   A    Approximately, 275, 300.

15   Q    Okay.  Did you see anybody else pepper sprayed during

16   that mass arrest?

17   A    I did not, no.

18   Q    Okay.  Do you know if other people were?

19   A    I do know there were, yes.

20   Q    Okay.  How do you know that?

21   A    Because of the reports that came in afterwards of the

22   resisting arrests we had.  Anyone that is pepper sprayed is

23   charged with resisting arrest.

24           MR. RELYS:  Judge, I have a copy of the department's

25   policy on mace.  It hasn't been made a part of the record so

Timothy Sachs Direct Examination                          Volume 2

42

1    far.  So there's a --

2              THE COURT:  Any objection?

3              MR. ROTHERT:  We disclosed exhibits earlier, and this

4    one wasn't.  So I don't think there's an objection, but we

5    only saw it a few minutes ago.  So we'd like to reserve until

6    after a break any objection.  I doubt there will be an

7    objection, but --

8              THE COURT:  Can he ask him about it now, or are you

9    going to --

10             MR. ROTHERT:  Yes, he can ask him about it.

11             MR. RELYS:  Okay.

12             THE COURT:  Okay.  Go ahead.  Is this an exhibit?

13             MR. RELYS:  Yeah, I'm going to make it an exhibit.

14   This will be, I believe, our first exhibit.  So we'll call

15   it -- I think I have other exhibits up to K or up to J, so I'm

16   going to call this Exhibit K.

17             THE COURT:  Okay.

18             MR. RELYS:  Permission to approach, Your Honor?

19             THE COURT:  Yes.

20   Q    (By Mr. Relys) Lieutenant, I've just handed you what --

21   you don't have a marked copy, but I'll represent I've got a

22   marked copy in my hand as Exhibit K.

23   A    Yes, sir.

24   Q    Can you take a look through that and just tell me if you

25   recognize that document?

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 43 of 248 PageID #:
1463
Timothy Sachs Direct Examination                          Volume 2

43

1    A    I do, sir.  This is part of our special order on the use

2    of force.  It's Section IV.

3    Q    I'd like you to just sort of -- you know, this is several

4    pages.  It's several pages in length.  Several pages in length

5    obviously.  So I don't want you to go through every -- you

6    know, every last line of it, but could you briefly summarize

7    the department's -- what the policy is for the use of mace?

8    A    Yeah.  Pepper mace is provided when the use of force is

9    necessary to control belligerent, uncooperative persons for

10   whom verbal commands are ineffective.  The product is designed

11   to be used as an alternative to physical contact between the

12   officer and a person.  It goes on to explain what it's made

13   out of, you know, the red pepper and that, and how it will

14   affect people, and then it goes into the --

15          MR. RELYS:  I'm going to stop you there for just a

16   second.

17          Judge, I've got an extra copy.  Would you like one?

18          THE COURT:  Yeah.  Go ahead.  I'm going to --

19          MR. RELYS:  I've got a paper copy.

20          THE COURT:  I mean I'll hear any objections.  I'll

21   take it subject to the objections.  Because what you marked

22   before was Section I of this order.  This is Section IV;

23   right?

24          MR. RELYS:  What's been submitted with the materials?

25          THE COURT:  Right.

Timothy Sachs Direct Examination                    Volume 2

44

1        MR. RELYS:  Yeah.

2        THE COURT:  Okay.  Go ahead.

3   Q    (By Mr. Relys) Continue, Lieutenant.

4   A    And then it goes on.  You know, the general procedures.

5   An officer may use pepper mace, and it explains that an

6   officer -- to effect a lawful arrest or otherwise lawfully

7   control a combative, uncooperative person, when verbal

8   commands or persuasion have been ineffective in inducing

9   cooperation.  And it goes on to state, you know, we can deploy

10  for animals, you know, to control a dangerous animal, and, you

11  know, when we cannot use it, and, you know, they specifically

12  say you cannot use this when someone is being controlled by a

13  neck restraint.

14  Q    Okay.

15  A    And then most everything else goes on to that you have to

16  charge a person with resisting arrest and then how to handle

17  it and then the reporting procedures, you know, as far as

18  completing a police report and that type of thing.

19  Q    What's the -- generally speaking, backing up to the

20  department's general use-of-force policy --

21  A    Yes, sir.

22  Q    -- I understand that there's sort of a continuum.  Is

23  that right?

24  A    Yes, sir, there is.

25  Q    Okay.  Could you just tell us a little bit about the

1  use-of-force continuum?

2  A     The use-of-force continuum is how we actually handle

3  people and how we escalate based on whatever response we get

4  from people when we have to take them into custody.  Most of

5  the time, it's just, you know, our presence and verbal

6  direction.  "Put your hands behind your back."  Most people

7  cooperate.  If not, there are some people that don't want to

8  go to jail, don't want to be arrested, so we have to escalate

9  as far as we usually stay one step above what they do.

10 Sometimes, depending on the size of the officer or the size of

11 the person involved, they may go two steps above, but there is

12 a continuum as either, you know, incooperative or belligerence

13 can increase, or if there's an assault on an officer, that we

14 actually increase the force continuum.

15 Q     Okay.  And sort of it sounds like verbal command is low

16 on the continuum?

17 A     Very low, yes, sir.

18 Q     And let's say that there's an escalation.  Sort of take

19 us through what an escalation would look like on the

20 continuum.

21 A     It would be noncompliance and then, you know, someone

22 actively noncomplying, refusing to -- you know, other than

23 telling, "Hey, I'm not going to do it," there will be active

24 noncompliance, you know, either ignoring or arbitrarily acting

25 against the command.

Timothy Sachs Direct Examination                          Volume 2

46

1    Q    Okay.

2    A    Then there will be, you know, some type of physical,

3    either a restraint -- they would either pull away or they

4    would actually try to assault the officer, once we have to go

5    hands-on, but there are a couple of steps that we have before

6    we actually try to go hands-on.  That's one of the last things

7    we like to do.

8    Q    Okay.  And between hands-on and verbal commands, what do

9    we have?

10   A    You have the use of pepper mace and the use of a Taser.

11   Again, most of those, you know, again, we have escalated to

12   the point where we can't control these people; they're not

13   complying; they are going to jail; it's a lawful arrest; but

14   we don't want to have to go to hands-on with them, so we try

15   to get compliance with pepper mace and we try to get

16   compliance with the use of a Taser.

17   Q    Why don't you want to go hands-on?  Why is -- let me

18   rephrase that or ask a different question.

19   A    Sure.

20   Q    Why is mace, let's say, preferable to going hands-on?

21   A    A lot of times, we can get compliance because the people

22   understand, hey, you know, we are going to use whatever force

23   we need to, and when they can't see, they have a hard time

24   breathing, a lot of people understand it's time to go to jail,

25   and the officer still doesn't have to fight and wrestle with

Timothy Sachs Direct Examination                              Volume 2

47

1   these people to try to, you know, forcibly handcuff them.

2   Q    Are there any safety issues that make mace preferable to

3   hands-on?

4   A    Most everything is preferable to hands-on.  You don't

5   know what anybody knows how to do or if they're going to

6   assault you, what type of person they are, and a lot of our

7   officers aren't in either the greatest shape or the largest

8   physical specimens.  So they have to gain compliance with

9   these type of implements or equipment we have to effect a

10  lawful arrest.

11  Q    Okay.  We've heard some testimony in this case from

12  witnesses who are claiming that during this mass arrest they

13  were zip-tied with their hands behind their backs and pepper

14  sprayed, after they were zip-tied, in the face.  Just based on

15  those facts that I've told you, would that be compliant with

16  the policy?

17  A    No, that would not.

18  Q    Okay.  Why not?

19  A    These people are in custody.  They are handcuffed.  And,

20  you know, unless they are kicking at the officer or engaged in

21  an assault or something to that effect, it wouldn't be prudent

22  for the officer to deploy a chemical because, again, now we've

23  gone hands-on and we have them in custody.  So all we have to

24  do is get additional officers, lift them up, and move them.

25  Q    So it sounds as though a person who is zip-tied and under

Timothy Sachs Direct Examination                              Volume 2

48

1   arrest, you can imagine scenarios in which mace may still be

2   appropriate?

3   A    Yes, yeah, if they're still assaulting or, you know,

4   trying to prevent them from being moved, if they're kicking at

5   the officers, rolling from side to side, and not allowing the

6   officers to actually take physical custody of them, you may

7   have to deploy some mace again.

8   Q    But if they're -- if they're completely compliant,

9   they're not kicking, they're not -- they're complying with

10  whatever directives they're given, it would be inappropriate

11  at that point to mace them?

12  A    That's correct, yes.

13  Q    Now, I've given you a series of hypotheticals

14  obviously --

15  A    Uh-huh.

16  Q    -- and asked you to sort of talk about the policy and how

17  it would relate to those hypotheticals.

18  A    Yes, sir.

19  Q    You told us earlier that you didn't see any of those type

20  of situations occurring?

21  A    No, sir, I didn't.

22  Q    Okay.  Not on that --

23  A    If I did, I would have to act on that.

24  Q    Not on that Sunday night?

25  A    No, sir, I did not.

Timothy Sachs Direct Examination                               Volume 2

49

1   Q    I'm sorry.  You said something about act on it?

2   A    As a commander of a unit, if I see something that is

3   outside of the special order, it is incumbent upon me to make

4   sure that there is an allegation prepared against the officers

5   if they step out of line or they don't comply with our

6   policies.

7   Q    And you didn't have -- you didn't see the need to do that

8   that evening?

9   A    Absolutely not.

10       MR. RELYS:  Okay.  At this time, Judge, I would move

11  to admit Defendant's Exhibit K into evidence.

12       THE COURT:  I'll reserve ruling if you want to look

13  at it.

14       MR. ROTHERT:  There's no objection.

15       THE COURT:  Okay.  Exhibit K is received.

16       MR. RELYS:  Thank you.

17       THE COURT:  I mean, frankly, I would ask for it if it

18  weren't -- I mean I want to see what it says.  I need it.

19  Q    (By Mr. Relys) Lieutenant Sachs, are you -- are you also

20  familiar with the department's policy or, I guess, does the

21  department have a policy relating to persons who wish to

22  record police activity?

23  A    Yes, sir, we do.

24       MR. RELYS:  And I'm going to put what's been

25  previously marked as Defendant's Exhibit D up on the ELMO

Timothy Sachs Direct Examination                                    Volume 2

50

1    here.

2           Well, permission to approach?

3           THE COURT:  You may.

4    Q    (By Mr. Relys) I'm going to give it to you and just ask

5    you to take a look through it.

6    A    Sure, yeah.

7           Yeah, this is Special Order 1-06, yeah.

8    Q    Okay.  And I'm going to go ahead and take it back.

9    A    Oh, I'm sorry.  Yeah.

10   Q    Sorry.  Tell me -- you've identified Special Order 6?

11   A    Yes, 1-06.

12   Q    1-06.  What is Special Order 1-06?

13   A    It's the policy for recording of police activity.

14   Q    And is the Exhibit D that I handed you a true and correct

15   copy of that special order?

16   A    Yes, sir.

17          MR. RELYS:  Okay.  I would, at this time, move to

18   admit Defendant's Exhibit D.

19          THE COURT:  Any objection?

20          MR. ROTHERT:  No objection.

21          THE COURT:  Exhibit D is received into evidence.

22   Q    (By Mr. Relys) All right.  And I don't -- you don't have

23   a copy of it.  I'm happy to flip the pages as necessary, but

24   could you just tell me; what is the policy regarding -- what's

25   the police department's policy regarding persons who are

1    recording police activity?

2    A    Bystanders are allowed to record activity at their

3    leisure as long as they don't interfere with the police

4    activity that they're recording.

5    Q    Okay.  So if someone's -- if someone's recording and

6    they're -- well, strike that.  The simple fact that someone's

7    recording would not be grounds for arresting someone?

8    A    That's correct.

9    Q    Okay.  Are you aware that in this case there's

10   allegations that people were arrested on the Sunday night,

11   September 17th, for recording?

12   A    I don't know that anyone was arrested for recording

13   anything, no.

14   Q    Okay.  Are you aware of any instances where that

15   occurred?

16   A    That they were arrested for recording something?

17   Q    Correct.

18   A    Not at all, no.

19   Q    What were the -- what was the reason for the mass arrest

20   there at Tucker and Washington?

21   A    The people were blocking traffic.  They failed to

22   disperse when given the commands.

23   Q    Did it matter, from your perspective as the commander on

24   the scene, whether they were recording or not?

25   A    No.  A lot of times that helps us.

Timothy Sachs Direct Examination                          Volume 2

52

1    Q    Okay.  A person who's recording police -- are they

2    allowed to -- once it's been determined that they are going to

3    be arrested, are they allowed to continue recording?

4    A    Not after they've been -- you know, it's been determined

5    they are going to be arrested.  Now, this pertains to

6    bystanders.

7    Q    Okay.

8    A    Once you're going to be arrested, you -- you know, you

9    are given commands.  Now, if it doesn't interfere with the

10   commands you're given, they can record until that time.

11   Q    I'm going to direct your attention to the second page of

12   three of this special order, paragraph (B)(2).  Is that where

13   you're talking about the bystanders?

14   A    Yes, sir.

15   Q    Okay.  It says, as a result, officers must understand

16   that any bystander has an absolute right to photograph and/or

17   video record the enforcement actions of any police officer so

18   long as the bystanders do not take a number of actions; right?

19   A    That's correct.  Yes, sir.

20   Q    And so the folks who were arrested on Sunday night,

21   Sunday, September 17th -- were those people bystanders?

22   A    No, they were not.

23   Q    Why were they not bystanders?

24   A    They were being detained and arrested.  So they were no

25   longer free to leave.  They were arrestees.

53

1   Q    Regardless of whether they were recording?

2   A    That's correct.

3   Q    Regardless of whether they were media?

4   A    That's correct.

5   Q    Regardless of whether or not they say they were just

6   observers?

7   A    Again, that's correct.  They were taken into custody,

8   yes, sir.

9   Q    And I think we've talked -- we've talked a lot about the

10  dispersal orders and such.  Is there an applicable order that

11  deals with that as well?

12  A    Yes, sir.  It should be the very last section of 1-1.

13          MR. RELYS:  Permission to approach.

14          THE COURT:  You may.

15  Q    (By Mr. Relys) Lieutenant, I've handed you what's been

16  marked as Defendant's Exhibit C.  Would you identify that for

17  us?

18  A    Yes.

19  Q    Tell me if you recognize it.

20  A    I do.  It's Section XIII of Special Order 1-1.  It has to

21  do with the deployment of chemical munitions for crowd control

22  dispersal.

23          MR. RELYS:  Thank you.

24          At this time, I'd move for the admission of

25  Defendant's Exhibit C.

Timothy Sachs Direct Examination                           Volume 2

54

1          MR. ROTHERT:  No objection.

2          THE COURT:  Exhibit C is received into evidence.

3          And D also, I assume, you want in evidence?

4          MR. RELYS:  I did.  Thank you, Judge.

5          THE COURT:  Yeah.  So D is also received into

6    evidence.

7    Q    (By Mr. Relys) And, again, this is a two-page order.  So

8    I don't want you to read the whole thing to us, but could you

9    tell us, generally speaking, what -- what the special order --

10   Section XIII of Special Order 1-01 says about the use of

11   chemical munitions as to it being used to disperse crowds?

12   A    Yeah.  We can use chemical munitions to disperse crowds.

13   They are only to be used by tactical units, which would be my

14   SWAT unit.  It's the use of chemical agents, and, you know,

15   it's not to be used, you know, for the purpose of frightening

16   or punishing any individuals.  It's just to be used, you know,

17   to disperse them.

18   Q    And does this special order cover the use of handheld

19   pepper spray?

20   A    Yes.

21   Q    Handheld pepper spray?

22   A    I believe on the next page it says something about

23   sergeants being issued foggers.  Or, no, I'm sorry.  No, this

24   one doesn't.  It was -- it was in the -- the one you've

25   already admitted.

1    Q    Okay.

2    A    Yeah.  I'm sorry.

3    Q    So I'm going to ask you the question again.  I think --

4    does the -- this deals with dispersal of crowds; right?

5    A    Yes, it does.

6    Q    And does this -- "chemical agent equipment" is defined in

7    paragraph (A)?

8    A    Yes, sir, it is.

9    Q    Is handheld mace included in that definition?

10   A    No.  Oh, no, that is not.  No.

11   Q    Okay.

12   A    The foggers and the spray are not.  No.  This is just the

13   chemical munitions that my team uses.

14   Q    Okay.  And so paragraph (C) deals with restrictions on

15   deployment here; right?

16   A    That's correct.

17   Q    Those restrictions do not necessarily apply to the

18   handheld mace?

19   A    No, not at all.  This is -- this is for the munitions

20   that the tactical team uses.

21   Q    Okay.  And is this a -- is this the order that you follow

22   when you give the dispersal orders that we've been talking

23   about?

24   A    Yes, sir.  Yes, sir.

25   Q    To the best of your knowledge, has this order been

Case: 4:18-cv-00308-JCH   Doc. #:   126-4   Filed: 01/30/20   Page: 56 of 248 PageID #:
1366
Timothy Sachs Direct Examination                              Volume 2

56

1   followed throughout the police response to the unrest since

2   September 15th?

3   A    Yes, it has.

4   Q    Are you familiar with the *Templeton* settlement agreement?

5   A    Somewhat.  I've never read it, but I've heard people talk

6   about it, yes, sir.

7   Q    Subsection (C) of this special order, Defendant's Exhibit

8   C, makes reference to a settlement agreement in the U.S.

9   District Court.

10  A    Yes, it does.

11  Q    Is it your understanding that that's the *Templeton*

12  agreement?

13  A    Yes, it is.

14  Q    Or the *Templeton* case?

15  A    Yes, sir, it is.

16  Q    Okay.  So this was a special order that's been

17  implemented pursuant to that settlement agreement?

18  A    Yes, sir.

19  Q    Were you -- were you in the command of the tactical team

20  or the tactical units at the time of that agreement?

21  A    No, sir, I was not.

22  Q    When did you -- when did you -- tell us again.  I think

23  you told us yesterday morning, but when -- or yesterday

24  afternoon.  When were you -- when were you assigned or given

25  your current assignment?

1    A    February of 2016.  February 1st of 2016.

2    Q    Okay.  And when you were made -- when you were given your

3    current assignment, were you made aware of the *Templeton*

4    agreement?

5    A    Yes, I was.

6    Q    And were you made aware of the special order?

7    A    Yes, I was.

8    Q    And have you -- have you, in your capacity as commander

9    of the tactical units for the St. Louis Metropolitan Police

10   Department, made it your mission to follow this special order?

11   A    Yes, sir.

12            MR. RELYS:  I have no further questions at this time.

13            THE COURT:  Okay.  I think we'll take a 10-minute

14   recess.  So court will be in recess for 10 minutes.

15       (Court recessed from 1:05 p.m. until 1:16 p.m.)

16            THE COURT:  You can resume the stand.

17            All right.  You may cross-examine.

18                       CROSS-EXAMINATION

19   BY MR. ROTHERT:

20   Q    Good afternoon, sir.

21   A    Good afternoon.

22   Q    You mentioned that St. Louis County Police and, I think,

23   Missouri Highway Patrol have been involved in activities in

24   the city since the 15th.  Is that right?

25   A    Yes, sir.

1   Q    Yes?

2   A    Yes, sir.

3   Q    And you said there's an agreement between -- amongst all

4   of you?

5   A    That's my understanding.  Yes, sir.

6   Q    Okay.  Do you know what that agreement is?

7   A    Oh, I do not, no.

8   Q    Okay.  Do you know who's in charge of St. Louis County

9   Police or Missouri Highway Patrol while they're operating in

10  the city of St. Louis?

11  A    I do not.

12  Q    You are not in charge of them?

13  A    No, I am not.

14  Q    CDP stands for what?

15  A    CDT?

16  Q    CDT.  Okay.

17  A    Civil Disobedience Team.

18  Q    Okay.  And what is civil disobedience?

19  A    It's any type of disobedience contrary to the laws and

20  accepted actions of people.

21  Q    Okay.  Have you ever heard of any use of civil

22  disobedience to -- in a nonthreatening way, or is civil

23  disobedience always threatening?

24  A    No.  It's -- I mean, again, demonstrations and nonviolent

25  protests are very viable, yes.

Timothy Sachs Cross-examination                                    Volume 2

59

1    Q    I'm talking about civil disobedience.  Do you think that

2    all protests are civil disobedience?

3    A    No, not at all is what I'm getting at.

4    Q    Right.

5    A    I guess civil disobedience would be where there is

6    criminal activity.

7    Q    Okay.  And is that violence only, or could it be

8    nonviolent?

9    A    No.  It could be nonviolent as much as, you know, failing

10   to allow traffic through, impeding the flow of traffic.  That

11   doesn't have to be violent, but, again, it's civil

12   disobedience, and it's against the law.

13   Q    Very well.  And the civil -- the folks -- you're familiar

14   with the term "riot gear"; correct?  Do you know what I mean

15   when I'm saying "riot gear"?

16   A    I assume you're referring to the protective gear that the

17   officers wear.

18   Q    Well, not every officer.  If you're -- I'm talking about

19   like masks and shin guards and long sticks.

20   A    That's a protective gear that the officers are issued,

21   yes.

22   Q    Okay.  Do all officers wear that?

23   A    The officers that are trained with it and assigned to the

24   CDT teams, yes.

25   Q    Okay.  So would it be fair to call that CDT protective

Timothy Sachs Cross-examination                        Volume 2

                                                              60

1   gear?  Is that -- I want to know what to call that.

2   A    Yes.  I mean that's what you -- I didn't hear you.

3   Q    Oh.

4   A    Protective gear?

5   Q    CDT protective gear -- would that be a fair --

6   A    Yes, yeah.

7   Q    -- thing to call that?

8   A    Yes.

9   Q    And does --

10        THE COURT:  Hold on a second.  Can you move your

11   chair up a little closer to the --

12        THE WITNESS:  Yes, ma'am.  I'm sorry.

13        THE COURT:  Thank you.  Go ahead.

14   Q    (By Mr. Rothert) Does that team wear the CDT protective

15   gear whenever it goes out?

16   A    No, it does not.

17   Q    Yesterday, you indicated that the use of chemical

18   munitions is sometimes a de-escalating tactic.  Is that

19   correct?  Do I understand that correctly?

20   A    I don't believe you understood correctly.

21   Q    Okay.  Could you explain to me what role chemical

22   munitions might play in --

23   A    That is more of a dispersal than de-escalation.

24   Q    So you would agree that the use of chemical munitions

25   does not de-escalate situations; correct?

1   A    I don't know that I could arbitrarily say that either.

2   Q    Well, how about instead of "arbitrarily," in your

3   experience, have you ever seen the use of chemical munitions

4   de-escalate?

5   A    In my experience, no, sir, I have not.

6   Q    Did you watch any of the videos that have been submitted

7   in evidence in this case or with the preliminary injunction

8   papers?

9   A    I'm -- I have watched videos.  I don't know what has been

10  submitted.

11  Q    Okay.  And in those videos you watched, did you see any

12  violations of -- in your view -- of any police department

13  policies regarding the use of force or --

14  A    No, sir.

15  Q    -- the use of pepper spray?

16  A    No, sir.

17  Q    Okay.  What's your understanding of when an assembly can

18  be declared or made unlawful?

19  A    I don't believe there is any line in the sand, if you

20  would.  It all depends on the actions of the people involved

21  in it.

22  Q    Okay.  So what actions -- well, who decides, first of

23  all, that an assembly is unlawful?

24  A    It's usually -- you know, it can be the officers on the

25  scene, okay, the immediate officers there, or it can go all

1    the way up to the incident commander.

2    Q    Okay.  And is that just in their discretion to decide

3    when an assembly becomes unlawful?

4    A    It depends on the actions, again, of what the officers

5    are observing or they're being told has happened.

6    Q    Okay.  So is --

7          THE COURT:  Is it your testimony there's no guidance

8    or rules; it's just whatever a particular person thinks is

9    unlawful?

10          THE WITNESS:  There is nothing written.  That's

11    correct, Judge.

12          THE COURT:  So any individual police officer at any

13    point can just say, "In my opinion, this is unlawful"?

14    There's no rules?

15          THE WITNESS:  That's correct.

16          THE COURT:  Okay.

17    Q    (By Mr. Rothert) And when an unlawful assembly is

18    determined, is it everyone who's in the assembly that's part

19    of an unlawful assembly is your understanding?

20    A    No.  It depends, again, on the individual's

21    participation.

22    Q    Okay.  Tell me what their participation has to be so that

23    they would be part of an unlawful assembly.

24    A    It would just be active participation in whoever decides

25    in their opinion that they are part of that group.

Timothy Sachs Cross-examination                          Volume 2

63

1    Q    Okay.  And when you say "whoever decides," is that a

2    police officer that makes that decision?

3    A    In my -- in my world or in my realm, yes, it's a police

4    officer that makes that decision.

5    Q    Turning your attention to September 17th, you indicated

6    somewhat passively that -- a passive voice -- that windows

7    were broken and property damage was done around 8:30 or 8:00

8    or 8:30 p.m.  Is that your understanding?

9    A    Yes, sir.

10   Q    Okay.  And where was that property damage?  Where in the

11   downtown area?

12   A    I believe it was on Locust and Olive.  Again, I didn't go

13   into the downtown area.

14   Q    Okay.  Now, Locust and Olive are parallel streets;

15   correct?

16   A    Yes.

17   Q    Okay.  Do you know -- do you have any idea on what cross

18   street there was damage?

19   A    I do not, no.

20          THE COURT:  So somewhere along Locust and Olive?

21   Olive goes all the way out to the park.

22          THE WITNESS:  Well, I mean -- well, it was east of

23   Tucker.  I know that.

24          THE COURT:  Okay.  Thank you.

25          THE WITNESS:  It was in the down -- yeah, the

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 64 of 248 PageID #:
4514
Timothy Sachs Cross-examination                              Volume 2

64

1    immediate downtown area east of Tucker.

2    Q    (By Mr. Rothert) Okay.  And how far do Locust and Olive

3    go east?

4    A    Broadway.

5    Q    Broadway.  Okay.  And how many blocks do you think there

6    are between Broadway and Tucker?

7    A    Eight.  I'm sorry.  You meant Broadway and Tucker;

8    correct?

9    Q    Yes.

10   A    Yeah, about eight.  Yeah, about eight blocks.

11   Q    Okay.  And between Washington and Olive, how many blocks

12   is that?

13   A    Four, I believe.

14   Q    So you mentioned that windows were broken.  Potted plant.

15   The people who did that -- they were arrested, weren't they?

16   A    I do not know.

17   Q    Okay.  And that was around 8:00 or 8:30?

18   A    That's correct.

19   Q    Are you aware of any property damage that happened after

20   8:30 on September 17th in the downtown area?

21   A    No, I'm not.

22   Q    Now, later that evening, at -- well, you said Olive and

23   Tucker by the bank.  Is that the Bank of America that's --

24   that you're talking about or --

25   A    I would have to look.  I know it's a bank, and I think it

Timothy Sachs Cross-examination                         Volume 2

65

1   is.  It's red and blue signage.  So I think it's the Bank of

2   America.

3   Q    Okay.  There was a dispersal order given there; correct?

4   A    Yes.

5   Q    And that was at your direction?

6   A    That's correct.

7   Q    And what time was that?

8   A    For an exact time, I'd have to look at the radio tapes.

9   It was somewhere between 8:00 and 9:00.

10  Q    Okay.  Was it before or after the property damage had

11  been done that you said happened between 8:00 and 8:30?

12  A    Directly after.

13  Q    Okay.  So it was after 8:30 but before 9:00?

14  A    Again, I'd have to look at the radio tapes to give you an

15  exact time, but yes.

16  Q    And you don't know how far away from the property damage

17  Olive and Tucker is because you don't know where the property

18  damage is?

19  A    They were on those streets, but, no, I do not know the

20  addresses of the buildings or the --

21  Q    What was your basis for ordering people to disperse?

22  A    Because of the damage and the groups not leaving the area

23  and then them wearing facial coverings to keep their

24  identities hidden, putting on equipment that would prevent or

25  provoke us to use some type of chemical.

1    Q     Now, surely no one could provoke you to use chemicals by

2    wearing something, could they?

3    A     Yes.

4    Q     Okay.  As far as you know, the people who had broken the

5    windows were already arrested; right?

6    A     No.  I told you before I did not know that.

7    Q     You don't know either way?

8    A     That's correct.

9    Q     All right.  And do you know how many people were involved

10   in breaking windows somewhere around Olive and Locust?

11   A     I do not.

12   Q     Okay.  So there's a group of people at Olive and Tucker.

13   How large is that group?

14   A     When they came across the street, 20 to -- 20 to 40, 45.

15   There was a large group of them.  Yes, sir.

16   Q     Twenty to 45 is a -- is a pretty big range.  Do you have

17   a -- can you pinpoint it any better than that?

18   A     No.

19   Q     All right.  So you believe some of them may have been

20   involved in --

21   A     Yes.

22   Q     -- the window breaking?  Okay.  And facial covering --

23   can you think of any reason why anyone around the police in

24   St. Louis might carry a facial covering with them other than

25   to hide their identity?

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 67 of 248 PageID #:
4517
Timothy Sachs Cross-examination                              Volume 2

67

1  A    The only folks that I would think of right away would be

2  folks for their religious reasons.

3  Q    Uh-huh.  Any other reasons?

4  A    Not in this weather, no.

5  Q    Okay.  Now, members of the media regularly wear masks

6  when they come around protests, don't they?

7  A    I'm not sure about that.

8  Q    Okay.  And people carry backpacks around St. Louis?

9  A    Yes.

10  Q    Okay.  And that's a pretty ordinary thing to happen?

11  A    To the extent that under different circumstances it would

12  be, but what we had experienced in the days prior, it led us

13  to believe that there was something other than a normal

14  carrying of a backpack, yes.

15  Q    Okay.  So based on what had happened days ago, you were

16  worried about people carrying backpacks?

17  A    Just in the last 48 hours of this incident, yes.  Not

18  days ago, but 48 hours, yeah.

19  Q    Okay.  How many days is 48 hours?

20  A    Two.

21  Q    All right.  Now, you testified that people were dressed

22  in a way that they were looking for a confrontation.  Is

23  that -- is that accurate?

24  A    No, it's not.

25  Q    You did not say that?  Okay.

1    A    No.  Your statement was not accurate.

2    Q    Okay.  Tell me what you said about people looking or

3    appearing or dressed like they might want a confrontation.

4    A    I said when they put on masks and goggles after they see

5    the police, that would lead me in that direction, and that is

6    just one item.

7    Q    Okay.  Now, when -- when these folks were putting on

8    goggles and masks, you say -- how many of them were putting on

9    goggles and masks?

10   A    I don't have an exact number.  There were four or five

11   that I saw personally.

12   Q    Okay.  Out of up to 45?

13   A    Correct.

14   Q    Were any of the police officers around wearing any masks

15   or helmets?

16   A    Helmets, yes.  Masks, no.

17   Q    Were those helmets indicating that they were looking for

18   a confrontation?

19   A    I couldn't answer that for you.

20   Q    Okay.  Now, you're not aware of any property damage

21   happening in downtown St. Louis after that 8:00 to 8:30, are

22   you?

23   A    No, I am not.

24   Q    So the final dispersement warning -- you authorized that

25   dispersal too?

1    A    I did not.

2    Q    Okay.  Who authorized -- it was your idea -- this kettle

3    thing; right?

4    A    Again, I don't know what you're referring to.  What my

5    idea --

6    Q    Have you ever heard of the term "kettle"?

7    A    Not until the day after when I saw it in the paper.

8    Q    Okay.  What's your understanding of what a kettle would

9    be?

10   A    A kettle is something that you put food in.

11   Q    Okay.  Do you have any other understandings related to

12   law enforcement?

13        THE COURT:  Well, are you just asking him what he

14   read in the paper?  He just said he never heard it before he

15   read it in the paper.

16        MR. ROTHERT:  Well --

17        THE COURT:  I mean, can you call it something else so

18   we don't waste time going over --

19        MR. ROTHERT:  Well, that's what I'm trying to do.  If

20   we could agree on the definition.

21        THE COURT:  So in all your years in law enforcement,

22   until you read it in the paper the day after this incident,

23   you'd never heard the term?

24        THE WITNESS:  That's correct, Judge.

25        THE COURT:  Okay.  Now let's just go on and call it

1    something else and ask him about what happened.

2    Q    (By Mr. Rothert) The tactic that was used of coming in

3    all directions and around the group that hadn't dispersed, you

4    say --

5    A    Yes.

6    Q    -- does that tactic have a name?

7    A    No.

8    Q    Okay.  Had you ever used it before?

9    A    I had not had to use it, no.

10   Q    Okay.  But did you just come up with that idea that

11   night?

12   A    You're going to have to help me.  What idea?

13   Q    The idea of coming at a group from all four sides and

14   locking them in and making a mass arrest.

15   A    Preventing people from escaping or leaving the area once

16   we determined that was based on the geographical area.  That's

17   why we struck lines in the four -- the four corners, if you

18   would.

19   Q    Okay.  Can we just call that striking lines in the four

20   corners?  You know what I'm talking about if I say that?

21   A    If you want to refer to it as that, yes, then I can

22   relate to that, yes.

23   Q    Okay.  The final dispersement announcement before you

24   struck the line in the four corners occurred where?

25   A    I believe it was just south of Washington on Tucker,

Timothy Sachs Cross-examination                              Volume 2

71

1    between Locust and Washington.

2    Q    And where you were, you couldn't understand what the

3    dispersal order said; right?

4    A    You're correct, yes.

5    Q    You could hear it, but you couldn't understand?

6    A    You're correct.

7    Q    And that was actually at 10:50 p.m.?

8    A    The final dispersal was at 2301.

9    Q    And who gave the final order?

10   A    Sergeant Rossomanno.

11   Q    Who was the incident commander?

12   A    The incident commander would have been Colonel Leyshock,

13   Gerald Leyshock.

14   Q    Okay.  So is it possible he gave that final order --

15   Mr. Leyshock?

16   A    No.

17   Q    So if Mr. Rossomanno states that he gave a dispersal

18   order, the last one he gave was at 10:50, would you believe

19   him if he said that under oath?

20   A    I would believe he gave one then if he told me.

21   Q    Okay.

22   A    But I have radio documentation that there was one given

23   at 2301.  So I don't know what his recollection was.

24          THE COURT:  Well, let me ask you this.

25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  Did you have that radio documentation

2    when you signed the affidavit you filed in this case last

3    week?

4          THE WITNESS:  No, ma'am.  I got that afterwards.

5          THE COURT:  Okay.  So when you said in there that it

6    was at 10:50, you were mistaken?

7          THE WITNESS:  That was the last I knew when I signed

8    the document, yes, ma'am.

9          THE COURT:  And so since then, what did you find out?

10         THE WITNESS:  That there was orders given after that

11   and the final order was given at 2301.

12         THE COURT:  All right.  Please proceed.

13   Q    (By Mr. Rothert) And what was the basis for dispersal at

14   that time, at 11:01 p.m.?

15   A    That the people were not leaving the area and they were

16   still blocking the streets.

17   Q    Okay.  So, first of all, your testimony is that they were

18   blocking the streets; is that right?

19   A    Correct.

20   Q    And by blocking the streets, what do you mean?

21   A    Standing in the street, laying in the streets, not

22   allowing traffic through.

23   Q    Okay.  So traffic was not being allowed through because

24   of people in the streets?

25   A    Because of people in the streets, the police department

Case: 4:18-cv-00308-JCH  Doc. #:  126-4   Filed: 01/30/20  Page: 73 of 248 PageID #:
4523
Timothy Sachs Cross-examination                              Volume 2

73

1    put vehicles to prevent them from being run over, but they

2    were the cause of that.  So the streets were blocked by them

3    and not allowing vehicular traffic through.

4    Q     Now, streets are regularly blocked by protest activity in

5    the city of St. Louis; correct?  That's a regular thing that

6    happens?

7    A     On occasion.  I mean I wouldn't say regularly.  I don't

8    know.  I don't go to every one of the protests.  I don't know.

9    Q     Okay.  But you've been to protests that block the street?

10   A     Yes.  Correct.

11   Q     And where people are marching in a street, for instance?

12   A     Yes.

13   Q     And when does that become illegal?

14   A     Actually, it's illegal right away.

15   Q     Okay.  Who decides that it's illegal?

16   A     I believe it's a state statute or the city ordinance

17   violations that indicate that they're in violation of that.

18   Q     All right.  So who decides when -- when someone's going

19   to be arrested for being in the street if there's a protest

20   that's in the street?

21   A     It would be the incident commander.

22   Q     Okay.  Is it just at their discretion?

23   A     As far as I know, yes.

24   Q     So you agree there was no destruction of property

25   happening when Mr. Rossomanno gave his last announcement?  No

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 74 of 248 PageID #:
4521
Timothy Sachs Cross-examination                          Volume 2

74

1   matter what time it was, you agree that there was no

2   destruction of property occurring at that time?

3   A    I can't say that, no, sir.

4   Q    Well, you're aware of none?

5   A    That's correct.

6   Q    And your understanding -- well, let's move on from there.

7   How much time passed from when the final announcement was made

8   until people were locked in by the four lines of police lines?

9   A    Nineteen minutes approximately.

10  Q    So you know that people came into that area after -- came

11  into the area that was blocked off after the last announcement

12  had been made; right?

13  A    I do not know that, no.

14  Q    Well, were you looking to see if that happened?

15  A    I was not in a position to do that.  No.

16  Q    Was there any step taken to make sure that no one entered

17  the zone after the announcement was made?

18  A    Officers were not allowed to let anyone pass from behind

19  them.

20  Q    Okay.  But they weren't blocking the streets?  Before

21  they blocked the streets, before they went in place, how long

22  was it before they were in place?

23  A    Okay.  I had different lines in place at different -- you

24  have to help me here.

25  Q    Okay.  So it was possible for people to enter into the

1   area after the last dispersal order and be locked in; isn't

2   that true?

3   A    I would -- I would say yes because there was still egress

4   allowed.  So I guess they were allowed ingress.  We weren't

5   controlling egress or ingress at the time.

6        THE COURT:  So when did you actually start

7   controlling it from different directions?  You said earlier

8   that to the east you had the bicycle people there.

9        THE WITNESS:  Right.  Yes, ma'am.

10        THE COURT:  So when were they not letting anybody go

11   east?  What time?

12        THE WITNESS:  Oh, that was well before 11:00 where

13   they couldn't go east.

14        THE COURT:  When did they stop letting people go

15   north?

16        THE WITNESS:  That was approximately -- north and

17   south was approximately quarter after.  And the egress to east

18   and west or egress west was still open until about 20 after,

19   and --

20        THE COURT:  And do you have records that show this,

21   where you're getting these precise numbers, or is it your

22   memory?

23        THE WITNESS:  It's my memory based on the radio

24   transmissions, Judge.

25        THE COURT:  Okay.

1        THE WITNESS:  The radio transmissions are

2   timestamped, and based on that, that's how I was coming up

3   with the times for you.

4        THE COURT:  Okay.  So if I understand what you said,

5   so they couldn't go east after 11:00, but up until 11:15, they

6   could have gone north and south?

7        THE WITNESS:  That's correct or west on Washington.

8        THE COURT:  Or west?

9        THE WITNESS:  Yes, ma'am.

10       THE COURT:  And then it was only at 11:20 when they

11  couldn't go anywhere?

12       THE WITNESS:  Yes, ma'am.

13       THE COURT:  And the last order was 11:01?

14       THE WITNESS:  That's correct.

15       THE COURT:  Okay.

16  Q    (By Mr. Rothert) So you knew you were arresting, causing

17  the arrest of people who had committed no crime; correct?

18  A    No.

19  Q    When Central Patrol pushed -- pushed the crowd, people

20  off St. Charles -- you testified about that; do you remember?

21  A    I do.

22  Q    Where were they pushed to?

23  A    I observed nobody come off of St. Charles Avenue.

24  Q    Oh, so when you said they cleared St. Charles, they

25  cleared nothing or they just made sure no one was there?

1    A    Made sure no one was there.  They were trying to, but I

2    didn't see anyone come off of St. Charles Avenue.

3    Q    You testified that you'd "left an egress as long as we

4    could."  Why did -- at what point did you decide to cut off an

5    egress?

6    A    Whenever the team made it up there and they were actually

7    in place.  It was not my idea, okay, at this particular minute

8    of the day we would stop the egress.  It's when the team

9    actually got there and got into place, moved up, and were able

10   to establish their line.

11   Q    Okay.  And why did you choose to cut off egress after

12   that?

13   A    Well, of the people that were not leaving the area, and

14   they were going to be arrested.

15   Q    Well, I'm asking why didn't you -- once you have everyone

16   blocked in, why didn't you let people leave?

17   A    Because they're under arrest.  We're not going to chase

18   people around.  Once we've determined that these were the

19   people that were going to be detained and taken into custody,

20   we're not going to allow people to escape or leave.

21   Q    Well, all right.  Then why did you decide that at that

22   time that would be the time at which you would arrest everyone

23   and not allow anyone else egress?

24   A    Once again, that was the time that I finally was able to

25   get a team in place after we had cleared the other areas.

Timothy Sachs Cross-examination                           Volume 2

78

1    Q    Okay.  But you could have -- you could have said, "Okay.

2    Now we're here.  We're on all four sides.  You're ordered to

3    disperse.  If you don't want to be arrested, disperse."  You

4    could have done that?

5    A    No.  We were -- at that time, the people were going to be

6    detained and taken into custody.

7    Q    Okay.  I understand that you decided that.

8    A    Correct.

9    Q    But you could have decided not to take them into custody

10   and to give people a chance to leave; correct?

11   A    They'd had a chance to leave all evening.

12   Q    So when do you think people should have left?

13   A    My opinion is when they got the first dispersal order.

14   Q    And when was that?

15   A    I don't know when each one of them received that.

16   Q    Just the first one.

17   A    I don't know.  I couldn't give you an exact time.

18        THE COURT:  Well, you testified there was one at

19   8:30.

20        THE WITNESS:  Yes, ma'am.

21        THE COURT:  So you're saying everybody should have

22   left the entire downtown area at 8:30 or otherwise they were

23   subject to arrest?  I mean there has to be some line.  We're

24   just trying to find out what it is.

25        THE WITNESS:  Yeah.  No. I understand, Judge.  No.

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 79 of 248 PageID #:
1529
Timothy Sachs Cross-examination                                    Volume 2

79

1   At that time, the groups that were there, you know, they were

2   being asked to leave about 8:30 because of all the damage.  I

3   would have preferred they left then, but they obviously

4   didn't.

5          THE COURT:  But as far as you're concerned, you could

6   have arrested everybody there who had just moved to a

7   different place in downtown because what you told them was get

8   completely out of downtown or get completely out of the city?

9   Again, I'm trying to understand these limits.

10         THE WITNESS:  And there was nothing that says, hey,

11  move to this block or move six blocks away.  It was just leave

12  the area.  So had they left the area, we wouldn't have had any

13  interaction with them is what I'm trying to explain to you.

14         THE COURT:  Okay.  So if they left the area and moved

15  to Washington and Tucker, you wouldn't have arrested them for

16  disobeying the 8:30 order?  Or would you?

17         THE WITNESS:  Again, they -- it depends on what --

18  they were congregating up there.  They've only moved three or

19  four blocks.  They haven't left the area, per se, as far as I

20  was concerned.  We still have concerns about people filtering

21  back into downtown and causing more damage or anything else

22  happening.

23         THE COURT:  But you didn't arrest them for three

24  hours.

25         THE WITNESS:  That group, no, ma'am, we did not.

Timothy Sachs Cross-examination                          Volume 2

                                                                    80

1              THE COURT:  But you're -- what you're saying is you

2    could have because you told them to leave the area --

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  -- and three blocks is not enough?

5              THE WITNESS:  That's correct.  Yes, ma'am.

6              THE COURT:  Okay.  So what if they had gone two more

7    blocks?  Would that have been enough?

8              THE WITNESS:  I don't -- I couldn't give you what is

9    enough.  I don't know.  If there is no longer problems,

10   they're not congregating, they're not doing things that would

11   lead us to believe that there could be more damage or other

12   incidents happening, but I don't have a script.  I couldn't

13   tell you exactly how far would be enough.  No, ma'am.

14             THE COURT:  Okay.  Thank you.  Sorry.

15   Q    (By Mr. Rothert) How is a person on the street supposed

16   to know how far is enough if you don't know?

17   A    I don't know.

18   Q    And when you're -- when someone's ordered to disperse,

19   how long until they can come back?

20   A    Again, I have no script.  I don't know what that would

21   mean.

22   Q    So when you're enforcing a dispersal order, you know, you

23   feel like you can enforce that hours later?

24   A    Depending, again, on the group involved, what they're

25   doing, you know, their actions, the area they're in.

Timothy Sachs Cross-examination                                    Volume 2

81

1    Q     Now, an unlawful assembly in the city of St. Louis and in

2    the state of Missouri -- you would agree that that requires a

3    crime of violence or force to be happening; right?

4    A     No.  Criminal activity.

5    Q     Just any kind of criminal activity is your understanding?

6    A     Yes.

7    Q     And is that how -- it's the policy of the St. Louis

8    Metropolitan Police Department to enforce unlawful assemblies

9    if there's any criminal activity?

10         MR. RELYS:  Objection.  Foundation.

11         THE COURT:  Overruled.

12   Q     (By Mr. Rothert) Or the custom?

13   A     Could you ask again please, if you don't mind?

14   Q     Is it the custom or policy of the St. Louis Metropolitan

15   Police Department to declare an unlawful assembly and order a

16   dispersal if there's any criminal activity at all, even

17   nonviolent?

18   A     It depends on what the activity is.  If it's just

19   blocking a street, if they're blocking a street like I, you

20   know, explained earlier in front of a hospital or a fire

21   department or anything like that, yes.  It all depends on the

22   activity that's involved.

23   Q     Okay.  If there's any criminal activity, a police officer

24   has discretion to declare an unlawful assembly and order a

25   dispersal?

1  A    Yes.  Now, again, they have to be able to articulate

2  their reasoning behind it, but yes.

3  Q    You indicated that one reason why increased force might

4  be used is belligerence by an arrestee or -- do you remember

5  saying that?

6  A    Noncompliance.

7  Q    You used the word "belligerence," though, didn't you?

8  A    I would have to have it read back if I did.  Yeah, I used

9  that word, but it's more noncompliance than it is -- I can be

10 belligerent to you, but if I'm still, again, doing what I'm

11 asked to do, I can be belligerent and it's not an issue.  It's

12 noncompliance is where we come into problems.

13 Q    You testified about the policy that was put in place

14 after the *Templeton* case; correct?  You understand which

15 policy I'm talking about?

16 A    Refresh again for me which one you're talking about.

17 Q    It is Exhibit --

18        THE COURT:  Are you talking about recording?  Give

19 him a --

20        MR. ROTHERT:  No.

21        THE COURT:  -- topic or something else.

22        MR. ROTHERT:  The use of chemical munitions for --

23        THE COURT:  Ah, chemical munitions.

24        MR. ROTHERT:  -- dispersal purposes.

25        THE WITNESS:  Okay.

Timothy Sachs Cross-examination                        Volume 2

83

1    Q    (By Mr. Rothert) Does that apply to the use of inert

2    smoke?

3    A    Yes.

4    Q    Okay.  Pepper spray?

5    A    Which type of pepper spray?

6    Q    Well, what types of pepper spray are there?

7    A    There are the officer-assigned; it's a stream pepper

8    spray.  And then there's a chemical or not a chemical but the

9    OC fogger.

10   Q    Is the actual liquid -- or is it liquid -- pepper spray?

11   A    Yes.  Yes, it is.

12   Q    Okay.  Is the liquid the same in both of those devices?

13   A    Yes, they are.

14   Q    Okay.  So I'll ask you about both devices then.

15   A    Okay.

16   Q    What about the fogger?  Is that covered?

17   A    Yes.  There's a line in there about the fogger.  Yes.

18   Q    Okay.  And how -- how else might there be pepper spray?

19   A    The individual officer has the ability to deploy pepper

20   spray on individuals they come into contact with.

21   Q    Okay.  Are they allowed to use that to disperse crowds?

22   A    In exigent circumstances, sure.

23   Q    In non-exigent circumstances?

24   A    I don't know that that would be feasible.

25   Q    Just asking if it's allowed under the policy.

1    A    There's no restriction for it.

2    Q    Is OC spray covered under the policy for chemicals used

3    for dispersal?

4    A    Which OC spray?

5    Q    Okay.  Well, tell me what kinds there are.

6    A    The fogger and the personal.

7    Q    If you could, how about the fogger?

8    A    Yes.

9    Q    Personal?

10   A    No, that's not addressed in the chemical munitions.

11   Q    And what about mace?

12   A    That's the same thing.

13   Q    Same thing as what?

14   A    The personal spray.

15   Q    Personal OC spray?

16   A    Well, actually, mace is a generic term that can be used

17   for either of them.

18   Q    Okay.

19        THE COURT:  And that's all the same?  That's also

20   pepper spray; right?

21        THE WITNESS:  Yes, ma'am.  It's all --

22        THE COURT:  It's all the same thing?

23        THE WITNESS:  Yes.

24        THE COURT:  There's only one thing?

25        THE WITNESS:  Yes, ma'am, it is.

1          THE COURT:  Yeah.  Okay.

2          THE WITNESS:  It's just the method of how it's

3   dispersed.

4   Q    (By Mr. Rothert) And what about PepperBalls?

5   A    Okay.  That is -- has liquid inside of the ball that's

6   actually deployed from an air gun.

7   Q    Okay.  Is it the same liquid that's in --

8   A    Yes, it is.  Yep.

9   Q    Okay.  And is that covered by the policy on the use of

10  chemical agents for dispersal?

11  A    Yes.  Chemical munitions, it is.

12  Q    And do you have -- can you explain why the same chemicals

13  are or are not included under the policy based on their method

14  of delivery?

15       If you know.

16  A    I'm trying to -- I'm trying to understand what you're

17  talking about "their method of delivery."

18  Q    Well --

19  A    Help me here.

20  Q    Okay.  If it's a personal OC spray of an officer --

21  A    Okay.

22  Q    -- it's not covered by the policy; is that right?

23  A    The chemical munitions policy, correct.

24  Q    Okay.  If it's a fogger OC spray, it is covered by the

25  chemical munitions policy; correct?

1    A    Yes.

2    Q    So why is one included and not the other, if you know?

3    A    I don't know the reasoning behind it or who wrote that,

4    but it's the same -- it's the same elements, the same liquid

5    in both of them.

6    Q    Now, how many of the I/LEADS reports for the use of

7    pepper mace that have been completed since September 15th have

8    you reviewed?

9    A    I've reviewed personally three.

10   Q    Okay.  And what is an I/LEADS report?

11   A    It's an incident report.

12   Q    Okay.  And how many -- do you know how many have been

13   completed regarding the use of mace since September 15th in

14   the city?

15   A    No, sir, I do not.

16   Q    Okay.  But you've only seen three?

17   A    I've reviewed three of them.  Yes, sir.

18   Q    And those have to be completed every time mace is used

19   against a person; correct?

20   A    Yes.

21   Q    And are they completed every time mace is used against a

22   person?

23   A    As far as I know, yes, sir.

24   Q    All right.  How many -- you were in charge September 15th

25   downtown?  You were one of the people in charge; right?

1   A    Of the tactical unit, but yes.

2   Q    All right.  And you know that pepper spray, pepper mace

3   was used against people downtown on the 15th?

4   A    Yes.

5   Q    Do you have any idea how many people it was used against?

6   A    I do not.  No, I do not.

7   Q    But more than 10; right?

8   A    I just explained I don't know how many.

9   Q    You don't have -- and how many reports, I/LEADS reports

10  from the use of pepper spray that day have you reviewed?

11  A    Just one.  But there's a caveat to that.  Individual

12  usages can be covered in one incident report.

13  Q    Okay.

14  A    So it doesn't have to be one report for each individual

15  involved.

16  Q    All right.  So the one you reviewed -- how many

17  individuals did that involve?

18  A    I don't recall.

19  Q    And the other two you used or you reviewed -- what were

20  they?  What incidents were they from?

21  A    The -- it would have been the incident at what we called

22  Waterman and Lake.

23  Q    Okay.

24  A    And then the arrest incident.

25  Q    On the 17th?

1    A    At, yeah, Washington and Tucker.

2    Q    The arrest incident at Washington and Tucker, that

3    I/LEADS report for the use of pepper spray -- how many people

4    did that indicate pepper spray had been used against?

5    A    I don't know, sir.

6    Q    But you reviewed that report?

7    A    I did.

8    Q    And do you remember if it was one or more than one?

9    A    I can tell you there was more than one.

10   Q    All right.  Now, after the four lines were, on the 17th,

11   at the four corners around Washington and Tucker, what were

12   people ordered to do -- the people being arrested?

13   A    To lay on the ground, put their hands behind their backs.

14   Q    Now, there were also orders to sit down; correct?

15   A    I didn't hear those.

16   Q    Okay.  So if you testified earlier that there were orders

17   to sit down, were you mistaken or --

18   A    Let me back up.  They were ordered to sit down and then

19   lay down.

20   Q    Okay.  Now, when you were testifying, at first, you

21   indicated two people were not complying, two people were

22   standing up.  Is that -- is that right?  Is that accurate?

23   A    That was the incident I saw where there were -- there was

24   a fogger deployed.

25   Q    Later, you testified that several people were not

Timothy Sachs Cross-examination                              Volume 2

89

1    complying.  Is that different from the two people that were

2    standing up?

3    A    I don't know if those two people were involved in that,

4    but that's the information that I had received.

5    Q    You have no personal knowledge of people not complying?

6    A    That'd be accurate, yes.

7    Q    And you understand that police officers used excessive

8    force that night on people who were caught in those four

9    lines?

10   A    Absolutely not.

11   Q    None?

12   A    No, sir.  I would have had to take action if I seen any

13   excessive force.  I didn't see anything like that.

14   Q    Did you later learn of excessive force?

15   A    Absolutely not.

16   Q    So you've taken no action?

17   A    What type of action?

18   Q    Well, I mean, you said you'd have to take action if you

19   saw excessive force.  You haven't done anything about

20   excessive use of force by police officers?

21   A    You're correct.

22   Q    All right.

23   A    In this incident, you're correct.

24   Q    All right.  Why did Luther Hall have to go to the

25   hospital?

Timothy Sachs Cross-examination                          Volume 2

90

1   A    I don't know.

2   Q    Do you know who Luther Hall is?

3   A    He's a detective with the police department.  Yes.

4   Q    And isn't it true that he was undercover that evening,

5   September 17th?

6   A    I don't know that.

7   Q    Okay.  And isn't it true that he was caught in the four

8   lines with other -- with other individuals?

9   A    Again, I don't know that, no, sir.

10  Q    And isn't it true that he was severely beaten by a police

11  officer?

12  A    I don't know that either.

13  Q    Is it funny if he was?

14  A    I thought the way you presented it was, yes.  It was very

15  comical.

16  Q    Okay.

17       THE COURT:  And you haven't read in the paper that

18  that happened?  You said you read in the paper they called it

19  kettling.

20       THE WITNESS:  Yes, ma'am, but I don't know why Luther

21  went to the hospital.  I don't know what happened to him at

22  all, and I haven't made any inquiries.

23  Q    (By Mr. Rothert) Well, why haven't you made an inquiry?

24  A    The man doesn't work for me.

25  Q    Well, does it upset you at all that under something you

Timothy Sachs Cross-examination                          Volume 2

91

1   were overseeing a police officer was sent to the hospital?

2   A    Again, I wasn't even aware of that, but afterwards, you

3   know, I became aware that he had, but, no, I would have no

4   reason to make an inquiry.

5   Q    Why not?

6   A    The man doesn't work for me.

7   Q    Okay.  The allegation is that he was beat up by people

8   under your command; right?

9   A    Again, I'm not aware of that.  I'm not even aware there's

10  an allegation.

11  Q    So you've never heard of that?

12       This is news to you?

13  A    That there's an allegation?  You're correct.

14  Q    Now, it's quite common for people who have been sprayed

15  with pepper spray to have breathing difficulties; right?

16  A    Yes.

17  Q    And people were having breathing difficulties on the 15th

18  in the downtown area after they'd been sprayed with pepper

19  spray; correct?  You saw that?

20  A    I did not.

21  Q    On the evening of the 17th, after the people were

22  arrested in the four lines and had been sprayed with pepper

23  spray, you saw people having difficulty breathing because of

24  the pepper spray; right?

25  A    I did not.

Timothy Sachs Cross-examination                        Volume 2

92

```
1    Q    What would you have done if you had seen people having

2    difficulty breathing because of the pepper spray?

3    A    You remove them from the area, and you allow them to have

4    fresh air.

5    Q    Anything else?

6    A    Not at that time, no.

7    Q    You wouldn't call EMS immediately?

8    A    No.

9    Q    It is the policy -- in the use of pepper mace, it is the

10   police department's policy, is it not, that EMS should be

11   called immediately for medical assistance if an individual

12   exposed to pepper mace exhibits breathing difficulties?

13   A    If they exhibit continued breathing difficulties, yes.

14   Q    Continued?  Okay.

15   A    That's -- yeah.  Just because you're experiencing it

16   right off the -- right away, once you're taken to an area,

17   like it explains above that, and given fresh air and allowed

18   to get away from the mace itself, that should alleviate it.

19   If they have continued breathing difficulties after they've

20   been allowed to do that, then, yes, we would contact EMS.

21   Q    And does the policy -- does it say "continued," or does

22   it just say "breathing difficulties"?

23   A    I couldn't quote the policy.

24   Q    But the way it's enforced, it has to be continuing

25   difficulties?
```

1    A    It would be after that, the first step in the remedy to

2    alleviate any effects, yes.

3    Q    All right.  And that first step -- that goes for everyone

4    who's sprayed with pepper spray; right?  Not just people who

5    are having difficulty breathing?  Everyone's supposed to be

6    taken somewhere where they can wash off?

7    A    No.  Only if you're exhibiting any type of issues.

8    Q    So isn't it true that the policy of the St. Louis

9    Metropolitan Police Department is that an individual exposed

10   to pepper mace will be treated for an exposure as soon as he

11   or she becomes manageable according to the following

12   procedures?  The exposed individual should be taken to a

13   secure location and permitted to thoroughly wash his or her

14   face and eyes with cold water for several minutes to

15   neutralize the effects of the pepper mace.

16   A    If they're exhibiting --

17   Q    Is that the policy?

18   A    If they are exhibiting difficulties, yes.

19   Q    Oh, okay.  But the policy doesn't say "if they're

20   exhibiting difficulties"; it says anyone exposed; right?

21   A    Again, that's somewhat arbitrary.  I wouldn't take

22   someone who's not asking for it and make them put their face

23   in cold water or anything.

24   Q    What about people who were asking for it on the night of

25   the 17th?  Did you see any people asking for it?

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 94 of 248 PageID #: 1344
Timothy Sachs Redirect Examination                              Volume 2

94

1   A     I did not, no.

2   Q     The *Templeton* agreement that you referenced -- I know

3   you're not the most familiar with it, but is it your

4   understanding that it expires at some point, or do you know?

5   A     Oh, I don't know.

6           MR. ROTHERT:  I have no further questions.

7           THE COURT:  Redirect.

8                      REDIRECT EXAMINATION

9   BY MR. RELYS:

10  Q     Lieutenant, you were asked a few questions about the

11  incident in which -- around 8:00 or 9:00, on Tucker, on

12  September 17th, where you were marching with the Highway

13  Patrol.

14  A     Yes, sir.

15  Q     Do you recall that?  And you were talking a little bit or

16  you were asked a couple of questions about sort of the grounds

17  for the decision to order that particular group to disperse

18  and use chemical munitions.

19  A     Yes, sir.

20  Q     Okay.  And it was suggested to you on cross-examination

21  that you made the decision to or the decision was made to

22  authorize the use of chemical munitions based on what those

23  people were wearing.

24  A     Not just what they were wearing.  That was what I was

25  trying to articulate.  It was based on their actions, the

Timothy Sachs Redirect Examination                          Volume 2

95

1   direction they were coming from, their refusal to comply with

2   our direction, some of the gestures that they were making, the

3   overt "We're not going to comply with this."

4   Q    Okay.  And when you say the direction they were coming

5   from, they were coming from --

6   A    They were coming east.

7   Q    From the east to the west?

8   A    Correct.

9   Q    And you're not saying that -- you're not saying that

10  everyone wearing a backpack gets chemical munitions; right?

11  A    No, sir, not at all.

12  Q    And you're not saying that everyone who's traveling from

13  east to west gets chemical munitions, are you?

14  A    That's correct.

15  Q    Okay.  What was it about the fact that they were coming

16  from east to west in this particular instance that made

17  that -- that -- that that factored into your decision?

18  A    They were coming from the direction where there was

19  already criminal activity.  And that they were wearing or they

20  had stopped and were putting on some, you know, equipment or

21  clothing that would prevent anything from affecting them.  And

22  they were moving from, again, the east where all this was to

23  the west and then stopped and then would not disperse when we

24  asked them to and then went forward.

25  Q    Okay.  You were asked a couple of questions also about --

Timothy Sachs Redirect Examination                              Volume 2

96

1    about when it's appropriate for -- or who has authority and

2    when it's appropriate to declare an assembly unlawful;

3    correct?

4    A    Yes.

5    Q    Do you remember that?  And you said officers, any officer

6    has the discretion.

7    A    Yes, sir.

8    Q    In your experience, is it common for an officer, a

9    regular patrol officer, to declare an assembly unlawful?

10   A    I've never known that to happen, no, sir.

11   Q    But it's possible?

12   A    It's possible, yes, sir.

13   Q    And must there be some type of unlawful activity to

14   declare an assembly unlawful?

15   A    Yes.

16   Q    It's not just the whim of a patrol officer, let's say?

17   A    No, it's not.

18   Q    Okay.  And is there a difference between an unlawful

19   assembly of people, in your mind, and a crowd where

20   identifiable individuals are behaving unlawfully?

21   A    Yes.

22   Q    Okay.  Tell us what the difference is in your mind.

23   A    Again, an assembly of people is just they're assembling

24   for a purpose or a reason.  You know, when we can articulate

25   individuals that have been involved in criminal activity, then

Timothy Sachs Redirect Examination                    Volume 2

97

1    these are the people that we would like to take into custody.

2    Q    But if it's an entire --

3              THE COURT:  Okay.  Well, here's -- his question was,

4    "Is there a difference between an unlawful assembly of people,

5    in your mind, and a crowd where identifiable individuals are

6    behaving unlawfully?"  And you said, "Yes."  And so what's the

7    difference between an unlawful assembly and a crowd where

8    there are identifiable individuals behaving unlawfully?

9              THE WITNESS:  Okay.

10             THE COURT:  Are you saying those are two different

11   things?

12             THE WITNESS:  Yes, ma'am.  Yeah.  Because you can

13   have a group of people that, you know, it's not an assembly of

14   people, but there are individuals that could be, you know,

15   involved in criminal activity is what I'm getting at, you

16   know, that may not be part of that group, but there -- I think

17   there is a distinction between the two.

18   Q    (By Mr. Relys) I guess what I'm asking you is does the

19   crowd have to sort of be acting in some type of concert, in

20   your mind, before an assembly could be declared unlawful?

21   A    Yes.

22   Q    Okay.  It's not enough for just one or two people to --

23   identifiable individuals -- to be able to -- acting unlawfully

24   before the entire crowd is declared --

25   A    No, that's -- yes, that's -- yeah, that's correct.

Timothy Sachs Redirect Examination                    Volume 2

98

1   Q    And when you talk about officer discretion, you would

2   expect officers, whoever they are who would be declaring

3   assemblies to be unlawful, to come at it with that sort of

4   mindset or to use that -- that framework?

5   A    Yes.

6   Q    Okay.  Talked a little bit about the -- you were asked

7   some questions about the dispersal orders and -- and what

8   that -- what dispersal orders might mean or how people on the

9   street were supposed to know where to go if you're -- if

10  you're telling them to leave an area.  Do you remember those

11  questions?

12  A    I do.

13  Q    So you ask somebody to leave the area, and you don't

14  say -- you don't define the area; right?

15  A    Correct.

16  Q    You're also asking them to disperse, are you not?

17  A    Yes.

18  Q    So you're not asking them to congregate in a new

19  location?

20  A    No, we're not asking them just to move a location or

21  anything like that.  We would like them to leave each other,

22  leave the area, disperse the crowd.

23  Q    And do you feel like there's any way that would -- that

24  would allow you to easily define how to say to leave the area

25  without saying just "Leave the area"?

Timothy Sachs Redirect Examination                    Volume 2

99

1    A    I don't know of any, no, sir.

2    Q    But it certainly doesn't mean recongregate in a new spot?

3    A    No.

4    Q    And -- and to the extent you're suggesting or to the

5    extent you'd say, "Go east on Washington," let's say, "and two

6    blocks," that would potentially be problematic because then

7    people would just recongregate two blocks away?

8    A    That's correct.

9    Q    Okay.  And in your experience, when crowds of folks who

10   hear these dispersal orders -- do some of them comply?

11   A    Absolutely.

12   Q    And how do you know -- how do you know when you've

13   witnessed compliance?

14   A    You can actually see people leaving, and you don't see

15   them coming back.  You know, at times, I've actually seen them

16   getting into their vehicles and driving away.  I saw two folks

17   do that.

18   Q    And do you see -- do you see -- do you see sometimes

19   people who move in the direction they're told that do not

20   disperse?

21   A    Yes.

22   Q    And even though they've moved in the direction that

23   they've been told, do you consider that to be compliance?

24   A    No, I do not.

25   Q    Why not?

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 100 of 248 PageID #:
1550
Timothy Sachs Redirect Examination                                    Volume 2

100

1  A     They're -- we're giving them a direction, but they're not

2  dispersing.  They're not leaving.  They're not moving away

3  from the activity they were involved in.  They're just

4  relocating.

5  Q     And recongregating?

6  A     Yes.

7  Q     I mean, is the issue -- is -- is -- is the thing that

8  you're trying to get at as a police officer when you're giving

9  an order to disperse -- is the end result, the goal that

10  you're looking for, to effect dispersal within a certain

11  number of blocks or a certain radius?  Is that what you're

12  looking for?

13  A     Not just, "Okay.  Go to the end of this block and stay

14  there."  We would like to see folks go about their normal

15  business.  And, you know, we're trying to regain, I guess,

16  order of what was going on and regain some type of -- not so

17  much control but order in the area.

18  Q     You want people to disengage from the assembly?

19  A     Correct.

20  Q     We talked a little bit about the policy and what is --

21  what sort of munitions are -- what type of chemicals and such

22  are or are not covered under the dispersal policy.

23  A     Yes, sir.

24  Q     And I think you testified based on the policy that pepper

25  foggers are -- are covered under the policy but handheld spray

1    cans are not?

2    A    Yes.

3    Q    Okay.

4    A    Yeah.

5    Q    And that's written in the policy?

6    A    Yes.

7    Q    In your experience, is it common for either foggers or

8    pepper spray, handheld, to be used to disperse crowds?

9    A    It's mostly the foggers.  The individual is just a stream

10   when it comes out, and it's a very small can.  It's

11   ineffective on very large crowds.

12   Q    For what reason?

13   A    There's not that much of it, and it's -- again, it's a

14   stream, and it doesn't affect but one person at a time.  You

15   have to be very accurate in deploying it.  Where with a

16   fogger, you can deploy it into a general area, and it will

17   affect more than one person.

18   Q    Okay.

19   A    And, again, there's a lot more of it in a can.

20   Q    And that policy, the Section XIII of Special Order 1. or

21   1-1, I think it is --

22   A    Yes, sir.

23   Q    Is that right?

24   A    Yeah.  1-01 covers that, yes, sir.

25   Q    That's right.  That's -- that's an order that pertains to

Timothy Sachs Redirect Examination                              Volume 2

102

1    the dispersal of crowds?

2    A    Yes.

3    Q    It's not -- it doesn't apply in situations where mace,

4    let's say, is used to gain compliance?

5    A    That's correct.

6           THE COURT:  I need to ask you this question, though.

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  You did say it could be used for

9    dispersal earlier.

10          THE WITNESS:  It can be, yes, ma'am.

11          THE COURT:  And so under the policies, it's

12   appropriate to use mace -- if, for instance, you're telling

13   people to leave the area and someone doesn't, you can spray

14   them with mace to make them leave?  It's not just to arrest

15   them and comply with orders to arrest?  It's okay to use it

16   just to spray them in the face and say -- or spray them any

17   way and say, "You need to leave"?

18          THE WITNESS:  To try to gain compliance, yes, ma'am.

19          THE COURT:  And that's to gain compliance?

20          THE WITNESS:  Yes.

21          THE COURT:  And is that considered a use of force?

22          THE WITNESS:  Yes, it would be.

23          THE COURT:  And so it doesn't have to be to arrest

24   someone?  A use of force can be anytime you want them to

25   follow your orders?

1          THE WITNESS:  No.  When there is a use of force, we

2    attempt to make an arrest.

3          THE COURT:  Okay.  Well, what if you just want people

4    to leave the area?  You just said you could spray them with

5    the handheld mace to make them leave and not to arrest them.

6    Is that under the policy appropriate?  I think you just told

7    me it was.

8          THE WITNESS:  All right.  Let me back up.  Because,

9    again, once you deploy the mace, that's a use of force, okay,

10   and we would want to use that, again, to effect an arrest, but

11   as far as a dispersal, again, it's kind of apples and oranges.

12   For a dispersal type incident, we're just trying to disperse

13   the crowd, but an individual mace can can be used on both

14   sides.

15         THE COURT:  So you could use the individual mace in a

16   dispersal situation?

17         THE WITNESS:  Yes, ma'am.  It's just not that

18   effective, but yes.

19         THE COURT:  And under your -- and under your

20   policies, you wouldn't have to give any warning for that?

21         THE WITNESS:  That's correct.  Yes, ma'am.

22   Q    (By Mr. Relys) Are you aware of any situation in which

23   handheld mace cans have been used for the specific purpose of

24   dispersing crowds?

25   A    I am not, no.

Timothy Sachs Redirect Examination                    Volume 2

104

1    Q    Okay.  Any of the incidents that we've talked about the

2    last two days, did that happen --

3    A    Not that I know of.

4    Q    -- to your knowledge?

5    A    No, not that I know of, no, sir.

6    Q    And --

7              THE COURT:  So let me ask you this.  On the 15th, the

8    incidents where you reviewed these reports, you said there

9    were -- you reviewed one on the 15th, and then you said you

10   reviewed one on the Waterman and Lake, but on the 15th, is

11   that one -- was that in the downtown area you reviewed a

12   report --

13             THE WITNESS:  Yes.

14             THE COURT:  -- about the use?

15             THE WITNESS:  Yeah.

16             THE COURT:  And was that to arrest someone?

17             THE WITNESS:  There were arrests effected, yes,

18   ma'am.

19             THE COURT:  And that's the report you were reading?

20             THE WITNESS:  Yes.

21             THE COURT:  It wasn't a report about "We used this to

22   get people to move out of the way"?

23             THE WITNESS:  It was all-encompassing.  There were --

24   there was -- you know, the pepper mace was used, and there

25   were arrests made, but there were also where it was used and

1    the crowd just dispersed and there were not arrests.

2              THE COURT:  Okay.

3              THE WITNESS:  But it was for that incident.

4              THE COURT:  Okay.

5              THE WITNESS:  But, again, there were several

6    different individuals involved in just the one incident

7    report.

8              THE COURT:  And in that report, there were no

9    warnings about the -- that chem -- that the pepper mace was

10   going to be used?

11             THE WITNESS:  That's correct.  Yes, ma'am.

12             THE COURT:  Okay.

13   Q   (By Mr. Relys) You were just asked some questions just

14   now about -- or I think you gave some testimony -- one or the

15   other -- about the use of mace and effecting arrests.  Is the

16   decision to use mace contingent upon or do you have -- before

17   someone can use mace as an officer must it also be -- that

18   person be within their authority to arrest somebody?

19   A    A lawful arrest, yes.

20   Q    So it would be the same sort of probable cause would be

21   required prior to the use of pepper spray?

22   A    Yes.

23   Q    Now, is every time pepper spray used, are arrests always

24   made?

25   A    No, unfortunately not.

Timothy Sachs Redirect Examination                              Volume 2

106

1    Q    Why?

2    A    People --

3    Q    I mean maybe there's many reasons, but can you give me

4    some?

5    A    People get away, okay, or -- you know, most of the time,

6    that's what it is, is, you know, if there is mace used and

7    people are not -- we're not able to actually put hands on

8    them.  They flee or -- whatever reasoning -- we're not able to

9    take them into custody at the time, whether it would incite

10   other acts that wouldn't be as advantageous.  We rely on, I

11   guess, the fact that these people may come back and make a

12   complaint and we can identify them then as being involved in

13   something.  But there are times where people actually do not

14   get, you know, arrested after there is a use.

15   Q    And how about in a situation where there's a large crowd

16   of people and mace is being used to -- to -- for crowd

17   compliance purposes?  I think we talked a little bit about --

18   you talked about the use of mace during the bus incident?

19   A    Yes.

20   Q    Okay.  Was everybody -- do you know, did everybody in

21   that incident who mace was used against -- do you know -- were

22   they all arrested?

23   A    No, they were not.

24   Q    Why not?

25   A    We couldn't get ahold of them, or it would have created

Timothy Sachs Redirect Examination                        Volume 2

107

1    other issues, you know, to where we didn't want to escalate

2    having to go into the crowd and just pull certain people out.

3    Again, we were -- the biggest portion of that was just to get

4    the dispersal, and we used that for a dispersal as opposed to

5    just an arrest.

6    Q    Okay.  And in the -- I think you just discussed -- I

7    think you used the word "dispersal" in the context of that bus

8    incident.

9    A    Yes.

10   Q    Is there -- is there an exigent-circumstances exception

11   to the dispersal --

12   A    Yes, sir, there --

13   Q    -- the warnings needed for dispersal?

14   A    Absolutely.

15   Q    And to the extent that any sort of handheld mace or other

16   fogger-type OC spray was used during those incidents, would

17   you -- would you -- in your opinion, would that fall under the

18   exigent-circumstances exception?

19   A    Yes, sir.

20        MR. ROTHERT:  Your Honor, I would object to anything

21   that he doesn't have personal knowledge of.

22        THE COURT:  Overruled.

23   A    Yes, that would fall into the exigent circumstances.

24        THE COURT:  Can you tell me why?

25        THE WITNESS:  Due to what the officers are

Timothy Sachs Redirect Examination                    Volume 2

108

1   encountering at the time, for their safety or the safety of

2   other people, if they have to use something --

3          THE COURT:  Wait.  No.  You're telling me

4   hypothetically.  You just told me in this particular incident

5   it's your testimony under oath that with the bus incident that

6   was exigent circumstances.  So tell me from your own personal

7   knowledge why that was exigent circumstances in that

8   particular incident.

9          THE WITNESS:  There were people throwing things at

10  the bus, and we could not get the officers off the bus.  So we

11  had to force the people away from the bus just to get the

12  officers off for their safety.

13         THE COURT:  And so what were the exigent

14  circumstances that meant you didn't -- I mean I think your

15  testimony before was you don't have to give them a warning.

16         THE WITNESS:  That -- yeah, for that, for the mace,

17  yeah, you're correct.

18         THE COURT:  Okay.  And so what did you have to have

19  exigent circumstances to do?  To not arrest them or what?  Why

20  was exigent circumstances important in that situation?

21         THE WITNESS:  For the officers' safety, to get them

22  off of the bus and get the buses moved.

23         THE COURT:  Yeah, and so he just asked you is there

24  an exception to the policy for exigent circumstances, and so

25  what I understood that to mean was there are circumstances

Timothy Sachs Redirect Examination                    Volume 2

1    where you don't have to follow the written policy because

2    there are exigent circumstances.

3            THE WITNESS:  Yes, ma'am.

4            THE COURT:  So what written policy were you not

5    following because of what you've just described as the written

6    circumstances?

7            THE WITNESS:  I believe it would just --

8            THE COURT:  Or exigent circumstances?  I'm sorry.

9            THE WITNESS:  Yeah.  It would be the actual -- the

10   munitions policy because the officers were using a fogger.

11           THE COURT:  Oh, so you're saying they did not use

12   handheld mace that afternoon?

13           THE WITNESS:  I'm sorry.  The small ones, no.  The

14   fogger is actually handheld.

15           THE COURT:  Okay.

16           THE WITNESS:  But, yeah, they were using the foggers.

17           THE COURT:  They weren't using the small ones?

18           THE WITNESS:  I didn't see anybody use the small

19   ones.  No, ma'am.

20           THE COURT:  Okay.  All right.  So that's why they

21   didn't have to give a warning?

22           THE WITNESS:  Correct.

23           THE COURT:  But they normally don't have to give a

24   warning to use the small ones?

25           THE WITNESS:  They don't with either of them, no,

1    ma'am.

2          THE COURT:  But you didn't see anybody that whole day

3    use the small ones?

4          THE WITNESS:  No, ma'am, I didn't.

5          THE COURT:  Okay.

6          MR. RELYS:  Nothing further.

7          THE WITNESS:  Thank you.

8          THE COURT:  Any redirect?  Or did I just do it for

9    you?  Sorry.  Recross?

10          MR. ROTHERT:  No.  Thank you.

11          THE COURT:  You may step down.

12          THE WITNESS:  Thank you.

13          THE COURT:  I'm just trying to know what happened --

14    I really am -- and what everybody's positions are.

15          You may call your next witness.

16          MR. MCDONNELL:  Your Honor, we're going to call

17    Matthew Karnowski.

18          THE COURT:  Okay.  Sir, would you step over here to

19    the clerk to be sworn?

20          If you wish to pull that chair over and just pull the

21    mike, you can just bend that mike down.  That's fine.

22          MR. MCDONNELL:  I will later, Judge, if the knee

23    starts acting up.

24          THE COURT:  Okay.  Okay.

25          THE WITNESS:  Good afternoon, Your Honor.

111

1                              **MATTHEW KARNOWSKI**,

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                            DIRECT EXAMINATION

5    BY MR. MCDONNELL:

6    Q    Please state your name again, sir.

7    A    Matthew Karnowski.

8    Q    Where are you employed?

9    A    The St. Louis Metropolitan Police Department.

10   Q    Do you have a certain rank?

11   A    I am a sergeant.

12   Q    And are you assigned to a particular division?

13   A    I am detached to the downtown Bike Unit.

14   Q    Can you explain what that is?

15   A    The downtown Bike Unit is a patrol unit within the Fourth

16   District that primarily focuses on downtown.

17   Q    Okay.  Let me direct your attention to the weekend of

18   Friday, September 15th, 2017, through Sunday, the 17th.  Can

19   you tell the Court how many hours you worked approximately

20   during that time frame?

21   A    I worked on Friday approximately 20 hours, and that

22   following Sunday, about 16.

23   Q    Okay.  And were those in response to activities related

24   to the protests?

25   A    Yes.

Matthew Karnowski Direct Examination                    Volume 2

112

1    Q    Sergeant, I'd like to direct your attention to what we

2    call the bus incident on Tucker and Clark.

3    A    Okay.

4    Q    Can you tell the Judge what was going on there?

5    A    That day, there were protestors situated in and around

6    the intersection of Tucker and Clark and also in front or in

7    between Engine House 2 and the Police Academy.  There were

8    some police resources that were staged over at that location,

9    and it came to my attention that protestors had blocked

10   ingress and egress routes of two MetroBuses that contained

11   civilians and police officers.

12   Q    Okay.  And did a problem develop with the officers on the

13   buses and the protestors?

14   A    Yes.  The protestors, as I said, blocked -- blocked the

15   ability for the buses to leave the area.

16   Q    Okay.  What did you do, if anything?

17   A    My -- my team that day -- I was -- I was a supervisor of

18   the bicycle response team, and we were given orders to enter

19   that area and bring the buses out.

20   Q    Okay.  Can you describe for the Court what happened when

21   you attempted to do that?

22   A    We formed two -- two columns or two rows of bicycle

23   officers, and when we approached the area the buses were in, a

24   number of protestors formed human chains and attempted to

25   block our access to the buses.  We had to drive through those

1    individuals and --

2    Q    When you say "drive," you mean ride your --

3    A    Well, we were walking our bikes at that point.

4    Q    Walking your bikes?

5    A    So we had to push through, rather, would probably be a

6    better choice of words.  And then I eventually made it to the

7    first bus, the bus that was situated further to the north.

8    Q    When you got there, what did you see?

9    A    I saw a -- several protestors that had formed a human

10   chain in front of the first bus, some of which had their arms

11   interwrapped or intertwined with the bike rack on the front of

12   the bus.

13   Q    There's a bike rack on top -- in the front of the

14   Bi-State Bus or the MetroBus?

15   A    It's affixed to the front of those buses.

16   Q    Okay.  And not only were their arms locked together; some

17   of them were actually holding onto that bike rack?

18   A    Yes.

19   Q    Did you give them any orders, sir?

20   A    I ordered the people that, the folks that were wrapped in

21   front of the bus to move away from the bus immediately or they

22   would be maced.

23   Q    And just so we're clear for the Court, what -- exactly

24   what was the order you gave to these individuals?

25   A    So when we were moving as a group into the area where the

1    buses were, my team was saying in unison, "Move back.  Move

2    back."  When I got to the bus, I ordered them to move away

3    from the bus.

4    Q    While this was going on, were there people throwing

5    anything?

6    A    Yes.  People were throwing water bottles and other

7    objects at the bike officers from the group of protestors.

8    Q    And these water bottles -- were they filled?  Were they

9    frozen?  How were they?

10   A    The ones I observed were filled.  I didn't see any frozen

11   ones at that point.

12   Q    So you -- after you had told the protestors to move back,

13   did they comply?

14   A    Some did.

15   Q    Okay.  What about the ones that didn't comply?

16   A    We -- on the way to the buses, we pushed our bikes

17   through those individuals that did not comply and did not move

18   back.

19   Q    What about the group of protestors that were directly in

20   front of the bus, hanging onto the bike rack?

21   A    Those particular folks, they did not comply with my

22   order.

23   Q    And, again, just so -- I want the Court to be certain.

24   What was your order to them, the ones directly in front of the

25   bus?

1    A    To get out of the way of the bus or remove themselves

2    from the front of the bus.

3    Q    And did you tell them there would be a consequence if

4    they did not do so?

5    A    I told them that they would be maced if they did not.

6    Q    Did they comply with your order?

7    A    No.

8    Q    What action did you take next?

9    A    I directed my handheld canister of pepper spray towards

10   the faces of the individuals that were blocking the bus.

11   Q    And just so we're clear with the Court, can you describe

12   your handheld pepper spray?  Is that something that's hooked

13   onto your utility belt?

14   A    Yeah.  It's locked up right now, but it's a smaller

15   canister, and it goes into my belt.

16   Q    And when you sprayed it, did you direct it at an

17   individual or individuals or --

18   A    The individuals that were blocking the bus -- that's who

19   I directed my pepper spray towards.

20   Q    And were you successful in striking them with the pepper

21   spray?

22   A    Yes.

23   Q    Okay.  What were their reactions?  Did they then comply?

24   A    That group of individuals immediately removed themselves

25   from the bus out of -- and they went in different directions.

Matthew Karnowski Direct Examination                    Volume 2

1    Q    And had they initially done that when you gave them the

2    order to move away from the bus, you wouldn't have had a need

3    to use your pepper spray; is that correct?

4    A    Correct.

5    Q    Did the -- the next day or so, did you see a photo in the

6    newspaper of someone that claimed that they were -- that they

7    had -- were maced --

8    A    Yes.

9    Q    -- while at the bus incident?

10   A    Yes.

11   Q    Okay.  And did you come to know that was Maleeha Ahmad?

12   A    Yes.

13   Q    Okay.  And she was one in front of the bus?

14   A    Yes.  She was one of the individuals in front of the bus,

15   wrapped in front of the bus.

16   Q    And she was one of them sprayed by you?

17   A    Yes.

18   Q    And the reason you sprayed her was she didn't comply with

19   your order; correct?

20   A    Correct.

21   Q    And she was warned that she would be maced; correct?

22   A    Yes.

23   Q    The entire situation in trying to extract the buses here

24   and the officers -- can you describe that for the Court?  Was

25   it chaotic?  Was it -- you know, what was your impression?

Matthew Karnowski Direct Examination                    Volume 2

117

1    A    It was very chaotic, and it was very dynamic.  There were

2    numerous individuals, as I had mentioned before, that were

3    attempting to prevent me and my team from gaining access to

4    the bus.  Objects were being thrown at the bus and us.  I was

5    concerned that one of the objects may break a bus window,

6    which would certainly cause injuries.  Again, there were

7    civilians on the bus as well.  The bus drivers were civilian

8    Metro employees.  And, of course, we were being yelled at and

9    screamed at and cussed at at the same time.  So a cacophony of

10   things were happening, and it was certainly a difficult

11   situation to be in.

12   Q    Any of the participants in the protest pulling on your

13   bicycles?

14   A    Yes.  While I was addressing the folks in front of the

15   bus, I looked to my right, and I saw that somebody had grabbed

16   ahold of one of my officer's bicycles, and I directed a short

17   burst of pepper spray at that individual to end the assault on

18   that officer.

19   Q    Did you see any of your fellow officers actually struck

20   by objects that were thrown?

21   A    I had later learned that several officers on my team were

22   struck.  Two were punched, and one sustained -- one of the

23   other sergeants was injured by somebody pushing back on his

24   bicycle, back into him.

25   Q    Was Lieutenant Boyher who's involved with the bike

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 118 of 248 PageID #: 1568
Matthew Karnowski Direct Examination                    Volume 2

118

1    response team --

2    A     Yes.

3    Q     -- was he struck?

4    A     He was struck several times in the head with water

5    bottles and also punched.

6    Q     Sergeant, let me -- let me push you ahead a little bit

7    further.  On Friday afternoon, was there an incident where

8    people were damaging police SUVs near this area?

9    A     Yes.

10   Q     Can you tell the Court where this occurred?

11   A     A police vehicle, a marked police SUV, was damaged while

12   it was parked at the front of the old headquarters on Clark --

13   excuse me -- on Clark, just west of Tucker, on the south side

14   of the street.

15   Q     What was going on with the -- with the SUV or the damage

16   that you saw?

17   A     I later learned that the windshield had been damaged and

18   that the vehicle had sustained body damage.

19   Q     Did you respond to that scene?

20   A     Yeah.  We were directed -- the bicycle response team --

21   members of the bicycle response team were directed to respond

22   to the area in order to extract the group of Special

23   Operations detectives that were -- had been sent in to try to

24   get the vehicles in the first place.  Apparently, they had

25   become surrounded by protestors.  And then also our other

Matthew Karnowski Direct Examination                    Volume 2

119

1  objective was to clear the area so we could remove our

2  vehicular assets from that street.

3  Q    And when you say "clear the area," Sergeant, what do you

4  mean?

5  A    So police vehicles are actively being damaged.  We have

6  to make it safe for everybody, including us.  So, as I said,

7  our objective was to clear the area of protestors so we were

8  able to safely bring those vehicles out and our people as

9  well.

10 Q    And did you give the protestors any type of orders?

11 A    So, again, we went back in with a couple of rows of

12 bicycle officers, bicycle response team officers, and as we

13 move into a situation such as that, we use the commands, "Move

14 back" in unison.  So, yes, we did.

15 Q    And when you gave that command, did some folks comply?

16 A    Some folks complied, and some folks actively attempted to

17 block our entry into the area.

18 Q    How did this situation finally wind up, resolve itself?

19 A    When we finally got into there, I actually ended up

20 losing my canister of mace, and several individuals in the

21 crowd, as I saw it roll on the ground, tried to block me from

22 regaining possession of my piece of equipment.  At some point,

23 a subject, who was later arrested, picked up my mace and tried

24 to put it into his pocket, and then individuals attempted to

25 prevent me and my team from trying to apprehend that

Matthew Karnowski Direct Examination                          Volume 2

120

1    individual, at which point one of my officers deployed a short

2    round of pepper spray to -- to address those individuals

3    attempting to impede us from arresting the responsible

4    subject.

5    Q    And were you able to arrest him at that time?  Or no?  Or

6    her?

7    A    It was a gentleman.  I indicated to some other nearby

8    detectives that the gentleman had stolen my mace, and they

9    were able to grab him kind of from behind the crowd and take

10   him into custody.

11   Q    So would it be a fair assessment, Sergeant, that between

12   the bus incident and this incident with damaging the police

13   vehicles on Friday afternoon that it was -- that it was a very

14   active and chaotic day for you?

15   A    It was, and once -- once the subject who had attempted to

16   take my mace was placed into custody, we started being pelted

17   with pieces of concrete.

18   Q    Did you know where that concrete came from?  Was it --

19   A    From the crowd of protestors.  I couldn't -- I couldn't

20   specify who was throwing it or exactly what direction, but in

21   the general direction of the protestors.

22   Q    And, Sergeant, jumping back to the bus incident just for

23   a second, were you also concerned about the safety of the

24   protestors being in front and behind the bus?

25   A    I was.  I think the bus driver had the wherewithal not to

1  run over any protestors, but they certainly placed themselves

2  in a precarious position of blocking egress routes for that

3  bus to travel.

4  Q     Sergeant Karnowski, let me direct your attention to later

5  Friday night.  Were you out by Barnes Hospital in the Central

6  West End?

7  A     Yes.

8  Q     Did you have any incidents regarding the protest activity

9  there?

10 A     Later that night, we were ordered to respond to the area

11 of the Central West End in order to support the monitoring of

12 the protestors.  At some point, they -- a large number of

13 protestors traveled to the intersection of Kingshighway and

14 40.  It was our understanding that their intention was to shut

15 down the highway, but we were fortunately able to thwart those

16 efforts at that point.  The protestors later traveled to --

17 from my understanding, I later learned -- the Mayor's house,

18 and there was a bit of destruction of property.  We weren't

19 necessarily involved with that, but while we were staging at

20 Euclid and Forest Park Parkway --

21            THE COURT:  Can you hold on a second?  I need to know

22 if you're -- are you talking about when they were trying to

23 block the highway or after the -- somehow at the Mayor's --

24            THE WITNESS:  So the --

25            THE COURT:  And let me just ask him to give you a --

1    break it up into new questions --

2              MR. MCDONNELL:  Sure.

3              THE COURT:  -- because I -- I mean you've got several

4    incidents going on here.

5              THE WITNESS:  Yes, ma'am.  Sorry.

6              THE COURT:  Why don't you ask him a fresh question so

7    I'm sure I understand.

8    Q    (By Mr. McDonnell) Sergeant, when you're in the Central

9    West End, near Barnes Hospital, do you have an occasion to

10   help arrest someone that lit a dumpster on fire?

11   A    Yes.

12   Q    Can you explain that to the Judge?

13   A    Yes.  So as the protests were wrapping up in the Central

14   West End, members of my team were alerted by two undercover

15   St. Louis County officers that two individuals had just lit a

16   fire in a dumpster in an alley near the northwest corner of

17   Euclid and Forest Park Parkway, and those guys, the two

18   suspects responsible, just happened to be walking by our

19   entire bike squad when we were alerted to this information.  I

20   assisted some of my officers in taking one guy into custody,

21   and then some of the other bicycle response team members took

22   the other guy into custody, and charges were issued by the

23   Circuit Attorney's Office relative to arson-related issues and

24   resisting arrest.

25   Q    Let's jump to Sunday, September 17th.

Matthew Karnowski Direct Examination                    Volume 2

123

1   A     Yes.

2   Q     Okay.  Were you in the downtown area that day?

3   A     I was.

4   Q     Okay.  And did you happen to be on Pine Street at a

5   certain time that evening?

6   A     Yes.

7   Q     Can you tell the Judge what -- around what time you were

8   there?

9   A     I think, backing up, there was a number of peaceful

10  protesters that had started -- there was a peaceful protest

11  that started in front of our headquarters, and that group of

12  individuals marched for a while, but once darkness fell, there

13  was a group of about two or three individuals that donned

14  masks and began traveling west on Olive from Police

15  Headquarters.  During their travels, they encountered an

16  outdoor stage that was set up in front of the public library,

17  I believe, and the streets had been blocked off.  The members

18  of that group destroyed objects within that area, and that

19  group continued west on Olive -- I'm sorry -- east on Olive.

20            THE COURT:  Yeah.  I'm trying to figure this out.

21            MR. MCDONNELL:  East.

22            THE COURT:  So from Police Headquarters, they were

23  coming east, not west?

24            THE WITNESS:  Yes, ma'am.  I'm sorry.  My apologies.

25            THE COURT:  Okay.

Matthew Karnowski Direct Examination                      Volume 2

124

1          THE WITNESS:  East.  Members of the group destroyed a

2    bunch of related materials within that stage area, and members

3    of that group also continued east across Tucker.  We were able

4    to make it to 9th, where we struck a line at about the time

5    members of that group were -- were continuing east.

6    Q     (By Mr. McDonnell) This was 9th and Olive, sir?

7    A     9th and Olive.

8    Q     Okay.  And approximately what time in the evening was

9    this?

10   A     I can't give you a specific time.

11   Q     Dark out?

12   A     It was dark.

13   Q     Okay.  What occurred around 9th and Pine Street or Olive?

14   A     As we were traveling north on 9th from Pine, I could hear

15   windows being destroyed and other property being damaged.

16   Q     What did you do in response to that?

17   A     We -- I had the bike officers strike a line on the south

18   side of Olive Street crossing 9th.

19   Q     And what could you observe from that point of view?

20   A     I was able to look down the street and to see several

21   windows that had been broken, and then we observed about 150

22   or so folks that were in the group.

23   Q     In the what?

24   A     In the group.

25   Q     Okay.  And could you describe for the Court what that

Matthew Karnowski Direct Examination                    Volume 2

125

1    group was doing?

2    A     They were mainly screaming at us, and as I said, members

3    of that group had already caused a bunch of property damage on

4    Olive, and then once the group approached us, different -- the

5    group kind of fragmented, and then we pushed forward up to the

6    street to the north and struck another line.  As we were doing

7    that, we observed further down, towards Washington, people

8    pushing planters over, throwing things at windows again, and

9    then pulling a bunch of material out into the street, like a

10   mattress and, I think, a couch and some other debris, and then

11   they also drug a bunch of, like, signs and grates in the

12   middle of the street.

13   Q     Now, it's been suggested earlier that these people were

14   arrested at that time.  Is that correct?

15   A     I believe there was just a couple of arrests made at that

16   time, but I don't know the specifics of those, and one of my

17   officers was injured, sustained a pretty significant knee

18   injury during the course of those, but that's about the extent

19   I know of those.

20   Q     And when you were seeing this damage, I guess, on

21   Washington Avenue at this point in time, did you try and push

22   these protestors to some location?

23   A     We pushed them north.  We continued to push them north,

24   and then they kind of dispersed for the most part for a little

25   bit, and then it's my -- like maybe a half an hour later,

Case: 4:18-cv-00308-JCH  Doc. #:  126-4  Filed: 01/30/20  Page: 126 of 248 PageID #: 1573
Matthew Karnowski Direct Examination                    Volume 2

126

1    there was a group of protestors that engaged a contingent of

2    the bicycle response team close to Lucas (sic) and Tucker.

3    Q    Can you describe what happened there?

4    A    Subjects were -- in the crowd were -- were some of the

5    same subjects that were in the crowd that was damaging

6    property beforehand, were screaming at our officers and

7    getting pretty close to our officers.  Sergeant Rossomanno, at

8    that time, issued an unlawful assembly, addressed the crowd

9    and told them that they were engaged in an unlawful assembly

10   via his police vehicle.

11   Q    Let me stop you there.  How did he announce this?

12   A    Over his -- the intercom or the speaker on his police

13   car.

14   Q    And do you remember the language he used or what --

15   what --

16   A    He said it was an unlawful assembly and subjects

17   remaining in the area would be subject to arrest and/or

18   chemical munitions, something along those -- those lines.  I

19   don't remember the exact verbiage.

20   Q    Okay.  And can you give me an estimate of the time of the

21   evening this was?

22   A    This was certainly later than the property damage, and I

23   would probably say about 45 minutes after -- after our initial

24   encounter with the protestors at 9th and Olive.

25   Q    After Sergeant Rossomanno gave this warning over the PA

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 127 of 248 PageID #:
1327
Matthew Karnowski Direct Examination                     Volume 2

127

1   system of his vehicle, did some of the people comply with

2   that?

3   A    At that particular moment, everybody complied and moved

4   onto Tucker, and then many walked northbound towards

5   Washington.  A short time later, Sergeant Rossomanno continued

6   to issue unlawful assembly orders over his PA, and Sergeant

7   Jemerson walked down or north on Tucker from Locust, issuing

8   the same thing verbally to individual groups.

9        And I should say, backing up to when we struck a line at

10  9th and Olive and then the next block to the north, I also

11  issued verbal unlawful assembly orders myself.

12  Q    And why?  What'd you base that on?

13  A    Property was actively being damaged, and things were

14  actively being thrown into the street.

15  Q    At some point in time, did you see any chemical munitions

16  used?

17  A    At -- at -- I'm sorry?

18  Q    Sometime after those warnings were given, did you see any

19  chemical munitions used?

20  A    Not until the controlled arrests later on that evening

21  began being effected.

22  Q    And the controlled arrests were down at Tucker and

23  Washington?

24  A    Yes.

25  Q    Okay.  Where were you stationed at that time?

Matthew Karnowski Direct Examination                    Volume 2

128

1   A    At that time, I was behind a contingent of bicycle

2   response team officers across Washington on the east side of

3   Tucker.

4   Q    Okay.  Did you hear any warnings given?

5   A    Numerous warnings given to protestors that were in and

6   around that intersection to leave the area immediately or they

7   would be subject to arrest and/or chemical munitions.

8   Q    Did you see some of the people heed the warning?

9   A    Yes.  Some people left the area.

10  Q    And can you tell us, Sergeant, what areas of egress they

11  have at that point in time?  Could they go west on Washington

12  or north on Tucker?  Tell the Court please.

13  A    At the time my bike line or the bike line -- Sergeant

14  Duke's bike line was struck across Washington on Tucker, all

15  directions other than eastbound were available for folks to

16  travel.

17  Q    Okay.  So your line, where you struck the line, you

18  weren't letting anybody go eastbound; correct?

19  A    Correct, because we didn't -- and the philosophy behind

20  that was we didn't want further property damage to occur

21  behind us.

22  Q    And you wouldn't let anybody like coming up behind you

23  through at that point in time; would that be --

24  A    Correct.

25  Q    -- correct?  Okay.  And so when you heard these warnings,

Matthew Karnowski Direct Examination                    Volume 2

129

1   were they over the PA system?

2   A    Yes.

3   Q    Okay.  Were you -- were you aware of any activity by

4   Sergeant Rossomanno or Sergeant Jemerson regarding them going

5   into the crowd?

6   A    As I said earlier, Sergeant Jemerson actually went into

7   the crowd and told individual -- told smaller groups and

8   individuals that the assembly was unlawful and that they had

9   to leave.

10  Q    Sergeant, did you observe the arrest teams come in and

11  start arresting the people at Washington and Tucker?

12  A    I did.

13  Q    Okay.  When that occurred, can you tell -- tell us what

14  you saw.  Did you see any resisting, noncompliance, anything

15  like that?

16  A    There were folks that did not comply.  There was -- I --

17  I -- there was a lot of things going on at that point, and

18  there was still nobody behind us.  So I'm trying to focus my

19  attention behind us and in front of us and to make sure that

20  our line is solid and secure.  I did see several individuals

21  resisting, several -- one kind of comes to mind where there

22  was a guy that would not bring his hands to a handcuffing

23  position, and there were other policeman that were trying to

24  get his arms out, saying that he was armed with knives.  So

25  that was a little concerning to me as well.

Matthew Karnowski Direct Examination                    Volume 2

130

1    Q    Were you aware of any weapons that were recovered from

2    any of the people arrested?

3    A    I later learned there were six firearms, approximately

4    six handguns recovered, not only from the ground and they were

5    laying there by themselves but also individuals that were

6    involved in the incident.

7    Q    Sergeant, on the evening of Sunday night, in the

8    Washington-Tucker area, did you observe any of the individuals

9    in the crowd of protestors wearing any type of goggles,

10   bandanas, masks, anything like that?

11   A    Numerous members of the group of folks that were arrested

12   were wearing goggles, masks, and bandanas over their faces.

13   Q    And in your experience as a police sergeant involved in

14   these protests, do you know why they were donning such

15   equipment?

16   A    It's my understanding that that equipment is used to

17   attempt to thwart any sort of pepper spray or chemical

18   munitions that may be used.

19   Q    Sergeant, I'm going to show you what's been marked

20   Defendant's Exhibit F.  It's a declaration which you signed

21   about a week ago.  Do you remember seeing that?

22   A    I do.

23   Q    It's four pages long, and did you sign this?

24   A    I did.

25   Q    Okay.  And is it still true and correct to the best of

1  your ability?

2  A    It is.

3         MR. MCDONNELL:  Your Honor, move in for evidence

4  Defendant's Exhibit F.

5         THE COURT:  Exhibit F is received into evidence.

6         MR. MCDONNELL:  No further questions at this time.

7         THE COURT:  All right.  Cross-examination.

8                    CROSS-EXAMINATION

9  BY MR. ROTHERT:

10 Q    Good afternoon, Mr. Karnowski.

11 A    Good afternoon, sir.

12 Q    The damage at the library that you were testifying about

13 on -- was that on Sunday night?

14 A    Sunday night, yes.

15 Q    The 17th?  That didn't make it into your declaration, did

16 it?

17 A    No.

18 Q    Okay.  Was there a reason why you left that out?

19 A    Not in particular.

20 Q    Now, you understood when these orders to disperse were

21 being given that they were directed at the protestors;

22 correct?

23 A    Yes.

24 Q    All right.  And they were not directed at the media?

25 A    They were directed at anybody who was out in the street

1    at the time.

2    Q    Okay.  They weren't directed at people who were observing

3    the protests, were they?

4    A    As I said, those dispersal orders were directed at

5    anybody in the street or on the sidewalks in that particular

6    area at that time.

7    Q    But anyone using common sense, if they were just a

8    neighbor walking by, they wouldn't think that applied to them,

9    would they?

10   A    I would think -- if it were me and I were hearing issues

11   being or orders being given over a loudspeaker by a police car

12   to leave the area immediately, I would leave.

13   Q    Okay.  But they were directed to the protestors.  You

14   said that several times; correct?

15   A    As I said, those orders were issued at anybody in that

16   area at that particular time.

17   Q    In your declaration, you say, "The protestors were

18   ordered to disperse."  Correct?

19   A    Yes.

20   Q    All right.  Why'd you say, "The protestors were ordered

21   to disperse" if you mean people other than the protestors?

22              MR. MCDONNELL:  Judge, I'm going to object.

23   Argumentative.

24              THE COURT:  Overruled.

25   A    As I -- as I just testified to, those orders were

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 133 of 248 PageID #: 4583
Matthew Karnowski Cross-examination                              Volume 2

133

1    directed to everybody in the crowd.

2    Q    (By Mr. Rothert) What's the last -- there was -- there

3    was damage to property, Sunday, the 17th, on Olive; correct?

4    A    Yes.

5    Q    And around the 900 block --

6    A    Yes.

7    Q    -- windows were broken?

8    A    Uh-huh.

9    Q    Where was furniture thrown into the streets?

10   A    The next block north of Olive, the block south of

11   Washington.

12   Q    Locust?

13   A    I'm sorry?

14   Q    Would that be Locust?

15   A    I think so, yeah.

16   Q    And was that also in the 900 block?

17   A    No.  It was on -- on 9th.

18   Q    9th?

19   A    Yes.

20   Q    Right at 9th?  Okay.  Were there -- was there property

21   damaged after those two incidents?

22   A    Yes.

23   Q    Okay.  Where did that happen?

24   A    There was property -- there was numerous giant planters

25   that were rolled over and broken on 9th, just south of

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 134 of 248 PageID #:
4584
Matthew Karnowski  Cross-examination                    Volume 2

134

1    Washington, and some of those chunks of material broken off

2    from the planters were used to break some windows at the hotel

3    at 9th and Washington.

4    Q    What time did that happen?

5    A    I can't give you a specific.  It was after the property

6    damage at Olive.

7    Q    Okay.  That also didn't make it into your declaration,

8    did it?

9    A    Nope.

10   Q    All right.  Reason why it's not in your declaration?

11   A    No.

12   Q    Other than -- and when you say numerous planters, I mean

13   one's a number; a hundred's a number.  How many are we talking

14   about?

15   A    I would say at least a dozen.

16   Q    A dozen.  Okay.  It seems like that would be a pretty

17   significant event if a dozen cement planters were used.  How

18   many windows were broken with that?

19   A    I can't say specifically.  Two or three over there.

20   Q    Okay.  What time would that have been?

21   A    As I just said, after the property was damaged on Olive.

22   Q    Okay.  "After" could be midnight, could be 8:31.

23   A    Within 15 minutes.

24   Q    Within 15 minutes.  So after 8:45, are you aware of any

25   violence downtown?

Matthew Karnowski Cross-examination                    Volume 2

1    A    I don't recall specifically when the time was the windows

2    were broken on Olive.  So I can't testify as to a time when

3    the windows were broken on 9th just south of Washington.

4    Q    Okay.  But you know that the -- well, in your

5    declaration, you said between 8:00 and 9:00 --

6    A    Okay.

7    Q    -- was the damage on Olive.  Would that be accurate if

8    it's in your declaration?

9    A    Sure.

10   Q    All right.  So -- and so knowing that, can you tell me

11   when the last time you know of violence in downtown was on

12   Sunday, the 17th?

13   A    So when the last time I knew -- probably when the

14   protests -- some of the protestors in the group of folks that

15   were being arrested were resisting arrest.

16   Q    Okay.  Well, that's before the arrest, yes.

17           THE COURT:  You said violence.  Are you talking about

18   property damage?

19   Q    (By Mr. Rothert) Okay.  Yes, I'm talking about any

20   property damage or violence prior to the arrests but after

21   9:00.

22   A    I'm not aware of any.

23   Q    Now, in your declaration, you say a multitude of

24   protestors engaged in criminal conduct.  Do you -- do you know

25   how many?

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 136 of 248 PageID #:
4566
Matthew Karnowski Cross-examination                          Volume 2

136

1   A     No.  More than one.

2   Q     More than one?

3   A     Yes.

4   Q     Okay.  More than 10?

5   A     That might be fair, yeah, to say.

6   Q     It might be fair to say that it's more than 10?

7   A     Ten or more.

8   Q     Okay.  Twenty or more?

9   A     I --

10  Q     Do you have any idea?

11  A     Multiple.

12  Q     All right.  Now, what's your understanding of -- you --

13  you've determined that assemblies are unlawful sometimes,

14  including on the 17th; correct?

15  A     Yes.

16  Q     All right.  So what's your understanding of when you can

17  decide an assembly is unlawful?

18  A     When I gave the unlawful assembly orders earlier that

19  evening off of Olive and 9th, I observed property being

20  damaged and things being thrown into the street.

21  Q     Okay.  So what's your understanding of when -- what your

22  authority is to determine an assembly is unlawful?

23  A     I used a common sense approach to it.  Things were being

24  damaged and actively destroyed, and so -- by a group of

25  individuals, so that's why I declared that assembly unlawful.

Case: 4:18-cv-00308-JCH  Doc. #:  126-4  Filed: 01/30/20  Page: 137 of 248 PageID #:
4567
Matthew Karnowski Cross-examination                          Volume 2

137

1   Q    Okay.  And I understand why -- why you did it on that

2   occasion.  I'm just asking more generally what is your

3   authority.  When can -- under what circumstances can you

4   determine an assembly is unlawful?  What's your understanding

5   of that?

6          MR. MCDONNELL:  Your Honor, I make an objection.  It

7   calls for a legal conclusion, not relevant to what he did that

8   evening.

9          THE COURT:  I'm going to sustain this one.  I

10  understand what he says he did.

11  Q    (By Mr. Rothert) Did you declare any unlawful assemblies

12  later, other than at 9th and Olive?

13  A    Personally, I did not.

14  Q    The people who were arrested at 10:40, after being caught

15  in those four lines, they were not engaged in any violent

16  activity prior to being arrested; is that correct?

17  A    Some of the folks that were in the group of people that

18  were arrested at Tucker and Washington were in the same group

19  of people that were damaging property at 9th and Olive.

20  Q    How do you know that?

21  A    Because I recognized some of them from their clothing.

22  Q    Now, if you recognized them as people who had damaged

23  property, why didn't you arrest them?

24  A    I didn't say that I recognized those particular

25  individuals that damaged the property.  I said I recognized

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 138 of 248 PageID #: 4588
Matthew Karnowski Cross-examination                              Volume 2

138

1    individuals that were with the folks that were damaging

2    property.

3    Q    Oh, okay.  So my question was the people who were

4    arrested at Tucker and Locust and Washington around 10:40 --

5    they were not engaged in any violent activity themselves?

6    A    They were when they resisted arrest.

7    Q    Okay.  Prior to being arrested, they had not engaged in

8    any violent activity; is that right?

9    A    As I said, they were with the group that was throwing

10   stuff through windows on Olive.

11   Q    Okay.  Can you identify anyone that was arrested that was

12   engaged in any violent activity?

13   A    I cannot.

14   Q    All right.  And in fact, in your declaration, what you

15   say they did wrong was physically obstruct the movement of

16   vehicular and pedestrian traffic.

17   A    That's one of the things that they were doing, yes.

18   Q    Okay.  So there were other things, but you just listed

19   the one?

20   A    Yes.

21   Q    And they weren't really interfering with pedestrian

22   traffic, were they?

23   A    There were so many folks that people couldn't possibly

24   walk through.

25   Q    No one was having trouble walking through that you saw.

Matthew Karnowski Cross-examination                    Volume 2

139

1   Did you?

2   A    They were blocking --

3   Q    I'm just asking if you saw, if you saw people having

4   trouble walking through the crowd.

5   A    There were neighborhood residents that were trying to get

6   back to their places, and there were some issues with them

7   getting -- getting through.

8   Q    And were those issues caused by police officers?  Right?

9   I mean police officers blocking the street stopped

10  neighborhood residents from getting --

11  A    I wasn't blocking anybody on the sidewalk until we struck

12  a line at Tucker and Washington.

13  Q    Were you then allowing neighborhood residents through?

14  A    If somebody lived in the neighborhood, yes, we let them

15  through.

16  Q    Going back to Friday, the 15th, at -- at -- we're going

17  to talk about the bus incident.  So bus time.  Do you know

18  what I'm talking about?

19  A    I do.

20  Q    All right.  Now, in your declaration, you talk about how

21  you maced some folks.  Is that -- is that accurate?

22  A    Yes.

23  Q    All right.  And when you say you maced them, what were

24  you using?  A personal mace?  A fogger?  What were you using?

25  A    As I testified earlier, I was at the bus incident using

Matthew Karnowski Cross-examination                              Volume 2

140

1    my handheld mace that fits on my duty belt that's issued by

2    the police department.

3    Q    Okay.

4    A    Excuse me.

5    Q    And did you indicate that in the -- in the I/LEADS report

6    that you did about those macings?  Is that indicated in there

7    that you used your personal mace?

8    A    I -- as I said, I used mace that is owned by the

9    department.

10   Q    I know it's owned, yes.  As opposed to a fogger.  What

11   would you call that, not the fogger but the one you carry with

12   you?

13   A    I would characterize that as a handheld canister of mace

14   or pepper spray, rather.

15   Q    Okay.  So in your -- did you indicate in your I/LEADS

16   report that you were using your handheld canister of pepper

17   mace?

18   A    I submitted a portion of a narrative to be included into

19   the original I/LEADS report for this incident.  So I don't

20   know if that's made it into an I/LEADS report yet or not.

21   Q    Now, you're required to prepare an I/LEADS report every

22   time you use pepper mace; correct?

23   A    Yes.

24   Q    All right.  Now, how many people -- as far as standing in

25   front of the bus, Ms. Ahmad was actually standing several feet

Matthew Karnowski Cross-examination                       Volume 2

141

1    away from the bus, in front of the bus, linked with other

2    people; correct?

3    A    The people I maced were standing directly in front of the

4    bus.  And then also during the bus incident, one or two

5    individuals who had grabbed one of my officer's bikes.

6    Q    Okay.  Can you tell me, when you say directly in front of

7    the bus, do you mean -- what do you mean by that?

8    A    People who were locked arms in front of the bus and also

9    who had arms interlocked in the bike rack of the bus.  I

10   ordered them to get away from the bus, if not, they would be

11   maced, and my commands were not followed.  I then deployed

12   pepper spray, and I directed it to the face of the folks that

13   were blocking the bus.

14   Q    I'm trying to understand if there's a -- if Ms. Ahmad --

15   was she, as you recollect, holding onto the bike rack on the

16   bus?

17   A    I don't remember specifically if she was holding onto the

18   bike rack or not.

19   Q    Okay.  Was she attached to people who were holding on --

20   A    Yes.

21   Q    -- to the bike rack?  Okay.  So in your recollection of

22   things, she wasn't several feet in front of the bus?

23   A    Correct.

24   Q    And if she was, is it possible that you're not the person

25   that maced her?

Matthew Karnowski  Cross-examination                         Volume 2

142

1    A     I suppose, but as I said, I directed my mace --

2    Q     Uh-huh.

3    A     -- towards the people that were impeding the egress of

4    the bus.

5    Q     All right.

6    A     And then I also directed, at that time, a burst of pepper

7    spray to folks that had grabbed onto my officer's bicycle.  To

8    the best of my knowledge, that far up in front of the bike

9    line, nobody else was deploying pepper spray at the time.

10   Q     All right.  And did you arrest these individuals?

11   A     I did not.

12   Q     You did not charge them with resisting arrest?

13   A     No.

14   Q     Do you believe they were committing a crime at the

15   time --

16   A     Yes.

17   Q     -- you maced them?  What crime?

18   A     Failure to obey a reasonable order from a police officer.

19   Interfering with a police officer.  Blocking traffic,

20   vehicular traffic, on the street.

21   Q     Now, the -- how long had the bus been sitting, standing

22   there?

23   A     At what point in time?

24   Q     At the time when you believe that vehicular traffic was

25   being obstructed.

1    A     I don't know.

2    Q     I mean hours; correct?

3    A     As I said, I do not know.

4    Q     Well, how long had you been there?

5    A     I -- we had been there at work since about 8:00 that

6    morning, and we spent the time between the bus incident and

7    the issuance of the verdict in the Jason Stockley case

8    shadowing protestors and denying access to several highway

9    ramps.

10   Q     Okay.  But the whole time you were there, the bus was

11   stationary?

12   A     I don't know.  I wasn't there.  I was all over the place.

13   Q     I meant the time that you were in the vicinity and you

14   could see the bus.  Was it moving, or was it stationary?

15   A     From the time that we got the orders to go in to the time

16   we got to the bus was probably between five and 10 minutes.

17   Q     And was it stationary during that time?

18   A     It was stationary because it couldn't go anywhere because

19   it was being blocked by protestors.

20   Q     And you don't know how long it had been there and

21   stationary?

22   A     No.

23   Q     It's your understanding that before you maced the people

24   in front of the bus that you had to give them an order to

25   disperse?

1   A      I never gave an order to disperse.

2   Q      What did you do?

3   A      As I testified to previously, I told them to move out

4   from the front of the bus, move out of the way from the front

5   of the bus.

6   Q      So you would not consider someone saying, "Move on" or --

7   to be an order to disperse, would you?

8   A      No.

9   Q      What treatment did you give to the persons who you maced?

10  A      None.

11  Q      And why not?

12  A      Because I was focused on getting the buses out of there

13  and then by the time it was -- we -- we didn't -- focusing our

14  efforts on arresting the folks that were in front of the bus

15  was not the priority at the time.  The priority was bringing

16  the situation to a point where it was safe, which included

17  removing the buses from the angry crowd.

18  Q      Okay.  And I'm sorry.  Maybe I misspoke.  I was asking --

19  I wasn't asking why you didn't arrest.  I was asking why you

20  didn't treat the individuals that you exposed to pepper spray.

21  A      Because I didn't have an opportunity to arrest them.

22  Q      Okay.  You understand that policy requires you to treat

23  people who you expose to pepper spray?

24  A      I'm well aware of that, yes.

25  Q      When you -- when you heard Mr. Rossomanno give dispersal

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 145 of 248 PageID #:
4565
Matthew Karnowski Cross-examination                              Volume 2

145

1    orders, do you recall how many he gave?

2    A    Are we going back to the Sunday night incident?

3    Q    Yes, we're back to Sunday night, the 17th.

4    A    Okay.  It was numerous, but I don't recall specifically.

5    Q    All right.  And what does "dispersal" mean to you as a

6    police officer enforcing dispersal orders?

7    A    Leave the area.

8    Q    And what does "the area" mean?

9    A    I guess that's something that has to be grounded in

10   common sense.  If, again, I were a downtown resident and I

11   overheard police officers commanding me to leave the area, I

12   wouldn't be found anywhere close to what's going on there.

13   Q    Okay.  So if you're at 9th and Olive and there's a

14   dispersal order, is Washington and Tucker leaving the area?

15   A    That's only a couple blocks away.

16   Q    So is it leaving the area or not?

17   A    I guess that's a pretty subjective question.

18        MR. ROTHERT:  Okay.  I have no further questions.

19        THE COURT:  Redirect.

20        MR. MCDONNELL:  No further questions for the

21   sergeant.

22        THE COURT:  All right.  You may step down.

23        THE WITNESS:  Thank you, Your Honor.

24        THE COURT:  We're going to take a 10-minute recess.

25   Court's in recess for 10 minutes.

```
 1        (Court recessed from 3:08 p.m. until 3:22 p.m.)

 2             THE COURT:  All right.  You may call your next

 3   witness.

 4             MR. RELYS:  Defendants call Sergeant Brian

 5   Rossomanno.

 6             THE COURT:  All right.  Would you step right here to

 7   the clerk to be sworn, sir?

 8             THE WITNESS:  Good afternoon, Your Honor.

 9             THE COURT:  Good afternoon.

10                        BRIAN ROSSOMANNO,

11   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

12   FOLLOWS:

13                        DIRECT EXAMINATION

14   BY MR. RELYS:

15   Q    Ready?  Good afternoon, Sergeant.  Could you please state

16   your name for the record?

17   A    Brian Rossomanno.

18             MR. RELYS:  And does the court reporter know how to

19   spell that?

20             COURT REPORTER:  (Nods head up and down.)

21   Q    (By Mr. Relys) Okay.  What's your occupation?

22   A    I'm a sergeant with the St. Louis Police Department.

23   Q    And how long have you held that rank?

24   A    Twenty years.

25             THE COURT:  Excuse me a second.
```

Brian Rossomanno Direct Examination                    Volume 2

147

1          THE WITNESS:  Or I'm sorry.  The rank?

2          MR. RELYS:  The rank.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  Hold on just a second.  Excuse me.

5          I just want to remind the spectators that cell phones

6     are not allowed.  They have to be turned off.  When I see you

7     walking in, holding them in your hands it makes me wonder if

8     you're really following the rules.

9          Okay.  Go ahead.

10    Q    (By Mr. Relys) All right.  How long have you held the --

11    well, let me back up.  How long have you been a police

12    officer?

13    A    Twenty years.

14    Q    All right.  And how long have you been a sergeant?

15    A    Almost seven.

16    Q    All right.  And what's your current assignment?

17    A    I'm assigned to the Bureau of Community Policing.

18    Q    And what are your duties in that assignment?

19    A    Main duties are I'm the coordinator for Civil

20    Disobedience Team.  I'm also a supervisor for SWAT team.

21    Q    Okay.  And tell us briefly what the Civil -- CDT?

22    A    CDT is what we refer to it.

23    Q    Some call it CDT?

24    A    Yes, sir.

25    Q    What's that?

Brian Rossomanno Direct Examination                    Volume 2

1   A     Again, it stands for Civil Disobedience Team.  It's

2   tasked with handling any events of civil unrest, protests,

3   managing protests, that sort of thing.

4   Q     Okay.  Have you been involved, in your capacity as a

5   police officer, in the police's response to the protests that

6   have emerged since the Jason Stockley verdict?

7   A     Yes, sir.

8   Q     All right.  And were you involved on the day of that

9   verdict, on September 15th, 2017?

10  A     Yes, I was.

11  Q     Okay.  We've talked a little bit in here over the past

12  couple days about an incident that occurred on that day, sort

13  of involving some buses?

14  A     Yes, sir.

15  Q     Were you involved in that incident?

16  A     Yes, I was.

17  Q     All right.  Tell us briefly what your involvement was in

18  the bus incident.

19  A     Our involvement -- we were staged at our Police Academy,

20  which is located on Tucker, just south of Clark.  A crowd had

21  amassed at the intersection of Market and Tucker following the

22  announcement of the verdict, and they -- they had been there

23  for a considerable amount of time.  Eventually, that crowd

24  conducted some marches and eventually ended up marching south

25  on Tucker to our location at the Police Academy.  We had four

Brian Rossomanno - Direct Examination                    Volume 2

149

1    or -- I think, oh, we had all four CDT teams at that location.

2    And what developed eventually was kind of just a standoff.  We

3    had some CDT lines formed facing to the north.  We also had

4    some CDT lines formed facing to the west.  And each group had

5    a group of protestors in front of those lines engaging them.

6    Q    Okay.  And you said there was a standoff?

7    A    What I would describe as a standoff, basically, yes.

8    Q    How is it -- once it was determined there was a standoff,

9    how is that -- what action was taken?

10   A    I consulted with the incident commander, and we were both

11   in agreement that, you know, the best way to de-escalate the

12   situation was just to pull our officers out of the area.

13   While it was a standoff, tensions -- you could read that

14   tensions were getting a little higher.  So it was our

15   determination, "Let's pull our officers out of the area and

16   hopefully de-escalate it."

17   Q    Okay.  And incident commander is who?

18   A    Lieutenant Colonel Jerry Leyshock.

19   Q    All right.  And so the decision was made to move those

20   buses?

21   A    Yes.

22   Q    And did that -- did that occur?

23   A    We attempted to.  We loaded two buses up with our CDT

24   officers, and it was immediate.  Even before all of our

25   officers were on the bus, as soon as we broke our lines down,

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 150 of 248 PageID #: 4800
Brian Rossomanno Direct Examination                          Volume 2

                                                                    150
1    the group immediately surrounded both buses, and both buses

2    were unable to move.

3    Q    Okay.  Were the buses -- were there any -- besides

4    surrounding the buses, were there any other acts of violence

5    from the crowd?

6    A    Yes.  They immediately -- several suspects began throwing

7    rocks and bottles at the buses.  I put out multiple

8    descriptions of individuals that I observed myself throwing

9    rocks at the buses, throwing rocks at the officers as they

10   attempted to get on the bus.  It became very violent very

11   quick.

12   Q    And where were you during this?

13   A    I was on Clark, kind of bouncing back and forth between

14   the west and east side.  I'm sorry.  Tucker.  Kind of bouncing

15   back and forth between the west side and east side of the

16   street.

17   Q    Okay.  We've had -- we've had previous witnesses -- well,

18   I guess one other witness, Lieutenant Sachs, described his

19   location, which was inside the Police Academy building.

20   A    I believe they were, yes.

21   Q    You were not -- you were not with them?

22   A    No.  I was down on the street.

23   Q    You were down on the street.  Okay.  So you witnessed --

24   you personally witnessed while you were down on the street

25   people throwing rocks and bottles?

Brian Rossomanno - Direct Examination                    Volume 2

151

1    A    Yes, sir.

2    Q    Anything else they were throwing?

3    A    It appeared at that time it was just rocks and water

4    bottles.

5    Q    Okay.  And they were surrounding the buses?

6    A    Yes.  There were two buses that remained, and both buses

7    were completely surrounded, unable to move.

8    Q    So how -- what action was taken then by the police?

9    A    At that point, we decided we were going to pull one team

10   off of one of the buses and form what we call a skirmish line

11   with those officers to create some space between the

12   protestors and the buses so that way we could get one bus out,

13   and then we were going to utilize the bikes to come in and

14   help us get the other bus out.

15   Q    Okay.  And so when you're -- I was going to -- that was

16   my next question.  When you're talking about the officers

17   coming off the buses, we're talking about the CDT officers?

18   A    Yes, sir.

19   Q    And those are the guys in the tactical gear?

20   A    Correct.

21   Q    All right.  How did that plan work?

22   A    It took us a second to get it organized, to get those

23   officers -- it was hard for them to even get off the bus

24   because, as I said, the protestors had it surrounded.  So they

25   almost had to push their way off the bus to get out and form a

1  line.  I believe the first line we formed was kind of on the

2  west side of the buses, and we tried to turn it kind of like a

3  door on a hinge to face north just to create that buffer space

4  so the buses could reverse out because going forward wasn't an

5  option.  So we were going to try to back them out.

6  Q    Okay.  And was that ultimately successful?

7  A    Eventually.

8  Q    How long do you think it took?

9  A    Several minutes.  I'd say to get both buses out of there

10  it took probably a half hour, if maybe 20, 30 minutes.

11  Q    Okay.  And did the protestors ever sort of let up and

12  decide it was okay, you know, grant the buses leave to leave?

13  A    Not willingly, no.  And there were several arrests as a

14  result.

15  Q    All right.  Do you remember what those arrests would have

16  been for?

17  A    It would have been for interfering.  I know the one was

18  for interfering.  There was one arrest for multiple counts of

19  assault on law enforcement for throwing rocks, a subject that

20  was taken into custody that we identified as one of the guys

21  that was throwing rocks.

22  Q    Any dispersal orders given during this time period?

23  A    There were.

24  Q    How were those given?

25  A    They were given initially by me from the PA in my

1   vehicle, but then once I was out on foot, I was verbally

2   continuing to give those orders.

3   Q     Okay.  Munitions?

4   A     There were no chemical munitions used.

5   Q     Okay.  Any other notable events or incidents of violence

6   downtown that day?

7   A     Later on, yes, there were.

8   Q     Tell me about that.

9   A     When we were finally able to get the buses out of there,

10  again, our goal was to de-escalate, disengage, and we pulled

11  out of the area.  We did make the mistake of leaving a police

12  vehicle behind.  There was a police vehicle parked on Clark,

13  directly in front of the main entrance of the old police

14  headquarters.  As we pulled out of the area, the crowd

15  filtered back into that intersection, and it didn't take long

16  before damage to that vehicle started taking place.

17  Q     Okay.  And where were you?  Did you witness the police

18  vehicle being damaged?

19  A     I did, yes.

20  Q     Where were you?

21  A     I was up near the Scottrade Center initially, coming down

22  like 14th and Clark.  All I could really see was that somebody

23  was standing on top of the vehicle, and then there was a big

24  crowd around the car.

25  Q     Were there police officers in the area at that time?

Brian Rossomanno Direct Examination                Volume 2

154

1   A    There were, yes.

2   Q    And in the area of that police vehicle, the direct

3   vicinity of that police vehicle?

4   A    Not immediately, not when the damage to the vehicle

5   started, but some officers had moved in to try to, you know,

6   put a stop to it.

7   Q    Okay.  And how -- what was the police response, if any,

8   to the police vehicle being damaged?

9   A    Initially, I believe it was some Special Ops detectives

10  had gone down there, and they were quickly overwhelmed because

11  there weren't that many of them.  I would say maybe 10

12  officers initially went down.  They were immediately

13  surrounded by the crowd, and I could see -- as I approached

14  from the north, I could see items starting to be thrown at

15  them.  At that point, I believe the bikes came in, and they

16  tried to do what we call a separation tactic.  The bikes tried

17  to come in and separate the crowd from the vehicle and our

18  officers that were being assaulted by thrown items.

19  Q    Okay.  You talk about the Special Ops guys.  What were --

20  how were they dressed?  What was their -- what was their

21  uniform?

22  A    Normal uniform.

23  Q    Tactical gear?

24  A    No, sir.

25  Q    All right.  And you said the bikes came in to assist?

Brian Rossomanno Direct Examination                    Volume 2

155

1    A    Correct.

2    Q    What were the bikes -- how were they outfitted?

3    A    I'm sorry?

4    Q    How were they outfitted?

5    A    Normal bike uniform with bicycle helmets really as their

6    only protective gear.

7    Q    So no armor?

8    A    No, sir.

9    Q    No shields?

10   A    No, sir.

11   Q    Okay.  Did the CDT teams get involved in this?

12   A    Yes, they did.

13   Q    Describe their involvement -- the CDT.

14   A    The bikes were relatively ineffective initially, and then

15   once we saw the objects being thrown, obviously, we have

16   officers out there without their personal protective

17   equipment.  So we had to bring CDT in.  We brought them.  To

18   be honest with you, I can't remember what direction they came

19   from, but eventually, they formed a line.  Kind of the same

20   separation technique we tried to do with the bikes, we did

21   with the CDT officers, and they were able to form a line kind

22   of facing to the northeast through the intersection, between

23   the crowd and the police vehicle and the other officers.

24   Q    All right.  And what was the purpose of forming that

25   line?

Brian Rossomanno Direct Examination                    Volume 2

156

1   A    Mainly, again, to get separation between the crowd and

2   the vehicle and those officers that were being assaulted by

3   the items that were being thrown, but at that point, we wanted

4   to push them north away from that intersection.

5   Q    So you wanted to push people off of Clark north?

6   A    Correct.  On Tucker.

7   Q    Okay.  So it would sort of be north.  It would be sort of

8   like northeast or -- is that -- is that right?

9   A    Northeast, yes, sir, that would be accurate.

10  Q    Okay.  Were you ultimately successful in doing that?

11  A    Ultimately, yes.  It took some time.

12  Q    Any officers injured during that incident that you

13  observed?

14  A    Yes, there were.

15  Q    How -- are you aware specifically of any of those

16  injuries?

17  A    The ones I remember are Sergeant John McLaughlin, I

18  believe, got hit in the head with a bottle, and then we had

19  two officers that we sent over to EMS to get treated for some

20  sort of unknown substance was thrown on them, and they were

21  feeling a burning sensation to their skin.

22  Q    How about -- backing up to the bus incident, any officer

23  injuries sustained during that?

24  A    There were officers that were hit by items, but as far as

25  I know, they all refused treatment.

157

1    Q    Okay.  Did the -- did -- after the streets were cleared

2    or the protestors were dispersed after the damaged vehicle

3    incident --

4    A    Yes, sir.

5    Q    -- were there any more notable instances of violence

6    downtown?

7    A    Umm, not really on that day, no.

8    Q    Okay.  How about elsewhere in the city?

9    A    On the evening of Friday of the verdict, yes, sir.  We

10   had some issues in the Central West End.

11   Q    Okay.  And were you involved in the police response in

12   the Central West End?

13   A    Yes, I was.

14   Q    All right.  Tell us -- tell us how the evening developed

15   in the Central West End.

16   A    We had actually, once again, pulled out of the area in an

17   effort to de-escalate, and most of our officers were back at

18   our staging area.  Then we received word of -- that a march --

19   a group had formed in the Central West End.  I believe around

20   Euclid and Maryland.  I may be wrong about that.  But that

21   they were marching, and at that time, it was peaceful.  So it

22   was our approach to not intervene, to let them march, let them

23   do their thing, and just stay back and see what happens.

24   Q    And were you involved in monitoring that march?

25   A    I was, yes.

Brian Rossomanno  Direct Examination                    Volume 2

158

1   Q    Was it peaceful?

2   A    It was.  They were blocking the streets and such, but no

3   acts of violence or anything like that.

4   Q    Okay.  Did the demonstrations or the protestors remain

5   peaceful throughout the night?

6   A    No, they did not.

7   Q    All right.  Tell us -- tell us about how -- what changed

8   and when?

9   A    They began to march.  It was after sunset, and it was

10  clear, at least to us, that they were heading towards the

11  Mayor's residence, and then that drew concern for us, and then

12  once they arrived at the Mayor's residence, we received

13  numerous calls over the radio from -- we had Special Ops

14  detectives posted up on the Mayor's house, and we were

15  starting to get a lot of calls from them that they were being

16  overwhelmed.  They had items being thrown at them.  Damage was

17  being done to the Mayor's house, and so we responded to that.

18  Q    And where -- when you started receiving these calls --

19  you said you had withdrawn; right?

20  A    Correct.

21  Q    So when you started getting this information about the

22  Mayor's house and you started receiving these calls, where

23  were you?

24  A    I was still in the Central West End area.  I want to say

25  I was down on Lindell, like around Lindell and Euclid.  So I

Brian Rossomanno Direct Examination                    Volume 2

159

1    wasn't that far away.

2    Q    Were you -- you weren't with the command staff?

3    A    I'm sorry?

4    Q    You weren't with the command staff?

5    A    No, sir.

6    Q    You were out in your patrol car?

7    A    Correct.

8    Q    All right.  And when you got those calls, what did you

9    do?

10   A    I started heading towards that area because it seemed

11   pretty urgent.  The calls for help from the Special Ops

12   detectives were -- you know, it wasn't -- they were actively

13   calling, "We need more cars up here."

14   Q    And what was your sense of why they needed more cars?

15   Why was it urgent?

16   A    Just the size of the crowd.  They said that the crowd was

17   in the several hundreds and that they had items being thrown

18   at them.  So that was really the exigent circumstances I was

19   looking at.

20   Q    Are these the same Special Ops guys who were involved

21   earlier in the day?

22   A    Same unit.  I can't say it was the same exact people.

23   Q    Were they outfitted the same way?

24   A    Yes, sir.

25   Q    So tell us again what that was.

1    A    Normal uniform.  Their regular street soft body armor.

2    Some of them may have had helmets, but some of them didn't.

3    Q    So sort of how you're dressed today?

4    A    Correct.  Yes, sir.

5    Q    All right.  And for the record, you're not wearing a riot

6    shield or anything like that?

7    A    No.  I'm in normal standard duty uniform.

8    Q    All right.  Okay.  So you responded to -- what's the

9    approximate intersection or coordinates of this crowd in the

10   Central West End?

11   A    I arrived at the intersection of Lake and Waterman.

12   Q    Okay.

13   A    And I had to stop there because there was -- there was no

14   way I could get up to -- I believe it's 502 Lake.  There was

15   no way I could get up to there just because the crowd was so

16   massive and in the street.  I wasn't even going to try to

17   drive my vehicle through it.

18   Q    All right.  Where did you park?  What direction did you

19   come from, and where did you park your vehicle?

20   A    I came from the east and parked my vehicle facing to the

21   east on -- on Waterman at Lake.

22   Q    Okay.  So you got pretty close to the intersection?

23   A    I did, yes, sir.

24   Q    All right.  And do you have any sense about what time

25   this is?

Brian Rossomanno - Direct Examination                    Volume 2

161

1    A     I would guess, ballparking, around 9:00.

2    Q     All right.  Was it dark out?

3    A     Yes, it was.

4    Q     And what did you see when you got to the intersection?

5    A     I saw what can only be described as a crowd of several

6    hundred people in all directions, mainly to the north of me,

7    towards the Mayor's house, but there were also people to the

8    east and west.

9    Q     And how were they behaving?

10   A     A lot of running through yards, a lot of screaming and

11   hollering, and then there were continued calls from the

12   detectives at the house that they were being pelted with

13   thrown items.  So I, on foot, made -- I made my way up to them

14   on foot.

15   Q     All right.  Did you see any of those items being thrown?

16   A     Yes, I did.  Numerous.

17   Q     So you verified that through your own personal knowledge?

18   A     Yes, sir.

19   Q     What sort of items were being thrown?

20   A     Rocks and bottles.  Some bricks.

21   Q     Were you able to determine, with a crowd that size, where

22   exactly the rocks and bottles were coming from?

23   A     From within the crowd.  I couldn't pinpoint individuals.

24   The crowd was just so big, and you would just see items.

25   You'd see the trajectory come from within the crowd towards

Brian Rossomanno Direct Examination                         Volume 2

                                                                    162

1    the officers.

2    Q    All right.  Any of those items hit the officers?

3    A    I'm not sure.

4    Q    Okay.  Any property damage at that location that you saw?

5    A    Yes, there was.

6    Q    What did you see there?

7    A    I observed the Mayor's house had a broken window and then

8    some red paint splattered on the side of it.  At that point,

9    that's all the property damage I'd seen, but there was much

10   more to come.

11   Q    All right.  Okay.  So you respond to the scene.  You make

12   your way to the house where the Special Ops guys are

13   stationed.

14   A    Right.

15   Q    What happens after that?

16   A    Pretty much almost immediately when I got there, we

17   turned to face the crowd, and we had very limited manpower.

18   There was only so much we were going to be able to do, but we

19   started ordering the people to leave the area.  And fairly --

20   within a minute of being there, I received a faceful of what I

21   determined to be pepper spray from within the crowd.  And it's

22   documented on our radio tapes.  I told the dispatcher, "I've

23   been hit.  The crowd has their own mace.  I've been hit, and

24   I'm going to be incapacitated for a few minutes," which I was.

25   Q    So you got hit by pepper spray at the house?

1    A      Yes, I did.

2    Q      And how long did it take you to -- did you -- did you

3    take any action to get rid of the pepper spray?

4    A      There were people -- again, I couldn't even tell who it

5    was.  I was fairly confident that it was police officers I was

6    surrounded by.  So I didn't feel too panicked, but there were

7    officers handing me water bottles, and I was kind of just

8    doing some self-aid to get myself, you know -- you know, to

9    get my faculties functioning again.

10   Q      How long do you think that took?

11   A      It took at least five minutes, if not longer.

12   Q      All right.  If I asked you questions about what was

13   happening around you during that time period, would you be

14   able to answer them?

15   A      During that five to seven minutes, not really.  Only that

16   I could hear a lot of screaming and yelling and I could hear

17   officers ordering people to leave the area, but other than

18   that, I couldn't see anything.

19   Q      All right.  Once you got -- once you recovered your

20   faculties, what happened next?

21   A      At that point, things have kind of gotten under control

22   at the house, at the Mayor's residence.  I'm sorry.  So I

23   headed back south, down Lake, back to my vehicle.

24   Q      Okay.  And what did you see?

25   A      By that point, Lieutenant Colonel Leyshock had arrived,

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 164 of 248 PageID #:
4814
Brian Rossomanno Direct Examination                         Volume 2

164

1   and I consulted with him, and he really was in agreement that

2   we had an unlawful assembly.  And so I got into my vehicle,

3   and I immediately started announcing that the assembly was

4   unlawful, and I started giving a dispersal order.

5   Q    Okay.  And is that the dispersal order that -- what are

6   the general contents of that dispersal order?

7   A    I announce, "This is an unlawful assembly," and I

8   articulate what is making it unlawful.  "You are impeding the

9   flow of traffic."  For this particular incident, it was an

10  unlawful assembly.  "You are destroying property.  You are

11  assaulting officers."  So I line out for them what the

12  violation is.

13  Q    Okay.

14  A    Give them an avenue of egress, what direction it is we

15  want them to go to leave the area, and generally tell them the

16  amount of time they have to do so.  And we also advise them

17  that anybody who remains in violation of that order is subject

18  to arrest and/or other actions, up to including the deployment

19  of chemical munitions.

20  Q    Okay.  Is that essentially the order that you gave at

21  that time?

22  A    Yes, sir.

23  Q    And you gave that, you said, over the PA system of your

24  car?

25  A    Yes, sir.

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 165 of 248 PageID #: 4615
Brian Rossomanno Direct Examination                          Volume 2

165

1   Q    All right.  Did people disperse when you --

2   A    Some did.

3   Q    Okay.  And when you say some did, how do you know they

4   were dispersing?

5   A    We could see people immediately walking, especially to

6   the west.  A lot of people left to the west.  The group to the

7   east was a little more defiant than the group to the west, but

8   you could see people walking down the street, walking through

9   yards, getting to the sidewalks, and you could see them

10  walking away.  So it was my assumption that they were

11  complying.

12  Q    All right.  After you gave that dispersal order -- and

13  you did warn about chemical munitions at that point?

14  A    I'm sorry?

15  Q    I said you did warn about chemical munitions?

16  A    Yeah.  It's a standard.  It's built into the dispersal

17  order that chemical munitions -- that chemical munitions might

18  be used.

19  Q    All right.  And that was part of that dispersal order you

20  gave?

21  A    Yes, sir.

22  Q    What happened after that?

23  A    By that point, we had -- CDT teams had arrived both from

24  the City and County.  The County CDT team formed a line to the

25  west, facing to the west.  The City team formed a line facing

1  to the east.  The crowd to the east was considerably larger

2  than the crowd to the west.  We were still having items thrown

3  at us from within the crowd.  And then we were just formed up,

4  and the determination was made that we were going to hold the

5  County line to the west and we were going to have the City

6  line to the east push that crowd back towards Kingshighway.

7  Q    What was your -- did you take -- did you take any action

8  at this time?

9  A    Yes, I did.

10 Q    What'd you do?

11 A    Again, after several dispersal orders, I got out of my

12 vehicle, and again, we were still receiving incoming rocks and

13 bottles.  There was a group to the west.  Although they were

14 smaller, they were still throwing items.  So I deployed one

15 handheld inert smoke grenade to the west in an effort to just

16 disperse.  Again, inert smoke.  It wasn't gas or anything.

17 When that didn't work, I deployed one handheld OC grenade to

18 the west.

19 Q    About how long -- when you say it didn't work, how long

20 about did you wait?

21 A    I'd say two to three minutes.

22 Q    Okay.  And the second thing you deployed was what again?

23 A    It was a handheld OC grenade.

24 Q    So it's essentially pepper spray?

25 A    Essentially, yes, sir.

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 167 of 248 PageID #:
4817
Brian Rossomanno Direct Examination                    Volume 2

167

1  Q    And did that have any effect on the protestors that you

2  saw?

3  A    It got a few more of them to leave, but it didn't have

4  the effect that I would have liked.  The crowd still -- the

5  crowd, for the most part, still remained, but some people did

6  leave.

7  Q    All right.  And this was to the west, you're saying?

8  A    Correct.

9  Q    Where the County CDT is pushing?

10 A    Well, they weren't pushing.  They were holding at that

11 point --

12 Q    They were holding the line.

13 A    -- because they didn't really have the numbers up there

14 yet to do a push.

15 Q    Got it.  Okay.  What happens after you deploy the smoke

16 and the handheld OC?

17 A    I remained there momentarily, and our City team started

18 pushing to the east.  And as they did so, they got probably a

19 couple blocks away from where I was towards Kingshighway, and

20 then that's when I heard a call come out for an officer down.

21 I had no idea if -- it didn't articulate was that the result

22 of gunfire, were they hit by something, but it sounded like

23 things were kind of still very fluid and very out of control

24 to the east while the west side had kind of calmed down.  So I

25 decided I'm going to go ahead.  I checked with the county

1    commander.  You know, I made sure they were okay with what

2    they had.  He stated they were.  So then I went to the east to

3    help assist down on that end.

4    Q    Okay.  So you went and rejoined the City folks going

5    east?

6    A    Yes, sir.

7    Q    About where was it that you rejoined them?  Were you at

8    Kingshighway yet?

9    A    They had made it to Kingshighway by the time I caught up

10   to them.

11   Q    Okay.  There's been some testimony and evidence in this

12   case about some of the protestors running into a couple of --

13   there's a synagogue and a church at the intersection of

14   Waterman and Kingshighway?

15   A    Correct.  It's at the southwest corner, I believe.

16   Q    Okay.  Did you -- were you there when any of the people

17   ran into that building?

18   A    They were already in there by the time I got up there.

19   Q    Okay.  Did you see anybody chase them in there?

20   A    No, I did not.

21   Q    Okay.  Did you chase them in there?

22   A    No, I did not.

23   Q    Okay.  So you get to the intersection.  You rejoin the

24   unit or the CDT teams pushing east on Waterman at

25   Kingshighway.  Where does it go from there?

Brian Rossomanno - Direct Examination                    Volume 2

169

1   A    Most of the protestors had gone across Kingshighway, and

2   I believe it turns into Hortense there.

3   Q    Okay.

4   A    Is that accurate?

5   Q    I'll tell you that it is.

6   A    So they were on Hortense, across from Kingshighway, and

7   the entrance to that street -- there's kind of these concrete,

8   decorative things that they were hiding behind, and every now

9   and then, they'd pop up from behind it, throw a rock, duck

10  back down, that sort of thing, and so there was at one point

11  there where I deployed another smoke and another handheld OC

12  grenade because we were catching rocks being thrown from them

13  hiding behind those -- I'm struggling to find the word to

14  describe -- the concrete entrance to that neighborhood.

15  Q    Sort of gateway?

16  A    Right.

17  Q    All right.  Did that have any effect -- the smoke and

18  the -- and the --

19  A    Not really.  They just moved a little more east.

20  Q    Okay.  Were any more warnings given at that point?

21  A    Yes.  We were giving warnings the whole time.

22  Q    Okay.  And how were those warnings being given?

23  A    At that point, they were given just verbally by me.  I

24  did not have my vehicle with me.  So I didn't have the PA, but

25  it was just across the street.  I don't think they had any

Brian Rossomanno - Direct Examination                    Volume 2

170

1    issues hearing me.

2    Q    All right.  And would that be the full warning, or was it

3    some sort of truncated warning?

4    A    A little bit of both.

5    Q    Okay.  And if it was truncated, in what fashion?  What

6    sort of -- what would you have like left out of the main

7    warning?

8    A    The verbiage probably just would have been, "It's time to

9    leave.  You need to leave the area.  This is an unlawful

10   assembly."  And then I would give the verbatim order as well.

11   Q    All right.  So you gave it both ways at that point?

12   A    Yes, sir.

13   Q    Okay.  All right.  What happened after that?

14   A    We continued to push.  Because as I came down Waterman, I

15   observed -- just following the path of the crowd, I observed

16   numerous vehicles that had been vandalized with "FTP"

17   spray-painted on the side of them, windows broken out.

18   Q    FTP -- what does that mean?

19   A    Pardon me, but "Fuck the police."

20   Q    Okay.

21   A    So as we, you know, saw them congregating on the next

22   block over, we had no reason to believe they wouldn't do the

23   same thing on that block.  So, again, our goal at this point

24   was to disperse the crowd.  So we continued our march east, I

25   guess, onto Hortense towards Euclid.

1  Q    And what were the conditions like on Hortense?

2  A    The same.  I observed a lot of vehicles had been

3  vandalized, and as we moved, they moved.  So the push

4  continued on to the east, and they continued to throw items at

5  us as they went.

6  Q    Did you engage -- did you or the officers you were with

7  engage the protestors with any more munitions during this

8  period?

9  A    I did not.  The -- there was some SWAT officers with us,

10 and there were some PepperBalls fired, but other than that,

11 there were no other munitions used just because of that

12 neighborhood.  There's no reason to -- you know, I didn't want

13 to destroy that street essentially.

14 Q    Okay.  How about mace or OC spray?

15 A    At that point, I didn't observe any of that.

16 Q    Okay.

17 A    They were keeping enough of a distance from us that it

18 would have been ineffective.

19 Q    All right.  So it sounds like they were keeping sort of

20 like a calculated distance between themselves and you?

21 A    Yes, sir.

22 Q    All right.  After you -- does -- Hortense is sort of a

23 short street?

24 A    Yes, sir.

25 Q    And what does it empty out onto?

Brian Rossomanno Direct Examination                    Volume 2

172

```
 1   A    Empties out onto Euclid.

 2   Q    All right.  Did you eventually come to Euclid?

 3   A    We did.

 4   Q    And tell us what happened then.

 5   A    We held our position at Euclid for quite some time,

 6   mainly, because there were still issues going on behind us and

 7   to the south of us.  So we held at Euclid.  The group of the

 8   protestors at that point was fairly small.  I'd say 25 to 30

 9   that we were dealing with.  We were aware that there were

10   other scenes active at the time.  They were mainly on the east

11   side of Euclid.  We stayed on the west side, again, within the

12   confines of the decorative gate.  Again, I apologize.  I can't

13   come up with a better way to describe it.  So it was kind of

14   like I described earlier, kind of a standoff at that point.

15   We were kind of just letting them be there for a minute

16   because we didn't have the resources to do much more than that

17   at that point.

18   Q    All right.  I mean, were they still under orders, in your

19   mind, to disperse?

20   A    Absolutely.

21   Q    Had they been told to disperse?

22   A    Yes.

23   Q    Just one time?

24   A    Dozens of times.

25   Q    Okay.  But they're still hanging around?
```

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 173 of 248 PageID #: 4823
Brian Rossomanno Direct Examination                    Volume 2

173

1  A     Yes, sir.

2  Q     And you say that you're sort of at a standoff.  Is that

3  because -- is that because you were okay with them hanging

4  around there?

5  A     No, but we were kind of at a point where we were just

6  kind of waiting for direction from the commanders of what they

7  wanted us to do because, as I said, I knew -- just based off

8  the radio transmissions, I could tell that there were some

9  issues to the south of us that they were dealing with.  We

10  still had -- as far as I knew, we still had the County back

11  there at Lake dealing with an issue to the west.  So we were

12  kind of just, what we would say, standing by, waiting to find

13  out what it is they wanted us to do and who was going to need

14  help.

15  Q     Are you still taking rocks and bottles at this point?

16  A     At that point, not so much, no.

17  Q     At some point, did you get orders to move from that

18  location?

19  A     Yes.  We were told to push that crowd north in an attempt

20  to disperse them and if we had to start making arrests we

21  could do so.

22  Q     Okay.  And did you -- was it your job or your assignment

23  to lead that team?

24  A     Yes, it was.  I had the South Patrol CDT team was with

25  me, and there's a lieutenant that's in charge of that.  So the

174

1    lieutenant would have actually been in command of that team,

2    but I was certainly there to assist the lieutenant in managing

3    that.

4    Q    And who was that lieutenant?

5    A    It was Lieutenant Bill Kiphart.

6    Q    Okay.  He was in charge of the South CDT team?

7    A    Yes, sir.

8    Q    Is that the team that went north?

9    A    Yes, it is.

10   Q    So in this case, South went north?

11   A    Correct.

12   Q    All right.  And you went with this group of CDT officers?

13   A    Yes, I did.

14   Q    And you went -- you're traveling north on what street?

15   A    On Euclid.

16   Q    And how far north did you go?

17   A    We went about three blocks, up to McPherson.

18   Q    Okay.  And McPherson is the street where on the -- it has

19   Pi Pizza?

20   A    Correct.  That's on the northeast corner of the

21   intersection.

22   Q    And also Left Bank Books if I'm incorrect or correct?

23   A    I believe, yeah, Left Bank Books is on the southwest

24   corner.

25   Q    Southwest.  All right.  Okay.  So you pushed forward to

1  that intersection?

2  A    Correct.

3  Q    How many officers are with you?

4  A    I had one CDT team, which would be approximately four

5  squads.  So about 40 officers.

6  Q    Okay.  And is this tactical -- tactical officers?

7  They're in tactical gear?

8  A    They're in personal protective equipment, CDT gear.

9  Q    Okay.  And is the lieutenant with you, or is the

10  lieutenant back further south?

11  A    Lieutenant was with me.  Lieutenant Kiphart was with me.

12  Q    All right.  What happened when you reached the

13  intersection of McPherson and Euclid?

14  A    We reached that intersection, and there were some people

15  that had come out of the businesses to kind of just watch what

16  was going on, but there was a group to the north of McPherson,

17  the same group we'd been dealing with when I described the

18  little standoff we had once we hit Euclid.  That same group

19  had pushed north, and they were in the middle of the street.

20  I should go back.  When we were at Euclid and McPherson, we

21  started to see a lot of cars were coming by, a lot of cars

22  with some familiar faces that I'd known to be with the protest

23  group.  So we knew vehicles were involved at this point.

24  Q    What do you mean vehicles were involved?

25  A    Oh, as they -- they would drive up and down -- the street

Brian Rossomanno - Direct Examination                    Volume 2

176

1   was still open at that point.  As they'd drive up and down the

2   street, they would yell and curse at us and that sort of

3   thing.  And, again, faces that I recognized from earlier.  So

4   I knew that they were there participating in the protest.

5   Q    So the protestors are getting around not just on foot but

6   in cars?

7   A    Some in cars, yes, sir.

8   Q    Okay.

9   A    So that's an obvious concern.  So when we reached

10  McPherson, as I said, we had that group that was just to the

11  north of us in the street, but also, some cars had amassed up

12  there too, and that creates for us an obvious officer safety

13  concern with a vehicle driving into our line or something like

14  that.  I had communicated with some Special Ops detectives,

15  and at that point, we were going to try to effect some arrests

16  if we could.  We had given numerous orders to leave.  They

17  were violating that order.  So at that point, we felt that

18  failure-to-disperse charges were authorized, and we were going

19  to try to make some arrests.  The problem with that is they

20  were so far enough away from us that if we tried to send an

21  arrest team out to get them, they would just -- and we would

22  just continue this push north until who knows when.  So some

23  Special Ops detectives advised me that they were going to come

24  from an alley; they were going to go north to, I guess, the

25  north alley of McPherson, and they were going to try to come

Brian Rossomanno Direct Examination                    Volume 2

177

1    out the alley and see if they could effect some arrests on the

2    street.  As that was happening, I observed the subjects in the

3    street start throwing rocks to the west towards that alley

4    where I believed the Special Ops officers to be.  So,

5    essentially, those officers had rocks being thrown at them.

6    So at that point, one of the SWAT officers did launch some

7    chemical munitions down the street to try to disperse them and

8    to put an end to the assault with the rocks, and I also threw

9    a handheld smoke in an attempt to disperse the crowd.

10   Q    Okay.  And were warnings given at this intersection?

11   A    Yes, sir.  Numerous.

12   Q    How were they given?

13   A    Verbally from me.  Again, I didn't have my car.  I didn't

14   have the PA, but they were within a distance where they -- I

15   was saying it loud enough that I felt they could hear it.

16   Q    And this was probably the same group that had heard

17   warnings before?

18   A    Absolutely.

19   Q    Did the -- did the smoke and the munition that you fired

20   have any effect?

21   A    The munitions fired by the SWAT officers didn't really

22   have the effect.  The smoke definitely didn't have the effect

23   because I simply didn't throw it far enough.

24   Q    I'm sorry.  I got that wrong.  You threw the smoke?

25   A    I threw the smoke, yes, sir.

Brian Rossomanno Direct Examination                    Volume 2

178

1    Q    Sorry.

2    A    They -- eventually, they -- it pushed them a little

3    farther north to where, again, us going up there and trying to

4    effect an arrest wasn't going to be plausible.  So we just

5    kind of held our position right there, and the detectives

6    pulled out.  So they stopped throwing the rocks, and at that

7    point, we were kind of back at a standoff again.

8    Q    How long did that last?

9    A    At least 30 minutes, if not longer.

10   Q    So you were sort of standing at that intersection for

11   about 30 minutes?

12   A    I would say so, yes, sir.

13   Q    Okay.  At some point, did -- did people from the

14   restaurant engage you?

15   A    Yes, they did.

16   Q    Tell us about that.

17   A    At first, it was verbally, being not in support of us, to

18   say the least.  And then as we had the issue with the subjects

19   to the north and the SWAT officers projected their gas -- when

20   I threw my smoke, as I said, my smoke didn't go -- it wasn't

21   one of my better throws.  It didn't go very far.  One of the

22   patrons from the pizza restaurant actually ran out into the

23   street, picked up that smoke canister, and threw it back at

24   us.  At that point, one of the SWAT officers fired some

25   PepperBall rounds at him.  I don't think he hit him.  He ran

Brian Rossomanno Direct Examination                    Volume 2

179

1    into the restaurant.  Lieutenant Kiphart made the

2    determination we were going to try to effect an arrest on that

3    subject for throwing the item back at us, and as they

4    approached the restaurant, a gentleman who I believed to be

5    the owner of the restaurant came up, locked the door, and

6    prevented the officers from getting inside and making that

7    arrest.

8    Q    After that happened, did you take any more action to try

9    to get inside that restaurant?

10   A    No, we did not.

11   Q    Okay.  How much longer do you think after that incident

12   you've described with the patron from the restaurant picking

13   up the smoke canister and throwing it at you and the

14   PepperBalls being fired back and running back into the

15   restaurant, all of that -- how long after that do you think it

16   was between that and when you ultimately left the area?

17   A    We pulled off to go south probably within five minutes.

18   It wasn't long at all.

19   Q    And that's just based on your memory?

20   A    Yes, sir.

21   Q    All right.  And your ultimate decision to fall back and

22   go back south -- why'd you decide to leave and go back south

23   at that point?

24   A    The team that was working to the south -- I can't

25   remember if that was Central Patrol or North Patrol -- they

1   had a fairly sizable group at Lindell and Euclid that they

2   were dealing with, and so they wanted some help.  They were

3   worried about somebody coming around, like on Maryland,

4   somebody coming around from their west flank.  So they wanted

5   a team to fall back down there and then shut off kind of

6   Maryland and Euclid area to prevent them getting flanked.  So

7   we pulled off from our position at McPherson and moved down

8   there.

9   Q    So when you decided to pull off the position at

10  McPherson, were you guys satisfied at that point that the

11  folks you'd been chasing or following up north that way had

12  dispersed or at least stopped being an issue in the immediate

13  issue?

14  A    They -- at that point, they were far enough away where we

15  couldn't address them really anyway, and at that point, the

16  vehicles that I was concerned about had pulled off.  So I felt

17  the more pressing concerns were to our south.

18  Q    Okay.  All right.  So you -- were you involved or -- or I

19  think you just told us about the reasons why you were --

20  another reason why you were pulling south is because you might

21  have needed to help the teams that were going south?

22  A    Correct.

23  Q    Did you have any involvement in that?

24  A    Not really, no.  We were kind of just a support element

25  at that point.

1  Q    Okay.

2  A    We didn't directly engage the crowd that was down on

3  Lindell.

4  Q    We've heard some testimony about a ballistic vehicle that

5  was authorized to use some rounds in the area of Lindell and

6  Kingshighway.  Were you involved in that at all?

7  A    No, I wasn't.

8  Q    Okay.  Anything else in the Central West End on the

9  evening of Friday, September 15th, that you were involved in

10 that's sort of noteworthy in the sense of engaging protestors?

11 A    No, sir.

12 Q    Okay.  Were you involved -- were there protests on the

13 following Saturday?

14 A    Yes, I was.

15 Q    And you were involved in that --

16 A    Yes, I was.

17 Q    -- the response at least?  I'm assuming you weren't a

18 protestor.

19 A    I'm sorry?

20 Q    I said I'm assuming you weren't a protestor.

21 A    No, no.  I was responding.

22 Q    You were involved in the police response?

23 A    Yes.

24 Q    Tell us a little bit about your involvement, just

25 briefly, involvement in the police response on that Saturday

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 182 of 248 PageID #: 4632
Brian Rossomanno Direct Examination                    Volume 2

182

1   night.

2   A     Yeah.  Saturday, if I remember correctly, was mostly

3   centralized in The Loop area.  During the day, there was an

4   organized march.  Maybe late afternoon, mid to late afternoon,

5   there was an organized march that started -- I believe they

6   met at Cicero's Pizza in U. City.  They had a pretty sizable

7   group, but it was peaceful for the most part.  They had

8   marched east on Delmar.  The came south on Skinker.  If I

9   remember correctly, they then went east on Forest Park, north

10  on maybe DeBaliviere to whatever that next street is, and they

11  came west back to Skinker.  They basically made a big loop in

12  that area, the Delmar-Skinker area.  We stayed off.  We just

13  monitored.  Again, it was peaceful.  Only laws being broken

14  were the blocking of the streets, which we were willing to --

15  more than happy to tolerate, and eventually, they made their

16  way back to their original location in U. City.

17  Q     Was that all during the day?

18  A     Yes, it was, during the daylight at least.

19  Q     Okay.  And did it ever become necessary for the police to

20  engage protestors after they became violent?

21  A     Yes.

22  Q     Tell us just a little bit about that.

23  A     As we were -- we were staged kind of in Forest Park, at

24  least where I was.  We were basically informed by our command

25  that it's going to be U. City's operation and St. Louis County

Brian Rossomanno  Direct Examination                    Volume 2

183

1    can't intervene until U. City requests it and then from there

2    we can't intervene until St. Louis County requests us.  So we

3    were kind of just at a standby mode at that point.

4        Listening to the transmissions on the radio, it became

5    pretty obvious that the U. City officers were overwhelmed

6    fairly quickly.  There were reports of them having items

7    thrown at them, storefront windows being broken, officers

8    being assaulted.  So it didn't take long before U. City

9    requested the County to come in and help.

10       When they did that, when the County started to respond,

11   we went and we began amassing our resources, and we went and

12   staged on -- I want to say Kingsland, just north of Delmar in

13   U. City.  We went and staged.  We just wanted to be in a

14   position that we could get there fairly quickly should the

15   County request our assistance.

16   Q    Did they?

17   A    They did.  It didn't take long before the County called

18   for our assistance as well.  So we formed up our CDT officers.

19   We went down on Delmar, and County had the lead.  They formed

20   the front lines.  We kind of formed lines in behind them for

21   support, and it was their determination that they wanted to

22   push this crowd east and get them out of U. City.

23   Q    And did you help them with that?

24   A    We did, in a support role.  Like I said, our lines were

25   behind their lines as we marched east.

1    Q    So, primarily, your job or your involvement on that

2    Saturday was support, support involvement?

3    A    Correct, until we hit the city limit.  We pushed them all

4    the way to Skinker, and at that point, the City lines replaced

5    the County lines in the front, but by then the crowd had

6    dissipated to -- it was a very small number at that point.

7    Q    Okay.  Any arrests that were made by the City folks?

8    A    Not by the City, no.  I know the County made some

9    arrests, but we did not.

10   Q    Okay.  Now, there had been -- had there been any -- we

11   talked about the property damage; right?

12   A    Yes, sir.

13   Q    Did you also mention or did you -- was there any rocks,

14   bottles, that kind of thing thrown during the --

15   A    There were, yes, several rocks and bottles thrown,

16   several, several windows broken.

17   Q    Okay.  I'm going to move on to the Sunday.  Were there

18   protests on that Sunday?

19   A    Yes, there were.

20   Q    And this is September 17th, I believe.

21   A    Yes, sir.

22   Q    Were you involved in the police response?

23   A    Yes, I was.

24   Q    Tell us about how Sunday unfolded for you.

25   A    Sunday kind of mirrored Saturday in that during the day

1    there was an organized march.  They arrived at Police

2    Headquarters.  It was pretty clear that they planned on being

3    there awhile.  They had supplies dropped off.  They had

4    pallets of water and food.  And so we intended that we were

5    going to be there for a little while.  They had a rally in

6    front of Police Headquarters, and eventually they marched west

7    on Olive.  They went all the way past Harris-Stowe, which is

8    like at Compton, and I believe it was at Compton they made a

9    move to go to the south, and it was our belief they were going

10   to try to take a highway.  The Highway Patrol dealt with that.

11   They formed a line with their CDT officers in front of the

12   highway, blocked them from access to the highway.  So then

13   they went back north, back up to Olive, continued marching

14   west and, eventually, after what I considered to be a very

15   long march, eventually made their way back in front of

16   headquarters.

17   Q    Okay.  And your knowledge of all this -- is it based on

18   the radio traffic, or are you physically present?

19   A    I was present for this.  I observed it.  And, again, we

20   did our normal routine of as long as they're marching, again,

21   they're taking the streets, but it was peaceful.  No property

22   damage.  No assaults.  So we just monitored.  We even blocked

23   traffic for them so no cars could be introduced into the

24   march, and there was no police interaction with protestors at

25   all.

Brian Rossomanno Direct Examination                          Volume 2

186

1           THE COURT:  So were you walking, or were you in a

2    car?

3           THE WITNESS:  I was driving, ma'am.

4           THE COURT:  You were driving.  So you were just

5    driving along, following them?

6           THE WITNESS:  Correct.  Usually, it's myself and

7    Sergeant Jemerson.  Usually, one of us will position ourselves

8    at the front, and then one of us will position ourselves at

9    the rear, just so we can monitor for activity and also divert

10   traffic away from them.

11   Q    (By Mr. Relys) Is that what you were doing that day?

12   A    Yes, sir.

13   Q    Okay.  So you described sort of shadowing this march,

14   what you described as a long march.  What happens after, after

15   that march ends?

16   A    They con --

17   Q    About what time -- could you give us a little bit of an

18   idea, if you know, about what time we're talking to?

19   A    It was getting close to dusk when they returned to

20   headquarters.  Well, they -- I'm sorry.  They went to

21   headquarters, and they remained there and continued their

22   demonstration in front of headquarters.  Around dusk is when

23   it started -- that started to break up, and at that point, we

24   had actually -- as that organized protest broke up, we started

25   pulling our resources out.  And actually, Lieutenant Colonel

1   Leyshock, at one point, called for all CDT officers to return

2   back to our staging area to get fed and get hydrated, and so

3   we had actually pulled everybody out of that area.

4   Q    Okay.  And when you say pulled out and returned to a

5   staging area, where's that staging area?

6   A    Staging area was at Hampton and Elizabeth.  So a

7   considerable distance away.

8   Q    And that sort of involves getting these people on buses

9   and all that?

10  A    Right.  Everybody loaded back up on the buses and

11  conveyed back out to Hampton.

12  Q    Sort of a slow way to move people around?

13  A    I'm sorry?

14  Q    Sort of a slow way to move people around?

15  A    Absolutely.

16  Q    Anyway, so you get out.  You go back to your staging

17  areas.  And I'm sorry.  Tell me again what time we're talking

18  about approximately.

19  A    This was around dusk.  The sun had gone down, and as I

20  said, the organized protest was breaking up.

21  Q    Okay.  What happens after that?

22  A    I personally -- I was heading back towards the staging

23  area.  I got to about 44 and Grand when I started hearing

24  radio transmissions from our bike officers who had remained

25  downtown, as they're stationed out of downtown.  So they

Brian Rossomanno Direct Examination                    Volume 2

188

1   remained there.  Started monitoring transmissions from them

2   about some incidents of there's another group marching,

3   another group of about 75 to 100 people had started marching

4   again, and that we were having some instances of property

5   damage as they marched.

6   Q    So people marching.  There's property damage.  Any more

7   detail than that that you got from the radio?

8   A    No.  That they were mainly in around the 9 to 1000 blocks

9   of Olive is where they were at that moment, where the property

10  damage had initiated.  And so at that point, as I said, I was

11  at Grand and Highway 44.  So I got off the highway, did a

12  U-turn, headed back towards downtown.

13  Q    So you went back.  You were headed away with the rest of

14  the CDT folks, but you decided to turn back around?

15  A    Correct.

16  Q    All right.  And what -- did you get back downtown?

17  A    I did.

18  Q    And what did you witness, or where did you go, and what

19  did you witness?

20  A    I went towards -- at that point, the bikes were still in

21  the area of 9th and Olive.  So that's where I went.  And as I

22  drove down Olive Street, I could see the broken windows,

23  potted plants knocked over.  All the things that they had

24  described on the radio were right there in front of my eyes to

25  see, and so I eventually linked up with two of the four bike

Brian Rossomanno Direct Examination                    Volume 2

189

1    squads.  I believe it was 8th and Olive.

2    Q    Okay.  And did you see any -- any crowds or protestors

3    or --

4    A    I did.  There was a group on the north side of Olive, and

5    they'd filtered up 8th Street.  A lot of familiar faces, you

6    know, people I knew to be involved in the previous

7    demonstration earlier in the day.

8    Q    Okay.  And were they -- how were they behaving at that

9    point?

10   A    Very rowdy, very boisterous towards the police, and not

11   in a positive manner.

12   Q    Okay.  And what action did you take at that point?  Any?

13   A    At that point, I kind of just observed because the bikes

14   were kind of handling it.  The bikes were giving them

15   dispersal orders.  I heard the bikes telling them it was an

16   unlawful assembly and so on.  And so at that point, I was

17   really just kind of trying to be eyes and ears for the

18   incident commander, and I was on the phone with him, letting

19   him know what I was observing and what -- you know, we were

20   talking about what steps we needed to take to get our officers

21   back downtown.

22   Q    And the incident commander, again, being Colonel --

23   A    Lieutenant Colonel Leyshock, yes, sir.

24   Q    All right.  What happens after that?  You sort of --

25   you're helping monitoring, providing information to Colonel

Brian Rossomanno Direct Examination                    Volume 2

190

1    Leyshock.

2    A    Right.

3    Q    What happens after that?

4    A    I headed back west, and I observed, again, more, more

5    property damage on Olive, around like the 9, 10 hundred

6    blocks, people running in every conceivable direction as the

7    bikes -- as I said, two squads of bikes had kind of formed a

8    line.  There were still kind of two squads of bikes patrolling

9    the area, trying to ensure there was no more damage.  So we

10   had, you know, people running from the bike officers.  People

11   would see me and take off running.  And so I just made my way

12   back west, and eventually, I went all the way back to 14th and

13   Olive because that's where I was going to meet up with

14   Lieutenant Colonel Leyshock and we were going to kind of game

15   plan what we were going to do.

16   Q    Okay.  And give us an idea of around what time we're

17   talking now.

18   A    I would say this was maybe around 8:00, ballpark figure.

19   Q    Ballpark.  Was it dark?

20   A    It was dark, yes, sir.

21   Q    Okay.  Is that based on your memory?

22   A    Yes, it is.

23   Q    All right.  Okay.  So do you ultimately end up meeting

24   with Colonel Leyshock?

25   A    I did, and by this point --

1   Q    I keep calling him Colonel Leyshock.  It's Lieutenant

2   Colonel?

3   A    Lieutenant Colonel Leyshock.

4   Q    Lieutenant Colonel Leyshock.  I apologize to the

5   Lieutenant Colonel.  So you meet up with him?

6   A    Correct.  Again, at 14th and Olive.  By that point, some

7   of our CDT teams are starting to show up, but certainly not

8   all of them.  Highway Patrol had some officers down there, and

9   he was with Lieutenant Sachs, the SWAT team commander, and

10  they were kind of just kind of looking at the terrain, trying

11  to get information from the bikes of where the groups of

12  protestors were, and we were just kind of trying to decide

13  where we wanted to deploy what teams.  You know, where do we

14  want to put South Patrol, where do we want to put North

15  Patrol, and so on.

16  Q    Okay.  And what sort of -- what decisions are ultimately

17  made?

18  A    Eventually, they formed up the teams, but while that was

19  going on, the bikes started calling for help again down in the

20  area of, I want to say, St. Charles and Tucker.  So I had

21  actually left 14th and Olive while they were still trying to

22  come up with what they wanted to do, and I went down to the

23  area of Tucker and St. Charles just to get eyes on and see

24  what it was the bikes were dealing with.

25  Q    And what was it that the bikes were dealing with?

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 192 of 248 PageID #: 4842
Brian Rossomanno Direct Examination                    Volume 2

192

1   A    A very rowdy crowd, some objects being thrown.  And the

2   bikes had formed a line on St. Charles, just east of Tucker,

3   and they were just kind of holding their position because they

4   really didn't have resources to do much more than that and the

5   crowd was in front of them, to the west and a little bit

6   north.

7   Q    And this is at St. Charles and Tucker?

8   A    Yes, sir.

9   Q    And the crowd is to the west and north?

10  A    Correct.  There's a parking lot on the north side of

11  St. Charles, just east of where the bike line was.  So they

12  were on that parking lot, and they were out towards the street

13  and Tucker.

14  Q    Okay.  And you said that they didn't have the resources.

15  How were they -- how -- maybe I asked you this before, but how

16  are the bikes outfitted?

17  A    Their normal bike gear -- just regular soft shirt, some

18  pants, some shorts, soft body armor, and their bike helmets.

19  No personal protective gear in terms of CDT gear.

20  Q    So did that -- it sounds like the bikes were sort of in a

21  standoff of sorts?

22  A    Correct.  Yes, sir.

23  Q    Did that standoff resolve itself in any way?

24  A    Not initially for a while.  At that point, after

25  observing the rocks being thrown, I consulted with Lieutenant

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 193 of 248 PageID #: 4843
Brian Rossomanno Direct Examination                    Volume 2

193

1   Colonel Leyshock, and he told me to go ahead and announce that

2   this was an unlawful assembly based on the fact that the

3   officers were being assaulted and based also on the fact that,

4   again, those bike officers don't have any personal protective

5   gear.  So from my vehicle, on the PA system, right there at

6   Tucker and St. Charles, I gave a dispersal order.

7   Q     Any idea about what time that was?

8   A     It was probably -- it was probably at 9:00 or a little

9   after 9:00 at that point.

10  Q     Okay.  And the dispersal order you gave at that point --

11  do you know about what it would have been or what you would

12  have said?  Do you remember?

13  A     Yes.  I would have said, "This is an unlawful assembly.

14  You are" -- I had them for impeding the flow of traffic

15  because they were in the streets as well as assaulting the

16  police officers.  "You're ordered to leave the area.  Anybody

17  who remains is subject to arrest and/or other actions, up to

18  including the deployment of chemical munitions.  You may leave

19  the area by going north on Tucker or west on St. Charles," I

20  think is what I said.

21  Q     Okay.  And did they disperse?

22  A     A few people left, but the group as a whole did not

23  leave.

24  Q     Okay.

25  A     They moved out to Tucker and then kind of congregated

Brian Rossomanno   Direct Examination                          Volume 2

194

1    more towards Washington, but they did not leave the immediate

2    area.

3    Q    So they went north a little bit?

4    A    A little bit, but I'm talking 25, 50 yards.  It's not

5    like they left the area.

6    Q    Okay.  Did you consider that to be in compliance with the

7    order?

8    A    Absolutely not.

9    Q    Well, they did move; right?

10   A    They did move.

11   Q    But why is that not compliance?

12   A    To disperse the area, it's basically that the

13   demonstration is over; it's time to -- for lack of a better

14   term, it's time to get in your cars and go home.  Our goal

15   with a dispersal order isn't to merely relocate the problem;

16   it's to disperse the problem.

17   Q    Okay.  And did they disperse then?

18   A    No.

19   Q    No.  Some of them did relocate?

20   A    A very short distance.  Let me emphasize that.

21   Q    Okay.  So some of these guys -- now they're in the area

22   of Washington and Tucker?

23   A    Correct.

24   Q    And what happens next?

25   A    We -- basically, again, another standoff.  The bikes had

Brian Rossomanno - Direct Examination                    Volume 2

195

1    kind of stayed where they were, and it took us a considerable

2    amount of time to get our assets in place where we wanted them

3    to be.  So for, I would say, well over an hour, it was just

4    kind of a standoff point when at that point we were -- we were

5    giving them orders to leave, they weren't leaving, but we

6    didn't really have our assets in place to enforce that

7    dispersal order just yet.  So it was kind of what I would

8    describe as just downtime at that point, but orders were being

9    continually given.

10   Q    Okay.  And who gave those orders?

11   A    I did along with Sergeant Jemerson.

12   Q    And how did you give the orders?

13   A    Initially, several times through the PA of my vehicle.  I

14   would say I did it at least nine, 10 times.  And then also

15   there were -- to kind of set the scene for you, there were

16   different pockets of protestors or people in the area of

17   Washington and Tucker.  There was a group on the northeast

18   corner.

19   Q    Let me stop you for a second --

20   A    Okay.

21   Q    -- because you said protestors or people.  Did it matter

22   to you at this point whether they were protestors or just

23   people?

24   A    At that point, we wanted the area cleared of everybody.

25   Q    Okay.

Brian Rossomanno Direct Examination                    Volume 2

196

1   A    For safety reasons on top of everything else.

2   Q    Does your dispersal warning single out only protestors as

3   people who need to disperse?

4   A    No.  It says anyone who remains in the area is subject to

5   arrest.

6   Q    And that's the standard warning that you give at all

7   times?

8   A    Yes, sir.  It's a verbatim, same every time.

9   Q    Okay.  You were telling us a little bit about how people

10  were positioned around that area.  Could you continue there?

11  A    Right.  There were -- there was a pocket of people, you

12  know, on the north, northeast corner of the intersection.

13  There was a pocket of people on the northwest corner of the

14  intersection of Washington and Tucker.  There were people

15  strown out on Tucker, in the street, on both sides, both

16  northbound and southbound lanes.  So there were I would

17  describe as four to five different pockets of people that were

18  remaining in the area in violation of the order.

19       So in addition to the dispersal orders I gave on my PA,

20  Sergeant Jemerson and I both got out on foot, and we went to

21  each group individually and told them, "It's time for you all

22  to go."  We were trying to be as clear as we possibly could

23  be.

24  Q    So "It's time for you to go" -- is that -- is that your

25  verbatim commands to these people, or what did you say, or was

Brian Rossomanno Direct Examination                    Volume 2

197

1    it more conversational?

2    A    It was more conversation.  You know, they were wanting it

3    explained to them why they had to leave, and so we were trying

4    to do our best to be as clear.  "You know, we can debate the

5    circumstances here another time, but as far as right now, a

6    dispersal order has been given.  You all need to leave the

7    area."  It was those types of conversations.

8    Q    Okay.  So those people who asked you for explanations --

9    "Why do we have to leave?" -- what were you telling them?

10   A    I was telling them that the assembly was declared

11   unlawful due to the property damage, due to the assault on

12   officers.  You know, we felt that if we were to allow this

13   group to remain downtown that further property damage would

14   exist or would occur.  And along with officers being

15   assaulted, that the behavior of the crowd as a whole couldn't

16   be tolerated anymore.

17   Q    Okay.  At this time, they weren't damaging any property;

18   right?

19   A    At that particular moment, they were not.

20   Q    And they weren't assaulting any officers?

21   A    Correct.

22   Q    But you said that you felt if they were allowed to stay

23   there, that that would continue?

24   A    Right.  And I should articulate that in that, you know,

25   that time earlier in the evening when I was driving up and

1    down Olive and Washington and I saw the groups of people

2    running from the areas where the property damage had occurred,

3    a lot of those same people were still present at Washington

4    and Tucker.  So I had reason to believe that, though I didn't

5    personally see them conduct any of the property damage, they

6    were with the group that did, and so to me, that posed enough

7    of a threat that we could reasonably articulate a genuine

8    concern that more property damage would take place.

9    Q    Did you feel as though it had been sort of a game of cat

10   and mouse all day?

11   A    It had, and it usually is.

12   Q    And you felt as though the time for that was over?

13   A    The incident commander felt the time for that was over.

14   Q    Okay.

15   A    So I was just acting on his orders.  But my personal

16   belief -- I agreed with the incident commander.

17   Q    And you felt that if they hadn't been moved there would

18   be more problems?

19   A    I was confident there would be, yes, sir.

20   Q    All right.  It wasn't your ultimate decision to tell them

21   to leave?

22   A    No, it wasn't.

23   Q    Was it your ultimate decision to effect a mass arrest?

24   A    No, it wasn't.

25   Q    Okay.  Whose decision was that?

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 199 of 248 PageID #:
4849
Brian Rossomanno Direct Examination                    Volume 2

199

1   A     The incident commander, Lieutenant Colonel Leyshock.

2   Q     And at some point, a decision was made to effect the

3   arrests of the people who remained; right?

4   A     Correct.

5   Q     Can you tell us about that, to the extent you have

6   knowledge about that decision-making process?

7   A     Yes.  Once we had formed our teams up, one, the bikes

8   were formed up to the east on Washington.  One of our CDT

9   teams had come up from the south.  Another CDT team was staged

10  up north at Tucker and Dr. King.  And at that point, the

11  egress route west on Washington was still open.  We were still

12  giving that as the egress route as we continued to give our

13  dispersal orders, and that's documented in several sources.

14  And so once we got to the point the incident commander decided

15  they've had more than enough time to leave, that egress route

16  to the west was eventually closed by a CDT team.

17  Q     And who gave that order?  Do you remember or do you know?

18  A     It was Lieutenant Sachs gave that order, and he was

19  acting, as far as I know, under the direction of Colonel

20  Leyshock.

21  Q     Okay.  And when those -- you said the route of egress to

22  the west was the last one to close?

23  A     Correct.

24  Q     And up until that point, people could have left west?

25  A     Yes, absolutely.

Brian Rossomanno Direct Examination                    Volume 2

200

1    Q    So even after the lines formed on the east, the north,

2    and the south, there was still -- there was still time during

3    which people could have left?

4    A    Right.  They could have walked west on Washington and

5    left the area completely.

6    Q    Do you have -- you told us already about how you were

7    giving warnings over your PA system?

8    A    Correct.

9    Q    And you told us a little bit about the efforts that you

10   and Sergeant Jemerson undertook to go and personally engage

11   with numerous of these people?

12   A    Correct.

13   Q    Do you have an idea of sort of what time frame that all

14   occurred over?

15   A    That occurred probably between -- and that went on for a

16   good 45 minutes to an hour where we were out there talking to

17   people.  So I would say between the range of 9:30 to 10:30, in

18   that area, was when we were actually out on foot, trying to

19   engage the protestors face-to-face and trying to explain to

20   them why it is they needed to leave.

21   Q    Do you know exactly what time the last warning was given?

22   A    I would have to say around 10:50.

23   Q    Okay.

24   A    Does that sound correct?

25   Q    Does that sound about right?

1  A    That sounds about right.

2  Q    10:50 is awfully exact.  Do you know that for a fact that

3  that would be the last warning?

4  A    I do now, yes.

5  Q    Okay.

6  A    Well, I've had a chance to review the communications

7  tapes, and I believe 10:50 was -- there was a dispersal order

8  given at 10:50.

9  Q    Okay.

10 A    And that's documented on --

11 Q    Do you know if it was -- do you know if it was the last

12 one?

13 A    It was not the last one.

14 Q    Okay.  Do you have -- do you know when -- I mean, if you

15 know, do you know when the last one was?

16 A    I can't say exactly, no.

17 Q    Okay.  At some point after the -- at some point, there

18 was a final dispersal order given?

19 A    There was --

20 Q    Correct?

21 A    Oh, yes, yes.

22 Q    And at that point after that final dispersal order was

23 given, do you know what happened next?

24 A    There was -- a few minutes were given to see if anybody

25 was going to comply.  It became pretty clear that the crowd as

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 202 of 248 PageID #: 4651
Brian Rossomanno Direct Examination                    Volume 2

202

1   a whole was not going to comply.  Some people, even upon

2   hearing that order, sat down in the street.  And at that

3   point, it was decided, all right, everybody here is now under

4   arrest and they're going to be taken into custody.

5   Q    Were you able to see the crowd at this point?

6   A    Yes, I was.

7   Q    So you just described people sitting down in the street?

8   A    Yes.

9   Q    Did you see that?

10  A    I did see that, yes, sir.

11  Q    Were you able to -- I mean from -- were you able to hear

12  the people in the crowd?

13  A    Yes, I was.

14  Q    Okay.  Based on what you observed, you know, with your

15  own two eyes and your ears, was it your feeling that the

16  people who were remaining at that point had heard the prior

17  orders of dispersal?

18  A    Yes.

19  Q    Why did you think that?

20  A    Because they were asking us questions, "Why are you

21  giving us an order to disperse?" or they're asking -- they

22  were wanting justification for the order.  So that indicated

23  to me that they did in fact hear it.

24  Q    They had heard the order.  And based on their reaction or

25  their body language or other things they said or did, was it

203

1   your impression that the people who remained at this point had

2   any intention of leaving?

3   A    They had no intention of leaving.

4   Q    Why do you think that?

5   A    Given the hour and a half opportunity.  Again, in the

6   conversations we were having with them, we had several people

7   telling us, "We're not leaving."  You know, quote, "We're not

8   leaving."  And so I would articulate to them that there would

9   probably be consequences to that.

10  Q    Okay.  And do you think that they understood that

11  consequences could include arrest?

12  A    I would think they did.

13  Q    Okay.

14  A    Just based on what we were telling them.

15  Q    Well, the warnings you give over the PA system suggest

16  that, do they not?

17  A    Yeah.  It says, "Anybody remaining is subject to arrest."

18  Q    Okay.  And eventually, so these police lines form and the

19  order is given for the lines to close in; correct?

20  A    Yes, sir.

21  Q    And does that occur?

22  A    It does.

23  Q    Okay.  And does that happen smoothly?

24  A    Fairly smoothly.  A lot of moving parts, but it was done

25  pretty efficiently.

Brian Rossomanno Direct Examination                    Volume 2

204

1    Q    Where were you when those lines were closing in?

2    A    I had moved over to the southeast corner of Washington

3    and Tucker.  There was a bike crew there.  There were also

4    some other commanders there.  So I kind of just put myself in

5    a position where I could observe the entire area.  Lieutenant

6    Sachs was directing all the movements.  So I kind of just sat

7    off to the side and observed.

8    Q    Okay.  And once those lines had closed in and the

9    intersection was sealed off, what happened next?

10   A    When the intersection was sealed off, the individual

11   arrest teams from all the CDT teams came through the lines,

12   and they started effecting arrests.  At that point, I walked a

13   little closer.  All the people that were being arrested kind

14   of gravitated over to that northeast corner, and that's where

15   they were all amassed, in that kind of one area.  So I moved a

16   little bit closer into the intersection where I could better

17   observe the arrests as the arrest teams came in.

18   Q    Okay.  And did you see anybody -- obviously, you saw a

19   bunch of people arrested; correct?

20   A    Yes, I did.

21   Q    Did you see anybody resisting arrest?

22   A    I did.

23   Q    How much of -- how much resisting would you say?  How

24   many people were arrested?  Do you have any idea?

25   A    I believe it was over 100; like 123, I believe it was.

1    Q    Okay.  And did you see some -- you saw some people

2    resisting?

3    A    I did see some isolated incidents of people resisting, a

4    lot of passive resisting.

5    Q    What do you mean by "passive resisting"?

6    A    Just ignoring commands.  As the officers approached,

7    there were a lot of commands for them to lay on the ground,

8    get on the ground, lay on the ground.  A lot of people weren't

9    doing that.  I saw a couple instances of subjects who had laid

10   on the ground, but they put their arms underneath their body

11   to where you couldn't see their hands, and I would see

12   officers forcibly getting -- they had to force their hands

13   back behind their back.  So that kind of thing.  Some passive

14   resistance.  After a few seconds, I left because as the first

15   arrests were starting to get taken -- I'm sorry -- starting to

16   get taken back to the van, I wanted to ensure that we were

17   getting the proper documentation.  So I went behind the line

18   for a few minutes to ensure -- because we have a process where

19   the arresting officer is photographed with the person he

20   arrested.  We make sure all the charges are right.  So I

21   wanted to make sure that process was happening.

22   Q    Okay.  So you didn't observe all the arrests?

23   A    I didn't observe all the arrests, no.

24   Q    But you were there for some of them?

25   A    Yes, I was.

Brian Rossomanno - Direct Examination                      Volume 2

206

1   Q    Did you see anybody -- any pepper spray used?

2   A    I did see some foggers, what we refer to as the foggers

3   used.

4   Q    Tell me what a fogger is.

5   A    A fogger is basically -- it's just a high-capacity,

6   long-range.  It sprays the same kind of mace that the officers

7   wear in their individual smaller cans.  It just shoots

8   farther, and they look like little miniature fire hydrant

9   or -- I'm sorry -- fire extinguishers.

10  Q    Okay.  And what was the circumstance under which you saw

11  the fogger used?

12  A    I saw one subject was refusing to get on the ground.  He

13  was getting fogged.  I saw another subject who was kind of on

14  his knees but was refusing the orders to lay down flat on the

15  ground.  I saw him get fogged, and that was about it.

16  Q    Okay.  And you're familiar with the department's

17  use-of-force policy?

18  A    Yes.

19  Q    You're familiar with the specific policy relating to the

20  use of OC spray?

21  A    Yes, I am.

22  Q    In either of the instances where you saw the fogging

23  occurred -- occur, was it your impression as a supervisor that

24  that was anything inappropriate about that?

25  A    No.  I felt it was within our guidelines.

Brian Rossomanno Direct Examination                      Volume 2

207

1   Q    Okay.  And describe why in those two instances.  You told

2   us about two incidents.  Tell us why you felt that.

3   A    I feel it was the proper process through the force

4   continuum.  Yeah, they were given -- officer presence --

5   obviously, they were there, but they were given -- I heard the

6   verbal commands.  They were given the verbal commands very

7   clear to lay on the ground.  They weren't ambiguous at all.

8   "Lay down flat on your stomach."  And there was noncompliance

9   with those commands.  So the next step from verbal commands is

10  pepper spray or Taser.

11  Q    Did you see anybody who having already been zip-tied or

12  cuffed or otherwise restrained and laying on the ground in a

13  compliant fashion had spray used against them?

14  A    I did not see that, no.

15  Q    Would you agree that if spray was used under those

16  circumstances I've just described, meaning someone's

17  compliant, already restrained, and lying on the ground, that

18  pepper spray should not be used?

19  A    If they're compliant, that would be inappropriate.  I

20  agree with that, yes.

21  Q    It's not impossible that someone who's already restrained

22  might be noncompliant in a way that would justify the use of

23  pepper spray?

24  A    Oh, absolutely.  They could still be kicking.  We've had

25  a police officer killed by a handcuffed suspect.  So you can

Brian Rossomanno  Direct Examination                    Volume 2

208

1    certainly resist while you're handcuffed.

2    Q    But assuming -- assuming everything else I've said is

3    true and they're also being compliant, they're complying with

4    all of the directives, you would agree that it would be

5    inappropriate under the department's policies to -- to use

6    pepper spray on a person who's not resisting and is already

7    restrained?

8    A    I would agree that'd be inappropriate, and I should also

9    state that among the arrests I observed, I observed numerous

10   instances of people who were in full compliance being stood

11   up, walked away.  No use of force being used at all.  No

12   pepper spray.  People who were being completely 100 percent

13   compliant had no issues at all.

14   Q    Did you see -- before we leave this topic, did you see

15   anybody under the circumstances I've described where they were

16   fully compliant but yet being sprayed with pepper spray?

17   A    No, I did not.

18   Q    Okay.  And on balance, would you say that most of the

19   people who were arrested that evening -- you say over a

20   hundred; right?

21   A    It was over 120, I believe, yes, sir.

22   Q    Of this over a hundred, with the caveat, of course, that

23   you've already told us that you didn't see all the arrests,

24   but your general impression based on the arrests that you did

25   see, were most people compliant or most people resisting?

Brian Rossomanno  Cross-examination                          Volume 2

209

1    A    The overwhelming majority was compliant.

2    Q    Okay.  And those compliant folks -- did you see any of

3    them get pepper sprayed?

4    A    No, I did not.

5         MR. RELYS:  I have no further questions for this

6    witness at this time.  Thank you.

7         THE COURT:  Cross-examination.

8                   CROSS-EXAMINATION

9    BY MR. ROTHERT:

10   Q    Good afternoon, Mr. Rossomanno.

11   A    Good afternoon, sir.

12   Q    Did you complete a declaration in this case?

13   A    I'm sorry?

14   Q    Did you sign a declaration in this case?

15   A    I did.

16   Q    All right.  And who wrote that for you?

17   A    City Counselors.

18   Q    So I'm correctly understanding that some County police

19   have been operating in the city of St. Louis with respect to

20   protests?

21   A    Yes, sir.

22   Q    Okay.  And is that still the case today?

23   A    No, it's not.

24   Q    Okay.  What time period was that?

25   A    That portion of the detail where the County was assisting

Brian Rossomanno Cross-examination                    Volume 2

210

1   us, that ended a week ago Sunday.

2   Q    Do you know who was -- who was in charge of the County

3   police when they were operating in the city?

4   A    Lieutenant Colonel Cox.

5   Q    And is that someone with the County or someone with the

6   City?

7   A    It's a county deputy chief, yes, sir.

8   Q    What's your understanding of, in the city of St. Louis,

9   when you have authority to declare an unlawful assembly?

10  A    Well, first of all, I don't exercise that without

11  direction from an incident commander.

12  Q    Okay.

13  A    But I -- you know, any officer, given the -- depending on

14  the circumstances, can declare an assembly unlawful based on

15  his observations and that particular situation.

16  Q    Okay.  What are the criteria for an unlawful assembly?

17  A    My criteria for an unlawful assembly would be when the

18  group as a whole is acting in an unlawful manner, be it

19  committing acts of violence towards citizens or police

20  officers, property damage, or other violations of law, to even

21  include blocking streets.

22  Q    So even if there's a peaceful protest that's blocking a

23  street, you believe that can be declared an unlawful assembly

24  in St. Louis under St. Louis laws?

25  A    It could be.  It very rarely is.

Brian Rossomanno Cross-examination                          Volume 2

211

1   Q     And who decides if -- if an assembly becomes unlawful?

2   A     Normally, the incident commander, which depending on some

3   of our, for lack of a better term, run-of-the-mill protests,

4   that can be a district captain, it can be an area major, or

5   for a larger detail like this, it was a lieutenant colonel.

6   Q     But it could be any police officer too?

7   A     It could be, but I would -- you'd be hard-pressed to find

8   an officer that would make that call on their own without

9   seeking guidance from above.

10  Q     Now, can you give a dispersal order if there's not an

11  unlawful assembly?

12  A     Ask that again.

13  Q     Can you give a dispersal order to an assembled group of

14  people if there's not an unlawful assembly?

15  A     Generally no, we don't do that.  I've never done that.

16  Q     Could you?

17  A     You would have to declare it unlawful first and then give

18  an order to -- sure.

19  Q     Okay.  So when you talked about the bicycle police

20  officers on 9th and Olive on September 17th giving dispersal

21  orders, was that -- had that been declared an unlawful

22  assembly by the incident commander?

23  A     I'm sure it'd been declared that by the officers on the

24  scene based on the property damage.  I would assume.  You'd

25  have to ask them.

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 212 of 248 PageID #:
1662
Brian Rossomanno Cross-examination                              Volume 2

212

1    Q    So it's not always the incident commander.  Sometimes

2    it's just the officers --

3    A    Not always.

4    Q    -- on the scene?

5    A    Correct.

6    Q    Also, that evening or that day, September 17th, you

7    shadowed a march for quite some time in streets in St. Louis;

8    correct?

9    A    17th -- was that Sunday?

10   Q    Yes.

11   A    Yes, yes, I did.  I'm sorry.

12   Q    All right.  Is it your belief that you could have

13   arrested any of the people at any time who were participating

14   in that march?

15   A    It's my belief that blocking the streets is against the

16   city ordinance.

17   Q    Okay.  So do you believe that under the city ordinances

18   you had authority to arrest any of those people at any time?

19   A    If we wanted to, we could have effected arrests after,

20   you know, going through the proper procedures of telling them

21   that their activity is unlawful and they need to leave the

22   streets.

23   Q    Well, do you really?  Do you really have to tell someone

24   that they're -- if they're violating the law about blocking

25   streets, do you have to tell them that it's unlawful and --

1    A    You'd be surprised how many times we've had to explain to

2    them that blocking the streets is unlawful.

3    Q    Okay.  Before you can do an arrest, do you have to

4    declare the assembly unlawful and order them to leave if

5    they're blocking the streets, or can you just arrest?

6    A    Oh, not necessarily.  If you have somebody -- for

7    example, you see a subject throw a rock at a police officer;

8    you don't have to give him an order to disperse before you

9    arrest him.  He's wanted for a charge at that point.

10   Q    But what about blocking traffic by marching in the

11   street?

12   A    Do you have to give them?

13   Q    Right.

14   A    No, you don't, but we do.  Of the 200 protests I've

15   worked, 90 percent of them, we've allowed them to march in the

16   streets, and we do nothing but block traffic for them.

17   Q    Okay.  And how do you decide when you're going to --

18   A    That's not my decision.

19   Q    Okay.  Whose decision is it?

20   A    The incident commander normally.

21   Q    All right.  And is that just in his discretion?

22   A    You'd have to ask the incident commander.

23   Q    Okay.  And who is the incident commander?

24   A    For this, for these details, for the Stockley verdict, it

25   was Lieutenant Colonel Leyshock, but as I said, day-to-day,

Brian Rossomanno Cross-examination                    Volume 2

1   the incident commander can change depending on where the

2   protest is and who is the district captain.

3   Q    All right.  If there are protests in the downtown area,

4   marching down Market during the day, do you know who the

5   incident commander is?

6   A    Captain Renee Kriesmann would be the incident commander.

7            THE COURT:  What was the name you said?

8            THE WITNESS:  Kriesmann, ma'am.  It's

9   K-R-I-E-S-M-A-N-N.

10  Q    (By Mr. Rothert) Now I want to ask you a couple questions

11  about dispersal orders.

12  A    Okay.

13  Q    Do you think it's reasonable that people might think that

14  when you give a dispersal order to a group of protestors that

15  you're ordering the protest to disperse and not people who

16  aren't involved in the protest?

17  A    I'm sorry.  I'm trying to -- because I can't really hear

18  you very good.  I apologize.  My hearing is -- I'm trying to

19  read it as you're --

20  Q    That's fine.  If -- when you give a dispersal order to a

21  group of protestors, do you think it's reasonable for people

22  who are not part of that assembly to think that that dispersal

23  order does not apply to them?

24  A    I think a reasonable person would order or would follow

25  the orders being given to them by police, whether they're

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 215 of 248 PageID #:
7865
Brian Rossomanno Cross-examination                           Volume 2

215

1    actively protesting or not.  I think when the police say it's

2    time to leave the area, I think a reasonable person would go

3    ahead and follow that order.

4    Q    And, you know, when you -- when you were walking down the

5    street that night, that's what you were saying -- "Time to

6    go" -- right?  I mean there's -- you were saying, "Time to

7    go"?

8    A    I was saying a wide variety of things.

9    Q    All right.

10   A    The verbatim dispersal order, the standard order, was

11   given numerous times, and then we reinforced that order by

12   going individually to each group, explaining to them what that

13   order meant and that it was time to leave.

14   Q    Okay.  And who -- who did you explain that to?  Can you

15   identify any individual that you explained that to personally?

16   A    Sure.  Some of them are sitting in the room right now.

17   Q    Okay.

18   A    Alicia Street, Keith Rose, Tony Rice, and a lot of other

19   people that I know by face but not necessarily by name.

20   Q    When you give a dispersal order, where do you intend

21   people to -- I know you want -- you would like people to leave

22   and go home; right?

23   A    They'd leave the area, leave the immediate area.  Sure.

24   Q    What does "leave the area" mean to you?

25   A    That's situational dependent.  You know, we don't have a

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 216 of 248 PageID #:
1865
Brian Rossomanno Cross-examination                          Volume 2

216

1    blanket, "You must leave this four-block, four-square-block

2    radius."  You know, it just depends on the situation, where we

3    are, the terrain.  But, essentially, again, as I mentioned

4    earlier, our goal isn't to relocate the problem.  Our goal is

5    to disperse the problem.  So for the lack of a better

6    description, we want them to get in their cars and go home.

7    Q    And, you know, what if they are home?  Let's take

8    September 17th.  People live on Washington --

9    A    They should have went inside.

10   Q    -- who you caused to arrest.

11   A    They should have went inside.

12   Q    They should have gone -- okay.  And how are people

13   supposed to know how far away is far enough away when you say,

14   "Disperse"?

15   A    I would think, again, a reasonable person being given

16   that order from the police -- you know, common sense has to

17   kick in at some point where you decide, "Hey, I just -- I need

18   to leave this area," and if it's not far enough away, you'll

19   be given further direction.

20   Q    All right.  So if you're not given further direction, is

21   it fair to assume you've gone far enough?

22   A    If the situation dictates.  It all depends on where we

23   are and what we're doing.

24   Q    And how long -- you don't want people to assemble again

25   after a dispersal order.  How long do you want them not to

Brian Rossomanno Cross-examination                        Volume 2

217

1    assemble?

2    A     There's no set timetable.

3    Q     Well, how long do you think you can arrest them for

4    failure to disperse if they have reassembled?

5    A     Again, it's kind of a reasonable standard.  If you leave

6    and turn around and come back 10 minutes later and start

7    engaging in unlawful activity again, you're probably going to

8    have some issues.  But there's no -- it's not a standard part

9    of our order where we say, "You are ordered to disperse, and

10   you have to stay away for two hours."  You know, that's not

11   something we do.  It's --

12   Q     So who decides whether it's -- you know, it's been too

13   long since the dispersal order?

14   A     It's never really been an issue.

15   Q     Well, it's not an issue for you because you're the one

16   enforcing it and arresting people, but could you see how it

17   could be an issue for someone who feels like they've left the

18   immediate vicinity of where the situation was and reassembled

19   somewhere else?  Can you understand how that would be --

20   A     Again, I think a reasonable person would understand the

21   circumstances and, if they're told to leave by the police,

22   they would leave and just stay away.

23   Q     Now, you were talking about the bus situation at Clark

24   and Tucker on the 15th of September.  Do you remember that?

25   A     Yes, sir.

Brian Rossomanno Cross-examination                        Volume 2

218

1    Q    All right.  And you understand -- have you talked to

2    anyone else about any of the testimony that was given

3    yesterday or today in this case?

4    A    No, I have not.

5    Q    All right.  If I -- if there's a factual dispute between

6    what you have said and other people have said about what

7    occurred, do you know -- could we do anything to resolve that

8    factual dispute other than deciding who's telling -- anything

9    that could help us in telling who's telling the truth?

10   A    It'd be --

11        MR. RELYS:  Objection.  Vague.  The question is

12   vague.

13        THE COURT:  Yeah.  Sustained.

14   Q    (By Mr. Rothert) Okay.  The City has cameras at Clark and

15   Tucker that record 24 hours a day, seven days a week; correct?

16   A    I believe so, yes.

17   Q    All right.  And so there is video of what happened that

18   day?

19   A    I would assume.

20   Q    Okay.  And have you viewed the video of what happened

21   that day?

22   A    I have not seen any video from the 15th.  No, sir.

23   Q    And did you bring it?  You don't have it with you by any

24   chance?

25   A    No.

1    Q    All right.  There are also cameras recording at McPherson

2    and Euclid, aren't there, in the city?

3    A    Okay.  I don't know exactly, but that wouldn't surprise

4    me.  We had one of our documentation teams there.  I know

5    that.

6    Q    Oh, you did.  And did -- did -- have you viewed the video

7    from your documentation team that was there?

8    A    I have not.

9    Q    Okay.  So do you know if it shows any of the things that

10   you've testified about?

11   A    If there's video of it, I imagine it shows it because

12   that's an accurate account of what happened.

13   Q    Okay.  Is there a reason why you didn't bring that video

14   with you?

15   A    I don't have custody of that video.

16   Q    Okay.  Who would have custody of that video?

17   A    I would imagine it's part of the police report.

18   Q    Back to the -- to the -- during the day of

19   September 15th, you testified that no chemical munitions were

20   used downtown on the 15th at protests; is that correct?

21   A    That's correct.  There was some mace deployed.  I know

22   that.  But nothing beyond that.

23   Q    Okay.  And can you tell me what's the difference between

24   mace and chemical munitions?

25   A    To me, chemical munitions is the OC and the CS mainly

220

1    that our SWAT team has.  Pepper spray.  I would classify those

2    as two separate things.

3    Q    All right.  Are they the same chemical as a chemical

4    munition?

5    A    Not necessarily, no.  OC and CS are two different -- two

6    different things.

7              THE COURT:  Well, is OC the same thing as mace?

8              THE WITNESS:  It is.  It's just a different

9    concentration between what the SWAT team has compared to what

10   the normal officer carries.

11   Q    (By Mr. Rothert) And the SWAT team carries foggers?

12   A    I don't know.  I imagine some of them do, yes.

13   Q    I want to show you, on the screen next to you, the third

14   page of Exhibit D to Plaintiffs' motion for preliminary

15   injunction, which was filed in this case.  It's Document 11-4,

16   page 3.  Can you see?

17             THE COURT:  Can you see that on the --

18   A    I can see it, yes.  I just can barely hear you.  I can

19   see that fine, though.

20   Q    (By Mr. Rothert) Okay.  Sorry.  Can you tell me -- can

21   you tell where the location of this picture is?

22   A    That would look to be looking south on Tucker, just north

23   of Clark, if I -- yeah, south on Tucker, north of -- you're

24   looking south on Tucker, just north of Clark.

25   Q    Okay.  And can you tell what's happening in that picture?

Brian Rossomanno Cross-examination                          Volume 2

221

1   A    It looks like we have a CDT line formed with some

2   protestors to the north of them.

3   Q    Anything else?

4   A    Well, it's a grainy picture.

5   Q    Yes.

6   A    It looks like there could be foggers being used, but I

7   can't testify that they are because that's not the highest

8   quality picture I'm looking at.

9   Q    As far as chemical munitions, are there any policies that

10  you follow before you use chemical munitions?

11  A    Yes.

12  Q    And what are those?

13  A    Chemical munitions -- really, they can't be used really

14  as a crowd control item.  They can't be used for a dispersal.

15  They're more used as -- to gain compliance.  In a perfect

16  world, we could effect arrests on everybody that we use

17  chemical munitions on, but sometimes that's just not feasible.

18  Q    Okay.  Do you give any warnings before you use chemical

19  munitions?

20  A    When we can, yes, and absent exigent circumstances, we do

21  give a warning.

22  Q    Okay.  Now, you would consider someone throwing things at

23  the police to be exigent circumstances?

24  A    Yes, I would.

25  Q    So if someone is throwing something at the police, no

222

1    warnings are necessary?

2    A    Correct.

3    Q    Turning to the 17th, evening of the 17th, that Sunday --

4    A    Okay.

5    Q    -- the last dispersal order you gave was at 10:50;

6    correct?

7    A    I can't say that that was the last one or not.  There was

8    one given at 10:50, but I don't believe that was the last one.

9    I believe I continued to give them.

10   Q    It's the last one you gave?

11   A    No.  Again, there was one given at 10:50, but I'm pretty

12   sure I gave -- continued to give them after that.

13   Q    Okay.  Do you think that -- if you continued to give

14   dispersal orders after 10:50, do you think you would have

15   included that in your declaration?

16   A    Not necessarily.

17   Q    You did include the one at 10:50, didn't you?

18   A    I did.

19   Q    And you did include the one at 8:51; correct?

20   A    Yeah, but it's fair that it should be -- it's fair to say

21   that there were several dozen dispersal orders given

22   throughout that entire time frame.

23   Q    All right.  And so --

24   A    So I can't sit here and say that was the last one.

25   Q    Okay.  So do you know -- several dozen given by you?

1    A    Correct.

2    Q    All right.  When was the last time, the latest period

3    you're aware of any violent or property damage activity in the

4    city of St. Louis, downtown, Sunday, September 17th?

5    A    I can't give you an exact time, but I can say between the

6    last known act of violence that I know of --

7    Q    Yes.

8    A    -- and the time the arrests were made, there's -- some

9    time passed -- probably an hour and a half, two hours.

10   Q    Do you believe that the act of violence that had happened

11   an hour and a half or an hour before you declared an unlawful

12   assembly and ordered people to disperse -- do you think that

13   justifies -- is that sufficient justification for you to order

14   a dispersal of an assembly?

15   A    That along with my reasonable belief that had that group

16   been allowed to stay downtown there would have been further

17   acts of violence or property damage, I should say.

18   Q    Now, I understand when you give a dispersal order you

19   would like everyone to leave who's in the vicinity, but you

20   understand that you don't have authority to order dispersal of

21   people who aren't a part of the assembly; right?

22   A    That's not my understanding, no.

23   Q    No?  Where do you get your understanding of who you can

24   order to disperse?

25   A    The order applies to everybody in that immediate area.

Brian Rossomanno Cross-examination                        Volume 2

224

1    Q    And where -- what do you base that on?

2    A    Based on just my observations of -- and, you know, the

3    situation dictates that as well -- you know, where are we, how

4    many people are there.  I'm not sure I'm tracking what your

5    question is.

6    Q    On the ELMO, can you see that?

7         THE COURT:  You need to make it much bigger.

8    Q    (By Mr. Rothert) Yeah.  I'll zoom in here.  Do you

9    recognize this definition of an unlawful assembly from

10   St. Louis City ordinances?

11   A    I've seen it before, yeah.

12   Q    Okay.  And reading this, do you believe -- well, what do

13   you think is required before you can declare an unlawful

14   assembly?  Do you think there has to be force and violence?

15        MR. RELYS:  Legal conclusion.

16        THE COURT:  Overruled.

17   A    Do I believe there has to be violence involved?  Is that

18   what you're asking me?

19   Q    (By Mr. Rothert) Force or violence, yes.

20   A    No.  There are different -- there are types of unlawful

21   assembly that can involve blocking of highways, blocking of

22   streets that don't necessarily involve violence.

23   Q    Okay.  Now, I'm just reading here.  Can you read along

24   with me?  It says, "Any two persons who shall in the city

25   assemble together or being assembled shall act in concert to

225

1   do any unlawful act with force or violence."  Do you -- do

2   you --

3   A    It also says "or against the peace of others" if you go

4   down to the next line.

5   Q    Okay.  So you don't believe that force or violence is

6   required under this ordinance?  That's not how it's applied?

7   That's not how you enforce it?

8           MR. RELYS:  Same objection, Judge.  And I'd ask that

9   it be made continuing.

10          THE COURT:  Overruled.  It's a continuing objection.

11          MR. RELYS:  Thank you.

12  A    Can you ask the question again?

13  Q    (By Mr. Rothert) The way it's enforced in the city of

14  St. Louis, this language here, "with force or violence" is not

15  mandatory; that's optional with all the other things; correct?

16  A    I'm not sure I understand what you're asking.  Can you

17  maybe rephrase it?

18  Q    Okay.  I'm asking you is -- if it doesn't say -- if

19  there's no unlawful act with force or violence, can it be an

20  unlawful assembly?

21  A    Possibly, yes, it can is my understanding.

22  Q    And that's how it's enforced by you and others in the

23  city?

24  A    Say it again.  I'm really having trouble hearing you.

25  Q    That is how you enforce it?  That's how you enforce it in

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 226 of 248 PageID #: 4676
Brian Rossomanno Cross-examination                        Volume 2

226

1    the city?

2    A    Not always, no.  Again, I've testified earlier that

3    there's 200 protests I've worked where they march in the

4    street and we did not declare the assembly unlawful at all.

5    Q    You mentioned you were present when folks were being

6    arrested after being boxed in on four sides in the Washington

7    and Tucker area?

8    A    Are you talking about Sunday evening?

9    Q    Right, Sunday, September 17th.

10   A    Yes, I was.  Yes.

11   Q    And how many people were in that area prior to the --

12   prior to the boxing in, how many people were in the vicinity?

13   A    Well over a hundred.

14   Q    How many were arrested?

15   A    I believe it was over like a hundred and -- over 120.  I

16   want to say 123.  I'm not really sure of the exact number.

17   Q    Now, at 10:40, there were only 50 to 100 people there,

18   isn't that right, in the intersection?

19   A    Are you testifying to that?

20   Q    I'm asking you if that's correct.

21   A    No.  There was well over 100 people in that immediate

22   area.

23   Q    At 10:40?

24   A    I would say so, yes.

25   Q    Okay.  You did file a declaration in this case; right?

```
 1   A    Say that again.
 2   Q    You filed a declaration in this case?  You completed it?
 3   A    Yes.
 4   Q    And you were under oath when you did that?
 5   A    Yeah.
 6   Q    You understood you were under oath?
 7   A    Yes.
 8   Q    Okay.  You didn't write it?
 9   A    No, I didn't.
10   Q    All right.  But you read it?
11   A    I did read it.
12   Q    And you understood that you had to be telling the truth?
13   A    Correct.
14   Q    All right.  And isn't it true that in your declaration
15   you state that at approximately 10:50 -- sorry -- I'll
16   restart.  In your declaration, you state that at 10:40 p.m., a
17   group of about 50 to 100 protestors gathered at the
18   intersections of Tucker and Locust and Tucker and Washington,
19   standing on all corners and in the street?
20   A    Yes.  There were also people strown out on Tucker, on the
21   west side.  They weren't at that intersection, but they were
22   still around.
23   Q    Okay.  So how far away were they?
24   A    Within two blocks.
25   Q    And how many of them were there?
```

Brian Rossomanno  Cross-examination                    Volume 2

228

1   A    A few dozen probably.

2   Q    All right.  So how many people were actually at the

3   intersection -- 50 or 100?

4   A    Probably closer to 100.

5   Q    Now, in your declaration, you say that those 50 to 100

6   people were physically obstructing the movement of vehicular

7   traffic.  Is that true?

8   A    As I said, several people were sitting in the street and

9   standing in the street, yes, sir.

10  Q    Okay.  And were they obstructing vehicular traffic?

11  A    There was still traffic coming through that area.  Yes.

12  Q    Okay.  I understand there was no traffic coming through

13  the area.  Was it because they were sitting in the street, or

14  was there no traffic?

15  A    Cars had to go around them to avoid them, yes.

16       THE COURT:  Yeah.  Because he said there was still

17  traffic coming through the area.

18  Q    (By Mr. Rothert) Oh, still.  Okay.

19  A    Yes.

20  Q    Okay.  So there was still traffic.  I thought he said no.

21  Sorry.

22  A    No.  I'm sorry.  There was still traffic coming through.

23  Q    But no pedestrian traffic was obstructed?

24  A    I can't say yes or no to that.

25  Q    You were nearby when the arrests were effectuated at that

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 229 of 248 PageID #:
7679
Brian Rossomanno Cross-examination                    Volume 2

229

1    intersection?

2    A    I was nearby, yes.

3    Q    And you testified that the commands were very clear and

4    unambiguous to lie down on the ground.  Is that correct?

5    A    I heard officers giving those orders, yes, sir.

6    Q    Did you also hear officers saying, "Sit down"?

7    A    Not that I recall, no.

8    Q    "Get down"?

9    A    "Get down," I probably heard, yes, sir.

10   Q    Okay.  Is "Get down" ambiguous?  Does that mean lay down

11   on the ground to you or --

12   A    To me, I would -- I would -- I hate to phrase it this

13   way; I would get down as much as I could, which would be to

14   lay down.

15   Q    All right.  And if there were commands to sit down, do

16   you think that people might reasonably think that that's what

17   they're supposed to do?

18   A    I didn't hear those commands, but I would expect that

19   people would -- some people would follow those commands.

20   Q    Now, when he was being arrested that evening, was Luther

21   Hall fully compliant?

22   A    I don't know anything about that incident.

23   Q    What incident don't you know about?

24   A    Anything involving Luther Hall.

25   Q    Okay.  Do you understand that he was part of the crowd

1    that was arrested that evening?

2    A    He was not arrested at Washington and Tucker.

3    Q    He was caught in the four corners; is that correct?

4    A    No, that's not correct, to my knowledge, but I have no

5    firsthand knowledge of that incident, so I can't really say.

6    Q    Well, I mean you've testified about a ton of things you

7    have no firsthand knowledge of that happened downtown that

8    night.  You don't know anything about what happened to him?

9    A    I know he was not taken into custody at Washington and

10   Tucker.  I do know that.

11   Q    Okay.  Well, what did happen?

12   A    I don't know.  I wasn't there.

13   Q    Again, though, you've testified about a lot of things

14   that you weren't there for, so what do you know?

15              MR. RELYS:  Object to the relevance of this.

16              THE COURT:  Overruled.

17   A    I -- I -- with all due respect, I'm not going to sit here

18   and testify to something I didn't witness.  I don't think

19   that's appropriate.

20              THE COURT:  But somehow you know he was not arrested

21   at Washington and Tucker; right?  How do you know that?

22              THE WITNESS:  Because I had heard that there was an

23   incident involving him long before the arrests at Washington

24   and Tucker were made.

25   Q    (By Mr. Rothert) And what incident?  What do you know

1   about this incident?

2   A    Say again.  I'm sorry.

3   Q    What do you know about this incident that you've heard?

4   A    That he was working undercover and he was mistaken for a

5   protestor and taken into custody.  That's about the extent of

6   what I know.

7   Q    And also beaten up; correct?

8   A    I wouldn't have any knowledge of that.

9   Q    So it's your testimony that you really have no knowledge

10  of that?

11  A    No firsthand direct knowledge.  Hearsay is all I know.

12  Q    Okay.  What hearsay do you know?

13  A    I heard that there was some sort of resisting involved.

14  That's all I know.

15  Q    Now, it's your view, isn't it, that you get to decide

16  when a protest is over?

17  A    No, that is not my decision, no.

18  Q    And it's your view that you have that authority as a

19  police officer in St. Louis?

20  A    Oh, could I?

21  Q    Yes.

22  A    I could, but I don't.

23  Q    Okay.  And it's also your view that when you give a

24  dispersal order or when you're ready for a protest to end,

25  that you can run it completely out of the city; correct?

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 232 of 248 PageID #:
7882
Brian Rossomanno Cross-examination                                Volume 2

232

1    A    No, that's not accurate.

2    Q    Okay.  And I mean you've even commented, haven't you,

3    that you could run it to Alton; you could run a protest to

4    Alton if you wanted to?

5    A    Say that again.  I'm sorry.  I'm really having a very

6    hard time --

7    Q    Okay.  You've stated, have you not, that if you want to

8    you could run a protest all the way to Alton?

9    A    All the way to where?

10   Q    Alton.

11   A    No, I didn't testify to that.

12   Q    I'm not saying you testified to it, but you have stated

13   that?

14   A    Not that I recall, no.

15   Q    All right.  Do you know where Alton is?

16   A    Do I know where Alton is?

17   Q    Yes.

18   A    Alton, Illinois?

19   Q    That's the one.

20   A    Yes.

21   Q    All right.  You don't recall saying anything like that on

22   September 17th?

23   A    I don't recall that, no.

24   Q    Do you recall talking to Aaron Banks on September 17th?

25   A    I don't know if I know -- I may know his face, but I

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 233 of 248 PageID #:
7883
Brian Rossomanno Cross-examination                              Volume 2

233

1   don't know who Aaron Banks is by name.

2   Q    Okay.  Do you think that when you -- when you began

3   making dispersal orders repeatedly for hours and people have

4   separated, moved around, not stayed in the exact same place

5   but moved around a little bit but no one's been arrested and

6   no one's continued to tell them to leave, do you think that

7   people might think that it's okay for them to assemble on a

8   street or sidewalk in the area?

9   A    Well, I would have a problem with the portion of that

10  question where you said no one's continued to tell them to

11  leave because that wasn't the case here.

12  Q    Well, let me ask you this way.  If you tell people to

13  leave, is it reasonable for them to assume that they have gone

14  far enough away for a long enough time if you haven't pushed

15  them back farther?

16  A    That's -- again, I'm having trouble tracking your

17  questions, but I would say that if the orders were not

18  continuous, I guess it's reasonable that they may think

19  they're no longer in place, but that was certainly not the

20  case here.

21  Q    And when you say "here," when do you mean?

22  A    I assume we're still talking about Sunday evening at

23  Washington and Tucker.

24  Q    Okay.  No dispersal order was given at McPherson and

25  Euclid; correct?

Brian Rossomanno Cross-examination                    Volume 2

234

 1   A    There was, yes.

 2   Q    Okay.  What time was that given?

 3   A    I couldn't tell you an exact time.

 4   Q    Okay.  Can you give me an approximate time?

 5   A    We're going back to what day now?

 6   Q    The 15th.

 7   A    I would say approximately -- I'm going to ballpark.  I'm

 8   going to give myself a wide window here.  I would say

 9   somewhere around 9:00, 10:00 to 11:00, somewhere in that time

10   range.

11   Q    And you would expect that to be on the video that you

12   took?

13   A    I didn't take video.

14   Q    Or that the police department took?

15   A    I can't tell you if it's on that video or not.  I haven't

16   seen it.

17   Q    Would you expect it to be on the video?

18   A    I would expect it to be.  But, again, that group had been

19   given dispersal orders continuously since Kingshighway and

20   Hortense.

21   Q    Well, let me ask you.  There were people sitting at the

22   restaurant across the street from you at tables; correct?

23   A    I don't remember anybody sitting at tables, no.

24   Q    Okay.  Were there people standing on the corners?

25   A    There were.

235

1    Q    Okay.  Do you think that they were ordered to disperse?

2    A    We asked them to step back inside.

3    Q    Did you ask them -- so how is that different?  What's the

4    difference between an order and -- and --

5    A    Well, those people weren't throwing rocks.

6    Q    I know.  I'm just asking what's the difference coming out

7    of your mouth between an order to disperse and a "Hey, would

8    you mind moving inside?"

9    A    The situation would be the difference.

10   Q    Okay.  So --

11   A    But it's our desire for everybody to leave that

12   intersection.

13   Q    Okay.  So how did you communicate that to the people who

14   were standing on the corners?

15   A    I actually had multiple conversations with individuals

16   who had walked up to us, and I told them, "You need to leave

17   the area."

18   Q    Okay.  What about the other side of -- the other side of

19   McPherson?  Like at McPherson -- well, McPherson and Euclid,

20   the northeast corner and the northwest corner -- how did you

21   communicate to those folks?

22   A    I didn't communicate with anybody on the east side.

23   Q    You mentioned the thing you didn't throw very well that

24   landed kind of in the middle of the street, the smoke.  Was

25   that smoke?

Case: 4:18-cv-00308-JCH   Doc. #: 126-4   Filed: 01/30/20   Page: 236 of 248 PageID #: 1886
Brian Rossomanno Cross-examination                                    Volume 2

                                                                              236

1    A    Yes.  It was inert smoke.

2    Q    Okay.  And is that a chemical munition?

3    A    Not technically.  It's inert.

4    Q    Okay.  So what does that mean?

5    A    It means there's no chemical compound to it.  There's no

6    irritant.  It's just -- it's white smoke.

7    Q    All right.  And that wound up -- you wound up throwing

8    that at pedestrians?

9    A    I threw it up the street towards the protestors that were

10   throwing rocks to the west.

11   Q    All right.  And you were pretty unhappy when that got

12   thrown back?

13   A    I don't know if "unhappy" is the word I would use.  It

14   was -- it made me want to take that person into custody.

15   Q    Okay.  Why?

16   A    That's an assault.

17   Q    Was it an assault when you were throwing it at

18   pedestrians who were on the sidewalk?

19   A    It wasn't thrown at pedestrians on the sidewalk.

20   Q    But was it closer to the pedestrians on the sidewalk or

21   to the people you were aiming for?

22   A    It was -- I'd split the difference.  It was in the street

23   to the north of the restaurant.

24   Q    Okay.  You understand north at that intersection would

25   mean toward Delmar; correct?

Case: 4:18-cv-00308-JCH   Doc. #:  126-4   Filed: 01/30/20   Page: 237 of 248 PageID #:
4887
Brian Rossomanno Cross-examination                           Volume 2

237

 1   A     Delmar is to the north, yes.

 2   Q     Yeah.  All right.  And, actually, I think you testified

 3   that that was thrown and then some -- some pepper pellets were

 4   shot.  Is that correct?

 5   A     A SWAT officer fired some PepperBall.

 6   Q     Okay.  And those actually came before the inert gas,

 7   didn't they?

 8   A     I don't recall.

 9   Q     And those were fired, at least one of them, directly at

10   the people standing on the corner, the northeast corner?

11   A     I don't recall.

12   Q     Well, you were there though?

13   A     I know PepperBalls were fired at the subject that threw

14   the gas or the smoke canister back at us.

15   Q     Okay.  Now, that smoke canister -- so he had to go

16   onto -- since it was north, north of the intersection, he had

17   to go onto Euclid to get that?

18   A     He had to come out towards the street to get it.

19   Q     Okay.  He had to come which way?  Which street?

20   A     Onto Euclid.

21   Q     All right.

22   A     That's where he threw it at us from.  He kind of threw it

23   from the -- I would say near the northeast corner of Euclid

24   and McPherson.

25   Q     Okay.  But it never went outside -- it didn't go past the

Brian Rossomanno   Cross-examination                       Volume 2

1    intersection on --

2    A    It might not have.

3         MR. ROTHERT:  That's fine.  We don't need it.

4    Q    (By Mr. Rothert) Do you have any side businesses?

5    A    I do.

6    Q    Okay.  What are they?

7    A    Just one.  A training company.

8    Q    What's it called?

9    A    It's called 0311.

10        MR. RELYS:  Object to the relevance of this question.

11        THE COURT:  Overruled.

12   A    0311 Tactical Solutions.

13        THE COURT:  Did you say this was a trading company or

14   a training company?

15        THE WITNESS:  Training and consulting, yes.

16        THE COURT:  Training and consulting?

17        THE WITNESS:  Yes, ma'am.

18        THE COURT:  Okay.  Thank you.

19   Q    (By Mr. Rothert) Now, is that -- is it 031 or 311 or is

20   it 0311?

21   A    0311.

22   Q    0311.  Okay.  And what does that refer to -- 0311?

23   A    That is a designation for a Marine Corps MOS, Military

24   Occupational Specialty.  Every job in the Marine Corps has a

25   four-digit number assigned to it, and that happened to be mine

Brian Rossomanno Cross-examination                          Volume 2

239

1   while I was in the Marines.

2   Q    And what kind of training do you offer?

3   A    The bulk of it is active shooter response, active shooter

4   preparation.  We also do firearms training.

5   Q    Okay.  Anything else?

6   A    In the past, we have done civil disobedience training.

7   We've gone to schools and businesses, and we talk to staff at

8   businesses and faculties at school about preparing for armed

9   intruders, that sort of thing.

10  Q    When you say civil disobedience, what is that to you?

11  A    In terms of what we train?

12  Q    Well, what do you mean by civil disobedience?

13  A    I should say civil disobedience response --

14  Q    Okay.

15  A    -- is something that we have done in the past.

16  Q    Okay.  And when you say you train people to respond to

17  civil disobedience, what is civil disobedience to you?

18  A    We've actually only had one client in that area.  It was

19  the Fort Wayne Police Department, and we talked to them about

20  just the different formations, what they look like, how

21  they're used.  We do cover for the First Amendment rights and

22  how to protect those rights and how they relate to civil

23  disobedience.

24  Q    And what is civil disobedience?

25  A    It's kind of a wide -- wide-ranging thing, anything from

Brian Rossomanno Cross-examination                        Volume 2

240

1   civil unrest to marches, demonstrations.

2   Q    Do you have any nicknames?

3   A    Any what?  I'm sorry.

4   Q    Nicknames.

5   A    Do I have any nicknames?

6   Q    Yeah, nicknames.

7   A    Not really, no.

8   Q    Okay.  Do you have any nicknames that you use in the

9   advertising for 0311 --

10  A    No.

11  Q    -- Tactical.  Okay.  In your ads -- you do some

12  advertising on Facebook and Twitter; is that correct?

13  A    We have accounts, yes.

14  Q    All right.  And who manages those?

15  A    I do.

16  Q    All right.  And so sometimes you put #riotking; right?

17  A    I wouldn't say sometimes.  Once.

18  Q    Okay.  So you have done that?

19  A    I have done it, yeah.

20  Q    What does that mean?

21  A    That was a hashtag created by the protestors, and that's

22  how they refer to me on occasion.

23  Q    And how did you get -- what do you take that name to

24  mean?

25  A    You'd have to ask them.  I didn't come up with it.

241

1    Q    Okay.  Why do you include it on your advertising for your

2    business?

3    A    It wasn't really an advertisement, first of all.  It was

4    just a general post.

5    Q    Okay.

6    A    And it was just kind of a tongue-in-cheek reference to

7    the false narrative of how I control everything that happens

8    at these protests.

9    Q    Speaking of that, you're not always in charge when

10   there's a large protest in the city of St. Louis, are you?

11   A    No, no, I'm not.

12   Q    And sometimes it's Mr. Jemerson; correct?

13   A    First of all, no, we're never in charge.  We're never the

14   incident commander of a protest.

15   Q    Okay.  Well, what are you?

16   A    We're the coordinators who -- we assist and handle --

17   really, you know, the incident commander decides he or she

18   wants this done; we assist them in getting it done.

19   Q    Okay.  So you're not really the person who's making the

20   decisions?

21   A    Absolutely not.

22   Q    Just kind of a facilitator?

23   A    Correct.

24   Q    All right.  Mr. Jemerson does that also?

25   A    He's the -- holds the same position as I do, yes.

Case: 4:18-cv-00308-JCH  Doc. #: 126-4  Filed: 01/30/20  Page: 242 of 248 PageID #:
4032
Brian Rossomanno Cross-examination                          Volume 2

242

1  Q    Are there other people in the St. Louis Metropolitan

2  Police Department who -- who hold that position and handle,

3  you know, larger protests?

4  A    No.  It's mainly myself and Sergeant Jemerson hold the --

5  it doesn't even really have an official job title, but I would

6  just say the CDT coordinator position.

7  Q    You mentioned that the Washington egress was open on

8  September 17th for quite some time?

9  A    Correct.

10  Q    Was that the last one to close?

11  A    Correct.

12  Q    And there's documentation of that?  You mentioned

13  documentation.

14  A    Yeah, I would assume.  Yeah, there is.  I'm sure it's

15  documented in the police report, but it's also documented on

16  even some of the live-streams that I saw.

17  Q    Do you have any of that documentation with you?

18  A    I do not.

19  Q    Okay.  Do you know that there is a police report about

20  this incident?

21  A    Yes.

22  Q    And you've seen it?

23  A    I have not seen it.  I did not write it.

24  Q    Okay.  But you know it exists?

25  A    There is a police report, yes.

1   Q    Do you know if there's been any charges filed against

2   anyone who was arrested on September 17th at the intersection,

3   the Washington-Tucker or four corners or four lines you

4   referred to?

5   A    Yeah.  There were people booked.  So I would assume

6   charges were applied on.  I don't know what the disposition of

7   that was.

8   Q    You don't know?

9   A    I do not know.

10          MR. ROTHERT:  I have no further questions.

11          THE COURT:  Redirect.

12          MR. RELYS:  Yes, Your Honor.

13                     REDIRECT EXAMINATION

14  BY MR. RELYS:

15  Q    Sergeant, you were asked --

16          THE COURT:  Can you move that mike closer to you?

17          THE WITNESS:  Yeah, please.

18          THE COURT:  He has trouble hearing.

19          THE WITNESS:  Thank you.

20  Q    (By Mr. Relys) You were asked several questions about

21  your declaration.

22  A    Yes.

23  Q    And I think you said -- you told us earlier that you

24  didn't draft of the declaration yourself.

25  A    No, I did not.

244

1    Q    You signed it; right?

2    A    Correct.

3    Q    But you didn't draft it?

4    A    No, I did not.

5    Q    Who drafted it?

6    A    The City Counselor's name escapes me right now.  I'm

7    sorry.

8    Q    Someone in the office I work for; correct?

9    A    Correct.

10   Q    All right.  And was that declaration -- you didn't make

11   decisions as to what to include or not include in that

12   declaration?

13   A    Correct.

14   Q    You just read it and made sure it was accurate?

15   A    Right.

16   Q    And signed it?

17   A    Yes, sir.

18   Q    Okay.  And I'm going to show you a copy of that

19   declaration now, and I'm going to show you it's -- this was

20   Exhibit I to Defendant's memorandum in response to Plaintiffs'

21   motion for preliminary injunction, Docket #33-6, and it's a

22   six-page document.  I'm going to sort of go through the pages

23   here.

24   A    Okay.

25   Q    Just take a look.  And here on the sixth page, does that

245

1    appear to be your signature at the bottom?

2    A    Yes, it is.

3    Q    Okay.  And at the time you read and signed this, did it

4    appear to be an accurate account of -- contain accurate

5    information that you were signing to?

6    A    At the time, yes, sir.

7         MR. RELYS:  Okay.  Judge, at this time, I would move

8    for admission of Defendant's Exhibit I.

9         THE COURT:  Defendant's Exhibit I is received into

10   evidence.

11        MR. RELYS:  Thank you, Your Honor.

12   Q    (By Mr. Relys) You've mentioned a couple different times,

13   Sergeant, that you've been involved in 200 or more -- the

14   police response to 200 or more protests.

15   A    Yes, sir.

16   Q    Over what sort of time period are we talking?

17   A    I would say since November of 2014.

18   Q    So since -- that would be Ferguson?

19   A    The grand jury decision came out in the Ferguson case.

20   Q    Okay.  So since -- so in the intervening years since the

21   night of the grand jury decision in the Ferguson matter, you

22   think you've been involved in the police response to upwards

23   of 200 protests?

24   A    At least 200.

25   Q    Okay.  And, obviously, we've talked about a couple

Brian Rossomanno Redirect Examination                         Volume 2

246

1    protests that you were involved in in the last month or so

2    involving -- you know, that sort of come in the wake of the

3    Jason Stockley verdict; right?

4    A    Yes, sir.

5    Q    Okay.  And, obviously, we've talked about the fact that

6    there were arrests, in some cases numerous arrests, made in

7    response or, you know, in relation to some of these protests

8    that have occurred recently in the city.

9    A    Correct.

10   Q    Okay.  Of the 200 or so protests that you feel like

11   you've -- that you've been involved in in the last several

12   years, how many do you think -- I'm just asking for an

13   estimate if you can.  How many of those protests do you think

14   involved arrests?

15   A    I'd be surprised if you told me it was 20.  So I'd say

16   less than 10 percent.

17   Q    So less than -- to the best of your knowledge, less than

18   10 percent of the protests that you help respond to result in

19   arrests?

20   A    Correct.

21   Q    All right.  And you were asked a couple -- a couple

22   questions about this smoke canister that you threw.  Was it

23   the smoke canister you threw at McPherson and Euclid?

24   A    Yes, sir.

25   Q    And there were some questions about the exact location of

Case: 4:18-cv-00308-JCH  Doc. #:  126-4  Filed: 01/30/20  Page: 247 of 248 PageID #:
Brian Rossomanno Redirect Examination                    Volume 2
4887

247

1    that smoke canister.

2    A    Yes.

3    Q    And I think you told us earlier that it maybe wasn't your

4    best throw you've ever made.

5    A    No.

6    Q    Okay.  Just could you tell us again what you meant by

7    that?

8    A    It didn't go near as far as I wanted it to.

9    Q    Okay.  You wanted -- where did you intend it to go?

10   A    I would like to have gotten closer to the protestors who

11   were north, throwing the rocks.

12   Q    All right.

13   A    But it kind of came out of my hand in a way that I wasn't

14   really happy with.

15            MR. RELYS:  Fair enough.

16            I have no further questions at this time.

17            THE COURT:  Any recross?

18            MR. ROTHERT:  No.

19            THE COURT:  All right.  You may step down.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  I'd like to talk to counsel in chambers

22   about scheduling.  So we'll be in temporary recess.

23       (Court recessed from 5:17 p.m. until 5:30 p.m., after

24   which the Deputy Clerk announced court was adjourned until

25   October 23, 2017, at 8:30 a.m.)

248

<u>CERTIFICATE</u>

      I, Gayle D. Madden, Registered Diplomate Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

      I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

      I further certify that this transcript contains pages
1 through 247 inclusive.

      Dated at St. Louis, Missouri, this 19th day of
November, 2017.


_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter